**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HANG LI, Individually and on Behalf of All Others Similarly Situated,<br><br>       Plaintiff,<br><br>    v.<br><br>SPIRIT AEROSYSTEMS HOLDINGS, INC., TOM GENTILE III, and MARK J. SUCHINSKI,<br><br>       Defendants. | Case No. 1:23-cv-03722-PAE<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

**TABLE OF CONTENTS**

I.      NATURE OF THE ACTION AND OVERVIEW ............................................................ 1

II.     JURISDICTION AND VENUE .................................................................................... 5

III.    PARTIES ................................................................................................................. 6

IV.     BACKGROUND REGARDING SPIRIT .......................................................................... 7

        A.      Spirit Was Created As A Spinoff From Boeing In 2005, And Boeing Has
                Remained Spirit's Key Customer Ever Since ........................................................ 7

        B.      Spirit's Business Depends On Manufacturing Boeing 737 MAX Airplane
                Components ............................................................................................................ 9

        C.      Spirit Lost Business And Fired Workers Following The 2019 Grounding Of
                The 737 MAX And The 2020 Implementation Of COVID Restrictions................ 9

        D.      Following The Grounding Of The 737 MAX, Defendants Sought To
                Reassure Investors About The Safety And Quality Of Spirit's Products ............. 11

        E.      The FAA Has Previously Levied Fines Totaling Millions Of Dollars
                Against Boeing For Using Defective Parts Supplied By Spirit ............................. 12

V.      FORMER SPIRIT EMPLOYEES CONFIRM THAT SPIRIT KNEW OF
        PERVASIVE QUALITY PROBLEMS, INCLUDING THE MIS-DRILLED
        HOLES DEFECT .......................................................................................................... 13

        A.      Product and Process Verification Core Quality Auditor Joshua Dean
                Identified The Mis-Drilled Holes Defect Months Before It Was Publicly
                Disclosed ............................................................................................................... 13

        B.      Quality Inspector Team Lead Former Employee 1 Notified Defendant
                Gentile Of Spirit's Probation With Boeing And Efforts To Conceal
                Excessive Defects .................................................................................................. 20

        C.      Internal Quality Auditor Former Employee 2 Observed Quality Problems
                Including Many Mechanics Using Out-Of-Calibration Tools ............................... 27

VI.     DEFENDANTS KNEW OF BUT CONCEALED MATERIAL FACTS
        REGARDING SPIRIT'S QUALITY FAILURES ............................................................ 31

        A.      Spirit Identified The Mis-Drilled Holes Defect Months Before It Was
                Disclosed To Investors........................................................................................... 31

        B.      Spirit Suffered From Severe Quality Problems Which Led Its Key Customer
                Boeing To Place Spirit On Probation..................................................................... 32

C.      Executives, Including Defendant Gentile, Were Informed of Defects and
        Knew of Pervasive Quality Issues ........................................................ 34

VII.    MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING
        THE CLASS PERIOD ........................................................................ 36

A.      April 8, 2020 Press Release Regarding COVID Response ................................ 36

B.      May 6, 2020 Quarterly Report For the First Quarter of 2020 ............................ 37

C.      February 25, 2021 Annual Report for 2020 ............................................. 40

D.      June 17, 2021 Sustainability Report ................................................... 42

E.      February 15, 2022 Annual Report for 2021 ............................................. 43

F.      March 2, 2022 Investor Day ............................................................ 46

G.      May 4, 2022 Quarterly Report For the First Quarter of 2022 ............................ 50

H.      November 3, 2022 Quarterly Report For the Third Quarter of 2022 ....................... 51

I.      January 25, 2023 Code of Conduct ...................................................... 53

J.      February 17, 2023 Annual Report for 2022 ............................................. 55

K.      March 29-31, 2023 Spirit Website Statements .......................................... 58

VIII.   THE TRUTH EMERGES, CAUSING SUBSTANTIAL DECLINES IN SPIRIT'S
        STOCK PRICE, WHILE DEFENDANTS CONTINUE TO MISLEAD
        INVESTORS ................................................................................ 62

A.      April 13, 2023 Boeing Press Statements And Articles Concerning Spirit's
        Defective Installation Of 737 MAX Tail Fin Fittings .......................... 62

B.      May 3, 2023 Spirit First Quarter Earnings Release ............................... 64

C.      August 2, 2023 Spirit Second Quarter Earnings Release .......................... 70

D.      August 23, 2023 Articles And Spirit Press Release Concerning Spirit's Mis-
        Drilling Of Fastener Holes On The 737 MAX Aft Pressure Bulkhead ............. 72

E.      September 7, 2023 Spirit and Boeing Comments Concerning Mis-Drilled
        Holes Defect At Jefferies Industrial Conference ............................... 74

IX.     POST-CLASS PERIOD EVENTS FURTHER CONFIRM SUSTAINED,
        WIDESPREAD QUALITY PROBLEMS AT SPIRIT ...................................... 76

A.      Spirit Replaced Defendant Gentile as CEO ...................................... 76

B.  Spirit and Boeing Entered A "Stability Plan" Requiring Spirit To Reduce Defects And Increase Quality Staffing .................................................. 77

C.  Reporting By The Air Current Revealed An Expanded Scope Of The Mis-Drilled Holes Defect ............................................................................... 79

D.  Spirit Announced The Departure Of The Head Of Its Commercial Division, Samantha Marnick ................................................................................ 80

X.  ADDITIONAL SCIENTER ALLEGATIONS ................................................ 80

A.  Defendants' Own Statements Show They Knew Of And Concealed The Mis-Drilled Holes Defect ...................................................................... 81

B.  Manufacturing And Quality Control For 737 MAX Components Were Core Operations For Spirit ............................................................................ 81

C.  Defendants Held Themselves Out As Knowledgeable About The 737 MAX And Quality Issues, And Had Access To The Concealed Facts ......................... 82

D.  Defendants' Incentive Compensation Provided A Motive To Conceal Quality Defects .................................................................................. 85

E.  Spirit Executives Including Defendant Gentile Left The Company Under Suspect Circumstances .......................................................................... 87

F.  Defendant Spirit Acted With Corporate Scienter ................................................. 87

XI.  LOSS CAUSATION .......................................................................... 88

XII.  CLASS ACTION ALLEGATIONS .......................................................... 88

XIII.  UNDISCLOSED ADVERSE FACTS ...................................................... 90

XIV.  APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ........................................................................ 91

XV.  NO SAFE HARBOR ........................................................................ 93

XVI.  FIRST CLAIM .............................................................................. 93

XVII.  SECOND CLAIM .......................................................................... 97

XVIII. PRAYER FOR RELIEF .................................................................. 98

XIX.  JURY TRIAL DEMANDED .............................................................. 98

## <u>EXHIBIT LIST</u>

Exhibit 1 –     Certification of Plaintiff Alex Freeman

Exhibit 2 –     February 22, 2022 internal Spirit email chain regarding documentation of defects

Exhibit 3 –     February 22, 2022 internal Spirit ethics complaint

Exhibit 4 –     March 16, 2022 internal Spirit email to Defendant Gentile regarding ethics
complaint and retaliation

Lead Plaintiff Hang Li and named plaintiff Alex Freeman ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following based upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes, without limitation: (a) review and analysis of regulatory filings made by Spirit AeroSystems Holdings, Inc. ("Spirit" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) interviews with former employees of Spirit; (c) review and analysis of press releases and media reports issued and disseminated by Spirit; and (d) review of other publicly available information concerning Spirit.

## I.     NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities who purchased or otherwise acquired the Class A common stock of Spirit between April 8, 2020 and September 7, 2023, both dates inclusive (the "Class Period"), and who were damaged thereby. Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.      Spirit AeroSystems is the main supplier of parts to The Boeing Company ("Boeing"), and Boeing is Spirit's main customer. One of Spirit's primary roles is to manufacture the majority of the fuselage for Boeing 737 aircraft, which fuselages Spirit ships to Boeing for final assembly of completed aircraft.

3.      Spirit's business was severely affected when, after tragic accidents involving Boeing 737 MAX aircraft in October 2018 and March 2019, regulators worldwide, including the U.S. Federal Aviation Administration ("FAA"), grounded the 737 MAX due to safety concerns.

From that time through the present, the safety and quality of the 737 MAX and its components has been a key focus for Defendants, investors, and the flying public.

4.      Throughout the Class Period, Spirit and its executives touted the purported safety and quality of Spirit's products to investors, for example, stating "Spirit is dedicated to a Zero-Defect target, with no escapements[1] to our customers," Spirit works to "ensure impeccable product quality and safety," "we build product that is the right quality, the first time that don't break," "[w]e are going above and beyond what the requirements ask of us to make sure that our customers are successful when it comes to quality," and "we have a great quality system that ensures our parts are inspected and controlled and go out FOD [foreign object debris] free and defect free."

5.      Defendants, prior to and throughout the Class Period, emphasized the importance of the 737 MAX program to their Company, as well as their heightened sensitivity to, and personal involvement in, ensuring the quality of Spirit's product, particularly in light of the 737's previous failures. Defendants in various statements highlighted their refined processes, safeguards, and core competencies in safety and quality to assuage investors' concerns about these significant issues.

6.      However, Defendants concealed from investors that Spirit suffered from widespread and sustained quality failures. These failures included defects such as the routine presence of foreign object debris ("FOD") in Spirit products, missing fasteners, peeling paint, and poor skin quality. Such constant quality failures resulted in part from Spirit's culture which prioritized production numbers and short-term financial outcomes over product quality, and

---

[1] In this context "escape" or "escapement" means a defect or nonconformance with manufacturing requirements.

Spirit's related failure to hire sufficient personnel to deliver quality products at the rates demanded by Spirit and its customers including Boeing.

7. Spirit's quality failures were so severe and persistent that Boeing even placed Spirit on probation for multiple years, from approximately 2018 through at least 2021. Boeing placing a supplier like Spirit on probation creates very serious risks for the supplier. Probation is the last step Boeing takes before "the supplier could be withdrawn" for continued failures.

8. While Spirit's widespread quality failures were almost certainly known to Defendants throughout the Class Period, they were undoubtedly known after March 16, 2022. On that date, a Spirit Quality Inspector Team Lead emailed Defendant Gentile (*see* **Exhibit 4**) a copy of an ethics complaint (*see* **Exhibit 3**) that he had filed in response to his manager demanding that his team falsify documentation to underreport numbers of defects in Spirit products. The employee's email stated that "I have lost faith on the quality organization here at spirit and this is my last cry for help into resolving this issue that violates the guide lines stablished by the AS9100 which governs our certification to build aircraft and which has been in question and even put on probation by Boeing on previous years." The ethics complaint attached to that email noted "the excessive amount of defects" and explained that the employee had been instructed to misreport the numbers of defects in a way "which would be falsifying the documentation." Defendant Gentile responded to the email. Spirit later sustained the allegations in the employee's ethics complaint.

9. Predictably, Spirit's widespread quality failures have resulted in serious defects, including two that have been recently revealed. The public only learned about the existence of the defects and their implications after Boeing and various media outlets, not Spirit, first reported the problems. First, in October 2022 Spirit Product and Process Verification Core Quality Auditor Joshua Dean identified that Spirit had mis-drilled holes on the 737 MAX aft pressure bulkhead

and that this was a very significant problem. The aft pressure bulkhead is a critical part of an airplane, which is necessary to maintain cabin pressure during flight. Dean reported this defect to multiple Spirit employees over a period of several months, including submitting formal written findings to his manager. However, Spirit concealed the defect.

10. Second, on April 13, 2023, Boeing revealed to the press that it had learned of a defect relating to the tail fin fittings on certain 737 MAX aircraft. Subsequent reporting revealed that the defect was due to Spirit's improper installation of tail fin fittings. In direct response to this news, Spirit's stock price plunged over 20% the following day. Spirit belatedly confirmed the tail fin fittings defect after it had been revealed by Boeing and the press but remained silent about the mis-drilled aft pressure bulkhead holes defect.

11. Over the following months more details were revealed about the scope and impact of the tail fin fittings defect, causing further substantial declines in Spirit's stock price. Yet, Spirit continued to conceal the mis-drilled aft pressure bulkhead holes defect. Spirit also continued to make highly misleading statements, including that it was now delivering products to Boeing "with no defects," and that it had "shared a lot of information" with Boeing, all the while concealing the mis-drilled aft pressure bulkhead holes defect not only from investors, but also apparently from Boeing.

12. On August 23, 2023, Boeing revealed to the press that it had "identified fastener holes that did not conform to our specifications in the aft pressure bulkhead on certain 737 airplanes." This was the same defect first identified by former Spirit employee Joshua Dean in October 2022, ten months earlier. After reporting by aerospace industry news publication The Air Current and other sources identified Spirit as the source of the defect, Spirit belatedly confirmed

the issue in a press release. In direct response to this news, Spirit's stock price plunged a further 12.7% the following day.

13.     At the end of the Class Period, during a presentation at an investor conference, Defendant Gentile revealed Spirit's knowledge regarding pervasive quality issues and its concealment of the mis-drilled holes defect, admitting that Spirit had been working on a solution to that defect when the "escape" was found by Boeing. Gentile also candidly admitted, "[s]o escapes happened, and they happen on all programs. They usually don't get this much attention."

14.      Three weeks after those comments Spirit abruptly replaced Gentile, naming an interim CEO in his stead.

15.     Shortly thereafter, Boeing required Spirit to enter into a "Stability Plan" to address its widespread quality failures.

16.     As a result of Defendants' misleading statements and omissions, and the resulting precipitous decline in the market value of Spirit's stock, Plaintiffs and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

17.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

19.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa). The alleged misstatements entered and subsequent damages took place within this judicial district. Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.

20.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

21.     Lead Plaintiff Hang Li, as set forth in his previously filed certification (Dkt. No. 1 at pages 41-43), incorporated by reference herein, purchased Spirit shares during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

22.     Plaintiff Alex Freeman, as set forth in the attached certification (**Exhibit 1**), purchased Spirit shares during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

23.     Defendant Spirit AeroSystems Holdings, Inc. is incorporated in Delaware and maintains its principal executive offices at 3801 South Oliver, Wichita, Kansas 67210. Spirit's shares are listed and trade on the New York Stock Exchange ("NYSE") under the ticker symbol "SPR".

24.     Defendant Tom Gentile III served as President and Chief Executive Officer of Spirit from August 1, 2016 to September 30, 2023. He joined Spirit in April 2016 as Executive Vice President and Chief Operating Officer. From 2016 until September 30, 2023, Gentile also served as a member of Spirit's Board of Directors.

25.     Defendant Mark Suchinski has served as Senior Vice President and Chief Financial Officer of Spirit since January 29, 2020. In this role he is responsible for the overall financial management of the Company, its financial reporting and transparency, and multiple corporate

functions including Controllership and Treasury. He also has responsibility for Contracts, Investor Relations, Strategy, and Mergers and Acquisitions. Defendant Suchinski has been with Spirit since 2006, in roles including Vice President, Quality, from August 2019 to January 2020 and Vice President, Boeing 787 Program, from February 2018 to August 2019.

26.     Defendants Gentile and Suchinski (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that Defendants made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

27.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## IV.     BACKGROUND REGARDING SPIRIT

### A.     Spirit Was Created As A Spinoff From Boeing In 2005, And Boeing Has Remained Spirit's Key Customer Ever Since

28.     In 2005 Boeing sold its commercial fabrication operations in Wichita, Kansas and Oklahoma, encompassing various manufacturing facilities and approximately 8,500 employees, to Canadian private equity firm Onex Corporation. This newly divested Boeing division began operating under the name Spirit AeroSystems, with Onex taking the company public in 2006.

29.     Despite becoming an independent public company, at all times Spirit remained heavily dependent on Boeing as Spirit's key customer, and Boeing remained heavily dependent on Spirit as the largest supplier of components for Boeing aircraft. From the 2005 divestiture through present, one of Spirit's primary roles has been to manufacture the majority of the fuselage for Boeing 737 aircraft, which it ships to Boeing for final assembly of completed aircraft.

30.     In connection with the 2005 divestiture, Boeing and Spirit entered into long-term supply agreements under which Spirit would be, and has remained, Boeing's exclusive supplier for substantially all of the products and services that Spirit previously provided when it was still a part of Boeing. Those supply agreements include products for Boeing's 737, 747, 767, 777, and 787 aircraft programs, and the agreements cover the life of those programs including any commercial derivative models of the aircraft.

31.     Spirit's agreements require Boeing to purchase from Spirit all its requirements for various products including fuselages, struts/pylons, and nacelles (including thrust reversers), wings and wing components, as well as tooling. Spirit is the sole source supplier to Boeing of nearly all of the products it sells to Boeing.

32.     While Spirit previously attempted to diversify its customer base away from Boeing, it had only limited success in doing so. In 2022 Boeing still accounted for 65% of Spirit's commercial segment net revenues, and 60% of Spirit's overall net revenues.

33.     After the end of the Class Period, Spirit abandoned, or at least halted, its plans to diversify away from Boeing. On Spirit's November 2, 2023 earnings call for the third quarter of 2023, Wolfe Research LLC analyst Myles Walton asked "is diversification necessary to make Spirit a great company?", to which Spirit's interim CEO Patrick Shanahan responded in relevant

part, "[t]o the degree that Spirit has approached that in the past, I would say, no. Diversification doesn't make sense at this time."

**B.     Spirit's Business Depends On Manufacturing Boeing 737 MAX Airplane Components**

34.     The Boeing 737 family of aircraft are narrow-body, single aisle planes produced by Boeing at its factories in Everett and Renton, Washington. The fuselage is manufactured by Spirit in Wichita, before being moved by rail to Washington. The 737 is one of the highest-selling commercial aircraft of all time, with over 11,000 delivered.

35.     The initial 737 models, referred to as 737 Original, entered service in 1968. A second generation referred to as 737 Classic, entered service in 1984. The third generation, called the 737 NG or Next Generation, entered service in 1997. The fourth and latest generation is the 737 MAX series, including the 737-7, -8, -9, and -10, which entered service in 2017.

36.     As stated in Spirit's SEC filings, "Our business depends largely on sales of components for a single aircraft program, the B737 MAX." 53% of Spirit's net revenues were generated from sales of components to Boeing for the 737 in 2019, and 45% in 2022. At year-end 2022, the 737 MAX accounted for 58% of Spirit's order backlog. As such, the 737 MAX is critically important to Spirit's business.

