**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HANG LI, et al.,<br><br>                    Plaintiffs,<br><br>     v.<br><br>SPIRIT AEROSYSTEMS HOLDINGS, INC., TOM GENTILE III and MARK J. SUCHINSKI,<br><br>                  Defendants. | No. 1:23-cv-03722-PAE |

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendants*

February 20, 2024

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................iii

PRELIMINARY STATEMENT .............................................................................. 1

I.      Background ...................................................................................... 2

      A.      Spirit Disclosed the Significance of Its Relationship to Boeing and that Quality Issues Could Endanger the Relationship....................................... 3

      B.      Prior to the Class Period, Spirit Detected and Remediated Quality Issues. .................................................................................................................... 4

      C.      Boeing 737 Grounding and COVID-19 Led to Downsizing. ................... 5

      D.      In October 2022, Joshua Dean Found Mis-Drilled Holes on 737 Aft Pressure Bulkhead During Audit and Investigations Began.................... 6

      E.      In March 2023, an Investigation Uncovered a Tail Fin Fitting Issue, Which Spirit Investigated and Promptly Disclosed to Boeing and Investors. ...................................................................................................... 6

LEGAL STANDARD............................................................................................... 8

ARGUMENT ............................................................................................................ 8

I.      Plaintiffs Fail To Plead Any False or Misleading Statements. .............. 8

      A.      Statements Regarding Spirit's Quality and Customer Service Goals Are Not Actionable (Stmts 8-9, 13-16, 23-24, 29-32). ...................................... 8

      B.      Spirit's Risk Factors Disclosed the Risks and Are Not False or Misleading............................................................................................... 12

      C.      The COVID-19 Statement (Stmt 1) Was Not False or Misleading. ........ 15

      D.      The Certifications (Stmts. 2, 5, 17, 20, 25) Are Not False or Misleading. ................................................................................................................. 16

II.      Plaintiffs Plead No Duty For Spirit To Disclose Any Additional Information. .. 16

      A.      Plaintiffs Fail To Plead a Duty Arising Under the Securities Laws. ....... 16

      B.      Plaintiffs Fail To Plead a Separate Duty To Speak................................. 17

III.      Plaintiffs' Scheme Claim (Count 1) Fails. ........................................... 18

IV.      The Complaint Does Not Adequately Allege Scienter. ....................... 18

      A.      Plaintiffs Fail To Plead the Individual Defendants' Motive To Defraud. 19

      B.      Plaintiffs Fail To Adequately Plead Conscious Misbehavior or Recklessness. ........................................................................................... 19

      C.      Plaintiffs Do Not Plead Corporate Scienter Against Spirit, Generally.... 23

V.      Plaintiffs Fail To Adequately Plead Loss Causation. ........................... 24

      A.      Plaintiffs Fail To Plead Any Corrective Disclosures............................. 24

      B.      Plaintiffs Fail To Plead Materialization of a Concealed Risk................. 25

VI.      Plaintiffs' Section 20(a) Claim Must be Dismissed............................. 25

CONCLUSION....................................................................................................... 25

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ark. Teacher Ret. Sys. v. Goldman Sachs Grp.*,
 77 F.4th 74 (2d Cir. 2023) ...............................................................................13

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
 493 F.3d 87 (2d Cir.2007)......................................................................2, 8, 19

*Banco Safra S.A. v. Andrade Gutierrez Int'l S.A.*,
 2018 WL 1276847 (S.D.N.Y. Mar. 8, 2018) ...............................................13

*Boluka Garment Co. v. Canaan Inc.*,
 547 F. Supp. 3d 439 (S.D.N.Y. 2021).............................................................24

*Carpenters Pension Tr. Fund v. Barclays PLC*,
 750 F.3d 227 (2d Cir. 2014).............................................................................24

*Chapman v. Mueller Water Prods., Inc.*,
 466 F. Supp. 3d 382 (S.D.N.Y. 2020).......................................................14, 15

*Chiarella v. United States*,
 445 U.S. 222 (1980) ........................................................................................17

*City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*,
 565 F. Supp. 3d 478 (S.D.N.Y. 2021)...............................................................1

*Denny v. Barber*,
 576 F.2d 465 (2d Cir. 1978)...............................................................................8

*Dura Pharms., Inc. v. Broudo*,
 544 U.S. 336 (2005)....................................................................................1, 24

*ECA & Local 134 IBEW v. JP Morgan Chase Co.*,
 553 F.3d 187 (2d Cir. 2009)..............................................................10, 19, 20

*Foley v. Transocean Ltd.*,
 861 F.Supp.2d 197 (S.D.N.Y. 2012)...............................................................10

*Ganino v. Citizens Utils. Co.*,
 228 F.3d 154 (2d Cir. 2000)............................................................................19

*Glaser v. The9, Ltd.*,
 772 F. Supp. 2d 573 (S.D.N.Y. 2011)...............................................................8

*Halperin v. Ebanker USA.com, Inc.*,
 295 F.3d 352 (2d Cir. 2002)......................................................................13, 16

*Hutchison v. Deutsche Bank Securities*,
 647 F.3d 479 (2d Cir. 2011)............................................................................17

*In re AppHarvest Sec. Litig.*,
   2023 WL 4866233 (S.D.N.Y. July 31, 2023) .......................................................14, 15

*In re Banco Bradesco S.A. Sec. Litig.*,
   277 F. Supp. 3d 600 (S.D.N.Y. 2017).......................................................................10

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
   980 F. Supp. 2d 564 (S.D.N.Y. 2013).......................................................................13

*In re Braskem S.A. Sec. Litig.*,
   246 F. Supp. 3d 731 (S.D.N.Y. 2017) (Engelmayer, J.) ....................................1, 11, 17

*In re DraftKings Inc. Sec. Litig.*,
   21 Civ. 5739 (PAE), (S.D.N.Y. Jan. 10, 2023)..........................................................18

*In re FBR Inc. Sec. Litig.*,
   544 F. Supp. 2d 346 (S.D.N.Y. 2008).......................................................................14

*In re IPO Sec. Litig.*,
   544 F. Supp. 2d 277 (S.D.N.Y. 2008).......................................................................25

*In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*,
   859 F. Supp. 2d 572 (S.D.N.Y. 2012).................................................................10, 12

*In re Keyspan Corp. Securities Lit.*,
   383 F. Supp. 2d 358 (E.D.N.Y. 2003) ......................................................................21

*In re Liberty Tax, Inc. Sec. Litig.*,
   435 F. Supp. 3d 457 (E.D.N.Y. 2020) ......................................................................14

*In re Lululemon Secs. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014).................................................................1, 8, 11

*In re Omega Healthcare Investors, Inc. Sec. Litig.*,
   375 F. Supp. 3d 496 (S.D.N.Y. 2019).................................................................15, 24

*In re Sanofi Sec. Litig.*,
   155 F. Supp. 3d 386 (S.D.N.Y. 2016).......................................................................25

*In re Tempur Sealy Int'l, Inc. Sec. Litig.*,
   2019 WL 1368787 (S.D.N.Y. Mar. 26, 2019) .......................................................8, 17

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
   13 Civ. 8846 (LGS), 2014 WL 7176187 (S.D.N.Y. Dec. 16, 2014) ..........................16

*In re UBS AG Securities Litig.*,
   2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012).....................................................22, 24

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016).......................................................................................17

*Intl. Assn. of Heat v. Intl. Bus. Machines Corp.*,
  205 F. Supp. 3d 527 (S.D.N.Y. 2016)..........................................................................22

*Jackson v. Abernathy*,
  960 F.3d 94 (2d Cir. 2020)..........................................................................................23

*Juan Chen v. Missfresh Ltd.*,
  22-cv-9836, 2023 WL 7289750 (S.D.N.Y. Nov. 6, 2023) .........................................13

*Lehmann v. Ohr Pharm., Inc.*,
  830 F. App'x 349 (2d Cir. 2020) .................................................................................20

*Loc. No. 38 IBEW v. Am. Exp. Co.*,
  724 F. Supp. 2d 447 (S.D.N.Y. 2010)..........................................................................21

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
  518 F. Supp. 3d 772 (S.D.N.Y. 2021)..........................................................................22

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) .......................................................................................................16

*McIntire v. China Mediaexpress Holdings, Inc.*,
  927 F. Supp. 2d 105 (S.D.N.Y. 2013)..........................................................................21

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
  164 F. Supp. 3d 568 (S.D.N.Y. 2016)..........................................................................17

*Nandkumar v. AstraZeneca PLC*,
  2023 WL 3477164 (2d Cir. May 16, 2023) .................................................................23

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)..................................................................................13, 20

*Ong v. Chipotle Mexican Grill, Inc.*,
  294 F. Supp. 3d 199 (S.D.N.Y. 2018)....................................................................10, 11