**C.     Spirit Lost Business And Fired Workers Following The 2019 Grounding Of The 737 MAX And The 2020 Implementation Of COVID Restrictions**

37.     Two events in recent years had a profound, negative impact on Spirit's business: the grounding of the 737 MAX due to safety concerns, and the decrease in travel from the implementation of COVID related restrictions.

38.     On October 29, 2018, Lion Air Flight 610 from Jakarta, Indonesia, operating a 737 MAX 8, crashed killing all 189 people aboard. On March 10, 2019, Ethiopian Airlines Flight 302 from Addis Ababa, Ethiopia, also operating a 737 MAX 8, crashed killing all 157 people aboard.

The crashes, occurring close in time and both involving the 737 MAX, generated widespread publicity and concern over the safety of the aircraft.

39.    Over March 11-13, 2019, regulators worldwide, including the U.S. Federal Aviation Administration ("FAA"), grounded the 737 MAX. The 737 MAX remained grounded in major markets for more than a year and a half. The FAA allowed it to return to service in November 2020. Canadian and European regulators allowed the 737 MAX to resume service in January 2021. China did not allow the 737 MAX to resume service until December 2021.

40.    The grounding orders and concerns over safety drastically reduced demand for the 737 MAX, with corresponding decreases in production at Boeing and at Spirit.

41.    While the 737 MAX remained grounded, the COVID pandemic emerged. Throughout 2020 and much of 2021, governments around the world enacted restrictions banning or limiting air travel, in an effort to reduce or delay the pandemic's spread. At the same time, demand for commercial flights plummeted as previously in-person activities were cancelled or conducted remotely. This caused the worst downturn in the history of the aviation industry.

42.    The dual impacts of the 737 MAX grounding and the COVID pandemic severely harmed Spirit's business. Boeing directed Spirit to suspend all 737 MAX production beginning on January 1, 2020. After the grounding orders began to be lifted, in December 2020, Boeing resumed deliveries of the 737 MAX. However, even then production at Spirit remained at substantially reduced levels due to decreased demand. Boeing and other Spirit customers likewise reduced their demand for Spirit products. This put tremendous financial strain on Spirit, as its revenue halved from pre-pandemic levels.

43.    In response to the dramatic decrease in demand following the 737 MAX grounding and COVID pandemic, Spirit increased its long-term debt by hundreds of millions of dollars, and

instituted mass layoffs. Whereas Spirit had 15,900 U.S. employees at year-end 2019, according to Defendant Gentile's remarks at the September 7, 2023 Jefferies Industrials Conference, Spirit "laid off 8,500 people in Wichita alone during the pandemic," a reduction of over 50% of the U.S. workforce.

### D. Following The Grounding Of The 737 MAX, Defendants Sought To Reassure Investors About The Safety And Quality Of Spirit's Products

44.      Following the Lion Air and Ethiopian Airlines accidents and the subsequent worldwide grounding of the 737 MAX, the safety and quality of the 737 MAX and its components became a key focus for Defendants, investors, and the flying public. Defendants therefore sought to reassure by emphasizing the safety and quality of Spirit's products in their public statements to investors.

45.      For example, Defendants emphasized safety and quality in Spirit's first public conference call following the March 2019 grounding of the 737 MAX. Spirit held its earnings call for the first quarter of 2019 on May 1, 2019. Defendant Gentile began the earnings call by stating:

> We had a strong quarter financially and I will summarize those results shortly, but I want to begin today by focusing on the recent situation involving the 737 MAX. In our industry, safety is the most important priority. We focus every day on safety in our factories and in the products we build. We know that millions of people around the world depend on the safety of the planes they fly every day, which is why all of us were so devastated after the recent accidents involving Lion Air and Ethiopian Airlines. Our sincere condolences go out to the families of those involved in these tragic events. Everyone is well aware of all the efforts that Boeing is taking to address the 737 MAX situation. We are proud to be a partner on the MAX, and we'll work with our largest customer, Boeing, and provide them with whatever support they need as they work with regulators around the world to return the MAX to service.

46.      Later in the earnings call, Defendant Gentile stated:

> The changes in the MAX production schedule will result in us maintaining the production rate of 52 aircraft per month, longer than previously planned. While this will result in fewer units produced this year, it will also give us more time to stabilize our production system and improve quality and efficiency.

11

47.     Defendant Gentile similarly stated, "During this period of time our focus has been entirely on the MAX, and adjusting the production schedules, making sure we're delivering quality."

48.     As discussed below in Part VII, Defendants' public statements to investors continued to emphasize the safety and quality of Spirit's products throughout the Class Period.

49.     Even at the end of the Class Period, on September 7, 2023, Defendant Gentile acknowledged the continued focus on safety and quality years after the initial grounding of the 737 MAX, stating, "I would say there's greater scrutiny on quality in general, post the MAX grounding and post the pandemic and particularly on the MAX, for obvious reasons."

**E.     The FAA Has Previously Levied Fines Totaling Millions Of Dollars Against Boeing For Using Defective Parts Supplied By Spirit**

50.     Spirit has a documented history of supplying defective parts to Boeing and failing to promptly disclose or fix the defects.

51.     On December 6, 2019, the FAA announced a proposed civil penalty of $3.9 million against Boeing for installing nonconforming components, provided to Boeing by Spirit, on approximately 133 aircraft. The affected planes were Boeing 737 NG aircraft.

52.     According to the FAA, the parts in question were slat tracks, which are located on the leading edge of the wings of a Boeing 737 and are used to guide the movement of panels known as slats. These panels provide additional lift during takeoff and landing. The affected slat tracks were processed by Southwest United Industries (SUI) on June 29, 2018. SUI subsequently shipped the parts to Spirit, which then delivered the parts to Boeing.

53.     The FAA alleged that Spirit was informed on or about August 3, 2018 that a batch of the slat tracks had failed a quality test indicating the presence of hydrogen embrittlement. According to the FAA, Spirit informed Boeing of the situation on or about September 11, 2018,

and subsequently proposed that Boeing accept the parts as delivered. On October 9, 2018, Boeing rejected that proposal and instructed Spirit to submit a Notice of Escapement. Spirit filed that notice on February 14, 2019.

54.     On January 10, 2020, the FAA announced a proposed civil penalty of $5.4 million against Boeing, in addition to the previous $3.9 million penalty, this time relating to Boeing's installation of nonconforming slat tracks, also obtained from Spirit, on approximately 178 Boeing 737 MAX aircraft.

## V.     FORMER SPIRIT EMPLOYEES CONFIRM THAT SPIRIT KNEW OF PERVASIVE QUALITY PROBLEMS, INCLUDING THE MIS-DRILLED HOLES DEFECT

### A.     Product and Process Verification Core Quality Auditor Joshua Dean Identified The Mis-Drilled Holes Defect Months Before It Was Publicly Disclosed

55.     Joshua Dean was formerly employed by Spirit in Wichita, Kansas. Dean has a mechanical engineering degree and approximately 20 years of experience. Dean was initially employed by Spirit for approximately 1.5 years as a Liaison Engineer beginning in approximately March 2019, and was let go in or about May 2020 during Spirit's mass layoffs during the COVID pandemic. Dean returned to Spirit on or about May 25, 2021 as a PPV [Product and Process Verification] Core Quality Auditor, and held this position until on or about November 22, 2022, when his role changed to Level 2 Stress Engineer, which remained his position until Spirit terminated him on or about April 26, 2023.

56.     As a PPV Core Quality Auditor, Dean performed audits on section 48 (extending from approximately the aft pressure bulkhead to the tail end of the fuselage) of the 737 MAX ("Section 48"). As a PPV Core Quality Auditor, Dean reported to Senior PPV Quality Manager Jaime Hanson. Hanson in turn initially reported to Richard Cassube, Senior Manager, Quality Engineering, Root Cause and Corrective Action, until Cassube's role changed to Director of

13

Quality in September 2022. Hanson then reported to Amie Emerson, Vice President, Core and Supplier Quality. Dean believes that Emerson reported to Spirit's executive team.

57.     Dean noticed a significant deterioration in Spirit's workforce after the mass layoffs that Spirit carried out during the COVID pandemic. Dean states that Spirit laid off or voluntarily retired a large number of senior engineers and mechanics, leaving a disproportionate number of new and less experienced personnel. Dean estimates that whereas Spirit previously had about 80% experienced mechanics and 20% inexperienced, those numbers are now approximately 60% and 40% respectively. Dean states Spirit had similar problems with inexperienced quality auditors and inspectors. Dean believes this lack of experienced personnel negatively impacted the quality of Spirit's work, resulting in more rework and repairs that had to be performed.

58.     According to Dean, based on his experiences working for the Company, Spirit has a culture of not wanting to look for or to find problems, which has led to poor decisions about quality and manufacturing issues.

59.     When Dean first joined Spirit in approximately March 2019, Boeing had placed Spirit on probation. Dean's understanding is that the probation was due to Boeing finding many defects in Spirit products, and that the probation lasted multiple years. Shortly after Dean rejoined Spirit as a PPV Core Quality Auditor in May 2021, he was in meetings with PPV personnel where his superior, Jaime Hanson, discussed Spirit's probation. Hanson stated that Spirit was trying to get off probation with Boeing, and that as conditions of exiting probation Boeing had demanded Spirit decrease the amounts of defects in its products, implement the PPV program, and create Visual Work Instructions (or "VWI"). In addition to the foregoing, Dean believes Boeing may have given Spirit further requirements to exit probation. According to Dean, Spirit's probation with Boeing was common knowledge in Spirit's PPV group.

60.     In Dean's experience, Spirit did not in fact materially decrease the amounts of defects in its products as required by Boeing, but simply undercounted or manipulated the documentation of defects to create the appearance of quality improvement. Dean recalled that Spirit threw pizza parties for operations personnel to celebrate purported reductions in defects, and recalls discussing with other Spirit employees at these pizza parties that Spirit was just undercounting defects instead of actually reducing defects. These pizza parties were led by Senior Operations Director J. Ball, who was responsible for leading all operations managers for Spirit's 737 program. The pizza parties were attended by operations personnel including first level and second level managers. According to Dean, in or around November 2021 Spirit presented information to Boeing showing a purported significant reduction in defect numbers as part of its effort to exit probation.

61.     In October 2022, while auditing Section 48, Dean identified the mis-drilled bulkhead holes issue recently announced by Spirit. Dean began to alert people throughout Spirit at that time.

62.     From on or about October 1, 2022 until he left his auditor role around November 22, 2022, Dean's primary focus, at the direction of his manager, Jaime Hanson, was conducting and writing up the audit of Section 48. Dean worked with Spirit design engineer Jim Ruschen on the Section 48 audit.

63.     Dean wrote up and submitted to Hanson three audit findings identifying mis-drilled holes on the aft pressure bulkhead (also referred to as the "1016 bulkhead" due to its location at station 1016 of the fuselage) and related improper procedures being used by Spirit personnel.

64.     First, Dean identified mis-drilled holes on the aft pressure bulkhead break rings. The aft pressure bulkhead has two break rings, with one in front of the bulkhead and one behind,

both forming a ring around the bulkhead at its maximum diameter. The break rings connect the bulkhead to the fuselage, and they are connected to both the bulkhead and the skin of the fuselage with fasteners. Dean observed mis-drilled holes where the break rings connect to the aft pressure bulkhead.

65.     Second, Dean identified an improper rework process being used by a mechanic to attempt to fix misaligned holes on the pie webs of the aft pressure bulkhead. The pie webs are pie slice-shaped sections that join together in a circle to form the rounded shape of the bulkhead. Dean identified this issue when he saw a mechanic doing additional, unplanned drilling to try to line up misaligned fastener holes on the pie webs.

66.     Third, Dean identified that Spirit was not properly labelling the aft pressure bulkhead break rings and certain other match drilled parts, which contributed to misalignment of holes drilled on the break rings.

67.     Dean believes that the mis-drilled holes issue recently announced by Spirit pertains to both his audit findings concerning the break rings and the pie webs, because both involve mis-drilled holes on the aft pressure bulkhead.

68.     Dean identified the mis-drilled bulkhead holes defect at some point between approximately October 5, 2022 and mid-October 2022. Upon identifying the defect, Dean immediately reported it to Section 48 managers Sean McVickers and Justin Hoch, and to design engineer Jim Ruschen, informing them that this was a very significant problem. Dean also discussed these issues with Senior PPV Quality Manager Jaime Hanson, Senior Quality Manager Steve Aubuchon, Manufacturing Engineering Manager Bruce Hysom, quality manager Michelle Butler, PPV Core Quality Auditor Lance Thompson, and lead mechanic Chris Coons. Lance Thompson and Dean sat next to each other, and held the same position as PPV Core Quality

Auditors. As Dean worked on his audit and the mis-drilled bulkhead holes defect, he frequently discussed the issue with Thompson and Ruschen.

69.     Dean made a formal write up of the mis-drilled bulkhead holes defect, which he completed between approximately October 17, 2022 and November 1, 2022, and submitted his findings to Hanson. According to Dean, Spirit's procedure for handling such reports required the responsible parties for each part of the process at issue to be notified of the report and to submit responses within 30 days to the relevant manager. Dean's findings regarding the mis-drilled holes defect were submitted to the design, planning, quality, and manufacturing departments for response, and their responses would have been submitted to Hanson.

70.     Dean stated that quality manager Michelle Butler, who reported to Senior Quality Manager Steve Aubuchon, was responsible for addressing his mis-drilled bulkhead holes findings for the quality department. Dean showed Butler the mis-drilled holes in the break rings and in the pie webs.

71.     Justin Hoch and Sean McVickers were also involved in responding to Dean's mis-drilled holes audit findings. At some point between approximately November 22, 2022 and December 5, 2022, Hanson sent Dean to help Justin Hoch and Sean McVickers with their responses to his audit findings. Dean told Justin Hoch that the mis-drilled holes defect was the worst finding that Dean had made in his entire time in his auditor role.

72.     From the beginning of Dean's Section 48 audit on or about October 1, 2022, Hanson wanted Dean to complete the audit before Dean's transition to his new role as Level 2 Stress Engineer which was scheduled to take place on or about November 22, 2022. Hanson put Dean on a tight schedule. Dean explained to Hanson that in order to complete the entire Section 48 audit before leaving his auditor position, he would need to work over 10-hour days and on the

17

weekends. Hanson responded that Dean was not approved to work overtime and had to complete the entire audit before starting his new position without working any overtime.

73.     Dean conducted an audit of the part of Section 48 that contains the tail fin fittings, approximately two to three weeks after he conducted the portion of the audit in which he found the mis-drilled bulkhead holes defects. Dean did not identify the tail fin fittings defect at the time. According to Dean, this was due in whole or in substantial part to the fact that Hanson did not allow him to observe all relevant parts of the manufacturing process.

74.     Roughly two months after Dean had submitted his report on the mis-drilled bulkhead holes defect to Hanson, Dean again raised the issue with Hanson in an in-person discussion in Hanson's office, around the December 2022 holidays. Dean told Hanson that the mis-drilled holes defect was the worst issue that he had found in one and a half years in his audit role, and that it should be carefully investigated further.

75.     Dean is informed that in mid-March 2023 Spirit found several parts with cracks, and Director of Quality Richard Cassube called an emergency, closed door meeting with high-ranking Spirit personnel to try to figure out what caused the cracks. This led Spirit to identify the tail fin fittings defect. Although Dean was not present at this meeting, he is informed that persons present included Cassube, Steve Aubuchon, Gregg Howard, and Aime Emerson.

76.     After this meeting, Sean McVickers and Justin Hoch were assigned to remove and check the tail fin fittings (also known as dagger fittings) on a sample of 10 production units. After approximately one week this process revealed 4-5 cracks in the sample, *i.e.* roughly 40% of units were affected, indicating that the issue was potentially widespread.

77.     In late March 2023, Dean saw design engineers walking around carrying tail fin fittings in their hands.

78.     Approximately 1.5 weeks after Dean saw design engineers carrying tail fin fittings, in late March or early April 2023, RCCA [Root Cause and Corrective Action] Core Quality Manager Gregg Howard had a meeting with Dean. Howard reported to Cassube at this time. This meeting with Howard was the first time that Dean learned of the tail fin fitting defect. Howard asked what Dean knew about the tail fin fitting defect from conducting his audit. Dean explained to Howard that he did not identify that defect, and that one reason why that could be was he had discovered the mis-drilled bulkhead holes defect shortly before conducting the portion of the audit containing the tail fin fittings, and he was focused on the mis-drilled holes defect at the time due to its high importance. Dean described the nature of the mis-drilled bulkhead holes defect to Howard.

79.     Approximately one week after meeting with Howard, Dean was called into a meeting with Emerson and Hanson, who inquired about Dean's audit of the part of Section 48 containing the tail fin fittings. Based on their questions at the meeting, Dean believed that he was being set up to be fired. Dean discussed his concerns about this meeting with many people including Howard, Ruschen, Thompson, and with Dean's manager at the time, Stress Engineer William Saguto, explaining that he felt he was being unfairly blamed for not identifying the tail fin fittings issue.

80.     Approximately one week after the meeting with Emerson and Hanson, Dean was called into a meeting with Spirit's Human Resources department. Spirit terminated Dean on or about April 26, 2023. Because Dean was a unionized engineer he could only be fired for cause. According to Dean, Spirit attempted to justify his termination on demonstrably false grounds that Dean had falsified paperwork concerning his audit. Dean maintains that Spirit wrongly claimed Dean never conducted an audit of the part of Section 48 that contains the tail fin fittings, and that

Dean's report indicating that he performed that part of the audit was therefore, supposedly, untrue. Dean believes this false justification was a pretext to scapegoat and silence him, and to intimidate other Spirit employees so that they would not speak out as Dean had done about the mis-drilled bulkhead holes defect.

81.     After Dean's wrongful termination, in late May or in June 2023, a friend of Dean's who was then working as a panelization manager for Spirit informed him that Greg Howard had visited the panelization department trying to figure out why certain parts were not lining up correctly in the manufacturing process. Dean believes this to be related to Spirit's investigation of the mis-drilled bulkhead holes defect.