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
  11 F.4th 90 (2d Cir. 2021) ...........................................................................................18

*Plumbers Steamfitters v. Canadian Imp. Bank of Comm*,
  694 F. Supp. 2d 287 (S.D.N.Y. 2010)....................................................................20, 21

*Plymouth Cnty. Ret. Ass'n v. Array Techs.*,
  2023 WL 3569068 (S.D.N.Y. May 19, 2023) .......................................................12, 18

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)..................................................................................15, 25

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
  573 F.3d 98 (2d Cir. 2009)...........................................................................................19

*Schaffer v. Horizon Pharma PLC*,
    2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ........................................................19, 21

*SEC v. Rio Tinto PLC*,
    41 F.4th 47 (2d Cir. 2022) ...................................................................................18

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019).....................................................................................8

*Starr v. Sony BMG Music Entm't*,
    592 F.3d 314 (2d Cir. 2010).................................................................................8

*Steamfitters Local 449 Pension Plan v. AT&T Inc.*,
    2022 WL 17587853 (2d Cir. Dec. 13, 2022) .......................................................9

*Teams. Local 445 v. Dynex Cap., Inc.*,
    531 F.3d 190 (2d Cir. 2008)...............................................................................23

*Tellabs v. Makor Issues Rights*,
    551 U.S. 308 (2007)......................................................................................2, 19

*Wandel v. Gao*,
    590 F. Supp. 3d 630 (S.D.N.Y. 2022)................................................................12

*Woolgar v. Kingstone Cos., Inc.*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020)...................................................20, 21, 22

**Statutes & Rules**

15 U.S.C. § 78u-5(i)(1)(B) ........................................................................................11

17 C.F.R. § 229.105 ..............................................................................................2, 18

17 C.F.R. § 229.105(a)..............................................................................................18

17 C.F.R. § 229.303 ..............................................................................................2, 17

17 C.F.R. § 229.303(b)(2)(ii)....................................................................................17

17 C.F.R. § 240.10b-5 (b) ................................................................................. passim

Federal Rule of Civil Procedure 9(b) ........................................................................8

## PRELIMINARY STATEMENT

The securities laws do not "provide investors with broad insurance against market losses"—even market losses caused by alleged mismanagement or faulty business practices. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).  The securities laws provide remedies only for fraud.  *Id.*  For that reason, it is well established that "[a]llegations of corporate mismanagement" are not actionable under the securities laws.  *In re Lululemon Secs. Litig.*, 14 F. Supp. 3d 553, 574 (S.D.N.Y. 2014).  Spirit AeroSystems ("Spirit" or the "Company") disputes Plaintiffs' allegations.  But even accepting Plaintiffs' allegations as true for purposes of this motion to dismiss, at most they allege mismanagement, not securities fraud.  As a result, the Amended Complaint ("AC") should be dismissed.

*First*, Plaintiffs do not plausibly allege any actionable misstatement or omission.  Even where there are allegations of "undisclosed corporate malfeasance", "disclosure [is] not required except where doing so was necessary to prevent the corporation's *other* statements from being misleading".  *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 752 (S.D.N.Y. 2017) (Engelmayer, J.).  Here, Plaintiffs rely on general statements about Spirit's quality goals and generic risk disclosures in an attempt to impose on Spirit a duty to disclose the specific problems Plaintiffs allege.  But no reasonable investor could find those generic statements misleading because they did not guarantee that quality issues did not exist or would not arise.  To the contrary, Spirit expressly disclosed that quality issues had occurred before and that there was a risk that quality issues would happen again.  "[A] securities fraud claim for misrepresentations or omissions does not lie when the company 'disclosed the very . . . risks about which [a plaintiff] claim[s] to have been misled.'"  *City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*, 565 F. Supp. 3d 478, 493 (S.D.N.Y. 2021).  Plaintiffs also assert a single misstatement related to the possible impact of COVID-19 on Spirit's workforce—but Spirit disclosed that risk too.  Finally, Plaintiffs assert that Sarbanes-Oxley certifications by Gentile and Suchinski (the "Individual Defendants") were misleading, but Plaintiffs do not identify any false or misleading statement contained therein (let alone knowledge of falsity by either Defendant).  (*Infra* § I.)

*Second*, Spirit had no independent disclosure duty under 17 C.F.R. § 229.303 or 17 C.F.R. § 229.105.  Neither requires detailed disclosure of internal operations, and neither imposes private liability unless disclosure was "necessary in order to make [other] statements made" not misleading, which is not the case here.  17 C.F.R. § 240.10b-5 (b).  (*Infra* § II.)

*Third*, Plaintiffs' scheme theory is an impermissible repackaging of its alleged misstatements and omissions—and fails to state a claim just as they do.  (*Infra* § III.)

*Fourth*, Plaintiffs fail to allege scienter because they rely on insufficient, boilerplate allegations as to the Individual Defendants and Spirit.  There are no facts alleged plausibly suggesting that any Defendant knew any statement to be false or misleading.  (*Infra* § IV.)

*Fifth*, Plaintiffs fail to plead loss causation because no alleged misstatement (or omission) was corrected (or revealed) on any corrective disclosure date.  (*Infra* § V.)

## I.   Background[1]

Spirit "design[s], engineer[s], and manufacture[s] large, complex, and highly engineered commercial aerostructures", like plane fuselages.  (Ex. 4, 2019 10-K at 3.)  Boeing is Spirit's main customer.  (AC ¶ 2.)  Spirit balances a "focus on safety and quality while working to meet [its] customers' requirements for production rate changes".  (Ex. 1, 2018 10-K at 33; *see also* Ex. 4, 2019 10-K at 37.)  Spirit employs internal auditors who inspect for quality problems.  (AC ¶ 56; 68; 71.)  Per Spirit's policies, once an auditor detects a problem, they must document it. (AC ¶ 68.)  The Spirit team responsible for this process is then notified and informs the auditor's manager, who speaks with the auditor or other knowledgeable persons.  (AC ¶ 69; 71; 78; 81.) The manager might also inspect a sample of parts to get an estimate of the prevalence of the issue.  (AC ¶ 76.)  The audit system is not infallible—Spirit's time and resources are finite (AC ¶ 71; 78; 107), and Plaintiffs claim even an experienced auditor may not detect a problem (AC ¶ 73).  Problems may not be visible to the naked eye, and more elaborate systems of inspection

---

[1] "Courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs v. Makor Issues Rights*, 551 U.S. 308, 322 (2007); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) ("[W]e may consider ... legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.").  This motion assumes as true, solely for the purposes of this motion, Plaintiffs' well-pled factual allegations.

may be required, like x-rays.  (AC ¶ 281.)  Any reasonable investor would understand that
"[q]uality 'escapes' as the aerospace industry calls them, and the resulting analyses and fixes are
a normal part of manufacturing."  (Ex. 13, The Air Current, *Boeing and Spirit Grapple with
Newly Discovered 737 Max Quality Issue"*, at 4 (cited in AC ¶ 122) (the "Air Current Article").)

### A.    Spirit Disclosed the Significance of Its Relationship to Boeing and that Quality Issues Could Endanger the Relationship.

Spirit routinely disclosed quality risks and the importance of its relationship to Boeing.
Spirit disclosed that its programs "carry risks associated with design responsibility, development
of new production tools, hiring and training of qualified personnel, . . . ability to meet customer
specifications, delivery schedules" and that if Spirit "were unable to perform [its] obligations
under new or maturing programs to the customer's satisfaction", or "successfully perform under
revised design and manufacturing plans or successfully resolve claims and assertions, or if a new
or maturing program in which we had made a significant investment was terminated or
experienced weak demand[, its] business, financial condition, and results of operations could be
materially adversely affected."  (Ex. 4, 2019 10-K at 17.[2])  It disclosed that quality issues could
result in "potential liabilities for warranty or other claims with respect to aircraft components that
have been designed, manufactured, or serviced by [Spirit] or [its] suppliers" and that if its
"products are found to be defective and lacking in quality, or if one of [its] products causes an
accident, [its] reputation could be damaged and [its] ability to retain and attract customers could
be materially adversely affected".  (*Id.* at 18.)  It stressed the importance of its skilled employees:
"to be successful, we must attract, retain, train, motivate, develop, and transition qualified
executives and other key employees, including those in managerial, manufacturing, and
engineering positions."  (*Id.* at 19.)  And it disclosed that "[t]alent is being replaced with less
experienced talent", requiring Spirit to "develop internal resources to meet the talent gap."  (*Id.*)
Not only did Spirit disclose the risk of quality issues and their significance, Spirit also disclosed
that it "***has experienced***, and ***may continue to experience***, quality" disruptions; "[s]ome of these

---

[2] The same disclosures are in Spirit's 2020 10-K at 20 (Ex. 8); 2021 10-K at 22 (Ex. 9); and 2022 10-K at 22
(Ex. 12).  All documents cited herein aside from the AC are appended as exhibits to the Declaration of Michael P.
Addis.

risks **have affected** [its] maturing programs"; and Spirit "**continues to face** similar risks as well as the potential for default [and] quality problems".  (*Id.* at 17-18 (emphases added).)