82.     Dean believes that Boeing first identified the mis-drilled bulkhead holes defect while disassembling fuselage parts in order to fix the tail fin fittings defect. The defectively installed tail fin fittings are located in close proximity to the aft pressure bulkhead. Both are located near station 1016 of the fuselage.

**B.     Quality Inspector Team Lead Former Employee 1 Notified Defendant Gentile Of Spirit's Probation With Boeing And Efforts To Conceal Excessive Defects**

83.     Former Employee 1 ("FE1") worked for Spirit in Wichita, Kansas for approximately 12 years. For approximately 8 months, he worked as a quality manager. For the majority of his time at Spirit, FE1 was an Inspector. FE1 served as a Team Lead for a group of Inspectors, in which capacity he oversaw various processes at the "end of the line," also known as the "rail pit," where Spirit finished working on products before shipping them to customers. This included preparation for completed fuselages to be shipped to Boeing, and oversight for the "final shake," which is what Spirit called its final inspection before shipment to the customer. For at least part of his time at Spirit, FE1 reported to first level manager Ryan Clark, who reported to second

level manager Steve Aubuchon, who in turn reported to Senior Director of Quality Scott Grabon (who held that position before it was assumed by Richard Cassube).

84.     FE1 struggled with Spirit's culture, which placed an emphasis on pushing out product over quality. When FE1 identified a defect, he would often receive pushback from production personnel and first level managers. For example, first level manager Robbin Ketterman would become very frustrated, lose her temper, and yell if FE1 identified a defect. FE1 almost always found "tags" (meaning significant defects that had to be fixed) on his final walk through a completed fuselage. FE1 was told not to find "tags" at the end of the line, because Spirit just wanted to ship its completed products as quickly as possible.

85.     According to FE1, there was significant friction between Spirit's quality inspectors and the production department. Production frequently failed to check for and fix their own mistakes as required, so when the quality department conducted inspections they often found many defects. The numerous defects found during inspections complicated the quality inspectors' task and took considerable time to document, creating additional time pressures and friction with the production teams. Production managers frequently pressured quality inspectors to simply approve work even if it contained defects. If FE1 or other quality personnel refused to approve defective work, production managers would complain to the quality inspector's respective manager, who would in turn assign other quality personnel to approve the defective work.

86.     In FE1's experience, the production department did not try to prevent problems, but was just focused on pushing products out. This dynamic created an almost hostile environment at Spirit, in which FE1 struggled, in the face of pushback from other Spirit employees, to get defects documented properly. According to FE1, Spirit was primarily concerned with costs, and did not want too many defects to be written up.

87.     FE1 also recalled problems arising due to Spirit's failure to hire sufficient personnel. FE1 attended a production managers' meeting in which a manager advocated for Spirit maintaining its output with fewer employees by analogizing to a situation in which a leg was removed from a four-legged table, stating that people would simply adapt to using it as a three-legged table. FE1 recalled that Spirit frequently pushed employees to "do more with less." According to FE1, he and other Spirit personnel repeatedly told managers that they needed to promptly hire additional people for Spirit to be able to achieve its planned production rate increases, but Spirit failed to hire the necessary people in time for FE1 and his colleagues to properly train the new hires. FE1 also stated that Spirit experienced high turnover due to its hostile environment and the excessive demands placed on its workers. Sometimes Spirit required employees to work 12 to 18 hours in a row, and then come back to work again the following day. For example, FE1 recalled working from Friday afternoon until Saturday morning.

88.     In FE1's experience, Spirit employees often rushed work and ignored defects to try to save the Company money. FE1 recalled instances in which he was told that a fuselage had to be shipped to the customer the same day, "no matter what." Due to its rushed production process, Spirit's products frequently contained defects. FE1 informed Spirit coworkers that he believed it was just a matter of time until a major defect escaped to a customer.

89.     FE1 believes that there frequently are defects in Spirit products, due in part to the pressure that Spirit puts on its employees. In FE1's experience, Spirit treats moving products down the line as more important than quality. FE1 stated that in his former employment at Cessna, inspectors would not let a product continue moving through the production process with a defect, whereas Spirit just tried to keep moving products through the process while trying to address defects at the end of the line once the product was already assembled.

90.     FE1 recalled an instance when Spirit managers wanted him to combine two different processes: the final inspection referred to internally at Spirit as the "final shake," and the foreign object debris ("FOD") walk. FE1 believes that combining these two tasks was problematic and not conducive to ensuring quality because doing so increases the likelihood that Spirit would miss defects and FOD, which would then be present in products shipped to customers.

91.     FE1 stated that issues such as FOD were routinely missed, with customers such as Boeing providing frequent feedback about the occurrence of FOD in the delivered fuselages.

92.     FE1 also recalled that, while Spirit had initially done a skin quality shake to inspect the outer surface of a completed fuselage, at some point during his employment Spirit simply stopped doing it because the process was so rushed. FE1 was told to just "look over" things rather than actually "inspect" them, which he thought was ineffective and did not make sense.

93.     FE1 stated that Boeing periodically conducted audits at Spirit, however FE1 viewed these audits as "a joke" because Spirit was given advance notice of what would be audited and when. As such, Spirit simply addressed any issues in the area and production units to be audited shortly before the audit, thereby concealing the true extent of problems from Boeing.

94.     FE1 recalled that beginning in approximately 2018 Boeing placed Spirit on probation, due to the large number of escapements found in fuselages that Spirit shipped to Boeing. Such escapements included commonly recurring issues such as FOD, missing fasteners, peeling paint, and poor skin quality. These issues slowed down Boeing's production process, as it had to spend time identifying and fixing defects created by Spirit. That Boeing had put Spirit on probation was widely known to employees in Spirit's quality department, and FE1 believes that Spirit's leadership was likely aware of this as well. The probation was the subject of meetings at Spirit, and exiting probation required Spirit to pass additional audits by Boeing.

95.     FE1 stated that during the probation, Spirit could not ship any product to Boeing without the approval of a manager. Boeing also sent Spirit weekly or even daily emails with PowerPoint presentations containing pictures of escapements that Boeing found on fuselages received from Spirit. Boeing would send these emails to high level Spirit managers, and the leadership of Spirit's quality department would send the emails out to all quality managers and some team leaders (such as FE1).

96.     At a point after Spirit's mass layoffs during the COVID pandemic, Ryan Clark became FE1's first level manager. Clark told FE1 that his second level manager, Steve Aubuchon, did not want FE1 to document every defect he found, and did not want him to record the quantities or precise locations of defects found, but rather to simply note that the broad fuselage "zone" in question contains a defect. According to FE1 this violated rules and policies that required Spirit to document a precise, 3-point location for all defects, and the precise quantity of such defects, so that the defects could be traced through the production process and addressed as necessary.

97.     Aubuchon discussed his request with FE1 at FE1's desk, explaining it as an attempt to save money, and said that it was coming from Aubuchon's boss Scott Grabon. FE1 responded that this was not the right thing to do and that Aubuchon was asking him to do things incorrectly. Aubuchon told FE1 that if he refused to do as he was told, Aubuchon would fire him on the spot. FE1 asked Aubuchon to put his request in writing. Aubuchon told FE1 that he would receive an email from Clark (his direct superior).

98.     On February 22, 2022, Clark emailed FE1 and his entire team relaying Aubuchon's request. FE1 responded to Clark, copying Aubuchon, as follows:

> I respect your direction and the team and I will follow the directions given as instructed however I would like to voice the way the team and my self feel about the situation. You are asking us to record in a inaccurately way the number of defects, using the zone box (that is for a drawing reference) will be asking us to

falsify the proper documentation with regards to the amount of defects being found on the plane. This make us and put us in a very uncomfortable situation where we have to question our integrity and our ability to follow directions.

I find it unethical and in violation of FAA regulations along with the proper regulations in place by Spirit Aerosystems of properly documenting the amount of defects being found.

We will follow the direction given to us but we are not comfortable with it.

A redacted copy of the email chain is attached as **Exhibit 2**.

99.     Soon after FE1 sent this email, Aubuchon asked him to meet in Spirit's quality department conference room. In that meeting, Aubuchon demoted FE1 from his Team Lead position. Shortly thereafter, FE1 heard from his team members that Aubuchon continued telling them to log defects in the same incorrect manner.

100.     Later on that same day, February 22, 2022, FE1 submitted an ethics complaint to Spirit concerning this incident. FE1's complaint stated:

The inspection team and myself have been put on a very unethical place. As part of our process we are to find and document the defects we find on our daily tasks. There has been too much tension lately with managers and the amount of defects being found on our FOD walks that we were instructed by our leadership to write pickups properly with the correct number of defects as its written per our procedures.

This has become an issue and has risen a very high level of attention due to the excessive amount of defects, today around 9 o'clock in the morning our manager Ryan Clark instructed us to change the way we wrote the defects and no longer document the amount of defects on the quantity box but change it and log it on the zone box which would be falsifying the documentation. I raised my concerns because this challenges our integrity because we are being asked to purposely record inaccurate information. As a team lead i asked my manager to please send a e-mail to inform this to the team because i felt uncomfortable to to instruct them the direction given.

I have attached the email send out along with my response to the situation and around 12:45PM i was called to the office by Steve Aubuchon, in the conference room i was informed that i will be moved to pre-integration (different area) and that i will no longer be a team lead de to my inability to follow instructions and being border line subordinate at times. this was informed to me in the presence of second

level manager Jon Louia, and first level manager Paula Hall. this happened within minutes of my reply to the email reply i send about the direction of how we document our defects and feel like my leadership is retaliating towards me for trying to do the right thing and do what is best for my team. The whole inspection team in the shipping center is involved and can concur with what i have said and will appreciate with the support being presented to us.

A redacted copy of FE1's ethics complaint is attached as **Exhibit 3**.

101.    After days and weeks passed with no action taken on his complaint, on Thursday March 10, 2022, FE1 followed up through Spirit's ethics complaint system to request an update, and was told that they planned to "wrap it up" that week. *See* **Exhibit 3**. When FE1 still received no response, he came to believe that Spirit's human resources department was dragging its feet and trying to sweep his complaint under the rug.

102.    On Wednesday March 16, 2022, FE1 emailed Defendant Gentile, with the subject line "Failure to Follow Company Policies," explaining the situation and attaching a copy of his ethics complaint. FE1 wrote:

Hello,

I am reaching out about clarification of the policies in place. Everywhere I go throughout the factory I see signs about "Quality Matters" and if there is something wrong to stop and raise a concern, however recently I been reprimanded for doing my job correctly accordingly to the policies in place. PRO-4005, POL-1271 support my allegations. and I have attached the reports I have made to HR in an attempt to call for help. It's been three weeks since the compliance was filed and i have not seen any response. Since then I been stripped from my team lead position and my team has been left intimidated and without a voice to speak up. I reached out to the investigator from HR and she is out for this whole week, mean while everything is a a stand still.

This is my last resort and I apologize to take time out of your busy schedule but I have lost faith on the quality organization here at spirit and this is my last cry for help into resolving this issue that violates the guide lines stablished by the AS9100 which governs our certification to build aircraft and which has been in question and even put on probation by Boeing on previous years. If I cannot do my job according to the policies in place then change them so I can perform my job within the guidelines in place.

I also know that and internal audit was reported that confirms what i stood up for yet the information has not been passed down?

 Thank you for your time and help!

A redacted copy of FE1's email to Defendant Gentile is attached as **Exhibit 4**.

103.    Defendant Gentile replied to FE1's email a few days later, thanking him for raising his concerns, and copying Spirit's Human Resources leader. About one month after that, FE1 was told that the allegations in his ethics complaint were sustained, his prior position was reinstated, and he was given backpay. After FE1's return to his prior position, Aubuchon tried to avoid talking to him.

104.    Similar to the above-described incident with Steve Aubuchon, FE1 recalled an instance where a second level manager Mahmoud Hamed told inspectors not to write up defects.

105.    Around July 2022 FE1 gave notice that he would leave Spirit, and left shortly thereafter. FE1 remained in touch with the team members he had led at the end of the line. They informed him that after his departure, Sprit moved them to different positions, because they tried to find too many defects.

### C.    Internal Quality Auditor Former Employee 2 Observed Quality Problems Including Many Mechanics Using Out-Of-Calibration Tools

106.    Former Employee 2 ("FE2") was employed by Spirit as an Internal Quality Auditor in Wichita, Kansas from October 2017 to February 2021. FE2 reported to First Level Manager Tina Leep, who in turn reported to Production Line Manager (which position was also known in Spirit as a Second Level Manager) Garrett Powell. Powell reported to Senior Director of Global Quality Marki Huston. As an Internal Quality Auditor, FE2 conducted audits on Spirit's production process for sections of 737s and other aircraft. At the beginning of FE2's tenure at Spirit FE2 worked in Spirit's commercial aircraft segment, and was assigned to the defense aircraft segment in Spring 2020.

107.     When FE2 joined Spirit in 2017, it was still trying to figure out how its internal audit function should operate. Auditors were overworked and spread thin, which led to significant frustration. Spirit would also conduct minor tweaks to the audit process, further complicating the audit process. These problems persisted throughout FE2's time at Spirit.

108.     According to FE2, the mechanics who performed Spirit's manufacturing were also overworked. Mechanics were repeatedly required to work mandatory weekend overtime, and 60-70 hour weeks, which angered many mechanics.

109.     In the role of Internal Quality Auditor, FE2 received assignments from his manager Leep to observe specific parts of the manufacturing process.  FE2 would then go to the relevant area of Spirit's manufacturing facility, introduce himself to the mechanics and their manager, and explain that he would be observing the specified process. FE2 was required to compile reports of his observations in Power Point form including photographs.

110.     During FE2's time auditing different aspects of the manufacturing process, FE2 encountered issues in multiple parts of the production process.

111.     FE2 recalled that auditors repeatedly found torque wrenches in mechanics' toolboxes that were not properly calibrated. This was potentially a serious problem, as a torque wrench that is out of calibration may not torque fasteners to the correct levels, resulting in over-tightening or under-tightening that could threaten the structural integrity of the parts in question.

112.     After auditors found a significant number of out-of-calibration torque wrenches, Spirit required FE2 and other auditors to audit mechanics' toolboxes and to remove any out-of-calibration tools, which angered some mechanics whose tools were taken, as well as their managers. Some mechanics would not even let auditors take such out-of-calibration tools, locking toolboxes or yanking them back out of the auditors' hands to prevent the audit. The mechanics'

first level managers did not like the toolbox audit because it disrupted production. In some instances, Production Line Managers had to get involved to enable the auditors to complete their work.

113.    This toolbox audit took place over several weeks in 2019. FE2 estimates that approximately 1,200-1,400 toolboxes were audited, and that well over 100 torque wrenches were found that were out of calibration. The toolbox audit also revealed other problematic findings in violation of Spirit rules, such as food being stored in toolboxes, and mechanics hiding aircraft parts in their toolboxes. Four of the eight or nine auditors on FE2's team were assigned to work on the toolbox audit, as well as many other Spirit employees. The significant time spent on this audit meant that certain other audits at Spirit had to be postponed.

114.    FE2 observed multiple instances of Spirit employees failing to perform their work as required. For example, in 2018 or 2019 FE2 observed a mechanic installing a bracket in Section 41 (the forward portion of the fuselage, from the nose to the aft of the cockpit). A quality inspector then came to check the work, but merely looked up at the bracket from 3.5-4 feet away, for about two seconds, and then signed off on the work. This was inadequate to inspect the work performed, and FE2 inquired of the quality inspector whether he was going to inspect the work. The inspector responded that he already had performed his inspection. FE2 reported this incident to superiors.

115.    As another example, FE2 recalled an instance in which he was inspecting the nose of an assembled fuselage just prior to its shipment via train to Boeing. FE2 found a large amount of foreign object debris in the fuselage such as metal shavings, rags, paper towels, rivets, and other items. FE2 found it alarming that the fuselage contained so much debris and was about to be shipped to Boeing.

116.     As yet another example of Spirit employees failing to perform their work as required, FE2 observed a mechanic drilling a hole for a fuselage floor beam. Such holes must be drilled straight, but the mechanic was drilling at an angle, which can make a rivet placed in such an improperly drilled hole not properly secured. FE2 took pictures of the defective drilling and reported his findings, however months later he witnessed the same mechanic repeating this improper angled drilling.

117.     FE2 was provided with insufficient direction about how to perform his work. Although FE2 was assigned to defense in Spring 2020, he was on medical leave from May-November 2020, and so November 2020 was effectively the beginning of his work in the defense area. In or around November 2020, FE2 requested support and guidance on how to conduct audits in the defense area, where he had been put in charge of setting up audit programs despite his limited experience with such work. Spirit sent an experienced employee, Doug Helms, to assist FE2, but Helms stopped providing support to FE2 after approximately one week. FE2 did not believe this was sufficient. While FE2 found Helms's support useful, FE2 estimates that at least a month of support would have been necessary for him to properly learn the role. FE2 again requested support from Spirit, but did not receive any. Within the next few weeks FE2 gave notice that he would leave Spirit.

118.     FE2's decision to leave Spirit was due in part to Spirit's failure to provide sufficient training for him to perform his work. His decision was also due in part to Spirit's culture in which some employees did not care about the quality of their work, did not perform their work with integrity, and did not attempt to fix known problems. On multiple occasions, such as those described above, FE2 witnessed Spirit employees exhibiting blatant disregard for the safety and structural integrity of the aircraft they were working on. In FE2's experience, when he spoke up

to identify problems, not much changed at Spirit, which also contributed to his decision to leave the company.

## VI.    DEFENDANTS KNEW OF BUT CONCEALED MATERIAL FACTS REGARDING SPIRIT'S QUALITY FAILURES

119.    Throughout the Class Period, Defendants knew, but failed to disclose to investors, material information that created substantial risks for Spirit's business. Defendants failed to disclose that: (1) Spirit identified mis-drilled holes on the 737 MAX aft pressure bulkhead months before this issue was disclosed to investors; and (2) Spirit suffered from severe and persistent quality problems which led Boeing to place Spirit on probation. These undisclosed facts severely undermined Defendants' misleading public statements during the Class Period, that emphasized the quality and safety of Spirit's products.

### A.    Spirit Identified The Mis-Drilled Holes Defect Months Before It Was Disclosed To Investors

120.    As discussed above in Section V.A, in October 2022 former Product and Process Verification Core Quality Auditor Joshua Dean identified that Spirit had mis-drilled holes on the 737 aft pressure bulkhead and that this was a very significant problem. However, Spirit concealed this issue from investors until it was revealed by independent reporting in August 2023, ten months after Spirit had identified it.