Spirit further disclosed that under its supply contract with Boeing, "failure to deliver products when and as required, and failure to maintain a required system of quality assurance, among other things" may be events of default, which "may allow Boeing to cancel orders under or terminate" the contract.  (*Id.* at 9.)  Spirit also disclosed that "[f]rom time to time [it] receives, or is subject to, customer and vendor claims arising in the ordinary course of business, including, but not limited to, those related to product quality and late delivery" and that the "final outcome of these types of matters cannot be predicted with certainty".  (*Id.* at 102.)  Spirit warned that its "revenues are substantially dependent on Boeing" and "in large part, on sales of components for a single aircraft program, the B737 MAX".  (*Id.* at 6; 12.)  In 2019, about 79% of Spirit's revenues were generated from sales to Boeing and about 53% of its net revenues were from sales of 737 components, specifically.  (*Id.* at 12.)  In 2022, Spirit disclosed that it "received notice of a claim from a key customer seeking cost recovery primarily related to alleged product quality issues associated with [Spirit's] performance".  (Ex. 12, 2022 10-K at 121.)

**B.**     **Prior to the Class Period, Spirit Detected and Remediated Quality Issues.**

Plaintiffs allege that starting in "approximately 2018", Boeing placed Spirit on probation due to its "severe and persistent" quality issues, including "the routine presence of foreign object debris ('FOD') in products, missing fasteners, peeling paint, and poor skin quality".  (AC ¶ 6-7.) To exit probation, which Spirit did in 2021, it had to decrease defects and improve its auditing processes.  (AC ¶ 59.)  A former Spirit auditor, Joshua Dean, who did not even work at Spirit from May 2020 to May 2021, alleges he heard from unspecified "other Spirit employees" that Spirit was "just undercounting defects instead of actually reducing defects".  (AC ¶ 60.)  The sole specific allegation is from a confidential witness, Former Employee 1 ("FE1"), who claims that after probation ended, in February 2022, he was asked to record defects in a new manner, refused to do so, complained, and, after sending an email to Gentile, was vindicated by Spirit's HR department after a two-month-long investigation.  (AC ¶ 102-03.)

Another confidential witness, Former Employee 2 ("FE2"), an Internal Quality Auditor from October 2017 to Spring 2020, audited Spirit's production process.  (AC ¶ 109.)  He claims that he sometimes detected isolated quality lapses, including:  in 2019, the occasional use of out-of-calibration torque wrenches (which Spirit inspected for and confiscated) (AC ¶ 112); in 2018 or 2019, the inspection of a bracket from 3.5-4 feet away (which FE2 reported as inadequate) (AC ¶ 114); an undated incident when FE2 found FOD (*e.g.*, metal shavings, rags paper towels, rivets) in an unshipped fuselage (AC ¶ 115); and an undated incident where a mechanic used an improper drilling angle (AC ¶ 116.  Plaintiffs do not allege that those isolated issues had any impact on Spirit's performance, let alone the quality of fuselages, and Plaintiffs never explain how any public statement by Spirit was rendered misleading by those isolated incidents.

### C.    Boeing 737 Grounding and COVID-19 Led to Downsizing.

In 2019 and 2020, Spirit was confronted with two issues:  the grounding of the 737 and COVID-19.  In March 2019, regulators worldwide grounded the 737 MAX due to two tragic plane crashes (AC ¶ 3), which authorities concluded were caused by software and crew errors unrelated to Spirit.  (Ex. 3, NTSB Report at 2.)  The 737 grounding and related production cuts harmed Spirit's financial performance, leading it to reduce its workforce and cut costs.  (Ex. 2, 2019 Q1 Earnings Call at 4-5; Ex. 7, June 2020 8-K, at 4.)  Spirit disclosed that a prolonged 737 grounding and production reduction "may have a material adverse impact on Spirit's business, financial condition, results of operations, and cash flows".  (Ex. 4, 2019 10-K at 12-13.)

While the 737 was grounded, COVID-19 began.  After Boeing suspended work due to COVID-19, Spirit followed and suspended Boeing-related work and instituted a four-day workweek for salaried workers and a 21-day production worker furlough at certain plants. (Ex. 7, June 2020 8-K, at 4.)  Spirit fully disclosed the risks created by these crises, including by disclosing that COVID-19 "has had and is expected to continue to have a material negative impact on our industry and business" and "presents significant challenges to [Spirit's] liquidity"; "the B737 MAX situation continues to present challenges to our liquidity" that "are exacerbated by the COVID-19 pandemic as other programs that alleviate the strain of the lower B737 MAX

production rate are now suspended or producing at lower rates"; and if the B737 MAX grounding and COVID-19 continued longer than anticipated, it may "take actions with longer-term impact, [like] changes to our production plans, employment reductions and/or the expenditure of significant resources to support our supply chain and/or Boeing." (Ex. 6, April 2020 8-K, at 16, 18.)  Spirit disclosed that it did not know "how long [the] Boeing production suspension will continue and the resulting impact on our financial performance, liquidity and our cash flows". (*Id.* at 16.)  It also disclosed that it did not know "whether, after a 21-day unpaid furlough, a sufficient part of our workforce will return to work"; "the effect of significant salary cuts across our workforce, which may result in critical employee departures"; or "the impact remote working arrangements, salary reductions, and shortened work weeks for salaried employees will have on the health and productivity of . . . our employees". (*Id.*)

### D.    In October 2022, Joshua Dean Found Mis-Drilled Holes on 737 Aft Pressure Bulkhead During Audit and Investigations Began.

In October 2022, Plaintiffs allege that Spirit auditor Joshua Dean identified mis-drilled holes on certain 737 aft pressure bulkheads during a routine inspection, which he documented in three reports.  (AC ¶ 9, 62-63.)  These reports allegedly were seen by several people with the title of mechanic, manager or engineer, including a manager who "was responsible for addressing his mis-drilled bulkhead holes findings for the quality department".  (AC ¶ 70.)  Two or three weeks later, prior to a change in assignment set for November 2022, Dean was assigned to inspect a neighboring part of the 737, the tail fin fitting, ***and found no defects***.  (AC ¶ 55, 62, 71; 73.)  After his transfer but before December 5, 2022, Dean was asked by Senior PPV Quality Manager Jaime Hanson to assist two managers, Sean McVickers and Justin Hoch, with "their responses to [Dean's] audit findings."  (AC ¶ 71.)  After that, Dean alleges no involvement or firsthand knowledge of the investigation or remediation efforts related to the mis-drilled holes.

### E.    In March 2023, an Investigation Uncovered a Tail Fin Fitting Issue, Which Spirit Investigated and Promptly Disclosed to Boeing and Investors.

Dean claims secondhand, that, in mid-March 2023, Spirit found several parts with cracks that indicated a possibly broader problem with tail fin fittings.  (AC ¶ 76.)  The investigation

continued and in late March or early April 2023, Dean was questioned about how he missed the issue during an assigned inspection and was then terminated on that basis.  (AC ¶ 78.)  On April 12, 2023, Spirit notified Boeing of the tail fin fitting issue.  (AC ¶ 223-224).  The following day, Boeing announced publicly that it paused deliveries of some 737s "after learning of a manufacturing issue that doesn't affect the safety of planes in the air".  (AC ¶ 223.)  On April 14, 2023, Spirit confirmed that it identified a quality issue and disclosed that it had "processes in place to address these types of production issues upon identification, which [it was] following" and "was working to develop an inspection and repair for the affected fuselages".  (AC ¶ 230.)  Spirit's shares fell 20.7% to close at $28.22.  (AC ¶ 226.)  Plaintiffs allege no facts suggesting that Spirit or Boeing knew of the tail fin fitting issue prior to these disclosures in Spring 2023.

As Spirit released information about remediation efforts, its stock declined further.  On a May 3, 2023 earnings call, Suchinski described the anticipated impact of the tail fin fitting problem on Spirit's financials.  (AC ¶ 232-33.)  Gentile explained that Spirit's "strong quality team, operations team, engineering team" had been "working in close association with Boeing to address the issue and get execution back on track to get production flowing again and also to recover some of the units that we lost".  (AC ¶ 251.)  That day, Spirit's shares fell 12.3% to $26.28.  (AC ¶ 240.)  On August 2, 2023, Suchinski reported that due to the quality issue with the tail fin fitting and a strike, Spirit would not "be able to generate significant cash flow in 2024 and 2025" (AC ¶ 263), and Spirit's shares fell 27.3% to close at $22.86.  (AC ¶ 264.)