121.    Dean reported the mis-drilled aft pressure bulkhead holes defect in writing and/or in person to multiple other Spirit employees and managers including Section 48 managers Sean McVickers and Justin Hoch, design engineer Jim Ruschen, Senior PPV Quality Manager Jaime Hanson, Senior Quality Manager Steve Aubuchon, Manufacturing Engineering Manager Bruce Hysom, quality manager Michelle Butler, PPV Core Quality Auditor Lance Thompson, and lead mechanic Chris Coons.

31

122.    Notwithstanding that Dean had repeatedly raised the mis-drilled aft pressure bulkhead holes defect with multiple Spirit employees and managers over a period of several months, repeatedly stressing its importance, Spirit did not disclose this defect to the public until August 23, 2023, after The Air Current published an article, after the close of stock market trading, titled "Boeing and Spirit Grapple With Newly Discovered 737 MAX Quality Issue." The article quoted a statement provided by Boeing stating that "we identified fastener holes that did not conform to our specifications in the aft pressure bulkhead on certain 737 airplanes." Later that same day, in response to The Air Current's article and subsequent reporting, Spirit issued a press release confirming that "[w]e are aware of a quality issue involving elongated fastener holes on the aft pressure bulkhead on certain models of the 737 fuselage produced by Spirit AeroSystems." When Spirit's stock resumed trading the following day, its share price promptly fell by 12.7% on unusually heavy trading volume.

**B.    Spirit Suffered From Severe Quality Problems Which Led Its Key Customer Boeing To Place Spirit On Probation**

123.    As discussed above in Section V, both Joshua Dean and Quality Inspector Team Lead Former Employee 1 noted widespread quality problems at Spirit. Both Dean and FE1 stated that the quality problems rose to such a level that Boeing placed Spirit on probation, demanding that Spirit decrease defects in its products and implement quality safeguards. FE1 directly reported these issues to Defendant Gentile in March 2022, after Spirit had failed to act on his internal ethics complaint. However, Spirit concealed its persistent quality problems and its Boeing probation from investors. The risks created by Spirit's concealment of widespread quality problems materialized in the tail fin fittings defect, the aft pressure bulkhead mis-drilled holes defect, and the negative consequences of those defects for Spirit's business.

124.    Dean and FE1 both confirmed that the high number of defects in Spirit products led Boeing to place it on probation. FE1 recalled that beginning in approximately 2018 Boeing placed Spirit on probation, due to the large number of defects in its products, such as the presence of FOD, missing fasteners, peeling paint, and poor skin quality. Dean recalled that, in order to exit probation, Boeing demanded Spirit decrease the amounts of defects in its products, implement the PPV program, and create Visual Work Instructions. FE1 stated that exiting probation required Spirit to pass additional audits by Boeing, and that during the probation Spirit could not ship any product to Boeing without the approval of a manager. Spirit remained on probation with Boeing through at least May 2021 when Dean attended meetings where his manager Jaime Hanson discussed Spirit's ongoing efforts to exit probation. According to Dean and FE1, Spirit's probation with Boeing was common knowledge in their respective PPV and quality departments.

125.    Documents published by Boeing confirm the seriousness of a decision to place a supplier such as Spirit on probation. Boeing maintains a website to provide information for its suppliers (https://www.boeingsuppliers.com/), including information about quality requirements. This website contains a FAQ list (https://www.boeingsuppliers.com/supplier/supplierconf/faq-addendum1.html), including the following question and answer:

> What if the supplier does not meet the minimum Addendum 1 requirements when they are contractually obligated to do so?
>
> In order of increasing severity: the Boeing representative could write a Supplier Evaluation Report (SER) requiring corrective action within 30 days; Addendum 1 could be removed from supplier contracts, and the supplier would be ineligible to bid on or perform work for which Addendum 1 is required; the supplier could be put on probation; the supplier could be withdrawn.

The Boeing website's "Supplier Quality" page (https://www.boeingsuppliers.com/quality.html) describes "Addendum 1" as an addendum to the Boeing Quality Management System Requirements for Suppliers, which "describes a process for managing the variation of key

characteristics (KC)," and "includes requirements that emphasize establishing both statistical control and capability of KCs, identification of improvement opportunities, and implementation of improvement actions." As such, a supplier's failure to meet Boeing's quality requirements can result in a series of escalating consequences, of which probation is the last before "the supplier could be withdrawn" for continued failures.

### C. Executives, Including Defendant Gentile, Were Informed of Defects and Knew of Pervasive Quality Issues

126.    Notwithstanding the severity of Boeing's decision to place Spirit on probation, Spirit continued to tolerate defects and to attempt to conceal them from customers. In Dean's experience, Spirit did not in fact materially decrease the amounts of defects in its products as required by Boeing, but simply undercounted or manipulated the documentation of defects to create the appearance of quality improvement. This is consistent with FE1's experience, when, in February 2022, FE1 was instructed to falsely undercount defects.

127.    FE1 voiced his concerns to his superiors Ryan Clark and Steve Aubuchon, stating in part:

> You are asking us to record in a inaccurately way the number of defects, using the zone box (that is for a drawing reference) will be asking us to falsify the proper documentation with regards to the amount of defects being found on the plane. This make us and put us in a very uncomfortable situation where we have to question our integrity and our ability to follow directions.
>
> I find it unethical and in violation of FAA regulations along with the proper regulations in place by Spirit Aerosystems of properly documenting the amount of defects being found.

*See* **Exhibit 2**.

128.    Soon after FE1 sent that email, Aubuchon demoted FE1 from his Team Lead position. On the same day, FE1 submitted an internal ethics complaint that stated in part:

> The inspection team and myself have been put on a very unethical place. As part of our process we are to find and document the defects we find on our daily tasks. . .

This has become an issue and has risen a very high level of attention due to the excessive amount of defects, today around 9 o'clock in the morning our manager Ryan Clark instructed us to change the way we wrote the defects and no longer document the amount of defects on the quantity box but change it and log it on the zone box which would be falsifying the documentation. I raised my concerns because this challenges our integrity because we are being asked to purposely record inaccurate information. . .

See **Exhibit 3**.

129.    After weeks passed with no action taken on his ethics complaint, on March 16, 2022, FE1 emailed Defendant Gentile, attaching his ethics complaint. FE1 further informed Gentile that:

I have lost faith on the quality organization here at spirit and this is my last cry for help into resolving this issue that violates the guide lines stablished by the AS9100 which governs our certification to build aircraft and which has been in question and even put on probation by Boeing on previous years.

See **Exhibit 4**. AS9100 is the widely adopted and standardized international quality management system standard for the aviation industry, created by the Society of Automotive Engineers ("SAE"). The standard provides suppliers with requirements for creating and maintaining a comprehensive quality system for providing safe and reliable products. Boeing requires suppliers such as Spirit to comply with AS9100.

130.    Defendant Gentile replied to FE1's March 16, 2022 email, and the allegations in FE1's ethics complaint were subsequently sustained by Spirit. Therefore, while Defendant Gentile, as Spirit's CEO, President and Director, was almost certainly already aware of Spirit's excessive defects, failure to follow quality requirements, and Boeing probation prior to receiving FE1's email, by no later than March 16, 2022 he was informed of those facts.

131.    Notwithstanding Defendants' knowledge that Spirit suffered from severe and persistent quality problems which led Boeing to place Spirit on probation, Defendants never

disclosed this information to investors. Instead, Defendants' public statements misleadingly emphasized the quality and safety of Spirit's products. The risks created by Spirit's concealment of widespread quality problems materialized in the tail fin fittings defect and the aft pressure bulkhead mis-drilled holes defect. Spirit's stock price promptly fell by large amounts when these defects, and their financial impacts, became known to investors.

## VII.   MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

132.   Defendants made numerous, similar statements over the Class Period, that misleadingly misrepresented and/or omitted to disclose that: (1) Spirit identified mis-drilled holes on the 737 MAX aft pressure bulkhead months before this issue was disclosed to investors; and (2) Spirit suffered from severe and persistent quality problems which led Boeing to place Spirit on probation. For the sake of brevity, Plaintiffs only allege herein certain key and/or representative misleading statements.

### A.   April 8, 2020 Press Release Regarding COVID Response

133.   The Class Period begins on April 8, 2020. On that day Spirit issued a press release titled "Spirit AeroSystems' Actions in Response to COVID-19," and filed with the SEC a Form 8-K including a copy of the press release.

134.   The press release identified various cost reductions implemented by Spirit:

In light of the 737 MAX production suspension that began on January 1, 2020, Spirit initiated the following actions to reduce costs:
- Implemented workforce reductions of 2,800 employees in Wichita, Kansas and 400 employees in Oklahoma
- Initiated a voluntary retirement program for 850 hourly and salaried workers

\*       \*       \*

To further reduce costs due to the economic impact of the COVID-19 pandemic and related production suspension, Spirit has taken the following additional actions:

36

\*       \*       \*

- Initiated a 21 calendar-day furlough of production workers and managers supporting Boeing programs in Wichita, Kansas and Oklahoma
- Implemented a four-day work week for its salaried workforce at its Wichita, Kansas facility until further notice

135.    The press release further stated that "***Spirit has taken the actions highlighted above to reduce costs and preserve its liquidity in this unprecedented time, while also working to maintain the health and viability of its supply chain to support operations post-production suspension***."[2]

136.    The above statements identified in ¶¶134-135 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, the mass layoffs and similar measures described in the press release resulted in Spirit's loss of many experienced mechanics and quality personnel, thereby posing a significant risk to Spirit's ability to maintain operations to support is customers, and to maintain the health and viability of its supply chain.

### B.    May 6, 2020 Quarterly Report For the First Quarter of 2020

137.    On May 6, 2020 Spirit filed with the SEC its quarterly report for the first quarter of 2020 on Form 10-Q. The quarterly report was signed by Defendant Suchinski.

138.    The quarterly report included as exhibits signed certifications from Defendants Gentile and Suchinski pursuant to the Sarbanes-Oxley Act of 2002, stating in relevant part that "I have reviewed this Quarterly Report on Form 10-Q of Spirit AeroSystems Holdings, Inc.," and "Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances***

---

[2] Bolded, italicized statements in Sections VII-VIII indicate that emphasis has been added.

***under which such statements were made, not misleading*** with respect to the period covered by this report."

139.   The above statements identified in ¶138 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, the quarterly report contained the below-detailed misstatements and omissions, which were materially false and misleading for the reasons set forth below.

140.   The quarterly report under the heading "Item 1A. Risk Factors" and the sub-heading "Our business depends on our ability to maintain a healthy supply chain and ***timely deliver products that meet or exceed stringent quality standards***, which are negatively impacted by the COVID-19 pandemic," stated in part:

> Our business depends on our ability to maintain a healthy supply chain, achieve planned production rate targets, and meet or exceed stringent performance and reliability standards. The supply chain for large commercial aerostructures is complex and involves hundreds of suppliers and their technical employees from all over the world.
>
> ***Operational issues, including delays or defects in supplier components relating to government mandated production shutdowns or otherwise, could result in significant out-of-sequence work and increased production costs, as well as delayed deliveries to customers***. Our suppliers' failure to provide parts on a timely basis or to provide parts that meet our technical specifications could have a materially adverse effect on production schedules, contract performance, and contract profitability.

141.   The above statements identified in ¶140 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Spirit did not "timely deliver products that meet or exceed stringent quality standards," but routinely delivered products that failed to meet quality standards, and this had already led Spirit's main customer, Boeing, to place Spirit on probation. These statements were additionally

misleading for presenting defects and quality failures as mere hypothetical risks, and solely relating to "supplier components," when Spirit itself routinely experienced defects and quality failures.

142.    Spirit's First Quarter 2020 Form 10-Q was also materially misleading for failing to provide disclosures required by Item 105 (17 C.F.R. § 229.105) and Item 303 (17 C.F.R. § 229.303) of SEC Regulation S-K.

143.    Item 105 of Regulation S-K requires public companies like Spirit to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering speculative or risky," and to "explain how each risk affects the registrant or the securities being offered." 17 C.F.R. § 229.105. Public companies are required to provide this information in their 10-Ks and 10-Qs.

144.    In violation of Item 105, Defendants failed to disclose in Spirit's First Quarter 2020 Form 10-Q that Spirit suffered from severe and persistent quality problems which led Boeing to place Spirit on probation. This was a material factor that made an investment in Spirit speculative or risky. Such persistent quality problems and probation created risks of future repair costs and lost business, and Boeing was at all times Spirit's most important customer, accounting for over half of revenues.

145.    Item 303 of SEC Regulation S-K requires public companies like Spirit to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations," and to "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." 17 C.F.R. § 229.303(b)(1)-(2). This discussion "must focus specifically on material events and uncertainties known to management that are

reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." 17 C.F.R. § 229.303(a). Public companies are also required to provide this information in their 10-Ks and 10-Qs.

146.     Defendants' failure to disclose in Spirit's First Quarter 2020 Form 10-Q that Spirit suffered from severe and persistent quality problems which led Boeing to place Spirit on probation also violated Item 303. The possibility of future repair costs and lost business due to such quality failures were known uncertainties likely to result in material decreases in Spirit's net sales, revenues, income from continuing operations, and liquidity.

### C.     February 25, 2021 Annual Report for 2020

147.     On February 25, 2021 Spirit filed with the SEC its annual report for 2020 on Form 10-K. The annual report was signed by Defendants Gentile and Suchinski.

148.     The annual report included as exhibits signed certifications from Defendants Gentile and Suchinski pursuant to the Sarbanes-Oxley Act of 2002, stating in relevant part that "I have reviewed this Annual Report on Form 10-K of Spirit AeroSystems Holdings, Inc.," and "Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading* with respect to the period covered by this report."

149.     The above statements identified in ¶148 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, the annual report contained the below-detailed misstatements and omissions, which were materially false and misleading for the reasons set forth below.

150.    The annual report, under the heading "Our business depends on our ability to maintain a healthy supply chain, meet production rate requirements, and *timely deliver products that meet or exceed stringent quality standards*", stated in relevant part:

> *Our business depends on our ability to maintain a healthy supply chain, achieve planned production rate targets, and meet or exceed stringent performance and reliability standards*. The supply chain for large commercial aerostructures is complex and involves hundreds of suppliers and their technical employees from all over the world.
>
> Operational issues, including delays or defects in supplier components, could result in significant out-of-sequence work and increased production costs, as well as delayed deliveries to customers. Our suppliers' failure to provide parts that meet our technical specifications could materially adversely affect production schedules and contract profitability. We may not be able to find acceptable alternatives, and any such alternatives could result in increased costs for us and possible forward losses on certain contracts. Even if acceptable alternatives are found, the process of locating and securing such alternatives might be disruptive to our business and might lead to termination of our supply agreements with our customers.
>
> *                *                *
>
> Additionally, the Company's ability to meet production rate increases is dependent upon several factors, including expansion and alignment of its production facilities, tooling, and equipment; improved efficiencies in its production line; on-time delivery of component parts from the Company's suppliers; adequate supply of skilled labor; and implementation of customer customizations upon demand. *If the Company fails to meet the quality or delivery expectations or requirements of its customers, disruptions in manufacturing lines could result, which could have a material adverse impact on the Company's ability to meet commitments to its customers and on its future financial results.*

151.    The above statements identified in ¶150 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Spirit did not "timely deliver products that meet or exceed stringent quality standards," but routinely delivered products that failed to meet quality standards, and this had already led Spirit's main customer, Boeing, to place Spirit on probation. These statements were additionally misleading for presenting defects and quality failures, or Spirit's "fail[ure] to meet the quality or

delivery expectations or requirements of its customers" as mere hypothetical risks, when Spirit routinely experienced defects and quality failures, and failed to meet the quality expectations of its customers including Boeing.

152.    Spirit's Annual Report for 2020 on Form 10-K was also materially misleading for failing to provide disclosures required by Item 105 and Item 303 of SEC Regulation S-K.

153.    In violation of Item 105, Defendants failed to disclose in Spirit's Annual Report for 2020 on Form 10-K that Spirit suffered from severe and persistent quality problems which led Boeing to place Spirit on probation. This was a material factor that made an investment in Spirit speculative or risky. Such persistent quality problems and probation created risks of future repair costs and lost business, and Boeing was at all times Spirit's most important customer, accounting for over half of revenues.

154.    Defendants' failure to disclose in Spirit's Annual Report for 2020 on Form 10-K that Spirit suffered from severe and persistent quality problems which led Boeing to place Spirit on probation also violated Item 303. The possibility of future repair costs and lost business due to such quality failures were known uncertainties likely to result in material decreases in Spirit's net sales, revenues, income from continuing operations, and liquidity.

### D.    June 17, 2021 Sustainability Report

155.    On June 17, 2021 Spirit published a press release titled "Spirit AeroSystems Publishes First Sustainability Report," which contained a link to a document titled "2020 Spirit AeroSystems Sustainability Report."

156.    Spirit's 2020 Sustainability Report stated under the heading "Products":

***Spirit is dedicated to the production of high quality and safe products for our customers and ultimately the end user***.

*        *        *

> *To ensure impeccable product quality and safety, Spirit has a dedicated Quality Department that uses a variety of assessment and audit tools.*

157.    The above statements identified in ¶156 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Spirit prioritized costs and production numbers over quality, and far from ensuring "impeccable product quality," Spirit suffered from severe and persistent quality problems which led Boeing to place Spirit on probation.

158.    Spirit's 2020 Sustainability Report stated under the heading "Due Diligence Procedures":

> *Spirit is dedicated to a Zero-Defect target, with no escapements to our customers. To ensure product quality and safety, daily compliance audits are conducted internally, while independent organizations review items that could negatively affect safety and quality, including Foreign Object Debris, Product Protection, Proper Tools (calibrated, inspected, and safe to use), and conformance to Spirit's standard work instructions and regulatory requirements.* These audits are completed in partnership with our customers to provide real-time feedback.

159.    The above statements identified in ¶158 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Spirit suffered from severe and persistent quality problems, including the routine presence of Foreign Object Debris, which led Boeing to place Spirit on probation. These statements were further false and misleading because Spirit actively undermined customer audits of Spirit by concealing defects from Boeing during its audits.