On August 23, 2023, Air Current published an article that "Boeing ha[d] identified a potentially widespread manufacturing quality issue on the 737 Max stemming from structural assembly work on the jet's aft pressure bulkhead conducted by supplier Spirit AeroSystems".  (AC ¶ 271.)  Air Current reported that the issue could only be identified via "x-ray inspections", and that Spirit and Boeing were "still trying to understand the full scope of the issue across their respective factories".  (Ex. 13 at 3-4.)  The article acknowledged that "quality 'escapes' as the aerospace industry calls them, and the[ir] resulting analyses and fixes are a normal part of manufacturing".  (Id. at 4.)  The next day, Spirit's share price fell 12.7%.  (AC ¶ 122.)

**LEGAL STANDARD**

"To avoid dismissal under Section 10(b) and Rule 10b-5, a complaint must plausibly allege:  (1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance . . . ; (5) economic loss; and (6) loss causation."  *Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019).  On a motion to dismiss under Rule 12(b)(6), the Court must accept well-pled factual allegations as true, but "it does not credit 'mere conclusory statements'".  *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 585 (S.D.N.Y. 2011).  A "complaint alleging securities fraud must satisfy Rule 9(b) . . . , which requires that the circumstances constituting fraud . . . shall be stated with particularity."  *ATSI Comms.*, 493 F.3d at 99.  The complaint must be dismissed if the allegations "permit no reasonable inference stronger than the 'mere possibility of misconduct.'" *Glaser*, 772 F. Supp. 2d at 585 (quoting *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010)).

**ARGUMENT**

**I.     Plaintiffs Fail To Plead Any False or Misleading Statements.**

"Under Rule 9(b) and the PSLRA, a plaintiff must identify with particularity the statement or statements alleged to be false or misleading and . . . why that is so."  *In re Tempur Sealy Int'l, Inc. Sec. Litig.*, No. 17-cv-2169, 2019 WL 1368787, at *6 (S.D.N.Y. Mar. 26, 2019). A statement is actionable if it "was false at the time it was made.  A statement believed to be true when made, but later shown to be false, is insufficient."  *Lululemon*, 14 F. Supp. 3d at 571. Plaintiffs cannot plead "fraud by hindsight".  *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978). Plaintiffs allege misstatements in (i) quality and customer service goals, from June 17, 2021 to March 31, 2023 (Stmts 8-9, 13-16, 23-24, 29-32); (ii) risk factors in quarterly or annual reports (Stmts 3, 6, 11, 18, 21, 26-27); (iii) the impact of COVID-19 (Stmt 1); and (iv) Sarbanes-Oxley certifications in quarterly or annual reports (Stmts 2, 5, 10, 17, 20, 25).  None is actionable.

**A.     Statements Regarding Spirit's Quality and Customer Service Goals Are Not Actionable (Stmts 8-9, 13-16, 23-24, 29-32).**

Statements regarding Spirit's quality and customer service are puffery, not false or

misleading, and not actionable because Spirit disclosed the risks Plaintiffs say were concealed.

*Nonactionable Puffery.* "It is well-established that general statements about reputation, integrity, and compliance with ethical norms are nonactionable puffery, meaning that they are too general to cause a reasonable investor to rely upon them." *Steamfitters Local 449 Pension Plan v. AT&T Inc.*, 2022 WL 17587853, at *1 (2d Cir. Dec. 13, 2022).  Puffery here includes:

- "Spirit is dedicated to the production of high quality and safe products for our customers and ultimately the end user" (Stmt 8);

- "Spirit is dedicated to a Zero-Defect target, with no escapements to our customers" (Stmt 9);

- "While it goes without saying safety, we've got to keep our employees safe, and we've got to have our products safe.  So safety is paramount, but quality is, too.  It goes without saying in our industry. . . . [O]ur customers quite rightly, and their customers have a much higher bar in terms of the quality expectations.  And that means a lot of new thinking around what are the processes and technologies that we can apply to ensure that rate executes flawlessly" (Stmt 13);

- "Spirit has a responsibility to our employees, customers, and communities to:  Deliver reliable, high-quality products that our customers and the public have confidence using" (Stmt 23);

- "To achieve the highest standards of safety for our customers, we must focus on quality all the time.  Quality is the cornerstone of our brand.  To achieve high performance and maintain our reputation for delivering the highest quality goods, we must comply with quality control standards and follow contract specifications at all times"  (Stmt 27);

- "The basic principles of quality are do not create, do not pass and do not accept a defect. . . . Do not create a defect and remember no one does anyone a favor by accepting or passing a defect down the line.  We are in a role of continuously reinventing ourselves.  Sometimes it might not seem that way if you are a mechanic building the same thing over and over again . . . (but) we need to challenge the status quo and raise the bar.  That is the foundational piece of quality."  (Stmt 30);

- "As production continues to accelerate, we must ensure deliveries are not achieved at the expense of our commitment to Quality Without Compromise. . . there should be no tolerance to allow an escape to our customers, but more importantly, to those individuals who have entrusted us with their safety."  (Stmt 31);

- "We can't risk our products ever being involved in an incident or accident.  And to protect that we have a great quality system that ensures our parts are inspected and controlled and go out FOD [foreign object debris] free and defect free."  (Stmt 32).[3]

Those statements are neither "guarantees" nor "supported by specific statements of fact"; nor do Plaintiffs allege that the speaker did "not genuinely or reasonably believe them"; as a result, they are nonactionable puffery as a matter of law.  *Steamfitters Local,* 2022 WL 17587853, at *1; *see*

---

[3] Plaintiffs also take a statement at Spirit's March 2, 2022 Investor Day, by Kailash Krishnaswamy, Spirit's SVP of Aftermarket Services, entirely out of context.  Krishnaswamy was describing Spirit's aftermarket business in repairing broken parts, which he described as distinct from its work as an original equipment manufacturer.  (Ex. 10, 2022 Investor Day Tr. at 23-24.)  No reasonable person could understand Krishnaswamy to make a statement about Spirit's manufacturing overall.

*also Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018) (statements that company was "committed to serving safe, high quality food to [its] customers" and that its "food safety programs are also designed to ensure that [the Company] compl[ies] with applicable federal, state and local food safety regulations" are inactionable puffery."); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 647 (S.D.N.Y. 2017) ("The quintessential examples of such inactionable "puffery" are "general statements about reputation, integrity, and compliance with ethical norms," particularly when such statements are "explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'"); *Foley v. Transocean Ltd.*, 861 F.Supp.2d 197, 204 n.7 (S.D.N.Y. 2012) (noting that company's "commitment to safety and training" "would likely be considered expressions of 'puffery' that cannot form the basis of a securities fraud claim"); *ECA & Local 134 IBEW v. JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009) (statements that company had "'highly disciplined' risk management", "standard-setting reputation for integrity" and would "continue to reposition and strengthen [its] franchises with a focus on financial discipline" were inactionable puffery); *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 580 (S.D.N.Y. 2012) (holding that statements that school was "focused on the outcomes for the students" and had a "single internal focus" on "maximizing students' success" were inactionable puffery).

***Not False or Misleading.*** Those same statements are inactionable for the independent reason that Plaintiffs fail to plead any facts to show that they were false or misleading. On this point, *Ong v. Chipotle Mexican Grill, Inc.*, is instructive. In *Ong*, the court held that statements that Chipotle's "quality assurance department establishes and monitors [its] quality and food safety programs" and its "training and risk management departments develop and implement operating standards for food quality, preparation, cleanliness and safety" were "not demonstrably false" because the "SAC [did] not allege that Chipotle failed to undertake such endeavors, but merely that Chipotle failed to do so 'adequately,' or that Chipotle 'failed to live up to its own food safety standards,' or that Chipotle's food-safety auditing system was 'inherently deficient.'" *Id.* at 232. The "allegations [did] not conflict with Defendants' statements regarding [Chipotle's]

food-safety programs and procedures", but "merely quibble[d] with Chipotle's execution of those programs and procedures".  *Id.*  Just as in *Ong*, Plaintiffs have not pleaded that it was untrue, *inter alia*, that:  Spirit's "customers ha[d] a much higher bar in terms of the quality expectations" (Stmt 13; *see* similar portions in Stmt 31); Spirit was doing "new thinking" about its compliance processes (Stmt 13; *see* similar portions in Stmt 16); Spirit had "a dedicated Quality Department that use[d] a variety of assessment and audit tools" (Stmt 8); "daily compliance audits [we]re conducted internally" (Stmt 9); "audits [we]re completed in partnership with Spirit's customers" (Stmt 9); Spirit "realized [it] needed to perpetually ensure that when [it was] building the product, [it was] building it per specification, per engineering, per the planning" (Stmt 16; *see* similar portions in Stmts 15, 31);" or Spirit had "spent time over the last year . . . ensuring that [its] processes and [its] products [we]re actually in conformance with the engineering requirements" (Stmt 16).[4]