### E.    February 15, 2022 Annual Report for 2021

160.    On February 15, 2022 Spirit filed with the SEC its annual report for 2021 on Form 10-K. The annual report was signed by Defendants Gentile and Suchinski.

161.    The annual report included as exhibits signed certifications from Defendants Gentile and Suchinski pursuant to the Sarbanes-Oxley Act of 2002, stating in relevant part that "I

have reviewed this Annual Report on Form 10-K of Spirit AeroSystems Holdings, Inc.," and "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

162.    The above statements identified in ¶161 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, the annual report contained the below-detailed misstatements and omissions, which were materially false and misleading for the reasons set forth below.

163.    The annual report, under the heading "Item 1A. Risk Factors" and the sub-heading "Our business depends on our ability to maintain a healthy supply chain, meet production rate requirements, and ***timely deliver products that meet or exceed stringent quality standards***", stated in relevant part:

> Our business depends on our ability to maintain a healthy supply chain, achieve planned production rate targets, and meet or exceed stringent delivery, performance and reliability standards. The supply chain for large commercial aerostructures is complex and involves hundreds of suppliers and their technical employees from all over the world.
>
> Operational issues, including delays or defects in supplier components, have resulted and could continue to result in significant out-of-sequence work and increased production costs, as well as delayed deliveries to customers. Our suppliers' failure to provide parts that meet our technical specifications could materially adversely affect production schedules and contract profitability. We may not be able to find acceptable alternatives, and any such alternatives could result in increased costs for us and possible forward losses on certain contracts. Even if acceptable alternatives are found, the process of locating and securing such alternatives might be disruptive to our business and might lead to termination of our supply agreements with our customers.
>
> *        *        *
>
> Additionally, the Company's ability to meet production rate increases is dependent upon several factors, including expansion and alignment of its production facilities, tooling, and equipment; improved efficiencies in its production line; on-time

delivery of component parts from the Company's suppliers; adequate supply and costs of skilled labor; and implementation of customer customizations upon demand. ***From time-to-time the Company has experienced, and may continue to experience, quality or delivery timing disruptions. This includes common carrier disruptions and other disruptions that affect manufacturing lines, any of which could have a material adverse impact on the Company's ability to meet commitments to its customers and on its future financial results***.

164.    The above statements identified in ¶163 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Spirit did not "timely deliver products that meet or exceed stringent quality standards," but routinely delivered products that failed to meet quality standards, and this had already led Spirit's main customer, Boeing, to place Spirit on probation. These statements were additionally misleading for stating that "[f]rom time-to-time the Company has experienced, and may continue to experience, quality or delivery timing disruptions," when Spirit routinely experienced quality failures and continued to do so.

165.    Spirit's Annual Report for 2021 on Form 10-K was also materially misleading for failing to provide disclosures required by Item 105 and Item 303 of SEC Regulation S-K.

166.    In violation of Item 105, Defendants failed to disclose in Spirit's Annual Report for 2021 on Form 10-K that Spirit suffered from severe and persistent quality problems which led Boeing to place Spirit on probation. This was a material factor that made an investment in Spirit speculative or risky. Such persistent quality problems and probation created risks of future repair costs and lost business, and Boeing was at all times Spirit's most important customer, accounting for over half of revenues.

167.    Defendants' failure to disclose in Spirit's Annual Report for 2021 on Form 10-K that Spirit suffered from severe and persistent quality problems which led Boeing to place Spirit on probation also violated Item 303. The possibility of future repair costs and lost business due to such

45

quality failures were known uncertainties likely to result in material decreases in Spirit's net sales, revenues, income from continuing operations, and liquidity.

F.     **March 2, 2022 Investor Day**

168.     On March 2, 2022 Spirit hosted its 2022 Investor Day, giving a presentation and responding to analyst questions.

169.     During the Investor Day presentation, Samantha J. Marnick, Spirit's Executive VP, President of Commercial Division, and COO, stated:

> *While it goes without saying safety, we've got to keep our employees safe, and we've got to have our products safe. So safety is paramount, but quality is, too. It goes without saying in our industry*.

> But then second, with this coming back from the times that we've been in, *our customers quite rightly, and their customers have a much higher bar in terms of the quality expectations. And that means a lot of new thinking around what are the processes and technologies that we can apply to ensure that rate executes flawlessly.* We spent a lot of time during the downturn getting ready for the next lot of rate increases. Frankly, we learned a lot from before when we had the NG and we had the MAX kicking in, we were in high 50s rate.

170.     The above statements identified in ¶169 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Spirit did not treat quality as paramount, but prioritized costs and production numbers. These statements were further misleading because, far from ensuring that Spirit could "execute[] flawlessly" an increased production rate, Spirit suffered from severe and persistent quality problems which led Boeing to place Spirit on probation, and Spirit lacked sufficient experienced personnel to produce quality products at its planned rates. These statements were further false and misleading because on February 22, 2022 FE1 notified Spirit that it suffered from an "excessive amount of defects," and that his team was being instructed by managers to "falsify[] the documentation."

171.     During the Investor Day presentation, Kailash Krishnaswamy, Spirit's SVP of Aftermarket Services, stated, "So yes, *we build product that is the right quality, the first time that*

***don't break***. However, others break it, and so we really do have to fix it, which we are thankful for."

172.     The above statements identified in ¶171 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Spirit frequently did not "build product that is the right quality, the first time that don't break," but rather Spirit suffered from severe and persistent quality problems which led Boeing to place Spirit on probation. These statements were further false and misleading because on February 22, 2022 FE1 notified Spirit that it suffered from an "excessive amount of defects," and that his team was being instructed by managers to "falsify[] the documentation."

173.     During the Investor Day presentation, Kevin Matthies, Spirit's CTO and Chief Quality Officer, stated:

> Our customers recognize that the value that we bring to them is higher. And frankly, we understand that our customers are becoming a lot more demanding of our big OEMs as it relates to quality. There was a discussion about skin quality a little bit. ***We are going above and beyond what the requirements ask of us to make sure that our customers are successful when it comes to quality so that they can enable the sale of that product to their customers efficiently and effectively***.
>
> *                *                *
>
> When I talk with our Board about quality, I mean that is one -- that is my primary job. I talked to them about the fact that ***I'm focused on building a production system and quality is a key component of that. And our team has done a great job of embracing that throughout the last few years as we've taken that opportunity to transform during the pandemic***.

174.     The above statements identified in ¶173 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Spirit was not "going above and beyond what the requirements ask of us to make sure that our customers are successful when it comes to quality," but rather Spirit suffered from severe and persistent quality problems. These statements were further misleading because Spirit had not

"done a great job of embracing [quality] throughout the last few years," in fact it had spent the last few years trying to get off of probation with Boeing, which was imposed due to its excessive defects. These statements were further false and misleading because on February 22, 2022 FE1 notified Spirit that it suffered from an "excessive amount of defects," and that his team was being instructed by managers to "falsify[] the documentation."

175.    Matthies further stated:

***The other thing we realized is that we needed to perpetually ensure that when we're building the product, we're building it per specification, per engineering, per the planning***. And so we've deployed a technique that we refer to as 3 lines of defense. You may have heard that in a couple of different areas. We've leveraged this a lot, not just from a quality perspective, but wherever we think -- we want to make sure that we have a surety in what we're doing. We're leveraging this type of technology. ***We actually spent time over the last year, and we have about one more year to go, ensuring that our processes and our products are actually in conformance with the engineering requirements. We've deployed teams to go verify all of that, which is mitigating any potential for future escapes***. And then we deploy these 3 lines of defense perpetually. So when the mechanics and the inspectors are responsible for making sure that the product is done every day, but we also have our engineering team out auditing that process and product to make sure that indeed it is actually being built per specification. And where it's not, we can actually make adjustments or update the planning.

And we've seen a lot of value by doing this, we can actually update the planning to make it a little bit more clear for the mechanics and inspectors so that they get it right. And then finally, we have a, what I would call that audit function, making sure that all of this works and is behaving, we're randomly selecting areas to dig in deeper.

176.    In connection with the Investor Day presentation provided by Spirit on March 2, 2022, Spirit published a slide deck titled "Welcome, Investor Day 2022," also dated March 2, 2022, which Spirit's presenters referred to during the presentation. The presentation contained the following slide, which Matthies presented in connection with his statements set forth above in the preceding paragraph:



177.   The above statements identified in ¶175-76 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Spirit frequently did not build its products "per specification, per engineering, per the planning" and Spirit was not "mitigating any potential for future escapes," but rather Spirit suffered from severe and persistent quality problems which led Boeing to place Spirit on probation. These statements were further false and misleading because on February 22, 2022 FE1 notified Spirit that it suffered from an "excessive amount of defects," and that his team was being instructed by managers to "falsify[] the documentation."

49

### G.     May 4, 2022 Quarterly Report For the First Quarter of 2022

178.    On May, 2022 Spirit filed with the SEC its quarterly report for the first quarter of 2022 on Form 10-Q. The quarterly report was signed by Defendant Suchinski.

179.    The quarterly report included as exhibits signed certifications from Defendants Gentile and Suchinski pursuant to the Sarbanes-Oxley Act of 2002, stating in relevant part that "I have reviewed this Quarterly Report on Form 10-Q of Spirit AeroSystems Holdings, Inc.," and "Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading*** with respect to the period covered by this report."

180.    The above statements identified in ¶179 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, the quarterly report contained the below-detailed misstatements and omissions, which were materially false and misleading for the reasons set forth below.

181.    The quarterly report under the heading "Item 1A. Risk Factors" stated "'Item 1A. Risk Factors' of our 2021 Form 10-K includes a discussion of our known material risk factors, other than risks that could apply to any issuer or offering. ***There have been no material changes from the risk factors described in our 2021 Form 10-K***."

182.    The above statements identified in ¶181 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, after Spirit filed its 2021 Form 10-K on February 15, 2022, on March 16, 2022 FE1 informed Defendant Gentile that Spirit suffered from an "excessive amount of defects," that his team was being instructed by managers to "falsify[] the documentation," and that Boeing had previously placed Spirit on probation.

183.     Spirit's First Quarter 2022 Form 10-Q was also materially misleading for failing to provide disclosures required by Item 105 and Item 303 of SEC Regulation S-K.

184.     In violation of Item 105, Defendants failed to disclose in Spirit's First Quarter 2022 Form 10-Q that Spirit suffered from severe and persistent quality problems which had led Boeing to place Spirit on probation. This was a material factor that made an investment in Spirit speculative or risky. Such persistent quality problems and probation created risks of future repair costs and lost business, and Boeing was at all times Spirit's most important customer, accounting for over half of revenues.

185.     Defendants' failure to disclose in Spirit's First Quarter 2022 Form 10-Q that Spirit suffered from severe and persistent quality problems which had led Boeing to place Spirit on probation also violated Item 303. The possibility of future repair costs and lost business due to such quality failures were known uncertainties likely to result in material decreases in Spirit's net sales, revenues, income from continuing operations, and liquidity.

**H.     November 3, 2022 Quarterly Report For the Third Quarter of 2022**

186.     On November 3, 2022 Spirit filed with the SEC its quarterly report for the third quarter of 2022 on Form 10-Q. The quarterly report was signed by Defendant Suchinski.

187.     The quarterly report included as exhibits signed certifications from Defendants Gentile and Suchinski pursuant to the Sarbanes-Oxley Act of 2002, stating in relevant part that "I have reviewed this Quarterly Report on Form 10-Q of Spirit AeroSystems Holdings, Inc.," and "Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading*** with respect to the period covered by this report."

188.    The above statements identified in ¶187 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, the quarterly report contained the below-detailed misstatements and omissions, which were materially false and misleading for the reasons set forth below.

189.    The quarterly report under the heading "Item 1A. Risk Factors" stated "'Item 1A. Risk Factors' of our 2021 Form 10-K includes a discussion of our known material risk factors, other than risks that could apply to any issuer or offering. ***There have been no material changes from the risk factors described in our 2021 Form 10-K***."

190.    The above statements identified in ¶189 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, after Spirit filed its 2021 Form 10-K on February 15, 2022, on March 16, 2022 FE1 informed Defendant Gentile that Spirit suffered from an "excessive amount of defects," that his team was being instructed by managers to "falsify[] the documentation," and that Boeing had previously placed Spirit on probation. These statements were further misleading because Joshua Dean identified the mis-drilled aft pressure bulkhead holes defect in October 2022, and had reported this issue internally to multiple Spirit employees.

191.    Spirit's Third Quarter 2022 Form 10-Q was also materially misleading for failing to provide disclosures required by Item 105 and Item 303 of SEC Regulation S-K.

192.    In violation of Item 105, Defendants failed to disclose in Spirit's Third Quarter 2022 Form 10-Q that Spirit suffered from severe and persistent quality problems which had led Boeing to place Spirit on probation, and also failed to disclose the mis-drilled aft pressure bulkhead holes defect. These were material factors that made an investment in Spirit speculative or risky. Such persistent quality problems, probation, and known defects created risks of future repair costs

and lost business, and Boeing was at all times Spirit's most important customer, accounting for over half of revenues.

193.    Defendants' failure to disclose in Spirit's Third Quarter 2022 Form 10-Q that Spirit suffered from severe and persistent quality problems which had led Boeing to place Spirit on probation, and their failure to disclose the mis-drilled aft pressure bulkhead holes defect, also violated Item 303. The possibility of future repair costs and lost business due to such quality failures and defects were known uncertainties likely to result in material decreases in Spirit's net sales, revenues, income from continuing operations, and liquidity.

### I.    January 25, 2023 Code of Conduct

194.    The page titled "Governance Documents" within Spirit's website lists and contains links to various corporate policies, including a "Code of Conduct" dated January 25, 2023.

195.    The Code of Conduct states that "The Code applies to everyone doing Spirit business, including all employees, officers, directors, and affiliates," and states that "failure to comply with the Code could result in disciplinary action, up to and including termination of employment." The Code further states that "We certify our compliance, and our knowledge of others' compliance, with the Code at least annually."

196.    The Code contained a cover letter from Defendant Gentile in which he states that "***Spirit has a responsibility to our employees, customers, and communities to: Deliver reliable, high-quality products that our customers and the public have confidence using***."

197.    The above statements identified in ¶196 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Spirit did not deliver "high-quality products that [its] customers . . . have confidence using," but rather Spirit suffered from severe and persistent quality problems. These statements were further misleading because on March 16, 2022 FE1 informed Defendant Gentile that Spirit

suffered from an "excessive amount of defects," that his team was being instructed by managers to "falsify[] the documentation," and that Boeing had previously placed Spirit on probation. These statements were still further misleading because Joshua Dean identified the mis-drilled aft pressure bulkhead holes defect in October 2022, and had reported this issue internally to multiple Spirit employees, including the submission of formal written findings to his manager.

198.     The Code, under the heading "Ensuring the quality of our products and services" stated:

> *The quality of our products and services determines the safety of aircraft passengers worldwide. To achieve the highest standards of safety for our customers, we must focus on quality all the time. Quality is the cornerstone of our brand.*
>
> *To achieve high performance and maintain our reputation for delivering the highest quality goods, we must comply with quality control standards and follow contract specifications at all times.*

199.     The above statements identified in ¶198 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Spirit did not "focus on quality all the time," have a "reputation for delivering the highest quality goods," or "comply with quality control standards and follow contract specifications at all times," but rather Spirit suffered from severe and persistent quality problems. These statements were further misleading because on March 16, 2022 FE1 informed Defendant Gentile that Spirit suffered from an "excessive amount of defects," that his team was being instructed by managers to "falsify[] the documentation," and that Boeing had previously placed Spirit on probation. These statements were still further misleading because Joshua Dean identified the mis-drilled aft pressure bulkhead holes defect in October 2022, and had reported this issue internally to multiple Spirit employees, including the submission of formal written findings to his manager.

**J.      February 17, 2023 Annual Report for 2022**

200.     On February 17, 2023 Spirit filed with the SEC its annual report for 2022 on Form 10-K. The annual report was signed by Defendants Gentile and Suchinski.

201.     The annual report included as exhibits signed certifications from Defendants Gentile and Suchinski pursuant to the Sarbanes-Oxley Act of 2002, stating in relevant part that "I have reviewed this Annual Report on Form 10-K of Spirit AeroSystems Holdings, Inc.," and "Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading*** with respect to the period covered by this report."

202.     The above statements identified in ¶201 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, the annual report contained the below-detailed misstatements and omissions, which were materially false and misleading for the reasons set forth below.

203.     The annual report, under the heading "Item 1A. Risk Factors" and the sub-heading "Our business depends on our ability to maintain a healthy supply chain, meet production rate requirements, and ***timely deliver products that meet or exceed stringent quality standards***", stated in relevant part:

> Our business depends on our ability to maintain a healthy supply chain, achieve planned production rate targets, and meet or exceed stringent delivery, performance and reliability standards . . .
>
> Operational issues, including delays or defects in supplier components, have resulted and could continue to result in significant out-of-sequence work and increased production costs, as well as delayed deliveries to customers. Our suppliers' failure to provide parts that meet our technical specifications has adversely affected and could continue to adversely affect production schedules and contract profitability.

\*      \*      \*

*From time-to-time the Company has experienced, and may continue to experience, quality or delivery timing disruptions. This includes common carrier disruptions and other disruptions that affect manufacturing lines, any of which could have a material adverse impact on the Company's ability to meet commitments to its customers and on its future financial results.*

204.    The above statements identified in ¶203 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Spirit did not "timely deliver products that meet or exceed stringent quality standards," but routinely delivered products that failed to meet quality standards. These statements were additionally misleading for stating that "[f]rom time-to-time the Company has experienced, and may continue to experience, quality or delivery timing disruptions," when Spirit routinely experienced quality failures and continued to do so. These statements were further misleading because on March 16, 2022 FE1 informed Defendant Gentile that Spirit suffered from an "excessive amount of defects," that his team was being instructed by managers to "falsify[] the documentation," and that Boeing had previously placed Spirit on probation. These statements were still further misleading because Joshua Dean identified the mis-drilled aft pressure bulkhead holes defect in October 2022, and had reported this issue internally to multiple Spirit employees, including the submission of formal written findings to his manager.