Nor could they—Plaintiffs' own allegations confirm that (i) Spirit had a dedicated quality department; (ii) Spirit was updating its compliance processes (iii)  those processes included audits for proper tools and FOD; (iv) Boeing was holding Spirit to higher standards; and (v) Boeing audited and provided feedback to Spirit.  (*See* AC ¶¶ 90-95, 107, 110-113.)  As in *Ong,* Plaintiffs merely critique Spirit's quality execution, but that does not render Spirit's statements false or misleading.  *See also Braskem*, 246 F. Supp. 3d at 755-56 ("Because a code of ethics is inherently aspirational[,] it simply cannot be that every time a violation of that code occurs, a company is liable under federal law."); *see also Lululemon*, 14 F. Supp. 3d at 577 (holding statements "it's our job to ensure every product is made to its truest form" and "[i]f a garment doesn't pass our standards at any point in production, it's back to the drawing board" not false or

---

[4] The portion of Statement 16 that states Spirit has "about one more year to go, ensuring that our processes and our products are actually in conformance with the engineering requirements" is inactionable for the independent reason that it a forward-looking statement protected by the PSLRA's safe harbor.  15 U.S.C. § 78u-5(i)(1)(B) (defining forward-looking statements to include "statement[s] of the plans and objectives of management for future operations").  Spirit identified its statements as forward-looking and provided a non-exhaustive list of factors "that could cause actual results to differ materially from those reflected in such forward-looking statements", including (a) "the COVID-19 pandemic"; (b) "the full worldwide return to service (including receiving the remaining regulatory approvals) of the B737 MAX, future demand for the aircraft, and any residual impacts of the B737 MAX grounding on production rates"; (c) Spirit's "reliance on The Boeing Company"; (d) "the outcome of product warranty or defective product claims and the impact settlement of such claims"; and (e) the ability of Spirit to "meet stringent delivery (including quality and timeliness) standards".  Ex. 11, 2022 Investor Day Deck at 2.

misleading where "[i]n context, the company's website posits a belief in high quality compared to unnamed others in the 'industry,' along with clear acknowledgements that product defects do occur"); *In re ITT Educ. Servs.*, 859 F. Supp. 2d at 580 (holding that statements that school was "focused on the outcomes for the students" and had a "single internal focus" on "maximizing students' success" were not made false or misleading because school was allegedly "focused upon manipulating its student population at all stages" and "increasing enrollment numbers").

Moreover, Spirit fully disclosed the risk that it might not meet its quality goals, including that it "*has experienced*, and *may continue to experience*, quality" disruptions; "[s]ome of these risks *have affected* [its] maturing programs"; and Spirit "*continues to face* similar risks as well as the potential for default [and] quality problems".  (Ex. 4, 2019 10-K at 18 (emphases added).)  In light of those warnings, no reasonable investor could be misled by the challenged statements. *See Plymouth Cnty. Ret. Ass'n v. Array Techs.*, 21 Civ. 4390 (VM), 2023 WL 3569068, at *12 (S.D.N.Y. May 19, 2023) (holding statements not misleading in light of "sufficient disclosures about the pressure [company] was facing from increased commodity costs"); *Wandel v. Gao*, 590 F. Supp. 3d 630, 644–45 (S.D.N.Y. 2022) (statements not misleading where company "warned investors of exactly the risk the plaintiffs claim was not disclosed:  the possibility that renter complaints could harm Phoenix Tree's business and reputation after the IPO").

### B.  Spirit's Risk Factors Disclosed the Risks and Are Not False or Misleading.

Plaintiffs' challenge to Spirit's risk factor disclosures turns securities law on its head. According to Plaintiffs, Spirit actually disclosed—extensively—the risks that Plaintiffs say materialized to cause Spirit's financial troubles.  Plaintiffs say that is not enough because Spirit did not predict in advance the specific manufacturing issues or their eventual consequences.  But because "[c]orporate officials need not be clairvoyant", "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."  *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).  "Nor, in any event, does securities law permit plaintiffs to target generic risk disclosures

on the theory that, had the risk disclosures contained a detailed admission of severe wrongdoing, a price drop would follow." *Ark. Teacher Ret. Sys. v. Goldman Sachs Grp.,* 77 F.4th 74, 101 (2d Cir. 2023).  "[W]here there is disclosure that is broad enough to cover a specific risk, the disclosure is not misleading simply because it fails to discuss the specific risk." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 579 (S.D.N.Y. 2013).

Here, Spirit repeatedly disclosed the risks that Plaintiffs allege came to fruition:

- "Our business depends on our ability to maintain a healthy supply chain and timely deliver products that meet or exceed stringent quality standards, which ***are*** negatively impacted by the COVID-19 pandemic" (Stmts 3, 6, 11, 26 (emphasis added));

- "If the Company fails to meet the quality or delivery expectations or requirements of its customers, disruptions in manufacturing lines could result, which could have ***a material adverse impact*** on the Company's ability to meet commitments to its customers and on its future financial results" (Stmt 6 (emphasis added));

- "From time-to-time the Company ***has experienced***, and ***may continue to experience***, ***quality*** or delivery timing ***disruptions***.  This includes common carrier disruptions and other disruptions that affect manufacturing lines, any of which could have a ***material adverse impac***t on the Company's ability to meet commitments to its customers and on its future financial results" (Stmt 11, 26 (emphases added));

- "Additional suspensions or reductions in, or increases in, the B737 MAX production rate may create financial and disruption risks for the Company and its suppliers on the program, which, may in turn, affect the Company's ability to comply with contractual obligations" (Stmt 27); and

- In 2022, Spirit "received notice of a claim from a key customer seeking cost recovery primarily related to alleged product quality issues associated with the Company's performance" (Ex. 12, 2022 10-K at 121).

Contrary to being actionable misstatements, Spirit's risk disclosures defeat Plaintiffs' claims.  *See Halperin v. Ebanker USA.com, Inc.*, 295 F.3d 352, 360 (2d Cir. 2002) (affirming dismissal where "cautionary language addresses the relevant risk directly"); *Juan Chen v. Missfresh Ltd.*, 22-cv-9836, 2023 WL 7289750, at *15 (S.D.N.Y. Nov. 6, 2023) (dismissing complaint where "risk factors addressed every single potential cause of the [materialized risk]"); *Banco Safra S.A. v. Andrade Gutierrez Int'l S.A.*, 16-CV-9997 (JMF), 2018 WL 1276847, at *4 (S.D.N.Y. Mar. 8, 2018) (because defendants "disclosed the precise risks that came to pass . . . no *reasonable investor* could have been misled about the nature of the risk when he invested").

A risk disclosure can be actionable only if it is (a) misleading and (b) "specific enough that a reasonable investor would rely on the risk disclosure as an assurance that a certain bad

outcome has not already occurred." *In re Liberty Tax, Inc. Sec. Litig.*, 435 F. Supp. 3d 457, 466 (E.D.N.Y. 2020). This is not the rare case where risk disclosures are actionable.

*First*, risk disclosures like Spirit's cannot somehow be contorted to be a "guarantee" against "defects or deficiencies". *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 406 (S.D.N.Y. 2020). In *Mueller*, the court found statements that "[t]he success of our new products and systems will depend on" the "ability to manage the risks . . . including the risk that new products and systems may have quality or other defects" were not actionable because it "would have been evident to the ordinary investor that Mueller was not warranting that every one of its newer technologies was defect-free or would not incur a warranty charge". *Id.* at 405-06. So too here. Spirit's statements cannot be read as guarantees against defects, especially because Spirit acknowledged that defects had and may continue to occur. (*See supra* § I.A.)

*Second*, Plaintiffs fail to plead that the risk disclosures were misleading. Statements 3, 6, 11, and 26 disclose, generally, that Spirit depends on its "ability to maintain a healthy supply chain and timely deliver products that meet or exceed stringent quality standards". (AC ¶ 140-41, 150-51, 163-64, 203-04.) That is indisputably true and warns investors that, if Spirit fails to meet quality standards, adverse financial results may follow. They do not imply that Spirit had not—or would not—experience quality problems. *See Mueller*, 466 F. Supp. 3d at 406; *see also In re AppHarvest Sec. Litig.*, 21-cv-7985 (LJL), 2023 WL 4866233, at *41 (S.D.N.Y. July 31, 2023) (statement that company "may not be able to fully recover costs and expenses" could not be understood by "ordinary investor" to mean that defendant "had been able to retain all of its employees or that all of its products were flawless."); *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 360 (S.D.N.Y. 2008) (risk disclosures that regulatory action "may" have adverse impact not actionable absent statement of "full compliance with all regulations, or that [defendant] had no outstanding regulatory issues" which was not implied by "touting. . . compliance policies").