205.    Under the heading "Item 1A. Risk Factors" and the sub-heading "Our business depends largely on sales of components for a single aircraft program, the B737 MAX, which has had significant reductions in production rate, including suspensions, relating to the B737 MAX grounding and the COVID-19 pandemic. *Additional suspensions or reductions in, or increases in, the B737 MAX production rate may create financial and disruption risks for the Company* and

its suppliers on the program, which, may in turn, affect the Company's ability to comply with contractual obligations," the annual report stated in relevant part:

> ***If production levels for the B737 MAX program are reduced beyond current expectations due to depressed demand or otherwise***, or if we have difficulties in managing our cost structure to take into account changes in production schedules or to accommodate a ramp-up in production, our liquidity position may worsen absent our ability to procure additional financing, we may trigger an event of default under our credit facilities, and our business, financial condition, results of operations and cash flows could be materially adversely impacted.

206.    The above statements identified in ¶205 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, "[a]dditional suspensions or reductions in . . . the B737 MAX production rate" were not merely a hypothetical risk, but were highly likely because Joshua Dean identified the mis-drilled aft pressure bulkhead holes defect in October 2022, and had reported this issue internally to multiple Spirit employees, including the submission of formal written findings to his manager.

207.    Spirit's Annual Report for 2022 on Form 10-K was also materially misleading for failing to provide disclosures required by Item 105 and Item 303 of SEC Regulation S-K.

208.    In violation of Item 105, Defendants failed to disclose in Spirit's Annual Report for 2022 on Form 10-K that Spirit suffered from severe and persistent quality problems which had led Boeing to place Spirit on probation, and also failed to disclose the mis-drilled aft pressure bulkhead holes defect. These were material factors that made an investment in Spirit speculative or risky. Such persistent quality problems, probation, and known defects created risks of future repair costs and lost business, and Boeing was at all times Spirit's most important customer, accounting for over half of revenues.

209.    Defendants' failure to disclose in Spirit's Annual Report for 2022 on Form 10-K that Spirit suffered from severe and persistent quality problems which had led Boeing to place Spirit

on probation, and their failure to disclose the mis-drilled aft pressure bulkhead holes defect, also violated Item 303. The possibility of future repair costs and lost business due to such quality failures and defects were known uncertainties likely to result in material decreases in Spirit's net sales, revenues, income from continuing operations, and liquidity.

210. The annual report stated under the heading "Code of Business Conduct":

> The Company is committed to the highest ethical standards and to complying with all laws and regulations applicable to the Company's business. To support and articulate its commitment and responsibility in this regard, the Company has adopted the Code of Business Conduct (the "Code"). The Code addresses a number of topics, including the Foreign Corrupt Practices Act, conflicts of interest, safeguarding assets, insider trading, and general adherence to laws and regulations. All directors and employees, including executive officers, must comply with the Code. The Code is available on the Company's website at *https://investor.spiritaero.com/corporate-governance/govdocs/*.

211. The webpage link in the preceding paragraph contains a document titled "Code of Conduct" and dated January 25, 2023. This is the document referred to in the annual report. That webpage does not contain any references to a document titled "Code of Business Conduct," and Spirit does not appear to have published a document titled "Code of Business Conduct." The "Code of Conduct" dated January 25, 2023 addresses topics including the Foreign Corrupt Practices Act, conflicts of interest, safeguarding assets, insider trading, and general adherence to laws and regulations.

212. By referencing and providing a link to the January 25, 2023 Code of Conduct, the annual report thereby incorporated and reiterated the misleading statements set forth above in Part VII.I, which were materially false and misleading for the reasons described *supra*.

**K. March 29-31, 2023 Spirit Website Statements**

213. Over March 29-31, 2023, Spirit published a series of statements to its webpage titled "Wichita Manufacturing News," at https://www.spiritaero.com/manufacturing/. While those statements are undated on Spirit's webpage, archived snapshots of the webpage show that the below

described statements had not been posted prior to March 29, 2023, and had been posted as of March 31, 2023. Therefore, Spirit published these statements to its website between March 29, 2023 and March 31, 2023.

214.    One such statement, titled "Getting to Know Pete Loecke," contained questions and answers with Spirit Senior Director of Manufacturing Pete Loecke, and stated in relevant part:

Q. Talk about our quality journey and the basic principles of quality.

A. ***The basic principles of quality are do not create, do not pass and do not accept a defect***. Think about it in order: If you create a defect, that creates an opportunity that could be expensive all the way to the customer. If you pass a defect or accept a defect…we can pass an expensive problem to our customer. Work it in that order. ***Do not create a defect and remember no one does anyone a favor by accepting or passing a defect down the line***. We are in a role of continuously reinventing ourselves. Sometimes it might not seem that way if you are a mechanic building the same thing over and over again… (but) ***we need to challenge the status quo and raise the bar. That is the foundational piece of quality***.

215.    The above statements identified in ¶214 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Spirit suffered from severe and persistent quality problems and often tolerated defects in order to expedite production. These statements were further misleading because on March 16, 2022 FE1 informed Defendant Gentile that Spirit suffered from an "excessive amount of defects," that his team was being instructed by managers to "falsify[] the documentation," and that Boeing had previously placed Spirit on probation. These statements were still further misleading because Joshua Dean identified the mis-drilled aft pressure bulkhead holes defect in October 2022, and had reported this issue internally to multiple Spirit employees, including the submission of formal written findings to his manager.

216.    Spirit published a second statement under the title "Raising the Bar on Quality," which it attributed to Bill Brown, Spirit's Senior Vice President of Quality and Ops Engineering, and which stated:

> Many of our fellow teams and colleagues are hard at work to realize rate increases across all programs this year. At the same time, ***our customers have raised the bar on expectations of product and service quality. As production continues to accelerate, we must ensure deliveries are not achieved at the expense of our commitment to Quality Without Compromise***.
>
> WHY THIS MATTERS: Without quality, a business is likely to fail.
>
> * Customers will look for a better product somewhere else, and the standard set for quality revolves solely around a customer's willingness to purchase your product.
>
> * ***We all know that even the smallest defect can create a flight safety concern - so there should be no tolerance to allow an escape to our customers***, but more importantly, to those individuals who have entrusted us with their safety.

217.    The above statements identified in ¶216 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Spirit suffered from severe and persistent quality problems and often allowed defects to escape to its customers. These statements were further misleading because on March 16, 2022 FE1 informed Defendant Gentile that Spirit suffered from an "excessive amount of defects," that his team was being instructed by managers to "falsify[] the documentation," and that Boeing had previously placed Spirit on probation. These statements were still further misleading because Joshua Dean identified the mis-drilled aft pressure bulkhead holes defect in October 2022, and had reported this issue internally to multiple Spirit employees, including the submission of formal written findings to his manager.

218.    The "Raising the Bar on Quality" statement included a video titled "Quality – A New Approach" in which Brown discusses quality issues. In the video, Brown states in relevant part:

Our slogan is quality matters. It's quality without compromise. Why? We can't risk our products ever being involved in an incident or accident. And to protect that **_we have a great quality system that ensures our parts are inspected and controlled and go out FOD [foreign object debris] free and defect free_**. That's a pretty simple process.

219.    The following still image was captured from the video (subtitles in original video):



220.    The above statements identified in ¶¶218-219 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Spirit did not "have a great quality system that ensures our parts are inspected and controlled and go out FOD [foreign object debris] free and defect free," but rather Spirit suffered from severe and persistent quality problems, and routinely delivered parts to customers with FOD and other defects. These statements were further misleading because on March 16, 2022 FE1 informed Defendant Gentile that Spirit suffered from an "excessive amount of defects," that his team was being instructed by managers to "falsify[] the documentation," and that Boeing had previously placed Spirit on probation. These statements were still further misleading

because Joshua Dean identified the mis-drilled aft pressure bulkhead holes defect in October 2022, and had reported this issue internally to multiple Spirit employees, including the submission of formal written findings to his manager.

## VIII. THE TRUTH EMERGES, CAUSING SUBSTANTIAL DECLINES IN SPIRIT'S STOCK PRICE, WHILE DEFENDANTS CONTINUE TO MISLEAD INVESTORS

221.    From April 13, 2023 to the end of the Class Period on September 7, 2023, the material risks and adverse information previously concealed by Defendants' false and misleading statements and omissions were revealed in a series of media reports and disclosures by Spirit and Boeing. As a result, Spirit's stock price suffered steep losses. Over this period Defendants continued to make misleading statements and continued to conceal material information from investors.

### A.    April 13, 2023 Boeing Press Statements And Articles Concerning Spirit's Defective Installation Of 737 MAX Tail Fin Fittings

222.    On April 13, 2023, after the close of stock market trading, various media outlets began to report that Boeing had issued a statement that it would halt deliveries of 737 MAX airplanes due to a supplier quality issue.

223.    For example, on April 13, 2023, Bloomberg wrote in an article titled "Boeing to Pause Some 737 Max Deliveries Over Production Issue" that:

> Boeing Co. is pausing deliveries of some 737 Max models after learning of a manufacturing issue that doesn't affect the safety of planes in the air, the company said Thursday. The planemaker said it was notified of the issue the day before by Spirit AeroSystems Holdings Inc., which assembles most of the 737's aluminum frame. The problem involves two fittings that attach the jet's vertical tail to the rear end of its fuselage and affects a portion of the 737 jets built since 2019, including much of the Max version.

> The problem will likely impact a significant number of undelivered aircraft as well as those stored at Boeing, according to the company. Boeing said it expects deliveries to decline in the near-term as it inspects affected aircraft.

224.    Similarly, on August 13, 2023, Barron's published an article titled "Boeing Stock Falls After Halting 737 MAX Deliveries. It's Not What Investors Want to Hear." The article quoted a statement provided by Boeing:

> "A supplier has notified us that a nonstandard manufacturing process was used during the installation of two fittings in the aft fuselage section of certain [737 MAX] airplanes, creating the potential for a nonconformance to required specifications," said a Boeing spokeswoman in an emailed statement. "This is not an immediate safety of flight issue and the in-service fleet can continue operating safely. However, the issue will likely affect a significant number of undelivered 737 MAX airplanes, both in production and in storage."

225.    Numerous media outlets published similar articles over April 13-14, 2023, including the Associated Press ("Boeing Max production could be slowed by issue with parts"), Aviation Week ("New Production Issue Will Delay 737 MAX Deliveries, Require Repairs"), Reuters ("Boeing halts deliveries of some 737 MAXs amid new supplier problem"), and the Seattle Times ("Boeing 737 MAX production hit by a new defect in supplier part"). These articles were based on statements from Boeing, and cited Spirit as the source of the defect.

226.    On this news, Spirit's share price fell $7.38 as compared to the prior day closing price, or 20.7%, to close at $28.22 per share on April 14, 2023, on heavy trading volume.

227.    Independent observers linked the decline in Spirit's share price to the revelation of the manufacturing defect. In an update published in the morning on April 14, 2023 to its April 13 article, Bloomberg attributed a sharp, immediate decline in Spirit's stock price to the news of the defect, stating:

> [Boeing's] shares fell 6.1% to $200.49 as of 9:37 a.m. in New York Friday after Boeing said late Thursday it expects deliveries to decline in the near-term as it inspects affected aircraft. Spirit AeroSystems Holdings Inc., which supplies the faulty part, declined 18% — its biggest drop in more than three years — to $29.18.

228.     Other media outlets likewise attributed the sharp fall in Spirit's stock price to the news of the defect. For example, Reuters wrote that "Boeing shares fell 5.3% and shares of Spirit AeroSystems fell 11.8% in after hours trade following the announcement."

229.     Although the truth and/or materialization of concealed risks were partially revealed to the market on April 13, 2023, Defendants continued to mislead investors.

230.     After numerous media reports had been published regarding the defect, on April 14, 2013 Spirit published a statement to its website titled "Spirit AeroSystems Statement on 737," which stated:

> ***Spirit has notified our customer, Boeing, that we have identified a quality issue on the aft fuselage section of certain models of the 737 fuselage that Spirit builds.*** This is not an immediate safety of flight issue. ***We have processes in place to address these of types of production issues upon identification, which we are following. Spirit is working to develop an inspection and repair for the affected fuselages.*** We continue to coordinate closely with our customer to resolve this matter and minimize impacts while maintaining our focus on safety.

231.     The above statements identified in ¶230 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, in addition to the disclosed tail fin fittings defect Spirit also knew of, but concealed, another "quality issue on the aft fuselage section of certain models of the 737 fuselage that Spirit builds" relating to mis-drilled aft pressure bulkhead holes.

### B.     May 3, 2023 Spirit First Quarter Earnings Release

232.     On May 3, 2023, Spirit held its earnings call for the first quarter of 2023.

233.     On that call, Defendant Suchinski stated:

I want to begin by discussing the financial impacts resulting from the vertical fin attach fitting issue that Tom addressed in his opening comments. We've performed a preliminary financial assessment of our production impacts, and as a result, expect disruptions and rework within Spirit's Wichita factory to negatively impact full year gross profit by approximately $31 million, of which $17 million is reflected in the first quarter 2023 financial results.

The rework costs on available units in Wichita is expected to average between $100,000 and $150,000 per unit, which is approximately $5 million of the total. We expect to incur future additional costs, including those that our customer may assert to repair previously delivered units in their factory and warranty costs related to the affected 737 units in service. However, those remaining costs cannot be reasonably estimated at this time.

The disruption of rework that will take place in Wichita will reduce near-term 737 production by about 30 to 40 units, leading to full year 737 deliveries of about 390, and with the potential to make up additional units in the back half of the year.

234.    Defendant Suchinski further stated on the earnings call:

Looking ahead, the rework and disruption from the vertical fin attach fitting issue as well as the risk of lower 737 deliveries will have a negative impact on free cash flow this year. The forward losses taken during the quarter will also result in additional pressure in our cash flows. Given these headwinds, we now expect our full year free cash flow usage to be in the range of $100 million to $150 million negative. This range does not include the additional items I mentioned earlier related to the vertical fin attach fittings that can't be reasonably estimated at this time.

Because we are in the very early stages of recovering from the 737 vertical fin attach fitting issue, we expect to further refine the impacts to full year free cash flow as we progress through the rework and associated disruptions and return to normal production. The biggest impact to our free cash flow range will be dependent on our full year 737 deliveries.

235.    On the earnings call TD Cowen analyst Cai von Rumohr asked:

So, I can appreciate the difficulty in estimating the cost of the 737 fittings, but can you give us some help in terms of how many planes are involved? I would have calculated 250 that are in inventory at Boeing, plus some 800 or so out in the fleet. So, somewhat over about 1,000 planes. Is that a relatively accurate range?

236.    Defendant Gentile responded to Rumohr's question:

Well, I think you mentioned, the airplanes that Boeing has kind of in its factory and in storage, and I think on the earnings call, Dave Calhoun said about 75% of those are affected. So that's in the realm of right. In terms of the units out in the field, I think 800 is a little bit high compared to the current bounding that we understand. It's probably closer to 500. And again, this could change, because there is still work going on in terms of the bounding. But about 500 in the field.

237.   On the earnings call, Godman Sachs & Co. LLC analyst Noah Poponak asked, "And are you -- is your best estimate that, that cost to rework what's not yours -- or it's not your fuselages will be a multiple of the $100,000 to $150,000 or it's just too early to tell?"

238.   Defendant Gentile responded to Poponak's question:

It's too early. We know that for us to repair a unit, it's $100,000 to $150,000. As I said, with Boeing, they have aircraft that are more complete, all the way to completed aircraft, and they have more structure to remove in some systems. So their costs will be higher than ours.

239.   On May 3, 2023 Spirit also made similar disclosures of the negative effects of the vertical fin attach fittings issue in a press release titled "Spirit AeroSystems Reports First Quarter 2023 Results," and in its quarterly report for the first quarter of 2023 on Form 10-Q.

240.   On this news, Spirit's share price fell $3.68 as compared to the prior day closing price, or 12.3%, to close at $26.28 per share on May 3, 2023, on heavy trading volume.

241.   Spirit's May 3, 2023 revelations concerning the negative affects of the vertical fin attach fittings issue were reported in financial media, and independent observers linked the decline in Spirit's share price to these revelations. For example, on May 3, 2023, Bloomberg published an article titled "Spirit Aero Falls as 737 Defect Crimps Boeing Deliveries, Cash," stating "Spirit AeroSystems Holdings Inc. expects to burn through about $100 million in free cash this year as repairs for a recently uncovered 737 manufacturing defect drag down deliveries to Boeing Co.," and noting "Shares fall as much as 10%, most since April 14."

242.   Although the truth and/or materialization of concealed risks were partially revealed to the market on May 3, 2023, Defendants continued to mislead investors.

243.   On Spirit's May 3, 2023 earnings call Defendant Gentile stated:

I want to begin today by providing an update to the quality issue with the Vertical Fin Attached Fittings, certain models of the 737 fuselage that Spirit builds. After identifying the issue, our top priority was to work with Boeing and the FAA for

66

their confirmation that it was not an immediate safety of flight issue. Once we confirm this, *we turned our attention to ensuring our ongoing production meets manufacturing standards. We have revised our assembly process in production, have restarted production and have resumed shipments of conforming fuselages to Boeing.*

244. The above statements identified in ¶243 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, in addition to the disclosed tail fin fittings defect Spirit also knew of, but concealed, the mis-drilled aft pressure bulkhead holes defect. These statements were further misleading because Spirit was not "ensuring [its] ongoing production meets manufacturing standards," and had not "resumed shipments of conforming fuselages to Boeing," because Spirit had failed to correct the known mis-drilled aft pressure bulkhead holes defect.

245. Defendant Gentile further stated:

*The quality and safety of our products are very important to Spirit and our customers*. Our employees understand and take great pride that the products we manufacture are enabling flights around the globe every single day. As part of our quality management system, we have processes in place to address issues like the Vertical Fin Attached Fittings, which we followed in this case. *We also have an extensive root cause corrective action process and are implementing additional protocols to reinforce our quality systems to prevent similar occurrences in the future. We are committed to strengthening and continuously improving our safety and quality culture as a trusted partner to our customers*.

246. The above statements identified in ¶245 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, despite claiming that Spirit was "implementing additional protocols to reinforce our quality systems to prevent similar occurrences in the future," Spirit had failed to correct the known mis-drilled aft pressure bulkhead holes defect.