Statements 3, 6, 11 and 26 warn that operational disruptions, including delays and defects in components from suppliers, supply of skilled labor, and implementation of customizations, could adversely impact Spirit. Again, those statements identify risks that might cause

disappointing financial results; they do not guarantee that the warned-of risks had not and would not occur.  *See Mueller*, 466 F. Supp. 3d at 406; *see also AppHarvest*, 2023 WL 4866233, at *41.

Statements 18 and 21 represent that there were no material changes to Spirit's risk factors in its 2021 10-K.  Plaintiffs assert these statements were misleading because Gentile had allegedly learned of FE1's alleged paperwork issue before then.  (AC ¶ 190.)  But the paperwork issue, which was resolved amicably and resulted in no harm to Spirit, is not inconsistent with any of Spirit's risk disclosures.  *See Rombach v. Chang*, 355 F.3d 164, 173-74 (2d Cir. 2004) (holding that "handful of incidents" at company that "operates 119 separate facilities nationwide" and is therefore "bound to have problems assimilating this or that property, to have disputes over payments with vendors and landlords, and to have some bills unpaid by reason of contested amounts or spot episodes of illiquidity" do not show materialized risk because they are "consistent with unremarkable circumstances short of financial peril or instability.").

*Third*, Plaintiffs plead no facts suggesting that, in October 2022, Spirit knew of the April 2023 737 issues.  Plaintiff cannot rely on "impermissible allegations of fraud by hindsight".  *In re Omega Healthcare Investors, Inc. Sec. Litig.*, 375 F. Supp. 3d 496, 508 (S.D.N.Y. 2019).

### C.      The COVID-19 Statement (Stmt 1) Was Not False or Misleading.

Plaintiffs challenge Spirit's statement that, during COVID-19, it was "working to maintain the health and viability of its supply chain to support operations post-production suspension".  (Stmt 1.)  Plaintiffs argue Spirit concealed that "Spirit's loss of many experienced mechanics and quality personnel" created a risk for "Spirit's ability to maintain operations to support is customers, and to maintain the health and viability of its supply chain."  (AC ¶ 133.)  But Spirit's disclosure—made in the midst of a global pandemic—does not suggest that Spirit was ***not*** experiencing disruption to the health and viability of its supply chain.  Just the opposite—one works to maintain health and viability only when one is threatened.  *See Mueller*, 466 F. Supp. 3d at 406 (explaining that "the risk disclosures would have been unnecessary . . . if there were not, in fact, risks with new products").

Moreover, Spirit expressly warned (a) that it could not predict "whether, after a 21-day

unpaid furlough, a sufficient part of our workforce will return to work to support Boeing production"; (b) that "the effect of significant salary cuts across our workforce . . may result in critical employee departures"; (Ex. 6, April 2020 8-K at 16) (c) that "to be successful, [it] must attract, retain, train, motivate, develop, and transition qualified executives and other key employees, including those in managerial, manufacturing, and engineering positions" (Ex. 4, 2019 10-K at 19); and (d) that it was difficult to predict "the impact remote working arrangements, salary reductions, and shortened work weeks for salaried employees will have on the health and productivity of management and our employees" (Ex. 6, April 2020 8-K, at 16). Spirit likewise disclosed that COVID-19 "has had and is expected to continue to have a material negative impact on our industry and business" and "presents significant challenges to [Spirit's] liquidity".  (*Id.* at 16-17; *see supra* § I.C.)  Spirit disclosed the risks Plaintiffs identify.  *See Halperin*, 295 F.3d at 360 (affirming dismissal where "cautionary language addresses the relevant risk directly").

### D.    The Certifications (Stmts. 2, 5, 17, 20, 25) Are Not False or Misleading.

Plaintiffs allege that Gentile and Suchinksi's certifications that certain of Spirit's reports do not, to their knowledge, "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made" were misleading.  (Stmts. 2, 5, 17, 20, 25).  But, as set forth above, Plaintiffs identify no misleading statements by Spirit and plead no facts to show that Gentile or Suchinski knew of any material misstatements or omissions, defeating these claims.  *See In re Turquoise Hill Res. Ltd. Sec. Litig.*, 13 Civ. 8846 (LGS), 2014 WL 7176187, at *6-8 (S.D.N.Y. Dec. 16, 2014).

## II.    Plaintiffs Plead No Duty For Spirit To Disclose Any Additional Information.

### A.    Plaintiffs Fail To Plead a Duty Arising Under the Securities Laws.

Companies have no duty to disclose all material information.  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011).  Rather, under Rule 10b–5, "[w]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak."  *Chiarella v. United*

*States*, 445 U.S. 222, 235 (1980).  There is a duty to speak only when "disclosure is necessary to avoid rendering existing statements misleading by failing to disclose material facts."  *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 579 (S.D.N.Y. 2016).  This does not "automatically render statements of fact on a certain topic misleading due to the omission of another fact concerning the same topic."  *In re Tempur Sealy*, 2019 WL 1368787, at *12.  In the "specific context here—of undisclosed corporate malfeasance or allegations of the same—[courts] have held that disclosure was not required except where doing so was necessary to prevent the corporation's *other* statements from being misleading".  *Braskem*, 246 F. Supp. 3d at 752 (collecting cases).  Spirit had no duty to disclose additional facts because none of the challenged statements was false or misleading.

**B.**     **Plaintiffs Fail To Plead a Separate Duty To Speak.**

Plaintiffs repackage their allegations as violations of SEC Items 303 and 105 to assert a theory of pure omission.  (*See e.g.*, AC ¶ 143-46; 152-54; 165-167; 183-185).  This argument fails due to Rule 10b-5's plain text, which permits liability when a company "omit[s] to state a material fact necessary ***in order to make the statements made*** . . . not misleading".  17 C.F.R. § 240.10b-5(b) (emphasis added).  In any event, Spirit had no additional disclosure obligation here.

Item 303 requires that a registrant "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(b)(2)(ii).  This provision "imposes a disclosure duty [when] a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations."  *Hutchison v. Deutsche Bank Securities*, 647 F.3d 479, 485 (2d Cir. 2011).  "Item 303 requires the registrant to disclose only those trends, events, or uncertainties that it actually knows of when it files the relevant report with the SEC.  It is not enough that it should have known of the existing trend, event, or uncertainty."  *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016).  Here, Plaintiffs have not pleaded facts to show that the issues they identify were trends or uncertainties

actually known by Spirit executives that were reasonably likely to have had material effects on Spirit's net sales, revenues or income from continuing operations, let alone when or how Spirit's executives knew of or could have predicted those consequences.  And Spirit *did disclose* the general risk of quality issues.  *See Plymouth,* 2023 WL 3569068, at *19.

Item 105 requires that, "under the caption 'Risk Factors'" a filer include "a discussion of the material factors that make an investment in the registrant or offering speculative or risky". 17 C.F.R. § 229.105(a).  Here, Spirit *did* disclose every risk that Plaintiffs contend was concealed:  quality issues, costs associated with remediating quality issues and claims, the importance of the Boeing contract, and the risk of termination by Boeing from quality issues. (*See supra* §§ I.A, I.C.)  Just as Plaintiffs fail to plead misleading risk factors, they fail to allege that Spirit failed to identify risk factors.  *See In re DraftKings Inc. Sec. Litig.*, 21 Civ. 5739 (PAE), at *82 (S.D.N.Y. Jan. 10, 2023) (finding no duty under Item 105 when argument relied on "same ill-pled factual premise as the claims of material misrepresentations and omissions found wanting above").  (*See supra* §§ I.A, I.C.)

## III.    Plaintiffs' Scheme Claim (Count 1) Fails.

A scheme must "be premised on deceptive acts that are distinct from misstatements and omissions that underlie an accompanying Rule 10b-5(b) claim."  *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S,* 11 F.4th 90, 105 n.6 (2d Cir. 2021).  "[M]isstatements and omissions can form *part* of a scheme liability claim, but an actionable scheme liability claim also requires something *beyond* misstatements and omissions, such as dissemination."  *SEC v. Rio Tinto PLC*, 41 F.4th 47, 49 (2d Cir. 2022).  Here, Plaintiffs allege nothing beyond the purported misstatements and omissions, which is fatal to their "scheme" claim.  (AC ¶ 342.)