247. On the earnings call Barclays Capital, Inc. analyst David Strauss asked, "Tom, when you say that you are now delivering clean MAX units to Boeing, can you define what that

means? Does that mean you're actually shipping to Boeing or are you just effectively delivering to Boeing by completing a unit and then sticking it in your own WIP and then will ship to Boeing?"

248.   Defendant Gentile responded to Strauss's question:

Yeah. Well, David, we're doing both. ***We're shipping units to Boeing and we're completing units, conforming units and putting them into ship in place***.

\*       \*       \*

***So, that's how we've been supplementing deliveries to Boeing in the short term, is taking units that are with no defects out of the stored units and also producing new conforming units***.

249.   The above statements identified in ¶248 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Spirit was not providing Boeing with "units that are with no defects out of the stored units" and was not "producing new conforming units," because Spirit had failed to correct the known mis-drilled aft pressure bulkhead holes defect.

250.   On the earnings call Sanford C. Bernstein & Co., LLC analyst Douglas Harned asked:

When you look at some of the challenges that you've had here, and we've seen challenges on the 787 and the A350 and the MAX even before this current issue, in last quarter, you made some organizational changes and we've still got new charges coming through now. And what I'm trying to understand is the steps you're taking now that can give us confidence that you can really get these operational issues behind you and start to deliver with the performance levels that I think you would hope for.

251.   Defendant Gentile responded to Harned's question:

And here in Wichita, on the 737, this was obviously an unexpected issue related to a quality issue. But ***we have a strong quality team, operations team, engineering team, and they've all been working in close association with Boeing to address the issue and get execution back on track to get production flowing again and also to recover some of the units that we lost. And I would say, one of the big things in terms of the 737 line is having those strong teams, but also really the strong coordination with Boeing.***

68

In challenging times like this, our two companies have really come together in terms of program, operations, supply chain, engineering, to help address the issue. *We've shared a lot of information, for example, on how to do the repair and shared best practices to accelerate and come down the learning curve. And so, I think that level of cooperation also gives us confidence that we can recover from this issue and get back to meeting the production rate increases as we go throughout the year*.

252.     The above statements identified in ¶251 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, despite emphasizing Spirit's "close association," "strong coordination," and "shar[ing] a lot of information" with Boeing to address quality issues, Spirit had not disclosed to Boeing the known mis-drilled aft pressure bulkhead holes defect.

253.     On the earnings call Truist Securities, Inc. analyst Michael Ciarmoli asked, "I guess just on the you've got basically $570 million of cash on the balance sheet. If you're going to burn $150 million, that leaves you with $418. Help me understand why you exactly need the $280 million cash advance. I mean what do we not know here that could be a big risk to cash?"

254.     Defendant Gentile responded:

It really is just to have some additional surplus and cushion because you're right, that's about the -- those are the right numbers. *We just felt it was prudent to make sure we had some additional cushion.* We've always said we want between $300 million and $500 million to run the business. And the $280 million gave us some cushion to put us above that threshold. And that's really the reason. *I don't think there's any other underlying reason other than we felt it prudent to have that cushion.* And we were fortunate that our customers were able to support us, particularly Boeing.

255.     The above statements identified in ¶254 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, the known mis-drilled aft pressure bulkhead holes defect was likely to result in

increased repair costs and decreased sales, and so represented "a big risk to cash" that investors did

not yet know about, and which substantially contributed to Spirit's need for the cash advance.

### C.    August 2, 2023 Spirit Second Quarter Earnings Release

256.    On August 2, 2023, Spirit held its earnings call for the second quarter of 2023.

257.    On that call, Defendant Suchinski stated concerning the vertical fin fitting defect:

We recorded a contra revenue charge of $23 million in the quarter to account for a potential claim from Boeing related to our estimate of the repair work to date at their facility, which we believe represents about half of the units. However, I want to emphasize that any potential claim we may receive from Boeing could be materially different from our estimate.

258.    Defendant Suchinski further stated:

Now let's turn to free cash flow. Free cash flow usage for the quarter was $211 million. Cash usage increased compared to the same period of 2022, largely driven by the negative impacts to working capital resulting from the rework and disruption related to the quality issue and the IAM work stoppage, as well as preparation for the third quarter 737 production rate increase.

259.    On the earnings call, RBC Capital Markets LLC analyst Stephen Strackhouse

asked, "is it fair for us to think that the $23 million should effectively double? Or can you give us

a little bit more color on the number of aircraft that the Boeing has identified or the cost to them?"

260.    Defendant Gentile responded to Strackhouse's question:

We think that they've repaired about half the units that they need to repair. So call it 73 or 74. So that is a little bit less than the 75% of the 250. So it's really the 73 that they've repaired, the $23 million repair estimate aligns to that. And so we've tried to make some conservative estimates. And it's just based on the units that are at Boeing, nothing in the fleet.

So our view is that, as our understanding of the current disposition in the fleet is, we don't expect any material impact for units in the fleet. So $23 million only represents the units that are at Boeing. And yes, it represents half of what we think is going to need to be done eventually. But that was the best estimate we could make. And so we took the charge based on the low end of that estimate.

261.    On the earnings call Jefferies LLC analyst Sheila Kahyaoglu asked:

I just wanted to step back from the cash outflows today and maybe specifically focusing on the MAX contribution in '23, '24 and '25. Obviously, work stoppages, pauses and IAM agreements change the free cash flow profile of the MAX in '23. How do you think about that in '24 and '25 and how does the rate and inventory depletion progress?

262.     Defendant Suchinski responded to Kahyaoglu's question:

Yeah. Sheila, good morning. I think the thing that I would add is the quality issue, the vertical fin, the work stoppage, that caused significant disruption to us, significant, right? And it was obviously not planned at the start of the year. Much lower deliveries in the second quarter. We've had to add more people. We're taking deliveries out of the plan. It had serious impact overall cash flow projections for the year.

263.     In response to a question from TD Cowen analyst Cai von Rumhor, Defendant Suchinski stated, "And so when you think about cash flow over the next couple years, obviously the issues around the quality issue and the strike has moved the cash flow generation a bit to the right, and therefore we won't be able to generate significant cash flow in 2024 and 2025."

264.     On this news, Spirit's share price fell $8.58 as compared to the prior day closing price, or 27.3%, to close at $22.86 per share on August 2, 2023, on heavy trading volume.

265.     Although the truth and/or materialization of concealed risks were partially revealed to the market on August 2, 2023, Defendants continued to mislead investors.

266.     On the earnings call, Defendant Gentile stated:

On the vertical fin attach fittings, first, *all the rework on the available 737 fuselages in Wichita was completed during the second quarter*, which was ahead of the timeline we provided on our last call and within the financial estimates that we provided.

267.     The above statements identified in ¶266 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, the known mis-drilled aft pressure bulkhead holes defect would require additional

rework on 737 fuselages at additional financial expense, so "all the rework" on Spirit's available 737 fuselages in Wichita had not been "completed."

268.   On the earnings call, Defendant Suchinski stated, "**With the quality issue resolved** in our factory and a new labor contract in place, **our entire focus is directed towards executing on our customer commitments**, including the upcoming production rate increases."

269.   The above statements identified in ¶268 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, quality issues were not "resolved" in Spirit's factory, because Spirit knew of, but had not addressed, the mis-drilled aft pressure bulkhead holes defect, and doing so would negatively affect Spirit's ability to execute production rate increases.

**D.     August 23, 2023 Articles And Spirit Press Release Concerning Spirit's Mis-Drilling Of Fastener Holes On The 737 MAX Aft Pressure Bulkhead**

270.   On August 23, 2023, after the close of stock market trading, aerospace industry news publication The Air Current published an article titled "Boeing and Spirit Grapple With Newly Discovered 737 MAX Quality Issue."

271.   The article stated that "Boeing has identified a potentially widespread manufacturing quality issue on the 737 Max stemming from structural assembly work on the jet's aft pressure bulkhead conducted by supplier Spirit AeroSystems," and quoted a statement provided by Boeing for the article:

> "During factory inspections, we identified fastener holes that did not conform to our specifications in the aft pressure bulkhead on certain 737 airplanes," said Boeing in a statement to The Air Current. "This is not an immediate safety of flight issue for the 737 fleet, which can continue operating safely. This issue will impact near-term 737 deliveries as we conduct inspections to determine the number of airplanes affected, and complete required rework on those airplanes. We continue to deliver 737s that are not affected. We have notified the FAA and our customers, and we will keep them informed as we work through the issue with our supplier."

272.    Other media outlets published similar stories, including a Bloomberg article titled "Boeing Finds New 737 Max Defect, Threatening Delivery Target," also published on August 23, 2023.

273.    After the publication of such articles, later on August 23, 2023, Spirit issued a press release titled "Spirit AeroSystems 737 Aft Bulkhead Statement," stating in part "We are aware of a quality issue involving elongated fastener holes on the aft pressure bulkhead on certain models of the 737 fuselage produced by Spirit AeroSystems."

274.    On this news, Spirit's share price fell $2.91 as compared to the prior day closing price, or 12.7%, to close at $20.06 per share on August 24, 2023, on heavy trading volume.

275.    News of this defect was widely reported, and independent observers linked the decline in Spirit's share price to these revelations. For example, on August 24, 2023, the Associated Press published an article titled "Boeing and a key supplier find a new manufacturing issue that affects the 737 Max airliner," stating "Boeing and Spirit AeroSystems said they discovered improperly drilled fastener holes in the aft pressure bulkhead," and noting "Shares of Spirit AeroSystems Holdings Inc. were down 14% in afternoon trading Thursday."

276.    Although the truth and/or materialization of concealed risks were partially revealed to the market on August 23, 2023, Defendants continued to mislead investors.

277.    Spirit's August 23, 2023 press release stated:

We are aware of a quality issue involving elongated fastener holes on the aft pressure bulkhead on certain models of the 737 fuselage produced by Spirit AeroSystems. ***Because Spirit uses multiple suppliers for the aft pressure bulkhead, only some units are affected. Spirit will continue to deliver units to Boeing***.

278.    The above statements identified in ¶277 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly

disregarded, contrary to the statement that "[b]ecause Spirit uses multiple suppliers for the aft pressure bulkhead, only some units are affected," the mis-drilled holes defect originated with Spirit, and not one of its suppliers.

### E. September 7, 2023 Spirit and Boeing Comments Concerning Mis-Drilled Holes Defect At Jefferies Industrial Conference

279.    On September 7, 2023, Spirit and Boeing gave separate presentations at the Jefferies Industrials Conference, with both companies addressing the elongated holes defect.

280.    Jefferies LLC analyst Sheila Kahyaoglu asked Boeing CFO Brian West, "We've heard about the 737 aft pressure bulkhead. So talk to us about the status of that issue and the trajectory of the recovery from here?"

281.    West responded:

The item you're referring to in the fuselage was a step back from that stability goal. It is the aft pressure bulkhead section of the airplane. We know how to fix it, but it's early in the rework process and the rework hours will likely be higher and the cycle time longer than the vertical fin NOE [notice of escapement], we had earlier in the summer. This is different. It's a bit more complicated, it's more involved. There's hundreds of holes that get inspected. There's an X-ray inspection process step that's required, and it's a very critical part of the airplane. So we have to make sure we do this right and we will.

It will impact about 75% of the 220 airplanes that were inventory – at inventory as the – as of the end of the second quarter. So it's large. In the near-term, it will impact deliveries, but we have no intention of changing the master schedule. As I mentioned, the demand signal is strong and we have to make sure everyone is coordinated on the longer term stability in that master schedule is very important. So we're not changing it.

In terms of our focus with our supplier, it is a 100% the most important thing we're working on right now. We've got literally armies of people from Boeing and the supplier working on this issue and to drive stability in their factory. And these are frustrating moments for our customers, for our investors and for our teams.

282.    Kahyaoglu asked Spirit, "Talk to us about the recently disclosed aft pressure bulkhead issue on the MAX. In terms of deliveries, it doesn't seem to change your guidance for the full year. Any potential rework to profitability and free cash flow?"

283.     Defendant Gentile responded in relevant part:

So escapes happened, and they happen on all programs. They usually don't get this much attention. In this case, I would say there's greater scrutiny on quality in general, post the MAX grounding and post the pandemic and particularly on the MAX, for obvious reasons. In this case, for an abundance of caution, Boeing decided to pause production or deliveries temporarily while we were doing bounding. Normally, that doesn't happen. We identify an escape. We bound it, do a safety of flight analysis. In this case, Boeing and the FAA determined there was no immediate safety of flight issue, and so the fleet could continue flying.

The other thing that was unusual about this particular issue is that normally when we have an escape, we fix the units in our factory and then in Boeing's factory and we're done. But of course, in this case, Boeing has 250 units that are stored and we have about 60 that are stored in Wichita, Boeing-owned inventory, and some number of those have to be fixed.

So in this case, with the aft pressure bulkhead, there were three suppliers over time. The issue related to Spirit, we were using an automated drilling process, which if not done perfectly, could create an oblong hole, okay? And this came up. But one of our quality processes actually found this. So our quality management system includes a process where we encourage employees to speak up if they see a manufacturing process that could be fixed or improved. And one employee came up and told us about this. We were already actively working on a fix when the escape was found.

But we are in the process of bounding it and for us, it looks like we have about 39 units to replace or to inspect and repair. We've already inspected through X-ray 15 of those. What we have to do is about 1,000 holes in the aft pressure bulkhead, 500 of them are machine-enabled, so could be suspect. So we X-ray all of those and then we look to see on the X-ray could they be suspect. And if they are, what we do is drill out the fastener, inspect the hole. If there's no issue with the hole and often there isn't, we just put in the same-sized fastener.

If there is an oblong hole, what we do is we oversize it, drill it out again so it's a little bit bigger, and then put it in a larger fastener. So we expect to be done with the repairs of the units in our factory by the end of November.

Now, for Boeing, it may take a little bit longer because they have, in many cases, completed aircraft. The 250, there's maybe 65% or 70% of those that could require inspection and repair. But for us, what they've agreed is we had 29 in WIP. We are going to complete the production on those 29. We set up essentially a separate factory across the street where we're going to have eight repair lines and we'll do X-ray on two of those and then repair on six.

75

284.     Kahyaoglu then asked, "So just to follow up on that point. As we think about your current production rate, you're still going to go at 42 as you repair the other ones? And how do we think about the delivery free cash flow impact for '23?"

285.     Defendant Gentile responded:

Right. Well, this particular issue, because we're going to get all the repairs done by the end of November and ship those units, this by itself won't have a material impact on our range. We said the range was 370 to 390. What we're seeing is some additional pressures on supply chain and labor so we think we'll be at the lower end of that range, possibly some pressure to that. But the good news is the team is cycling at 42 and we're working a number of different initiatives to offset any impact.

286.     On this news, Spirit's share price fell $1.52 as compared to the prior day closing price, or 7.3%, to close at $19.19 per share on September 7, 2023, on heavy trading volume.

287.     Spirit's and Boeing's statements concerning the impact of the elongated holes defect were reported in the financial media, and independent observers linked the decline in Spirit's share price to these revelations. For example, on September 7, 2023, Bloomberg published an article titled "Boeing Warns 737 Deliveries to Be at Low End of 2023 Target," stating "Addressing the latest manufacturing defect is proving thornier than an earlier Spirit issue, especially for completed 737 Max jets with cabin equipment already installed," and noting "Boeing shares declined 1% at 3:06 p.m. in New York trading, while Spirit fell 6.6%."

## IX.     POST-CLASS PERIOD EVENTS FURTHER CONFIRM SUSTAINED, WIDESPREAD QUALITY PROBLEMS AT SPIRIT

### A.     Spirit Replaced Defendant Gentile as CEO

288.     On October 2, 2023, Spirit issued a press release and filed a Form 8-K with the SEC announcing that it had replaced Defendant Gentile as President and CEO, effective September 30, 2023, and that Defendant Gentile had resigned from Spirit's board of directors. The press release was titled "Spirit AeroSystems Announces Leadership Transition," and prominently featured the

sub-heading "Thomas C. Gentile III No Longer Serves as President, Chief Executive Officer and Director." Spirit named an interim CEO, Patrick Shanahan, and stated that it would conduct a search for a permanent CEO. No explanation was given for Defendant Gentile's departure.

289.    Spirit and Gentile entered into a Separation Agreement dated October 1, 2023, under which Spirit would pay Gentile cash severance equal to his $1.3 million base salary, and an additional $2,500 per hour for his consulting services. Spirit also waived requirements under its Long-Term Incentive Plan for Gentile to be employed on the vesting date for tens of thousands of certain Spirit restricted stock units, which were worth potentially more than $1 million. As a condition of receiving this consideration, Spirit required Gentile to agree to release it and its personnel from all claims, and to agree not to sue them. Spirit also required Gentile to agree not to make any disparaging statements about Spirit, its employees, or its products or services.

290.    Gentile's departure from Spirit was not a planned retirement. When Spirit filed its annual report with the SEC on February 17, 2023, Gentile was only 58 years old, and had worked at Spirit for almost seven years. That annual report summarized Gentile's employment at Spirit, stating "Mr. Gentile became President and Chief Executive Officer on August 1, 2016. From April 2016 to July 2016, Mr. Gentile served as Executive Vice President and Chief Operating Officer."

**B.      Spirit and Boeing Entered A "Stability Plan" Requiring Spirit To Reduce Defects And Increase Quality Staffing**

291.    On October 18, 2023, Spirit issued a press release and filed a Form 8-K with the SEC announcing that it had entered into an agreement with Boeing on October 12, 2023, to support Spirit's production quality. Spirit's press release was titled "Spirit AeroSystems, Boeing Reach Agreement to Support Production Stability," and stated that "[t]he agreement enables greater collaboration to achieve improved quality and higher deliveries in the future." In the press release,

Spirit quoted itself as saying "Boeing and Spirit will continue to work shoulder to shoulder to mitigate today's operational challenges."

292.    The agreement included pricing changes for Spirit products delivered to Boeing, a mutual release of claims, and for Boeing to provide Spirit $100 million within 10 business days for "tooling and capital through 2025 for certain planned and potential 737 and 787 rate increases."