## IV.    The Complaint Does Not Adequately Allege Scienter.

Plaintiffs' 10b-5 claims should be dismissed for an additional, independent reason:  the allegations do not raise a strong inference of scienter.  To plead scienter, Plaintiffs must allege facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness".  *ATSI*

*Comms.*, 493 F.3d at 99.   "[I]n determining whether the pleaded facts give rise to a 'strong'
inference of scienter, the court must take into account plausible opposing inferences" and,
ultimately, "a reasonable person [must] deem [it] cogent and at least as compelling as any
opposing inference one could draw from the facts alleged." *Tellabs,* 551 U.S. at 323-24.

### A.   Plaintiffs Fail To Plead the Individual Defendants' Motive To Defraud.

To plead motive, Plaintiffs must allege "concrete benefits that could be realized by one or
more of the false statements and wrongful nondisclosures alleged". *Ganino v. Citizens Utils.
Co.,* 228 F.3d 154, 170 (2d Cir. 2000).   "General allegations that the defendants acted in their
economic self-interest are not enough." *Id.*   Here, Plaintiffs seek to plead motive by alleging that
"Spirit's executive compensation plans gave the Individual Defendants motives to conceal
defects that had the potential to impact the Company's performance or share price."   (AC ¶ 319-
24.)   But "[t]he Second Circuit has made clear . . . that 'it is not sufficient to allege goals that are
possessed by virtually all corporate insiders, such as . . . the desire to maintain a high stock price
in order to increase executive compensation.'"   *Schaffer v. Horizon Pharma PLC*, 16-CV-1763
(JMF), 2018 WL 481883 at *11 (S.D.N.Y. Jan. 18, 2018) (quoting *S. Cherry St.*, *LLC v.
Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009)).   That is because "[m]otives that are
common to most corporate officers . . . do not constitute 'motive'" to commit securities fraud.
*ECA,* 553 F.3d at 198.

Plaintiffs allege that the Individual Defendants' incentive compensation was high (a) in
absolute terms (AC ¶ 323), (b) compared to their salaries (AC ¶ 324), and (c) compared to the
typical Spirit employee (AC ¶ 325).   But that only shows that the Individual Defendants' motives
were ***no different from*** those "common to most corporate officers".   *ECA,* 553 F.3d at 198.[5]

### B.   Plaintiffs Fail To Adequately Plead Conscious Misbehavior or Recklessness.

Having failed to plead motive, Plaintiffs may plead scienter through "strong
circumstantial evidence of conscious misbehavior or recklessness", *Lehmann v. Ohr Pharm.,*

---

[5] Likewise, Plaintiffs' allegation that the Individual Defendants' compensation was based in part on quality as
measured by "key customer metrics" (AC ¶ 320) is irrelevant to whether the Individual Defendants had a motive to
conceal alleged quality issues from investors.   If anything, it would only incentivize Defendants to improve quality.
Further, "key customer metrics" measured confidentially by Boeing have no relationship to investors at all.

*Inc.*, 830 F. App'x 349, 352 (2d Cir. 2020), but "the strength of the circumstantial allegations must be correspondingly greater". *ECA*, 553 F.3d at 199. Plaintiffs must plead that defendants either "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Id.* Plaintiffs focus on the third prong. There, "Second Circuit cases uniformly rely on allegations that (1) ***specific*** contradictory information was available to the defendants (2) ***at the same time*** they made their misleading statements"; moreover, Plaintiffs "must specifically identify the reports or statements containing this information." *Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 237 (S.D.N.Y. 2020) (emphasis in original). "[A]ccusations founded on nothing more than a defendant's corporate position are entitled to no weight." *Plumbers Steamfitters v. Canadian Imp. Bank of Comm*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010).

Plaintiffs allege that the Individual Defendants knew of two alleged facts: (1) the existence of "mis-drilled holes on the 737 MAX aft pressure bulkhead"; and (2) the existence of "severe and persistent quality problems" at Spirit. (AC ¶ 119.) Neither is sufficient. As a general matter, even if Plaintiffs adequately alleged that the Individual Defendants were aware of the two alleged issues, that does not establish scienter because, as explained above, Defendants never guaranteed Spirit would meet all quality standards. Therefore, Plaintiffs fail to allege "contradictory information was available to the defendants". *Woolgar*, 477 F. Supp. 3d at 237.

On the alleged mis-drilled bulkhead issue, Plaintiffs allege that "in October 2022 . . . Dean identified that Spirit had mis-drilled holes on the 737 aft pressure bulkhead" and that rank-and-file Spirit employees knew of this issue. (AC ¶ 120-21.) Those allegations do not contradict or render misleading any public statement made by the Individual Defendants or Spirit. As a result, there can be no scienter. *See Novak*, 216 F.3d at 308 (requiring plaintiffs to "specifically allege[] defendants' knowledge of facts or access to information contradicting their public statements"). Moreover, Plaintiffs "provide [no] specific instances in which Defendants received information" about the alleged mis-drilled bulkhead issue. *Canadian Imp. Bank*, 694 F.

Supp. 2d at 299.  Accepting Plaintiffs' allegations as true, the only employees who knew about the mis-drilled holes worked in "rank-and-file positions" and "had no contact with the Individual Defendants".  *Loc. No. 38 IBEW v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010), *aff'd* 430 Fed. Appx. 63 (2d Cir. 2011).  "[A]llegations that [defendant's] lower-level managers monitored the [alleged misconduct] are . . . certainly insufficient with respect to the Company's senior executives."  *Horizon*, 2018 WL 481883, at *12.  Because Plaintiffs fail to allege that ***any*** rank-and-file employees had ***any*** contact with the Individual Defendants—let alone communicated the issue to the Individual Defendants—dismissal is warranted.[6]

Plaintiffs' allegation that the Individual Defendants knew of "severe and persistent quality problems" that led to Spirit's probation (AC ¶ 123) are insufficient to plead scienter.

*First*, Plaintiffs' allegations that the Individual Defendants were "almost certainly already aware of Spirit's excessive defects, failure to follow quality requirements, and Boeing probation" (AC ¶ 130) or had access to contrary information (AC ¶ 311-18) "are precisely the sort of vague conclusions that courts have rejected" in the scienter context.  *In re Keyspan Corp. Securities Lit.*, 383 F. Supp. 2d 358, 388 (E.D.N.Y. 2003).  "[B]oilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their . . . executive positions are insufficient to plead scienter."  *McIntire v. China Mediaexpress Holdings, Inc.*, 927 F. Supp. 2d 105, 128 (S.D.N.Y. 2013).  Such general allegations cannot suffice because they do not plead "specific contradictory information [that] was available to the defendants" when "they made their misleading statements".  *Woolgar*, 477 F. Supp. 3d at 237.

*Second*, Plaintiffs' allegation that FE1's email informed Gentile of "widespread quality problems at Spirit" (AC ¶ 123) is contradicted by the email itself.  Allegedly, the email informed Gentile that FE1's manager told him "to change the way [h]e wrote the defects and no longer document the amount of defects on the quantity box but change it and log it on the zone box" in paperwork.  (*Id.* ¶ 100.)  This does not suggest that Spirit had poor quality or was concealing

---

[6] Plaintiffs also attempt to plead Gentile's knowledge of the alleged mis-drilled bulkhead issue through his statement that Spirit was "already actively working on a fix when" Boeing identified the issue.  (AC ¶ 305.)  Even if Gentile eventually learned of the issue, that does not establish his contrary knowledge "at the same time [he] made [his earlier, allegedly] misleading statements".  *Woolgar*, 477 F. Supp. 3d at 237.

defects; rather, it suggests a Spirit manager at one time instructed employees to modify their recording of defects.  In fact, FE1 suggests that Spirit maintains a culture of quality, as FE1 told Gentile that "[e]verywhere I go throughout the factory I see signs about 'Quality Matters' and if there is something wrong to stop and raise a concern."  (AC ¶ 102.)  FE1 allegedly did that here, and Gentile allegedly responded "a few days later . . . thanking [FE1] for raising his concerns and copying Spirit's Human Resources leader".  (AC ¶ 103.)  Thereafter, "the allegations in [FE1's] ethics complaint were sustained, his prior position was reinstated, and he was given backpay."  (*Id.*)  This establishes Gentile's support of Spirit's reporting process, is an example of quality controls working, and contradicts Plaintiffs' theory of alleged quality problems.