293.    The agreement stated under the heading "Stability Plan":

Spirit will create and implement, to Boeing's satisfaction, an operational stability plan that:

    a.  demonstrates reductions in nonconformances, foreign object debris, customer sensitive items, significant repair log items, and sub tier shortages;

    b.  increases staffing (as jointly agreed) in support functions, including engineering, quality, lean, and supply chain;

    c.  provides maintenance plans for all major equipment and facilities;

    d.  provides work transfer plans (as required by the Agreements) that include key milestones and demonstrate qualified and capable rate performance prior to full reliance on any new supplier; and

    e.  provides jointly-coordinated buffer-stock plans (which may include ship in place) for all programs (including two weeks' worth of finished goods for 737).

294.    The agreement provided under the heading "Supply Chain Health" that "[t]he Parties agree to work together on systemic, rate constraining, and shared supply chain challenges. Prior to the end of calendar year 2023, the Parties will jointly establish a collaborative working team and agreed-to cadence with a shared objective to monitor and mitigate risk and strengthen a supply chain capable of meeting Boeing's future desired production rates."

295.    The agreement was signed by Defendant Suchinski on behalf of Spirit.

C.      **Reporting By The Air Current Revealed An Expanded Scope Of The Mis-Drilled Holes Defect**

296.    On October 12, 2023, The Air Current published an article titled "Boeing And Spirit Expand Scope Of 737 MAX Aft Pressure Bulkhead Inspections." Citing "two people familiar with the issue," The Air Current reported:

> Boeing and Spirit have previously focused their search and replacement efforts on hundreds of misdrilled fasteners installed with an automated laser-guided fastening machine at Spirit's Wichita, Kansas operations. Six weeks after the issue was first reported by The Air Current, Boeing and its largest supplier have now begun examining hand-drilled fasteners on the critical structure, as well.

297.    According to The Air Current:

> The aft pressure bulkhead is made up of pie-shaped slices that together form the dome that sits behind the aft galley and creates the fuselage's aft structural seal. The manually drilled fasteners in question run along the seams of each slice of the substructure, according to one person familiar with the expanded quality checks.

298.    The Air Current further reported that "The company earlier this week notified the Federal Aviation Administration of its initial findings," and quoted an FAA spokesman as confirming that the agency is "aware of the issue and are working it through our regular oversight process."

299.    On October 25, 2023, Boeing held its earnings call for the third quarter of 2023. On the call, Boeing's Executive Vice President and CFO, Brian West, stated, "Since our early September update, additional areas of the aft pressure bulkhead were identified that require further inspection and rework, which you likely read about. This additional scope impacts units that had already gone through the initial rework and will take us more time to stabilize production and deliveries."

> **D.** **Spirit Announced The Departure Of The Head Of Its Commercial Division,
> Samantha Marnick**

300.    On November 28, 2023, Spirit issued a press release titled "Spirit AeroSystems Makes Changes to Strengthen Operational Alignment and Program Execution." The press release "announced the departure of Sam Marnick, Executive Vice President and Chief Operating Officer, President, Commercial from the Company." The press release further stated that "[a]s part of this transition, Spirit is making organizational changes to strengthen its focus on quality and operational performance."  As President of Spirit's Commercial Division Marnick oversaw Spirit's programs with Boeing.

301.    Marnick's departure from Spirit was not a planned retirement. When Spirit filed its annual report with the SEC on February 15, 2022, Marnick was only 52 years old, and had worked at Spirit for approximately 17 years. Spirit named an interim replacement for Marnick. The press release quoted Spirit's interim CEO as stating "[w]e wish Sam well on future endeavors." Spirit provided no explanation for Marnick's departure.

302.    In connection with her departure, Marnick agreed to enter into a non-disparagement agreement and to release all claims in exchange for over $1 million in compensation.

## X.    ADDITIONAL SCIENTER ALLEGATIONS

303.    As alleged herein, Defendants acted with scienter because Defendants: knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

304.     As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Spirit, their control over, and/or receipt and/or modification of Spirit's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Spirit, participated in the fraudulent scheme alleged herein.

### A.     Defendants' Own Statements Show They Knew Of And Concealed The Mis-Drilled Holes Defect

305.     Spirit's mis-drilling of holes on the aft pressure bulkhead was identified by Boeing. The public was not aware of the issue until Boeing issued press statements on the subject that were published on August 23, 2023. Defendant Gentile's statements during the September 7, 2023 Jefferies Industrials Conference show that Spirit had knowledge of the problem before it was "found" by Boeing:

> Okay. This came up. But one of our quality processes actually found this. So our quality management system includes a process where we encourage employees to speak up if they see a manufacturing process that could be fixed or improved. One employee came up and told us about this, we were already actively working on a fix when the escape was found.

306.     Spirit's August 23, 2023 press release similarly indicates that Defendants were previously aware of the issue. For example, in the press release Spirit states that "Spirit has implemented changes to its manufacturing process to address this issue." Because changes to manufacturing processes necessarily require time to design and implement, this statement confirms that Spirit was aware of the mis-drilled holes defect substantially in advance of its August 23, 2023 public disclosure.

### B.     Manufacturing And Quality Control For 737 MAX Components Were Core Operations For Spirit

307.     Leading up to and during the Class Period, work relating to the Boeing 737 MAX was Spirit's core operation. As stated in Spirit's SEC filings, "Our business depends largely on

sales of components for a single aircraft program, the B737 MAX." 53% of Spirit's net revenues were generated from sales of components to Boeing for the 737 in 2019, and 45% in 2022.

308.    Moreover, in light of the two widely publicized crashes of 737 MAX airplanes in October 2018 and March 2019, subsequent worldwide grounding of the 737 MAX, related governmental investigations and congressional hearings, and the revelation that a defect in the 737 MAX flight systems caused the crashes, quality control for the 737 MAX came under intense scrutiny, both in public and within the 737 MAX supply chain, including at Spirit.

309.    As stated by Defendant Gentile during the September 7, 2023 Jefferies Industrials Conference, "I would say there's greater scrutiny on quality in general, post the MAX grounding and post the pandemic and particularly on the MAX, for obvious reasons."

310.    This intense scrutiny made quality control for the 737 MAX a core operation for Spirit. For example, on April 13, 2023, the Seattle Times published an article titled "Boeing 737 MAX production hit by a new defect in supplier part," stating:

> Ron Epstein, a financial analyst with Bank of America who has an aerospace engineering degree, expressed amazement at yet another defect belatedly surfacing now despite all the scrutiny on the MAX since the two crashes.
>
> "How could they have missed this after four years when they were supposed to have looked at everything with a fine-tooth comb?" Epstein said.

**C.    Defendants Held Themselves Out As Knowledgeable About The 737 MAX And Quality Issues, And Had Access To The Concealed Facts**

311.    As alleged herein, the Individual Defendants repeatedly held themselves out as knowledgeable regarding the operational details of Spirit and the subject matter of Defendants' misrepresentations and omissions.

312.    The positions of the Individual Defendants, as Spirit's CEO and CFO, gave them responsibility for and access to information concerning issues relating to Spirit's deficient quality controls and known manufacturing defects, and the financial impact of these defects.

313.    Spirit's March 2, 2022 slide deck titled "Welcome, Investor Day 2022," contained the following slide, which Kevin Matthies, Spirit's CTO and Chief Quality Officer, presented in connection with his Investor Day remarks. As shown in the slide, Spirit represented to investors that its Executive Leadership Team oversaw Spirit's quality control efforts, with the Product & Process Verification Project Management Team directly reporting to the Executive Leadership Team, which includes Defendants Gentile and Suchinski:



314.    During the Investor Day presentation, Matthies also stated:

[W]e have a quality excellence council, and we have a safety council. Tom personally spends his time in the safety council with us every other week. That's the priority level that Tom puts on safety and quality. He is demonstrating and leading the company in all aspects of this.

315.    Defendants also repeatedly stated in Spirit's annual reports that quality was, and would continue to be, a key focus for Spirit's management.

316.    Spirit's Form 10-K for 2020 stated under the heading "Management's Focus":

For the year ended December 31, 2020, management's focus revolved around preserving and enhancing liquidity and reducing costs in light of the significant impacts of the B737 MAX grounding and COVID-19 pandemic. Additionally, management focused on operational execution, with a focus on safety and quality, while working to meet our customers' requirements, and pursuing and completing organic and inorganic growth opportunities.

For the year ended December 31, 2021, management's focus is expected to be on continued preservation and enhancement of our liquidity and cost reduction in light of the continuing impacts of the COVID-19 pandemic; revenue growth and diversification, integrating the Belfast, Morocco and Dallas sites; repaying and/or restructuring debt; and operational execution, with a continuing focus on safety and quality.

317.    Spirit's 10-K for 2021 stated under the heading "Management's Focus":

For the year ended December 31, 2021, management's focus was on:
•       continued preservation and enhancement of our liquidity and cost reduction in light of the continuing impacts of the COVID-19 pandemic;
•       revenue growth and diversification;
•       integrating the Belfast, Morocco and Dallas sites;
•       repaying and/or restructuring debt; and
•       operational execution, with a continuing focus on safety and quality.

For the year ending December 31, 2022, management's focus is on:
•       continued management of the impacts of the COVID-19 pandemic;
•       internal and external rate readiness preparedness;
•       growth, diversification, and operational execution; and
•       safety and quality in the key markets that we serve.

318.    Spirit's 10-K for 2022 stated under the heading "Management's Focus":

For the year ended December 31, 2022, management's focus was on:

*       *       *

•  safety and quality in the key markets that we serve.

For the year ending December 31, 2023, management's focus is on:

84

- realizing production rate increases across all our programs while maintaining a safe workplace and improving quality;

**D.     Defendants' Incentive Compensation Provided A Motive To Conceal Quality Defects**

319.    Spirit's executive compensation plans gave the Individual Defendants motives to conceal defects that had the potential to impact the Company's performance or share price.

320.    Spirit's annual cash incentive plan was designed to allow executives including the Individual Defendants to earn annual cash bonuses equal to or exceeding their base salaries. During the Class Period, payouts under the annual cash incentive plan were based on factors including EBIT [earnings before interest and taxes], free cash flow, revenue, and quality. Spirit's SEC filings explain the quality factor as "how our customers measure compliance with specifications and has direct financial impact. Our quality index uses key customer metrics."

321.    Spirit's long-term incentive plan was designed to allow executives to receive annual awards of Spirit stock (or restricted stock units) equal to a multiple of their base salary. During the Class Period, payouts under the long-term incentive plan were based on factors including total stockholder return, free cash flow, and revenue growth. Spirit's SEC filings explain the total stockholder return factor as "measuring the Company's TSR percentile rank against its peers over a three-year performance period."

322.    Spirit's compensation to the Individual Defendants during the Class Period, through 2022, the last year for which complete information is available, is summarized in the following table:

|  | **2022** | **2021** | **2020** |
|---|---|---|---|
| **Defendant Gentile** |  |  |  |
| Base Salary | $1,300,000 | $1,300,000 | $1,300,000 |
| Cash Incentive Award | $339,300 | $1,497,053 | $1,410,494 |

| | | | |
|---|---|---|---|
| Long-Term Incentive Award | $7,150,000 | $7,150,000 | $7,150,082 |
| Total compensation[3] | $11,728,900 | $10,849,938 | $10,454,350 |
| | | | |
| **Defendant Suchinski** | | | |
| Base Salary | $619,863 | $525,000 | $500,000 |
| Cash Incentive Award | $122,055 | $427,839 | $363,696 |
| Long-Term Incentive Award | $1,437,500 | $1,050,000 | $875,064 |
| Total compensation | $2,622,267 | $2,051,367 | $1,695,552 |

323.  The incentive compensation available to the Individual Defendants under these programs was exceedingly high in absolute terms, in comparison to their base salaries, and in comparison to wages for average Spirit employees.

324.  Defendant Gentile's combined 2022 Cash Incentive Award and Long-Term Incentive Award was 5.7 times his salary. Defendant Suchinski's combined 2022 Cash Incentive Award and Long-Term Incentive Award was 2.5 times his salary.

325.  The 2022 annual total compensation of the median Spirit employee (excluding the CEO) was $64,171. Therefore, Defendant Gentile's combined 2022 Cash Incentive Award and Long-Term Incentive Award was over 116 times the median employee's total compensation. Similarly, Defendant Suchinski's combined 2022 Cash Incentive Award and Long-Term Incentive Award was over 24 times the median employee's total compensation.

---

[3] This table does not present all components of the Individual Defendants' total compensation, so the figures in the "Total compensation" rows are greater than the sum of base salary, cash incentive award, and long-term incentive award.

**E.      Spirit Executives Including Defendant Gentile Left The Company Under Suspect Circumstances**

326.    As discussed above in Parts IX.A and IX.D, Defendant Gentile and Spirit's Commercial Division Head Samantha Marnick both abruptly left the Company shortly after the end of the Class Period, and with no explanation given for their departures. Neither departure was the result of a planned retirement. Both former executives signed non-disparagement agreements and released all potential claims against Spirit in exchange for aggregate payments that will amount to over a million dollars.

327.    In addition, during the Class Period, on January 24, 2023, Spirit's Board abruptly terminated Kevin Matthies, with his separation to be effective as of January 26, 2023. At the time of his termination, Matthies' title was Senior Vice President and General Manager, Boeing Programs. His previous roles at Spirit included Chief Technology and Quality Officer, and Senior Vice President of Quality.

328.    Matthies's departure from Spirit was not a planned retirement. When Spirit filed its annual report with the SEC on February 15, 2022, Matthies was only 52 years old, and had worked at Spirit for approximately nine years. Spirit announced Matthies' termination on January 27, 2023, but provided no explanation of the reasons for his departure.

329.    In connection with his termination, Matthies agreed to enter into a non-disparagement agreement and to release all claims in exchange for over $1 million in compensation.

**F.      Defendant Spirit Acted With Corporate Scienter**

330.    The scienter of the Individual Defendants is imputable to Spirit because they were officers of Spirit acting within the scope of their authority.

331.    The misrepresentations and omissions of Spirit as alleged herein are of such a nature that they would have been approved by corporate officials sufficiently knowledgeable about Spirit to know that those statements and omissions were misleading.

## XI.    LOSS CAUSATION

332.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

333.    During the Class Period, Plaintiffs and the Class purchased Spirit's shares at artificially inflated prices and were damaged thereby. The price of the Company's shares significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## XII.    CLASS ACTION ALLEGATIONS

334.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities who purchased or otherwise acquired the Class A common stock of Spirit between April 8, 2020 and September 7, 2023, both dates inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

335.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Spirit's shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of Spirit shares were traded publicly during the Class

Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Spirit or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

336.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

337.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

338.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Spirit; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

339.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**XIII.   UNDISCLOSED ADVERSE FACTS**

340.   The market for Spirit's shares was open, well-developed and efficient at all relevant times. As a result of Defendants' materially false and/or misleading statements, and/or failures to disclose, Spirit's shares traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Spirit's shares relying upon the integrity of the market price of the Company's shares and market information relating to Spirit and have been damaged thereby.

341.   During the Class Period, Defendants materially misled the investing public thereby inflating the price of Spirit's shares, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading for the reasons set forth herein and because they failed to disclose material adverse information and/or misrepresented the truth about Spirit's business, operations, and prospects as alleged herein.

342.   At all relevant times, the material misrepresentations and omissions and undisclosed scheme particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Spirit's prospects and engaged in a scheme to do the same. These material misstatements and/or omissions and/or conduct had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its prospects, thus causing the Company's shares to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements and/or conduct during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's

shares at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## XIV.   APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

343.   The market for Spirit's shares was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Spirit's shares traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's shares relying upon the integrity of the market price of Spirit's shares and market information relating to Spirit, and have been damaged thereby.

344.   During the Class Period, the artificial inflation of Spirit's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Spirit's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Spirit and its business, operations, and prospects, thus causing the price of the Company's shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's shares at such artificially inflated prices, and each of them has been damaged as a result.

345.   At all relevant times, the market for Spirit's shares was an efficient market for the following reasons, among others:

(a)      Spirit shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)      As a regulated issuer, Spirit filed periodic public reports with the SEC and/or the NYSE;

(c)      Spirit regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)      Spirit was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

346.     As a result of the foregoing, the market for Spirit's shares promptly digested current information regarding Spirit from all publicly available sources and reflected such information in Spirit's share price. Under these circumstances, all purchasers of Spirit's shares during the Class Period suffered similar injury through their purchase of Spirit's shares at artificially inflated prices and a presumption of reliance applies.

347.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is

necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material omissions set forth above, that requirement is satisfied here.

## XV.   NO SAFE HARBOR

348.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Spirit who knew that the statement was false when made.

## XVI.   FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5(a) — (c) Promulgated Thereunder Against All Defendants

349.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

350.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Plaintiffs and other Class members, as alleged herein; and (iii) cause Plaintiffs and other members of the Class to purchase Spirit's shares at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

351.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for Spirit's shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) — (c). All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

352.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Spirit's financial well-being and prospects, as specified herein.

353.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Spirit's value, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Spirit and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course

94

of business which operated as a fraud and deceit upon the purchasers of the Company's shares during the Class Period.

354.   Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as an officer of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

355.   Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Spirit's prospects from the investing public and supporting the artificially inflated price of its shares. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions

alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

356.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Spirit's shares was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's shares were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the shares trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Spirit's shares during the Class Period at artificially high prices and were damaged thereby.

357.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were unaware of their falsity and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding Spirit, which was not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Spirit shares, or, if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

358.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

359.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's shares during the Class Period.

## XVII.  SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### <u>Against the Individual Defendants</u>

360.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

361.    Individual Defendants acted as controlling persons of Spirit within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false statements disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

362.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular decisions giving rise to the securities violations as alleged herein, and exercised the same.

363.    As set forth above, Spirit and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other

members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## XVIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)      Such other and further relief as the Court may deem just and proper.

## XIX.   JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: December 19, 2023

**GLANCY PRONGAY & MURRAY LLP**

By: _/s/ Garth Spencer_
Garth A. Spencer (GS-7623)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
gspencer@glancylaw.com

Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
glinkh@glancylaw.com

**HOLZER & HOLZER, LLC**
Corey D. Holzer (_pro hac vice_)
211 Perimeter Center Parkway, Suite 1010
Atlanta, Georgia 30346
Telephone: (770) 392-0090
Facsimile: (770) 392-0029

_Co-Lead Counsel for Lead Plaintiff Hang Li and Named Plaintiff Alex Freeman_

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On December 19, 2023, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 19, 2023.


_s/ Garth Spencer_____
Garth Spencer