*Third*, Plaintiffs' allegation that Gentile "left the Company under suspect circumstances" is insufficient.  "[A]bsent additional factual allegations linking the executives' resignation to the alleged fraud, such allegations are insufficient to raise a strong inference of scienter."  *In re UBS AG Securities Litig.*, No. 07 Civ. 11225(RJS), 2012 WL 4471265, at *18 (S.D.N.Y. Sept. 28, 2012).  Plaintiffs plead no such facts with respect to Gentile (or two other departed Spirit executives, discussed below, *infra* § IV.C).  Indeed, Plaintiffs do not plead that Gentile was terminated; they merely allege his departure was not a "planned retirement".  (AC ¶ 326.)

*Fourth*, Plaintiffs seek to plead scienter by alleging that the 737 and quality, generally, are "core operation[s]" of Spirit.  (AC ¶ 307-10)  The core operations doctrine—a pre-PSLRA relic that "may no longer be good law"—posited that "fraudulent intent can be inferred whenever a defendant makes false or misleading statements if those statements concern the core operations of the company."  *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021).  But even before the PSLRA, the core operations doctrine "at most constitute[d] supplemental support for alleging scienter but [did] not independently establish scienter."  *Id.* at 781-82.  Plaintiffs' core operations allegations cannot rescue their claim.[7]

---

[7] Plaintiffs' reliance on "required certifications under Sarbanes–Oxley section 302(a) adds nothing to the scienter calculus" because "allowing Sarbanes–Oxley certifications to create an inference of scienter in every case where there was an [error or mistake] made by a publicly traded company would eviscerate the [PSLRA] pleading requirements."  *Intl. Assn. of Heat v. Intl. Bus. Machines Corp.*, 205 F. Supp. 3d 527, 536 (S.D.N.Y. 2016).

**C.        Plaintiffs Do Not Plead Corporate Scienter Against Spirit, Generally.**

To plead corporate scienter, Plaintiffs must allege facts to "create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020).  "The most straightforward way [to do that is] to impute it from an individual defendant who made the challenged misstatement."  *Id.* Because Plaintiffs fail to plead the Individual Defendants' scienter, Plaintiffs must establish that this is among the "exceedingly rare instances" in which a statement is "so dramatic that collective corporate scienter may be inferred".  *Nandkumar v. AstraZeneca PLC,* 2023 WL 3477164, at *4 (2d Cir. May 16, 2023).  That is absent here.  *Cf. Teams. Local 445 v. Dynex Cap., Inc.*, 531 F.3d 190, 195-96 (2d Cir. 2008) (explaining that corporate scienter would exist if "[GM] announced that it had sold one million SUVs . . . and the actual number was zero".).

This case is like *Abernathy*, where plaintiff attempted to plead corporate scienter by alleging that employees knew of issues at the company that contradicted challenged statements. 960 F.3d at 99.  The Second Circuit upheld the complaint's dismissal because it included "no connective tissue between those employees and the alleged misstatements" through, for example, "particularized allegations that senior officers ignored those employees' warnings".  *Id.*  So too here.  Plaintiffs allege that a handful of managers were aware of various issues at Spirit, but, aside from the alleged March 2022 email to Gentile (which contradicts Plaintiffs' arguments), they plead no facts to link those managers or their conduct to senior officers at Spirit.[8]

All Plaintiffs have left are allegations that (a) a Commercial Division Head left Spirit after the class period and an SVP and General Manager was terminated during the class period (AC ¶ 326-31); and (b) the 737 and quality, generally, are "core operation[s]" for Spirit (AC ¶ 307-10).  But Plaintiffs' allegations that two other Spirit executives, aside from Gentile, "left the Company under suspect circumstances" are inapposite for the same reasons as Gentile's

---

[8] Plaintiffs' flowchart allegedly showing that various teams reported to a PPV management team that reported to an executive team that allegedly included Gentile and Suchinski does not change this.  (AC ¶ 313.)  Plaintiffs allege no facts to suggest that those on the PPV management team who knew about alleged quality issues at Spirit reported to executives, let alone informed such executives, or how many layers existed between those individuals and Spirit executives.  For similar reasons, Plaintiffs' allegations that Gentile sat on a "quality excellence council" (AC ¶ 314) and that quality was a focus of management (AC ¶¶ 315-18) likewise fail to establish scienter.

departure.  Again, Plaintiffs plead no "factual allegations linking the executives' resignation to the alleged fraud."  *In re UBS AG Securities Litig.*, 2012 WL 4471265, at *18.  For the reasons stated above (*supra* IV.B), the core operations doctrine is no longer good law and is at most supplemental support for other viable scienter allegations, which here are lacking.

**V.      Plaintiffs Fail To Adequately Plead Loss Causation.**

"Loss causation" is the "causal connection between the material misrepresentation and the loss".  *Dura*, 544 U.S. at 342.  Plaintiffs may plead loss causation by alleging (1) that "the market reacted negatively to a corrective disclosure of the fraud", or (2) "the materialization of the risk concealed by the fraudulent statement".  *Carpenters Pension Tr. Fund v. Barclays PLC,* 750 F.3d 227, 232-33 (2d Cir. 2014).  Failure to plead loss causation is an appropriate basis for dismissal.  *See, e.g., Boluka Garment Co. v. Canaan Inc.*, 547 F. Supp. 3d 439, 446 (S.D.N.Y. 2021).  Here, Plaintiffs do not adequately plead either theory of loss causation.

**A.      Plaintiffs Fail To Plead Any Corrective Disclosures.**

"To plead loss causation through a corrective disclosure, plaintiffs must establish that the latter disclosure revealed to the market the falsity of the prior disclosure and that the market reacted negatively to the revelation that that prior disclosure had been false."  *Omega*, 563 F. Supp. 3d at 267.  Plaintiffs attempt to plead loss causation based on five stock drops in 2023: April 13 (the first day the tail-fin fitting became public); May 3; August 2; August 23 (the first day the mis-drilled hole issue became public); and September 7.  "[T]here is nothing in [these] disclosures that suggested to the market that [Spirit] had been untruthful in making its prior statements."  *Omega*, 563 F. Supp. 3d at 267.  Plaintiffs' allegations show that the market did not react to any revelation that Spirit's prior statements had been false, but instead to decreased production and the cost of remediation from newly discovered issues.  (AC ¶ 225 ("Boeing Max production could be slowed by issue with parts", "New Production Issue Will Delay 737 MAX Deliveries, Require Repairs", "Boeing 737 MAX production hit by a new defect in supplier part"); AC ¶ 270, 275 ("Boeing and Spirit Grapple With Newly Discovered 737 MAX Quality Issue", "Boeing and a key supplier find a new manufacturing issue that affects the 737 Max

airliner"); AC ¶ 287 ("Boeing Warns 737 Deliveries to Be at Low End of 2023 Target").

Plaintiffs may not recover for the stock declines on May 3, August 2 and September 7 for the independent reason that no news related to the purported fraud was released on those days. The tail fin fitting and mis-drilled hole issues were fully disclosed on April 13 and August 23, respectively. Any stock impact from those events occurred on those earlier dates because "the price of a security in a functioning market accurately reflects its value, given the information available to the public." *In re IPO Sec. Litig.*, 544 F. Supp. 2d 277, 288 (S.D.N.Y. 2008).

### B.   Plaintiffs Fail To Plead Materialization of a Concealed Risk.

Plaintiffs likewise fail to plead loss causation through the materialization of a concealed risk, which requires Plaintiffs to allege that "the[ ]loss was foreseeable and caused by the materialization of the risk *concealed* by the fraudulent statement." *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 409 (S.D.N.Y. 2016) (emphasis in original). Plaintiffs have pleaded no *concealed* risks, and thus cannot show a foreseeable loss arising therefrom. (*See supra* § I.B, II.B.) Many of the statements Plaintiffs challenge are disclosures of the very risks that were purportedly concealed. (*Id.*) "[W]here (as here) substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk, a plaintiff must allege (i) facts sufficient to support an inference that it was defendant's fraud—rather than other salient factors—that proximately caused plaintiff's loss; or (ii) facts sufficient to apportion the losses between the disclosed and concealed portions of the risk that ultimately destroyed an investment". *Lentell*, 396 F.3d at 177. Plaintiffs have done neither.

### VI.   Plaintiffs' Section 20(a) Claim Must be Dismissed.

Because Plaintiffs fail to state a claim for a primary violation under Section 10(b), their claims arising under Section 20(a) must also be dismissed. *Rombach*, 355 F.3d at 177-178.

### <u>CONCLUSION</u>

Defendants respectfully request that the Court dismiss the AC with prejudice.

February 20, 2023

Respectfully submitted,

CRAVATH, SWAINE & MOORE LLP

by
/s/ *J. Wesley Earnhardt*
J. Wesley Earnhardt
Michael P. Addis
Members of the Firm

Worldwide Plaza
   825 Eighth Avenue
     New York, NY 10019
       (212) 474-1000
       wearnhardt@cravath.com
       maddis@cravath.com

*Counsel for Defendants*