# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HANG LI, Individually and on Behalf of All Others Similarly Situated,<br><br>            Plaintiff,<br><br>    v.<br><br>SPIRIT AEROSYSTEMS HOLDINGS, INC., TOM GENTILE III, and MARK J. SUCHINSKI,<br><br>            Defendants. | Case No. 1:23-cv-03722-PAE<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION AND OVERVIEW ........................................................ 1

II.     JURISDICTION AND VENUE ............................................................................. 6

III.    PARTIES ....................................................................................................... 6

IV.     BACKGROUND ............................................................................................... 8

        A.      Spirit Was Created As A Spinoff From Boeing In 2005, And Boeing Has
                Remained Spirit's Key Customer Ever Since ........................................... 8

        B.      Spirit's Business Depends On Manufacturing Boeing 737 MAX Airplane
                Components ........................................................................................ 9

        C.      Spirit Lost Business And Fired Workers Following The 2019 Grounding
                Of The 737 MAX And The 2020 Implementation Of COVID Restrictions ........ 10

V.      DEFENDANTS ISSUED MATERIALLY FALSE AND MISLEADING
        STATEMENTS REGARDING SPIRIT'S MANUFACTURING CAPIBILITIES ......... 12

        A.      The Class Period Begins on April 8, 2020 When Spirit Issued a Press
                Release Regarding COVID .................................................................... 13

        B.      May 6, 2020 Quarterly Report For the First Quarter of 2020 ................ 14

        C.      February 25, 2021 Annual Report for 2020 ......................................... 16

        D.      June 17, 2021 Sustainability Report ................................................... 17

        E.      February 15, 2022 Annual Report for 2021 ......................................... 18

        F.      March 2, 2022 Investor Day .............................................................. 20

        G.      May 4, 2022 Quarterly Report For the First Quarter of 2022 ............... 23

        H.      November 3, 2022 Quarterly Report For the Third Quarter of 2022 ....... 24

        I.      February 17, 2023 Annual Report for 2022 ......................................... 25

        J.      March 29-31, 2023 Spirit Website Statements ................................... 27

VI.     THE TRUTH EMERGES, CAUSING SUBSTANTIAL DECLINES IN
        SPIRIT'S STOCK PRICE, WHILE DEFENDANTS CONTINUE TO ISSUE
        MATERIALLY FALSE AND MISLEADING STATEMENTS .............................. 30

        A.      April 13, 2023 Boeing Press Statements And Articles Concerning Spirit's
                Defective Installation Of 737 MAX Tail Fin Fittings ........................... 30

B.    May 3, 2023 Spirit First Quarter Earnings Release ................................................ 32

C.    August 2, 2023 Spirit Second Quarter Earnings Release ...................................... 37

D.    August 23, 2023 Articles And Spirit Press Release Concerning Spirit's Mis-Drilling Of Fastener Holes On The 737 MAX Aft Pressure Bulkhead......... 40

E.    Spirit and Boeing Confirmed The True Extent Of The Mis-Drilled Holes Defect At Jefferies Industrial Conference................................................................ 42

VII.    FORMER SPIRIT EMPLOYEES CONFIRM THAT SPIRIT AND THE INDIVIDUAL DEFENDANTS KNEW OF PERVASIVE QUALITY PROBLEMS ................................................................................................................ 45

A.    Quality Inspector Team Lead Former Employee 1 Notified Gentile Of Spirit's Probation With Boeing And Efforts To Conceal Excessive Defects ....... 45

B.    Product and Process Verification Core Quality Auditor Joshua Dean Identified and Reported The Mis-Drilled Holes Defect Months Before It Was Publicly Disclosed ......................................................................................... 51

C.    Inspector Team Lead Robert Hurt Observed Numerous Quality Problems And Confirmed Spirit's Prior Knowledge Of The Mis-Drilled Holes Defect................................................................................................................... 58

D.    Metals Mechanic Former Employee 3 Notified Gentile of Violations of Boeing and FAA Standards and Confirmed Spirit's Prior Knowledge of The Mis-Drilled Holes Defect .............................................................................. 64

E.    Internal Quality Auditor Former Employee 2 Observed Quality Problems Including Many Mechanics Using Out-Of-Calibration Tools .............................. 69

VIII.    POST CLASS PERIOD EVENTS CONFIRM DEFENDANTS' FALSE AND MISLEADING STATEMENTS WERE MADE WITH SCIENTER .............................. 71

A.    Spirit Replaced Gentile as CEO............................................................................ 71

B.    The Head Of Spirit's Commercial Division, Samantha Marnick, left Spirit, and its Senior Vice President and General Manager, Boeing Programs Kevin Matthies Was Abruptly Fired.................................................................... 72

C.    Spirit and Boeing Entered A "Stability Plan" Requiring Spirit To Reduce Defects And Increase Quality Staffing ................................................................. 73

D.    Reporting By The Air Current Revealed An Expanded Scope Of The Mis-Drilled Holes Defect ........................................................................................ 74

E.     Spirit's Defective Manufacturing Contributed To The 737 MAX Door Plug Blowout, Which Has Resulted In Governmental Investigations Of Spirit...................................................................................................... 75

F.     Reporting Following The Door Plug Blowout Confirms Pervasive Quality Problems At Spirit ............................................................................... 77

IX.     ADDITIONAL SCIENTER ALLEGATIONS ................................................... 82

A.     Defendants' Own Statements Show They Knew Of And Concealed The Mis-Drilled Holes Defect......................................................................... 82

B.     Manufacturing And Quality Control For 737 MAX Components Were Core Operations For Spirit....................................................................... 83

C.     Defendants Held Themselves Out As Knowledgeable About The 737 MAX And Quality Issues, And Had Access To The Concealed Facts................ 84

D.     Defendants' Incentive Compensation Provided A Motive To Conceal Quality Defects ...................................................................................... 86

D.     The FAA Levied Fines Totaling Millions Of Dollars Against Boeing For Using Defective Parts Supplied By Spirit................................................. 88

E.     Defendant Spirit Acted With Corporate Scienter ................................... 89

X.      LOSS CAUSATION.......................................................................................... 89

XI.     CLASS ACTION ALLEGATIONS ................................................................... 90

XII.    UNDISCLOSED ADVERSE FACTS ............................................................... 91

XIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ...................................................................................... 92

XIV.    NO SAFE HARBOR ......................................................................................... 94

XV.     FIRST CLAIM................................................................................................... 95

XVI.    SECOND CLAIM.............................................................................................. 98

XVII.   PRAYER FOR RELIEF .................................................................................... 99

XVIII.  JURY TRIAL DEMANDED ............................................................................. 100

## <u>EXHIBIT LIST</u>

Exhibit 1 –    Certification of Plaintiff Mike Drumright

Exhibit 2 –    Certification of Plaintiff Marco Amiotti

Exhibit 3 –    February 22, 2022 internal Spirit email chain regarding documentation of defects

Exhibit 4 –    February 22, 2022 internal Spirit ethics complaint

Exhibit 5 –    March 16, 2022 internal Spirit email to Defendant Gentile regarding ethics complaint and retaliation

Lead Plaintiff Hang Li and named plaintiffs Mike Drumright and Marco Amiotti ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following based upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes, without limitation: (a) review and analysis of regulatory filings made by Spirit AeroSystems Holdings, Inc. ("Spirit" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) interviews with former employees of Spirit; (c) review and analysis of press releases and media reports issued and disseminated by Spirit; and (d) review of other publicly available information concerning Spirit.

## I.      NATURE OF THE ACTION AND OVERVIEW

1.      This is a securities class action on behalf of a class consisting of all persons and entities who purchased or otherwise acquired the Class A common stock of Spirit between April 8, 2020 and September 7, 2023, both dates inclusive (the "Class Period"), and who were damaged thereby. Plaintiffs seek to recover compensable damages caused by Spirit, Tom Gentile III ("Gentile"), and Mark J. Suchinski ("Suchinski") (collectively referred to as "Defendants"), for violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.      Spirit is the main supplier of parts to The Boeing Company ("Boeing"), and Boeing is Spirit's main customer. One of Spirit's primary roles is to manufacture most of the fuselage for Boeing 737 aircraft, which it then ships to Boeing for final assembly of completed aircraft.

3.      Two tragic crashes of Boeing 737 MAX aircraft in October 2018 and March 2019 severely affected Spirit's business.  Regulators worldwide, including the U.S. Federal Aviation Administration ("FAA"), grounded the 737 MAX due to safety concerns.  From that time through the present, the safety and quality of the 737 MAX and its components has been a key focus for Spirit, investors, and the flying public.

4.      Prior to and throughout the Class Period, Spirit's Chief Executive Officer, Gentile, and its Chief Financial Officer, Suchinski,[1] emphasized the importance of the 737 MAX program, as well as their heightened sensitivity to, and personal involvement in, ensuring the quality of Spirit's product, particularly considering the 737's previous failures.

5.      Throughout the Class Period, Defendants highlighted Spirit's processes, safeguards, and core competencies in safety and quality to assuage investors' concerns. For example, Defendants issued statements claiming that Spirit: "is dedicated to a Zero-Defect target, with no escapements[2] to our customers," maintains a dedicated Quality Department to "ensure impeccable product quality and safety," "build[s] product that is the right quality, the first time that don't break," goes "above and beyond what the requirements ask of us to make sure that our customers are successful when it comes to quality," and has "a great quality system that ensures our parts are inspected and controlled and go out [foreign object debris] free and defect free."

6.      However, these statements concealed from investors that Spirit was suffering from known, widespread, and sustained quality failures. These failures included defects such as the routine presence of foreign object debris ("FOD") in Spirit products, missing fasteners, peeling paint, and poor skin quality. These constant quality failures resulted from Spirit's culture,

---

[1] Collectively, Gentile and Suchinski are referred to as the "Individual Defendants." *See* ¶28.

[2] In this context "escape" or "escapement" means a defect or nonconformance with manufacturing requirements.

which prioritized production numbers and short-term financial outcomes over product quality, and Spirit's related failure to hire sufficient personnel to deliver quality products at the demanded rates.

7.      Spirit's quality failures were so severe and persistent that Boeing placed Spirit on probation from approximately 2018 through at least 2021. This probation created serious financial risks for Spirit, as it is the last step Boeing takes before "the supplier could be withdrawn" for continued failures. According to former employees, Spirit responded to this probation by manipulating the way it counted defects, rather than addressing the root cause of the deficiencies.

8.      While Spirit's widespread quality failures would have been known to the Individual Defendants throughout the Class Period, the Individual Defendants were expressly made aware on March 16, 2022, when a Spirit Quality Inspector Team Lead emailed Gentile (*see* **Exhibit 5**) a copy of an ethics complaint (*see* **Exhibit 4**) that he had filed in response to his manager demanding that his team falsify documentation to underreport the number of defects in Spirit products. The  email stated that "I have lost faith on the quality organization here at spirit and this is my last cry for help into resolving this issue that violates the guide lines stablished by the AS9100 which governs our certification to build aircraft and which has been in question and even put on probation by Boeing on previous years."[3] The ethics complaint attached to the email noted "the excessive amount of defects" and explained that the employee had been instructed to

---

[3] AS9100 is the widely adopted and standardized international quality management system standard for the aviation industry, created by the Society of Automotive Engineers ("SAE"). The standard provides suppliers with requirements for creating and maintaining a comprehensive quality system for providing safe and reliable products. Boeing requires suppliers such as Spirit to comply with AS9100.

misreport the numbers of defects in a way "which would be falsifying the documentation." Gentile personally responded to the email, and Spirit later sustained the allegations in the ethics complaint.

9.       Similarly, in October 2022 Spirit Product and Process Verification Core Quality Auditor Joshua Dean identified that Spirit had mis-drilled holes on the 737 MAX aft pressure bulkhead. The aft pressure bulkhead is a critical part of an airplane and is necessary to maintain cabin pressure during flight. Dean reported this defect to multiple Spirit employees over several months, including submitting formal written findings to his manager.

10.      Despite repeated assurances about Spirit's emphasis on quality and manufacturing defect-free components, Spirit's systemic quality failures resulted in serious defects. The public only learned about the existence of these defects and their implications after Boeing and various media outlets, not Spirit, first reported the problems.

11.      On April 13, 2023, Boeing revealed to the press that a defect in the tail fin fittings on certain 737 MAX aircraft assembled by Spirit appeared widespread. Subsequent reporting revealed the defect was due to Spirit's improper installation of tail fin fittings. In response to this news, Spirit's stock price plunged more than 20% the following day. Spirit belatedly confirmed the tail fin fittings defect after it had been revealed by Boeing and the press but remained silent about the mis-drilled aft pressure bulkhead holes defect.

12.      In the following months, more details were revealed about the scope and impact of the tail fin fittings defect, causing further substantial declines in Spirit's stock price. Spirit nonetheless continued to conceal the mis-drilled aft pressure bulkhead holes defect claiming that the problems had been resolved. Spirit made highly misleading statements, including that it was delivering products to Boeing "with no defects," that it was delivering "conforming fuselages,"

and that it had "shared a lot of information" with Boeing, all the while concealing the mis-drilled aft pressure bulkhead holes defect not only from investors, but apparently also from Boeing.

13.     On August 23, 2023, Boeing revealed that it had "identified fastener holes that did not conform to our specifications in the aft pressure bulkhead on certain 737 airplanes." This was precisely the same defect identified by former Spirit employee Joshua Dean in October 2022. Only after The Air Current, an aerospace industry news publication, and other sources identified Spirit as the source of the defect did Spirit belatedly confirm this fact. In response to this news, Spirit's stock price plunged 12.7% the following day.

14.     At the end of the Class Period, during a presentation at an investor conference, Gentile confirmed Spirit knew about the pervasive quality issues, as well as Spirit's concealment of the mis-drilled holes defect, admitting that Spirit had been working on a solution to that defect when the "escape" was found by Boeing. Gentile also candidly admitted, "escapes happened, and they happen on all programs. They usually don't get this much attention."

15.     Three weeks after those comments, Spirit abruptly replaced Gentile with an interim CEO.  The Board of Directors subsequently terminated the employment of Samantha Marnick, who as President of Spirit's Commercial Division was responsible for overseeing its programs with Boeing.

16.     Shortly thereafter, Boeing required Spirit to enter a "Stability Plan" to address its widespread quality failures.

17.     As a result of Defendants' misleading statements and omissions, and the resulting precipitous decline in the market value of Spirit's stock, Plaintiffs and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

18.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

20.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa). The alleged misstatements entered and subsequent damages took place within this judicial district. Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.

21.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

22.     Lead Plaintiff Hang Li, as set forth in his previously filed certification (Dkt. No. 1 at pages 41-43), incorporated by reference herein, purchased Spirit shares during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

23.     Plaintiff Mike Drumright, as set forth in the attached certification (**Exhibit 1**), purchased Spirit shares during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

24.     Plaintiff Marco Amiotti, as set forth in the attached certification (**Exhibit 2**), purchased Spirit shares during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

25.     Defendant Spirit AeroSystems Holdings, Inc. is incorporated in Delaware and maintains its principal executive offices at 3801 South Oliver, Wichita, Kansas 67210. Spirit's shares are listed and trade on the New York Stock Exchange ("NYSE") under the ticker symbol "SPR".

26.     Defendant Tom Gentile III served as President and Chief Executive Officer of Spirit from August 1, 2016 to September 30, 2023. He joined Spirit in April 2016 as Executive Vice President and Chief Operating Officer. From 2016 until September 30, 2023, Gentile also served as a member of Spirit's Board of Directors.

27.     Defendant Mark Suchinski has served as Senior Vice President and Chief Financial Officer of Spirit since January 29, 2020. In this role he is responsible for the overall financial management of the Company, its financial reporting and transparency, and multiple corporate functions including Controllership and Treasury. He also has responsibility for Contracts, Investor Relations, Strategy, and Mergers and Acquisitions. Suchinski has been with Spirit since 2006, in roles including Vice President, Quality, from August 2019 to January 2020 and Vice President, Boeing 787 Program, from February 2018 to August 2019.

28.     Defendants Gentile and Suchinski (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The

Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that Defendants made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

29.     The Company and the Individual Defendants are referred to herein, collectively, as "Defendants."

## IV.     BACKGROUND

### A.     Spirit Was Created As A Spinoff From Boeing In 2005, And Boeing Has Remained Spirit's Key Customer Ever Since

30.     In 2005 Boeing sold its commercial fabrication operations in Wichita, Kansas and Oklahoma, encompassing various manufacturing facilities. This newly divested Boeing division began operating under the name Spirit AeroSystems, which went public in 2006.

31.     Spirit was heavily dependent on Boeing as Spirit's key customer, and Boeing remained heavily dependent on Spirit as its largest supplier of components for Boeing aircraft. From the 2005 divestiture through present, one of Spirit's primary roles has been to manufacture the majority of the fuselage for Boeing 737 aircraft, including the Boeing 737 MAX, which it ships to Boeing for final assembly of completed aircraft.

32.     In connection with the 2005 divestiture, Boeing and Spirit entered into long-term supply agreements under which Spirit would be, and has remained, Boeing's exclusive supplier for substantially all the products and services that Spirit previously provided when it was still a part of Boeing.

33.     Spirit's agreements require Boeing to purchase from Spirit all its requirements for various products including fuselages, struts/pylons, and nacelles (including thrust reversers), wings and wing components, as well as tooling. Spirit is the sole source supplier to Boeing of nearly all of the products it sells to Boeing.

**B.     Spirit's Business Depends On Manufacturing Boeing 737 MAX Airplane Components**

34.     The Boeing 737 fuselage is manufactured by Spirit in Wichita, Kansas before it is shipped by rail to Boeing factories in Everett and Renton, Washington.

35.     As stated in Spirit's SEC filings, "Our business depends largely on sales of components for a single aircraft program, the B737 MAX." 53% of Spirit's net revenues were generated from sales of components to Boeing for the 737 in 2019, and 45% in 2022. At year-end 2022, the 737 MAX accounted for 58% of Spirit's order backlog. As such, the 737 MAX is critically important to Spirit's business.

36.     In approximately 2018, Boeing placed Spirit on probation, due to the large number of escapements found in fuselages that Spirit had shipped to Boeing.

37.     Documents published by Boeing confirm the seriousness of its decision to place Spirit on probation. Boeing's website provides information for its suppliers (https://www.boeingsuppliers.com/), including information about quality requirements. This website contains a FAQ list (https://www.boeingsuppliers.com/supplier/supplierconf/faq-addendum1.html), including the following question and answer:

> What if the supplier does not meet the minimum Addendum 1 requirements when they are contractually obligated to do so?
>
> In order of increasing severity: the Boeing representative could write a Supplier Evaluation Report (SER) requiring corrective action within 30 days; Addendum 1 could be removed from supplier contracts, and the supplier would be ineligible to bid on or perform work for which Addendum 1 is required; the supplier could be put on probation; the supplier could be withdrawn.

38. The Boeing website's "Supplier Quality" page (https://www.boeingsuppliers.com/quality.html) describes "Addendum 1" as an addendum to the Boeing Quality Management System Requirements for Suppliers, which "describes a process for managing the variation of key characteristics (KC)." A supplier's failure to meet Boeing's quality requirements can result in a series of escalating consequences, of which probation is the last before "the supplier could be withdrawn" for continued failures.

**C.   Spirit Lost Business And Fired Workers Following The 2019 Grounding Of The 737 MAX And The 2020 Implementation Of COVID Restrictions**

39. The decrease in travel from the implementation of COVID related restrictions and the grounding of the 737 MAX due to safety concerns in recent years had a profound, negative impact on Spirit's business.

40. On October 29, 2018, Lion Air Flight 610 from Jakarta, Indonesia, operating a 737 MAX 8, crashed killing all 189 people aboard. On March 10, 2019, Ethiopian Airlines Flight 302 from Addis Ababa, Ethiopia, also operating a 737 MAX 8, crashed killing all 157 people aboard. The crashes, occurring close in time and both involving the 737 MAX, generated widespread publicity and concern over the safety of the aircraft.

41. Over March 11-13, 2019, regulators worldwide, including the U.S. Federal Aviation Administration ("FAA"), grounded the 737 MAX. It remained grounded in major markets for more than a year and a half. The FAA allowed it to return to service in November 2020. Canadian and European regulators allowed the 737 MAX to resume service in January 2021. China did not allow the 737 MAX to resume service until December 2021.

42. The grounding orders and concerns over safety drastically reduced demand for the 737 MAX, with corresponding decreases in production at Boeing and at Spirit.

43.     Following the Lion Air and Ethiopian Airlines accidents and the subsequent worldwide grounding of the 737 MAX, Spirit sought to reassure concerned investors and the flying public about the 737 MAX and its components by emphasizing the safety and quality of Spirit's products.

44.     For example, on May 1, 2019, Spirit emphasized safety and quality in its first public conference call following the March 2019 grounding of the 737 MAX. Gentile began the earnings call by stating:

> I want to begin today by focusing on the recent situation involving the 737 MAX. In our industry, safety is the most important priority. We focus every day on safety in our factories and in the products we build. We know that millions of people around the world depend on the safety of the planes they fly every day, which is why all of us were so devastated after the recent accidents involving Lion Air and Ethiopian Airlines.

45.     Gentile similarly stated, "During this period of time our focus has been entirely on the MAX, and adjusting the production schedules, making sure we're delivering quality."

46.     While the 737 MAX remained grounded, the COVID pandemic emerged. Throughout 2020 and much of 2021, governments around the world restricted or banned air travel. Demand for commercial flights plummeted which caused the worst downturn in the history of the aviation industry.

47.     Boeing directed Spirit to suspend all 737 MAX production beginning on January 1, 2020. In December 2020, after the grounding orders began to be lifted, Boeing resumed deliveries of the 737 MAX.  However, Spirit's production remained at substantially reduced levels due to decreased demand. This put tremendous financial strain on Spirit, as its revenue halved from pre-pandemic levels.

48.     In response to the dramatic decrease in demand, Spirit increased its long-term debt by hundreds of millions of dollars and instituted mass layoffs. At year-end 2019, Spirit had

15,900 U.S. employees, but Spirit "laid off 8,500 people in Wichita alone during the pandemic," a reduction of over 50% of the U.S. workforce.

## V.   DEFENDANTS ISSUED MATERIALLY FALSE AND MISLEADING STATEMENTS REGARDING SPIRIT'S MANUFACTURING CAPIBILITIES

49.   Throughout the Class Period, Spirit told investors that Spirit's dedication to quality meant manufacturing products "per specification, per engineering, [and] per the planning." *See* ¶83.  Spirit further told investors that the "basic principles of quality are do not create, do not pass and do not accept a defect." *See* ¶105.  Defendants made numerous statements throughout the Class Period indicating to investors that Spirit was dedicated to manufacturing quality products, that its manufacturing processes ensured that products were shipped without defects, and that, after a major defect led to Boeing pausing deliveries of the 737 MAX in April 2023, Spirit was shipping conforming products.

50.   However, when Defendants made these Class Period statements, they were aware of, but concealed, the facts that: (1) Spirit suffered from systemic and persistent manufacturing issues that were severe and prolonged enough to cause Boeing to place Spirit on probation; and (2) Spirit identified a mis-drilled hole defect on the 737 MAX aft pressure bulkhead in October 2022, months before this issue was disclosed to investors, which led to significant costs and production delays. These undisclosed facts contradicted Defendants' public statements during the Class Period about the quality and safety of Spirit's products, rendering those statements false and misleading.[4]

---

[4]  For the sake of brevity, Plaintiffs only allege herein certain key and/or representative misleading statements.

**A.      The Class Period Begins on April 8, 2020 When Spirit Issued a Press Release Regarding COVID**

51.      The Class Period begins on April 8, 2020.  On that day Spirit issued a press release titled "Spirit AeroSystems' Actions in Response to COVID-19," and filed with the SEC a Form 8-K including a copy of the press release which identified various cost reductions implemented by Spirit:

> In light of the 737 MAX production suspension that began on January 1, 2020, Spirit initiated the following actions to reduce costs:
> - Implemented workforce reductions of 2,800 employees in Wichita, Kansas and 400 employees in Oklahoma
> - Initiated a voluntary retirement program for 850 hourly and salaried workers
>
> *      *      *
>
> To further reduce costs due to the economic impact of the COVID-19 pandemic and related production suspension, Spirit has taken the following additional actions:
>
> *      *      *
>
> - Initiated a 21 calendar-day furlough of production workers and managers supporting Boeing programs in Wichita, Kansas and Oklahoma
> - Implemented a four-day work week for its salaried workforce at its Wichita, Kansas facility until further notice

52.      The press release further stated that "***Spirit has taken the actions highlighted above to reduce costs and preserve its liquidity in this unprecedented time, while also working to maintain the health and viability of its supply chain to support operations post-production suspension***."[5]

53.      The above statements identified in ¶¶51-52 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or

---

[5] Bolded, italicized statements in Sections V-VI indicate that emphasis has been added.

recklessly disregarded, the mass layoffs and similar measures described in the press release resulted in Spirit's loss of many experienced mechanics and quality personnel, thereby materially reducing Spirit's ability to maintain operations to support its customers or the health and viability of its supply chain.

**B.      May 6, 2020 Quarterly Report For the First Quarter of 2020**

54.     On May 6, 2020, Spirit filed with the SEC its quarterly report for the first quarter of 2020 on Form 10-Q. The quarterly report was signed by Suchinski.

55.     Under the heading "Item 1A. Risk Factors" and the sub-heading "Our business depends on our ability to maintain a healthy supply chain and timely deliver products that meet or exceed stringent quality standards, which are negatively impacted by the COVID-19 pandemic," the quarterly report stated:

> ***Operational issues, including delays or defects in supplier components relating to government mandated production shutdowns or otherwise, could result in significant out-of-sequence work and increased production costs, as well as delayed deliveries to customers***.

56.     The above statements identified in ¶55 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Spirit was already experiencing "operational issues" necessitating frequent out of sequence manufacturing and production, which created a heightened risk of and did in fact contribute to pervasive quality escapes. As a result of these systemic operational issues, Spirit was experiencing increased production costs due to the need for repairs and was unable to "timely deliver products that meet or exceed stringent quality standards," which had already led Boeing to place Spirit on probation.

57.     Spirit's First Quarter 2020 Form 10-Q was also materially misleading for failing to provide disclosures required by Item 105 (17 C.F.R. § 229.105) and Item 303 (17 C.F.R. §

229.303) of SEC Regulation S-K. Item 105 of Regulation S-K requires public companies like Spirit to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering speculative or risky," and to "explain how each risk affects the registrant or the securities being offered." 17 C.F.R. § 229.105. Public companies are required to provide this information in their quarterly and annual reports.

58.     In violation of Item 105, Defendants failed to disclose in Spirit's First Quarter 2020 Form 10-Q that Spirit suffered from severe and persistent quality problems, which led Boeing to place Spirit on probation. This was a material factor that made an investment in Spirit speculative or risky. Such persistent quality problems and probation created risks of future repair costs and lost business from Boeing, which accounted for more than half of Spirit's revenues.

59.     Item 303 of SEC Regulation S-K requires public companies like Spirit to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations," and to "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." 17 C.F.R. § 229.303(b)(1)-(2). This discussion "must focus specifically on material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." 17 C.F.R. § 229.303(a). Public companies are also required to provide this information in their quarterly and annual reports.

60.     In Spirit's First Quarter 2020 Form 10-Q Defendants also violated Item 303 by failing to disclose that Spirit suffered from severe and persistent quality problems that led Boeing to place Spirit on probation. The possibility of future repair costs and lost business due to such

quality failures were known uncertainties likely to result in material decreases in Spirit's net sales, revenues, income from continuing operations, and liquidity.

### C.   February 25, 2021 Annual Report for 2020

61.    On February 25, 2021, Spirit filed with the SEC its annual report for 2020 on Form 10-K. The annual report was signed by Gentile and Suchinski.

62.    Under the heading "Our business depends on our ability to maintain a healthy supply chain, meet production rate requirements, and timely deliver products that meet or exceed stringent quality standards", the annual report stated:

> *If the Company fails to meet the quality or delivery expectations or requirements of its customers, disruptions in manufacturing lines could result, which could have a material adverse impact on the Company's ability to meet commitments to its customers and on its future financial results.*

63.    The above statements identified in ¶62 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Spirit did not "timely deliver products that meet or exceed stringent quality standards," but routinely delivered products that failed to meet quality standards, and this had already led to manufacturing disruptions and Boeing placing Spirit on probation. These statements were additionally misleading for presenting defects and quality failures, or Spirit's "fail[ure] to meet the quality or delivery expectations or requirements of its customers," as hypothetical risks when Spirit routinely experienced defects and quality failures and failed to meet the quality expectations of its customers, including Boeing.

64.    Spirit's Annual Report for 2020 on Form 10-K was also materially misleading for failing to provide disclosures required by Item 105 and Item 303 of SEC Regulation S-K.

65.    In violation of Item 105, Defendants failed to disclose in Spirit's Annual Report for 2020 on Form 10-K that Spirit suffered from severe and persistent quality problems which led

Boeing to place Spirit on probation. This was a material factor that made an investment in Spirit speculative or risky. Such persistent quality problems and probation created risks of future repair costs and lost business from Boeing, which accounted for more than half of Spirit's revenues.

66.     Spirit's Annual Report for 2020 on Form 10-K also violated Item 303 by failing to disclose that Spirit suffered from severe and persistent quality problems that led Boeing to place Spirit on probation. The possibility of future repair costs and lost business due to such quality failures were known uncertainties likely to result in material decreases in Spirit's net sales, revenues, income from continuing operations, and liquidity.

**D.     June 17, 2021 Sustainability Report**

67.     On June 17, 2021 Spirit published a press release titled "Spirit AeroSystems Publishes First Sustainability Report," which contained a link to a document titled "2020 Spirit AeroSystems Sustainability Report."

68.     Under the heading "Products" the 2020 Sustainability Report stated:

***Spirit is dedicated to the production of high quality and safe products for our customers and ultimately the end user***.

\*     \*     \*

***To ensure impeccable product quality and safety, Spirit has a dedicated Quality Department that uses a variety of assessment and audit tools***.

69.     The above statements identified in ¶68 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Spirit was not dedicated to quality because it knowingly and intentionally prioritized costs and production over quality, and far from ensuring "impeccable product quality," Spirit suffered from known, persistent quality problems that led Boeing to place Spirit on probation.

70.     Under the heading "Due Diligence Procedures" the 2020 Sustainability Report stated:

> *Spirit is dedicated to a Zero-Defect target, with no escapements to our customers. To ensure product quality and safety, daily compliance audits are conducted internally, while independent organizations review items that could negatively affect safety and quality, including Foreign Object Debris, Product Protection, Proper Tools (calibrated, inspected, and safe to use), and conformance to Spirit's standard work instructions and regulatory requirements*. These audits are completed in partnership with our customers to provide real-time feedback.

71.    The above statements identified in ¶70 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Spirit was not dedicated to a Zero-Defect Target and instead it suffered from known, persistent quality problems, including Spirit employees actively undermining customer audits by concealing defects from Boeing; and the process did not ensure quality but instead allowed for the routine presence of Foreign Object Debris and the passing along of defective products, which led Boeing to place Spirit on probation.

**E.    February 15, 2022 Annual Report for 2021**

72.    On February 15, 2022, Spirit filed with the SEC its annual report for 2021 on Form 10-K. The annual report was signed by Defendants Gentile and Suchinski.

73.    Under the heading "Item 1A. Risk Factors" and the sub-heading "Our business depends on our ability to maintain a healthy supply chain, meet production rate requirements, and timely deliver products that meet or exceed stringent quality standards", the annual report stated:

> *From time-to-time the Company has experienced, and may continue to experience, quality or delivery timing disruptions. This includes common carrier disruptions and other disruptions that affect manufacturing lines, any of which could have a material adverse impact on the Company's ability to meet commitments to its customers and on its future financial results*.

74.    The above statements identified in ¶73 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Spirit did not "timely deliver products that meet or exceed stringent quality

standards," but routinely delivered products that failed to meet quality standards, and this already led Spirit's main customer, Boeing, to place Spirit on probation. These statements were additionally misleading for stating that "[f]rom time-to-time the Company has experienced, and may continue to experience, quality or delivery timing disruptions," when Spirit routinely experienced quality failures and continued to do so.

75.    The above statement also failed to disclose active, ongoing, and widespread measures the Company was taking to undermine audits and conceal defects from Boeing.

76.    Spirit's Annual Report for 2021 on Form 10-K was also materially misleading for failing to provide disclosures required by Item 105 and Item 303 of SEC Regulation S-K.

77.    In violation of Item 105, Defendants failed to disclose in Spirit's Annual Report for 2021 on Form 10-K that Spirit suffered from severe and persistent quality problems which previously led Boeing to place Spirit on probation. Spirit also failed to disclose the measures it employed to purportedly reduce defects and the effectiveness (or lack thereof) of those measures. These were material factors that made an investment in Spirit speculative or risky. Such persistent quality problems created risks of future repair costs, production delays, repeat placement on probation, and lost business from Spirit's most important customer, Boeing, accounting for more than half of its revenues.

78.    Defendants' failure to disclose in Spirit's Annual Report for 2021 on Form 10-K that Spirit suffered from severe and persistent quality problems which previously led Boeing to place Spirit on probation also violated Item 303. The possibility of future repair costs, production delays, repeat placement on probation, and lost business due to such quality failures were known uncertainties likely to result in material decreases in Spirit's net sales, revenues, income from continuing operations, and liquidity.

### F.   March 2, 2022 Investor Day

79.   On March 2, 2022, Spirit hosted its 2022 Investor Day, giving a presentation and responding to analyst questions. During the Investor Day presentation, Kailash Krishnaswamy, Spirit's SVP of Aftermarket Services, stated, "So yes, *we build product that is the right quality, the first time that don't break.*"

80.   The above statements identified in ¶79 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Spirit frequently did not "build product that is the right quality, the first time that don't break," but rather Spirit suffered from severe and persistent quality problems which previously led Boeing to place Spirit on probation. In fact, Spirit was actively employing measures to avoid the recurrence of probation, not problems. These statements were also false and misleading because, on February 22, 2022, FE1 notified Spirit that it suffered from an "excessive amount of defects," and that his team was being instructed by managers to "falsify[] the documentation."

81.   During the Investor Day presentation, Kevin Matthies, Spirit's CTO and Chief Quality Officer, stated:

> *We are going above and beyond what the requirements ask of us to make sure that our customers are successful when it comes to quality so that they can enable the sale of that product to their customers efficiently and effectively*.
>
> \*      \*      \*
>
> When I talk with our Board about quality, I mean that is one -- that is my primary job. I talked to them about the fact that I'm focused on building a production system and quality is a key component of that. *And our team has done a great job of embracing that throughout the last few years as we've taken that opportunity to transform during the pandemic*.

82.   The above statements identified in ¶81 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly

disregarded, Spirit was not "going above and beyond what the requirements ask of us to make sure that our customers are successful when it comes to quality," but rather Spirit suffered from severe and persistent quality problems. These statements were further misleading because Spirit had not "done a great job of embracing [quality] throughout the last few years," but, in fact, had dramatically reduced its workforce following the pandemic, which contributed to an "excessive amount of defects." Rather than reporting and addressing these defects, Spirit was actively working to manipulate downward the defect count to avoid the consequences of Boeing's probation, including frontline employees receiving instructions from managers to "falsify[] the documentation."

83.     Matthies further stated:

***The other thing we realized is that we needed to perpetually ensure that when we're building the product, we're building it per specification, per engineering, per the planning***. And so we've deployed a technique that we refer to as 3 lines of defense. You may have heard that in a couple of different areas. We've leveraged this a lot, not just from a quality perspective, but wherever we think -- we want to make sure that we have a surety in what we're doing. We're leveraging this type of technology. ***We actually spent time over the last year, and we have about one more year to go, ensuring that our processes and our products are actually in conformance with the engineering requirements. We've deployed teams to go verify all of that, which is mitigating any potential for future escapes***. And then we deploy these 3 lines of defense perpetually. So when the mechanics and the inspectors are responsible for making sure that the product is done every day, but ***we also have our engineering team out auditing that process and product to make sure that indeed it is actually being built per specification***. And where it's not, we can actually make adjustments or update the planning.

And we've seen a lot of value by doing this, we can actually update the planning to make it a little bit more clear for the mechanics and inspectors so that they get it right. And then finally, ***we have a, what I would call that audit function, making sure that all of this works and is behaving***, we're randomly selecting areas to dig in deeper.

84.     In connection with the Investor Day presentation on March 2, 2022, Spirit published a slide deck titled "Welcome, Investor Day 2022," also dated March 2, 2022. The

presentation contained the following slide, which Matthies presented in connection with his statements set forth above in the preceding paragraph, indicating Spirit's "Executive Leadership Team" personally oversaw the various lines of defense:



85.     The above statements identified in ¶¶83-84 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Spirit was not "going above and beyond what the requirements ask of us to make sure that our customers are successful when it comes to quality," but rather Spirit suffered from severe and persistent quality problems. These statements were further misleading because Spirit had not "done a great job of embracing [quality] throughout the last few years,"

but, in fact, had dramatically reduced its workforce following the pandemic, which contributed to an "excessive amount of defects." But rather than reporting and addressing these defects, Spirit was actively working to manipulate downward the defect count to avoid the consequences of Boeing's probation, including frontline employees receiving instructions from managers to "falsify[] the documentation."

### G.     May 4, 2022 Quarterly Report For the First Quarter of 2022

86.     On May 4, 2022 Spirit filed with the SEC its quarterly report for the first quarter of 2022 on Form 10-Q. The quarterly report was signed by Suchinski.

87.     Under the heading "Item 1A. Risk Factors," the quarterly report stated "'Item 1A. Risk Factors' of our 2021 Form 10-K includes a discussion of our known material risk factors, other than risks that could apply to any issuer or offering. ***There have been no material changes from the risk factors described in our 2021 Form 10-K***."

88.     The above statements identified in ¶87 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, after Spirit filed its 2021 Form 10-K on February 15, 2022, on March 16, 2022 FE1 informed Gentile that Spirit suffered from an "excessive amount of defects," that his team was being instructed by managers to "falsify[] the documentation," and that Boeing had previously placed Spirit on probation.

89.     Spirit's First Quarter 2022 Form 10-Q was also materially misleading for failing to provide disclosures required by Item 105 and Item 303 of SEC Regulation S-K.

90.     In violation of Item 105, Defendants failed to disclose in Spirit's First Quarter 2022 Form 10-Q that Spirit suffered from severe and persistent quality problems which had previously led Boeing to place Spirit on probation, and that Spirit was actively employing measures to hide defects. These were material factors that made an investment in Spirit

speculative or risky. Such persistent quality problems and probation created risks of future repair costs, production delays, repeat placement on probation, and lost business, and Boeing was at all times Spirit's most important customer, accounting for over half of revenues.

91.     Defendants' failure to disclose in Spirit's First Quarter 2022 Form 10-Q that Spirit suffered from severe and persistent quality problems which had led Boeing to place Spirit on probation also violated Item 303. The possibility of future repair costs, production delays, repeat placement on probation, and lost business due to such quality failures were known uncertainties likely to result in material decreases in Spirit's net sales, revenues, income from continuing operations, and liquidity.

**H.     November 3, 2022 Quarterly Report For the Third Quarter of 2022**

92.     On November 3, 2022 Spirit filed with the SEC its quarterly report for the third quarter of 2022 on Form 10-Q. The quarterly report was signed by Suchinski.

93.     Under the heading "Item 1A. Risk Factors," the quarterly report stated "'Item 1A. Risk Factors' of our 2021 Form 10-K includes a discussion of our known material risk factors, other than risks that could apply to any issuer or offering. ***There have been no material changes from the risk factors described in our 2021 Form 10-K***."

94.     The above statements identified in ¶93 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, after Spirit filed its 2021 Form 10-K on February 15, 2022, on March 16, 2022, FE1 informed Gentile that Spirit suffered from an "excessive amount of defects," that his team was being instructed by managers to "falsify[] the documentation," and that Boeing had previously placed Spirit on probation. These statements were further misleading because Joshua Dean identified the mis-drilled aft pressure bulkhead holes defect in October 2022, and had reported this issue internally to multiple Spirit employees.

95.     Spirit's Third Quarter 2022 Form 10-Q was also materially misleading for failing to provide disclosures required by Item 105 and Item 303 of SEC Regulation S-K.

96.     In violation of Item 105, Defendants failed to disclose in Spirit's Third Quarter 2022 Form 10-Q that Spirit suffered from severe and persistent quality problems which had previously led Boeing to place Spirit on probation, that Spirit was actively employing measures to hide defects, and also failed to disclose the mis-drilled aft pressure bulkhead holes defect. These were material factors that made an investment in Spirit speculative or risky. Such persistent quality problems, probation, and known defects created risks of future repair costs, production delays, repeat placement on probation, and lost business from Spirit's most important customer, Boeing, accounting for more than half of its revenues.

97.     Defendants' failure to disclose in Spirit's Third Quarter 2022 Form 10-Q that Spirit suffered from severe and persistent quality problems which had previously led Boeing to place Spirit on probation, and their failure to disclose the mis-drilled aft pressure bulkhead holes defect, also violated Item 303. The possibility of future repair costs and lost business due to such quality failures and defects were known uncertainties likely to result in material decreases in Spirit's net sales, revenues, income from continuing operations, and liquidity.

**I.      February 17, 2023 Annual Report for 2022**

98.     On February 17, 2023 Spirit filed with the SEC its annual report for 2022 on Form 10-K. The annual report was signed by Gentile and Suchinski.

99.     Under the heading "Item 1A. Risk Factors" and the sub-heading "Our business depends on our ability to maintain a healthy supply chain, meet production rate requirements, and timely deliver products that meet or exceed stringent quality standards", the annual report stated in relevant part:

*From time-to-time the Company has experienced, and may continue to experience, quality or delivery timing disruptions. This includes common carrier disruptions and other disruptions that affect manufacturing lines, any of which could have a material adverse impact on the Company's ability to meet commitments to its customers and on its future financial results.*

100.    The above statements identified in ¶99 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Spirit did not "timely deliver products that meet or exceed stringent quality standards," because Spirit routinely experienced quality failures, including Gentile being informed on March 16, 2022 by FE1 that Spirit suffered from an "excessive amount of defects," that his team was being instructed by managers to "falsify[] the documentation," and that Boeing had previously placed Spirit on probation; and because Joshua Dean identified the mis-drilled aft pressure bulkhead holes defect in October 2022, and had reported this issue internally to multiple Spirit employees, including the submission of formal written findings to his manager.

101.    Spirit's Annual Report for 2022 on Form 10-K was also materially misleading for failing to provide disclosures required by Item 105 and Item 303 of SEC Regulation S-K.

102.    In violation of Item 105, Defendants failed to disclose in Spirit's Annual Report for 2022 on Form 10-K that Spirit suffered from severe and persistent quality problems which had previously led Boeing to place Spirit on probation, that Spirit was actively employing measures to hide defects, and also failed to disclose the mis-drilled aft pressure bulkhead holes defect. These were material factors that made an investment in Spirit speculative or risky. Such persistent quality problems, probation, and known defects created risks of future repair costs, production delays, repeat placement on probation, and lost business from Spirit's most important customer, Boeing, accounting for more than half of its revenues.

103.    Defendants' failure to disclose in Spirit's Annual Report for 2022 on Form 10-K that Spirit suffered from severe and persistent quality problems which had led Boeing to previously place Spirit on probation, and their failure to disclose the mis-drilled aft pressure bulkhead holes defect, also violated Item 303. The possibility of future repair costs, production delays, repeat placement on probation, and lost business due to such quality failures and defects were known uncertainties likely to result in material decreases in Spirit's net sales, revenues, income from continuing operations, and liquidity.

**J.    March 29-31, 2023 Spirit Website Statements**

104.    Over March 29-31, 2023, Spirit published a series of statements to its webpage titled "Wichita Manufacturing News," at https://www.spiritaero.com/manufacturing/. While those statements are undated on Spirit's webpage, archived snapshots of the webpage show that the below described statements had not been posted prior to March 29, 2023, and had been posted as of March 31, 2023. Therefore, Spirit published these statements to its website between March 29, 2023, and March 31, 2023.

105.    One such statement, titled "Getting to Know Pete Loecke," contained questions and answers with Spirit Senior Director of Manufacturing Pete Loecke, and stated in relevant part:

> Q. Talk about our quality journey and the basic principles of quality.
>
> A. ***The basic principles of quality are do not create, do not pass and do not accept a defect***. Think about it in order: If you create a defect, that creates an opportunity that could be expensive all the way to the customer. If you pass a defect or accept a defect…we can pass an expensive problem to our customer. Work it in that order. ***Do not create a defect and remember no one does anyone a favor by accepting or passing a defect down the line***. We are in a role of continuously reinventing ourselves. Sometimes it might not seem that way if you are a mechanic building the same thing over and over again… (but) ***we need to challenge the status quo and raise the bar. That is the foundational piece of quality***.

106.    The above statements identified in ¶105 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Spirit suffered from severe and persistent quality problems and often tolerated defects in order to expedite production. These statements were further misleading because on March 16, 2022 FE1 informed Gentile that Spirit suffered from an "excessive amount of defects," that his team was being instructed by managers to "falsify[] the documentation," which allowed known defects to pass down the line. Defendants knew of defects including the mis-drilled aft pressure bulkhead holes defect discovered in October 2022, which Dean had reported internally to multiple Spirit employees, including through the submission of a formal written finding.

107.    Spirit published a second statement under the title "Raising the Bar on Quality," which it attributed to Bill Brown, Spirit's Senior Vice President of Quality and Ops Engineering. The "Raising the Bar on Quality" statement included a video titled, "Quality – A New Approach" in which Brown discusses quality issues. In the video, Brown states in relevant part:

> Our slogan is quality matters. It's quality without compromise. Why? We can't risk our products ever being involved in an incident or accident. And to protect that **we have a great quality system that ensures our parts are inspected and controlled and go out FOD [foreign object debris] free and defect free**. That's a pretty simple process.

108.    The following still image was captured from the video (subtitles in original video):



our parts are inspected and controlled
and go out FOD free and defect free.

109.   The above statements identified in ¶¶107-108 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Spirit did not "have a great quality system that ensures our parts are inspected and controlled and go out FOD [foreign object debris] free and defect free," but rather Spirit suffered from severe and persistent quality problems, and routinely delivered parts to customers with FOD and other defects. These statements were further misleading because on March 16, 2022 FE1 informed Gentile that Spirit suffered from an "excessive amount of defects," that his team was being instructed by managers to "falsify[] the documentation," and that Boeing had previously placed Spirit on probation. These statements were still further misleading because Joshua Dean identified the mis-drilled aft pressure bulkhead holes defect in October 2022, and had reported this issue internally to multiple Spirit employees, including the submission of formal written findings to his manager.

**VI.    THE TRUTH EMERGES, CAUSING SUBSTANTIAL DECLINES IN SPIRIT'S STOCK PRICE, WHILE DEFENDANTS CONTINUE TO ISSUE MATERIALLY FALSE AND MISLEADING STATEMENTS**

110.    Between April 13, 2023 and September 7, 2023, the adverse information previously concealed by Defendants' false and misleading statements and omissions were revealed in a series of media reports and disclosures by Spirit and Boeing. As a result, Spirit's stock price suffered steep losses. Throughout this period, Defendants continued to make misleading statements and conceal material information from investors.

**A.    April 13, 2023 Boeing Press Statements And Articles Concerning Spirit's Defective Installation Of 737 MAX Tail Fin Fittings**

111.    On April 13, 2023, after the close of stock market trading, various media outlets began to report that Boeing had issued a statement that it would halt deliveries of 737 MAX airplanes due to a supplier quality issue.

112.    For example, on April 13, 2023, Bloomberg wrote in an article titled "Boeing to Pause Some 737 Max Deliveries Over Production Issue" that:

> Boeing Co. is pausing deliveries of some 737 Max models after learning of a manufacturing issue that doesn't affect the safety of planes in the air, the company said Thursday. The planemaker said it was notified of the issue the day before by Spirit AeroSystems Holdings Inc., which assembles most of the 737's aluminum frame. The problem involves two fittings that attach the jet's vertical tail to the rear end of its fuselage and affects a portion of the 737 jets built since 2019, including much of the Max version.
>
> The problem will likely impact a significant number of undelivered aircraft as well as those stored at Boeing, according to the company. Boeing said it expects deliveries to decline in the near-term as it inspects affected aircraft.

113.    Similarly, on August 13, 2023, Barron's published an article titled, "Boeing Stock Falls After Halting 737 MAX Deliveries. It's Not What Investors Want to Hear." The article quoted a statement provided by Boeing:

> "A supplier has notified us that a nonstandard manufacturing process was used during the installation of two fittings in the aft fuselage section of certain [737

30

MAX] airplanes, creating the potential for a nonconformance to required specifications," said a Boeing spokeswoman in an emailed statement. "This is not an immediate safety of flight issue and the in-service fleet can continue operating safely. However, the issue will likely affect a significant number of undelivered 737 MAX airplanes, both in production and in storage."

114.    Numerous media outlets published similar articles April 13-14, 2023, including the Associated Press ("Boeing Max production could be slowed by issue with parts"), Aviation Week ("New Production Issue Will Delay 737 MAX Deliveries, Require Repairs"), Reuters ("Boeing halts deliveries of some 737 MAXs amid new supplier problem"), and The Seattle Times ("Boeing 737 MAX production hit by a new defect in supplier part"). These articles were based on statements from Boeing, and cited Spirit as the source of the defect.

115.    On this news, Spirit's share price fell $7.38 as compared to the prior day closing price, or 20.7%, to close at $28.22 per share on April 14, 2023, on heavy trading volume.

116.    The disclosure revealed that Defendants' claims about maintaining quality manufacturing processes and ensuring defect-free production were false and misleading. When Boeing paused deliveries of the 737 Max because Spirit used a non-standard manufacturing process, the known failures in Spirit's manufacturing processes, which allowed for the creation, acceptance and passing of defective products to Boeing, resulted in production delays.

117.    Independent observers linked the decline in Spirit's share price to the revelation of the manufacturing defect. In an update published on the morning of April 14, 2023 to its April 13 article, Bloomberg attributed a sharp, immediate decline in Spirit's stock price to the news of the defect, stating:

> [Boeing's] shares fell 6.1% to $200.49 as of 9:37 a.m. in New York Friday after Boeing said late Thursday it expects deliveries to decline in the near-term as it inspects affected aircraft. Spirit AeroSystems Holdings Inc., which supplies the faulty part, declined 18% — its biggest drop in more than three years — to $29.18.

118.   Other media outlets likewise attributed the sharp fall in Spirit's stock price to the news of the defect. For example, Reuters wrote that "Boeing shares fell 5.3% and shares of Spirit AeroSystems fell 11.8% in after hours trade following the announcement."

119.   Although the truth and/or materialization of concealed risks were partially revealed to the market on April 13, 2023, Defendants continued to mislead investors.

120.   After numerous media reports had been published regarding the defect, on April 14, 2023 Spirit published a statement to its website titled "Spirit AeroSystems Statement on 737," which stated:

> Spirit has notified our customer, Boeing, that we have identified a quality issue on the aft fuselage section of certain models of the 737 fuselage that Spirit builds. This is not an immediate safety of flight issue. ***We have processes in place to address these of types of production issues upon identification, which we are following. Spirit is working to develop an inspection and repair for the affected fuselages***. We continue to coordinate closely with our customer to resolve this matter and minimize impacts while maintaining our focus on safety.

121.   The above statements identified in ¶120 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, in addition to the disclosed tail fin fittings defect Spirit also knew of, but concealed, another "quality issue on the aft fuselage section of certain models of the 737 fuselage that Spirit builds" relating to mis-drilled aft pressure bulkhead holes.

## B.   May 3, 2023 Spirit First Quarter Earnings Release

122.   On May 3, 2023, Spirit held its earnings call for the first quarter of 2023.  On that call, Suchinski stated:

> I want to begin by discussing the financial impacts resulting from the vertical fin attach fitting issue that Tom addressed in his opening comments. We've performed a preliminary financial assessment of our production impacts, and as a result, expect disruptions and rework within Spirit's Wichita factory to negatively impact full year gross profit by approximately $31 million, of which $17 million is reflected in the first quarter 2023 financial results.

The rework costs on available units in Wichita is expected to average between $100,000 and $150,000 per unit, which is approximately $5 million of the total. We expect to incur future additional costs, including those that our customer may assert to repair previously delivered units in their factory and warranty costs related to the affected 737 units in service. However, those remaining costs cannot be reasonably estimated at this time.

123.   Suchinski further stated on the earnings call:

Looking ahead, the rework and disruption from the vertical fin attach fitting issue as well as the risk of lower 737 deliveries will have a negative impact on free cash flow this year.

124.   On the earnings call, TD Cowen analyst Cai von Rumohr asked:

So, I can appreciate the difficulty in estimating the cost of the 737 fittings, but can you give us some help in terms of how many planes are involved? I would have calculated 250 that are in inventory at Boeing, plus some 800 or so out in the fleet. So, somewhat over about 1,000 planes. Is that a relatively accurate range?

125.   Gentile responded to Rumohr's question:

In terms of the units out in the field, I think 800 is a little bit high compared to the current bounding that we understand. It's probably closer to 500. And again, this could change, because there is still work going on in terms of the bounding. But about 500 in the field.

126.   On the earnings call, Godman Sachs & Co. LLC analyst Noah Poponak asked, "And are you -- is your best estimate that, that cost to rework what's not yours -- or it's not your fuselages will be a multiple of the $100,000 to $150,000 or it's just too early to tell?"

127.   Gentile responded to Poponak's question:

It's too early. We know that for us to repair a unit, it's $100,000 to $150,000. As I said, with Boeing, they have aircraft that are more complete, all the way to completed aircraft, and they have more structure to remove in some systems. So their costs will be higher than ours.

128.   On May 3, 2023, Spirit also made similar disclosures of the negative effects of the vertical fin attach fittings issue in a press release titled "Spirit AeroSystems Reports First Quarter 2023 Results," and in its quarterly report for the first quarter of 2023 on Form 10-Q.

129.    On this news, Spirit's share price fell $3.68 as compared to the prior day closing price, or 12.3%, to close at $26.28 per share on May 3, 2023, on heavy trading volume.

130.    The disclosure revealed that Defendants' claims about being dedicated to quality manufacturing processes and ensuring defect-free production were false and misleading as approximately 500 planes already in the field could be impacted by the same manufacturing failure. When Boeing paused deliveries of the 737 Max because Spirit used a non-standard manufacturing process, the known failures in Spirit's manufacturing processes, which allowed for the creation, acceptance and passing of defective products to Boeing, resulted in a material adverse financial result for Spirit.

131.    Spirit's May 3, 2023 revelations concerning the negative effects of the vertical fin attach fittings issue were reported in financial media, and independent observers linked the decline in Spirit's share price to these revelations. For example, on May 3, 2023, Bloomberg published an article titled "Spirit Aero Falls as 737 Defect Crimps Boeing Deliveries, Cash," stating "Spirit AeroSystems Holdings Inc. expects to burn through about $100 million in free cash this year as repairs for a recently uncovered 737 manufacturing defect drag down deliveries to Boeing Co.," and noting "Shares fall as much as 10%, most since April 14."

132.    Although the truth and/or materialization of concealed risks were partially revealed to the market on May 3, 2023, Defendants continued to mislead investors.

133.    On Spirit's May 3, 2023 earnings call Gentile stated:

> I want to begin today by providing an update to the quality issue with the Vertical Fin Attached Fittings, certain models of the 737 fuselage that Spirit builds. After identifying the issue, our top priority was to work with Boeing and the FAA for their confirmation that it was not an immediate safety of flight issue. Once we confirm this, ***we turned our attention to ensuring our ongoing production meets manufacturing standards. We have revised our assembly process in production, have restarted production and have resumed shipments of conforming fuselages to Boeing.***

134.     The above statements identified in ¶133 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, in addition to the disclosed tail fin fittings defect Spirit also knew of, but concealed, the mis-drilled aft pressure bulkhead holes defect. These statements were further misleading because Spirit was not "ensuring [its] ongoing production meets manufacturing standards," and had not "resumed shipments of conforming fuselages to Boeing," because Spirit had failed to correct the known mis-drilled aft pressure bulkhead holes defect.

135.     Gentile further stated:

As part of our quality management system, we have processes in place to address issues like the Vertical Fin Attached Fittings, which we followed in this case. *We also have an extensive root cause corrective action process and are implementing additional protocols to reinforce our quality systems to prevent similar occurrences in the future. We are committed to strengthening and continuously improving our safety and quality culture as a trusted partner to our customers*.

136.     The above statements identified in ¶135 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, despite claiming that Spirit was "implementing additional protocols to reinforce our quality systems to prevent similar occurrences in the future," Spirit had failed to correct the known mis-drilled aft pressure bulkhead holes defect.

137.     On the earnings call Barclays Capital, Inc. analyst David Strauss asked, "Tom, when you say that you are now delivering clean MAX units to Boeing, can you define what that means? Does that mean you're actually shipping to Boeing or are you just effectively delivering to Boeing by completing a unit and then sticking it in your own WIP and then will ship to Boeing?"

138.     Gentile responded to Strauss's question:

Yeah. Well, David, we're doing both. *We're shipping units to Boeing and we're completing units, conforming units and putting them into ship in place*.

*   *   *

*So, that's how we've been supplementing deliveries to Boeing in the short term, is taking units that are with no defects out of the stored units and also producing new conforming units*.

139.    The above statements identified in ¶138 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Spirit was not providing Boeing with "units that are with no defects out of the stored units" and was not "producing new conforming units," because Spirit had failed to correct the known mis-drilled aft pressure bulkhead holes defect.

140.    On the earnings call, Sanford C. Bernstein & Co., LLC analyst Douglas Harned asked:

When you look at some of the challenges that you've had here, and we've seen challenges on the 787 and the A350 and the MAX even before this current issue, in last quarter, you made some organizational changes and we've still got new charges coming through now. And what I'm trying to understand is the steps you're taking now that can give us confidence that you can really get these operational issues behind you and start to deliver with the performance levels that I think you would hope for.

141.    Gentile responded to Harned's question:

And here in Wichita, on the 737, this was obviously an unexpected issue related to a quality issue. But *we have a strong quality team, operations team, engineering team, and they've all been working in close association with Boeing to address the issue and get execution back on track to get production flowing again and also to recover some of the units that we lost. And I would say, one of the big things in terms of the 737 line is having those strong teams, but also really the strong coordination with Boeing.*

In challenging times like this, our two companies have really come together in terms of program, operations, supply chain, engineering, to help address the issue. *We've shared a lot of information, for example, on how to do the repair and shared best practices to accelerate and come down the learning curve. And so, I think that level of cooperation also gives us confidence that we can recover*

36

*from this issue and get back to meeting the production rate increases as we go throughout the year*.

142.    The above statements identified in ¶141 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, despite emphasizing Spirit's "close association," "strong coordination," and "shar[ing] a lot of information" with Boeing to address quality issues, Spirit had not disclosed to Boeing or investors the known mis-drilled aft pressure bulkhead holes defect.

143.    On the earnings call Truist Securities, Inc. analyst Michael Ciarmoli asked, "I guess just on the you've got basically $570 million of cash on the balance sheet. If you're going to burn $150 million, that leaves you with $418. Help me understand why you exactly need the $280 million cash advance. I mean what do we not know here that could be a big risk to cash?"

144.    Gentile responded:

It really is just to have some additional surplus and cushion because you're right, that's about the -- those are the right numbers. ***We just felt it was prudent to make sure we had some additional cushion.*** We've always said we want between $300 million and $500 million to run the business. And the $280 million gave us some cushion to put us above that threshold. And that's really the reason. ***I don't think there's any other underlying reason other than we felt it prudent to have that cushion.*** And we were fortunate that our customers were able to support us, particularly Boeing.

145.    The above statements identified in ¶144 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, the known mis-drilled aft pressure bulkhead holes defect was likely to result in increased repair costs and decreased sales and represented "a big risk to cash" that of which investors were unaware, and which substantially contributed to Spirit's need for the cash advance.

**C.    August 2, 2023 Spirit Second Quarter Earnings Release**

146.    On August 2, 2023, Spirit held its earnings call for the second quarter of 2023.

147.    On that call, Suchinski stated concerning the vertical fin fitting defect:

We recorded a contra revenue charge of $23 million in the quarter to account for a potential claim from Boeing related to our estimate of the repair work to date at their facility, which we believe represents about half of the units. However, I want to emphasize that any potential claim we may receive from Boeing could be materially different from our estimate.

148.    Suchinski further stated:

Now let's turn to free cash flow. Free cash flow usage for the quarter was $211 million. Cash usage increased compared to the same period of 2022, largely driven by the negative impacts to working capital resulting from the rework and disruption related to the quality issue and the IAM work stoppage, as well as preparation for the third quarter 737 production rate increase.

149.    On the earnings call, RBC Capital Markets LLC analyst Stephen Strackhouse asked, "is it fair for us to think that the $23 million should effectively double? Or can you give us a little bit more color on the number of aircraft that the Boeing has identified or the cost to them?"

150.    Gentile responded to Strackhouse's question:

We think that they've repaired about half the units that they need to repair. So call it 73 or 74. So that is a little bit less than the 75% of the 250. So it's really the 73 that they've repaired, the $23 million repair estimate aligns to that. And so we've tried to make some conservative estimates. And it's just based on the units that are at Boeing, nothing in the fleet.

So our view is that, as our understanding of the current disposition in the fleet is, we don't expect any material impact for units in the fleet. So $23 million only represents the units that are at Boeing. And yes, it represents half of what we think is going to need to be done eventually. But that was the best estimate we could make. And so we took the charge based on the low end of that estimate.

151.    On the earnings call Jefferies LLC analyst Sheila Kahyaoglu asked:

I just wanted to step back from the cash outflows today and maybe specifically focusing on the MAX contribution in '23, '24 and '25. Obviously, work stoppages, pauses and IAM agreements change the free cash flow profile of the MAX in '23. How do you think about that in '24 and '25 and how does the rate and inventory depletion progress?

152.    Suchinski responded to Kahyaoglu's question:

I think the thing that I would add is the quality issue, the vertical fin, the work stoppage, that caused significant disruption to us, significant, right? And it was obviously not planned at the start of the year. Much lower deliveries in the second quarter. We've had to add more people. We're taking deliveries out of the plan. It had serious impact overall cash flow projections for the year.

153.    In response to a question from TD Cowen analyst Cai von Rumhor, Suchinski stated, "And so when you think about cash flow over the next couple years, obviously the issues around the quality issue and the strike has moved the cash flow generation a bit to the right, and therefore we won't be able to generate significant cash flow in 2024 and 2025."

154.    On this news, Spirit's share price fell $8.58 as compared to the prior day closing price, or 27.3%, to close at $22.86 per share on August 2, 2023, on heavy trading volume as the markets reacted to additional disclosures relating the extent of the manufacturing problems and the costs of resolving the issues.

155.    Although the truth and/or materialization of concealed risks were partially revealed to the market on August 2, 2023, Defendants continued to mislead investors.

156.    On the earnings call, Gentile stated:

On the vertical fin attach fittings, first, ***all the rework on the available 737 fuselages in Wichita was completed during the second quarter***, which was ahead of the timeline we provided on our last call and within the financial estimates that we provided.

157.    The above statements identified in ¶156 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, the known mis-drilled aft pressure bulkhead holes defect would require additional rework on 737 fuselages at additional financial expense, so "all the rework" on Spirit's available 737 fuselages in Wichita had not been "completed."

158.    On the earnings call, Suchinski stated, "***With the quality issue resolved*** in our factory and a new labor contract in place, ***our entire focus is directed towards executing on our customer commitments***, including the upcoming production rate increases."

159.    The above statements identified in ¶158 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, quality issues were not "resolved" in Spirit's factory, because Spirit knew of, but had not addressed, the mis-drilled aft pressure bulkhead holes defect, and doing so would negatively affect Spirit's ability to execute production rate increases.

### D.    August 23, 2023 Articles And Spirit Press Release Concerning Spirit's Mis-Drilling Of Fastener Holes On The 737 MAX Aft Pressure Bulkhead

160.    On August 23, 2023, after the close of stock market trading, aerospace industry news publication The Air Current published an article titled "Boeing and Spirit Grapple With Newly Discovered 737 MAX Quality Issue." The article stated that "Boeing has identified a potentially widespread manufacturing quality issue on the 737 Max stemming from structural assembly work on the jet's aft pressure bulkhead conducted by supplier Spirit AeroSystems," and quoted a statement provided by Boeing for the article:

> "During factory inspections, we identified fastener holes that did not conform to our specifications in the aft pressure bulkhead on certain 737 airplanes," said Boeing in a statement to The Air Current. "This is not an immediate safety of flight issue for the 737 fleet, which can continue operating safely. This issue will impact near-term 737 deliveries as we conduct inspections to determine the number of airplanes affected, and complete required rework on those airplanes. We continue to deliver 737s that are not affected. We have notified the FAA and our customers, and we will keep them informed as we work through the issue with our supplier."

161.    Other media outlets published similar stories, including a Bloomberg article titled "Boeing Finds New 737 Max Defect, Threatening Delivery Target," also published on August 23, 2023.

162.    After the publication of such articles, later on August 23, 2023, Spirit issued a press release titled "Spirit AeroSystems 737 Aft Bulkhead Statement," stating in part: "We are aware of a quality issue involving elongated fastener holes on the aft pressure bulkhead on certain models of the 737 fuselage produced by Spirit AeroSystems."

163.    On this news, Spirit's share price fell $2.91 as compared to the prior day closing price, or 12.7%, to close at $20.06 per share on August 24, 2023, on heavy trading volume.

164.    The public disclosure of the previously known but concealed mis-drilled aft pressure bulkhead holes defect revealed that Defendants issued false and misleading statements when they previously told investors: that Spirit was shipping "conforming units"; that Spirit's quality, operations, and engineering teams had been sharing critical information to Boeing; that units shipped to Boeing had "no defects"; that there were no underlying reasons for dramatically increasing loss reserves; that "all the rework" was completed in the second quarter; and the "quality issue [was] resolved[.]"

165.    News of this defect was widely reported, and independent observers linked the decline in Spirit's share price to these revelations. For example, on August 24, 2023, the Associated Press published an article titled "Boeing and a key supplier find a new manufacturing issue that affects the 737 Max airliner," stating "Boeing and Spirit AeroSystems said they discovered improperly drilled fastener holes in the aft pressure bulkhead," and noting "Shares of Spirit AeroSystems Holdings Inc. were down 14% in afternoon trading Thursday."

166.    Although the truth and/or materialization of concealed risks were partially revealed to the market on August 23, 2023, Defendants continued to mislead investors.

167.    Spirit's August 23, 2023 press release stated:

We are aware of a quality issue involving elongated fastener holes on the aft pressure bulkhead on certain models of the 737 fuselage produced by Spirit

AeroSystems. ***Because Spirit uses multiple suppliers for the aft pressure bulkhead, only some units are affected. Spirit will continue to deliver units to Boeing***.

168.    The above statements identified in ¶167 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, contrary to the statement that "[b]ecause Spirit uses multiple suppliers for the aft pressure bulkhead, only some units are affected," the mis-drilled holes defect originated with Spirit, and not one of its suppliers.

### E.    Spirit and Boeing Confirmed The True Extent Of The Mis-Drilled Holes Defect At Jefferies Industrial Conference

169.    On September 7, 2023, Spirit and Boeing gave separate presentations at the Jefferies Industrials Conference, with both companies addressing the elongated holes defect.

170.    Jefferies LLC analyst Sheila Kahyaoglu asked Boeing CFO Brian West, "We've heard about the 737 aft pressure bulkhead. So talk to us about the status of that issue and the trajectory of the recovery from here?"

171.    West responded:

The item you're referring to in the fuselage was a step back from that stability goal. It is the aft pressure bulkhead section of the airplane. We know how to fix it, but it's early in the rework process and the rework hours will likely be higher and the cycle time longer than the vertical fin NOE [notice of escapement], we had earlier in the summer. This is different. It's a bit more complicated, it's more involved. There's hundreds of holes that get inspected. There's an X-ray inspection process step that's required, and it's a very critical part of the airplane. So we have to make sure we do this right and we will.

It will impact about 75% of the 220 airplanes that were inventory – at inventory as the – as of the end of the second quarter. So it's large. In the near-term, it will impact deliveries, but we have no intention of changing the master schedule. As I mentioned, the demand signal is strong and we have to make sure everyone is coordinated on the longer term stability in that master schedule is very important. So we're not changing it.

In terms of our focus with our supplier, it is 100% the most important thing we're working on right now. We've got literally armies of people from Boeing and the

supplier working on this issue and to drive stability in their factory. And these are frustrating moments for our customers, for our investors and for our teams.

172.    Kahyaoglu asked Spirit, "Talk to us about the recently disclosed aft pressure bulkhead issue on the MAX. In terms of deliveries, it doesn't seem to change your guidance for the full year. Any potential rework to profitability and free cash flow?"

173.    Gentile responded in relevant part:

So escapes happened, and they happen on all programs. They usually don't get this much attention. In this case, I would say there's greater scrutiny on quality in general, post the MAX grounding and post the pandemic and particularly on the MAX, for obvious reasons. In this case, for an abundance of caution, Boeing decided to pause production or deliveries temporarily while we were doing bounding. Normally, that doesn't happen. We identify an escape. We bound it, do a safety of flight analysis. In this case, Boeing and the FAA determined there was no immediate safety of flight issue, and so the fleet could continue flying.

The other thing that was unusual about this particular issue is that normally when we have an escape, we fix the units in our factory and then in Boeing's factory and we're done. But of course, in this case, Boeing has 250 units that are stored and we have about 60 that are stored in Wichita, Boeing-owned inventory, and some number of those have to be fixed.

So in this case, with the aft pressure bulkhead, there were three suppliers over time. The issue related to Spirit, we were using an automated drilling process, which if not done perfectly, could create an oblong hole, okay? And this came up. But one of our quality processes actually found this. So our quality management system includes a process where we encourage employees to speak up if they see a manufacturing process that could be fixed or improved. And one employee came up and told us about this. We were already actively working on a fix when the escape was found.                    ****

Now, for Boeing, it may take a little bit longer because they have, in many cases, completed aircraft. The 250, there's maybe 65% or 70% of those that could require inspection and repair. But for us, what they've agreed is we had 29 in WIP. We are going to complete the production on those 29. We set up essentially a separate factory across the street where we're going to have eight repair lines and we'll do X-ray on two of those and then repair on six.

174.     Kahyaoglu then asked, "So just to follow up on that point. As we think about your current production rate, you're still going to go at 42 as you repair the other ones? And how do we think about the delivery free cash flow impact for '23?"

175.     Gentile responded:

Right. Well, this particular issue, because we're going to get all the repairs done by the end of November and ship those units, this by itself won't have a material impact on our range. We said the range was 370 to 390. What we're seeing is some additional pressures on supply chain and labor so we think we'll be at the lower end of that range, possibly some pressure to that. But the good news is the team is cycling at 42 and we're working a number of different initiatives to offset any impact.

176.     On this news, Spirit's share price fell $1.52 as compared to the prior day closing price, or 7.3%, to close at $19.19 per share on September 7, 2023, on heavy trading volume.

177.     This disclosure revealed the extent of the impact of the mis-drilled holes defect to Boeing, confirmed that the defect originated at Spirit and not at a supplier, and demonstrated that Defendants had known not only that "escapes happened, and they happen on all programs," but that they knew about this specific defect before it was revealed, and, upon conducting a safety of flight analysis, Spirit prioritized costs over quality and worked on a fix instead of admitting the manufacturing deficiency.

178.     Spirit's and Boeing's statements concerning the impact of the elongated holes defect were reported in the financial media, and independent observers linked the decline in Spirit's share price to these revelations. For example, on September 7, 2023, Bloomberg published an article titled "Boeing Warns 737 Deliveries to Be at Low End of 2023 Target," stating "Addressing the latest manufacturing defect is proving thornier than an earlier Spirit issue, especially for completed 737 Max jets with cabin equipment already installed," and noting "Boeing shares declined 1% at 3:06 p.m. in New York trading, while Spirit fell 6.6%."

VII.    **FORMER SPIRIT EMPLOYEES CONFIRM THAT SPIRIT AND THE INDIVIDUAL DEFENDANTS KNEW OF PERVASIVE QUALITY PROBLEMS**

A.      **Quality Inspector Team Lead Former Employee 1 Notified Gentile Of Spirit's Probation With Boeing And Efforts To Conceal Excessive Defects**

179.    Former Employee 1 ("FE1") worked for Spirit in Wichita, Kansas for approximately 12 years, starting in or around 2010. For approximately 8 months, he worked as a quality manager. For most of his time at Spirit, FE1 was an Inspector. FE1 served as a Team Lead for a group of Inspectors, in which capacity he oversaw various processes at the "end of the line," also known as the "rail pit," where Spirit finished working on products before shipping them to customers. This included preparation for completed fuselages to be shipped to Boeing, and oversight for the "final shake," which is what Spirit called its final inspection before shipment to the customer. For at least part of his time at Spirit, FE1 reported to first level manager Ryan Clark, who reported to second level manager Steve Aubuchon, who in turn reported to Senior Director of Quality Scott Grabon (who held that position before it was assumed by Richard Cassube).

180.    FE1 believes Spirit's culture placed an emphasis on pushing out product over quality. When FE1 identified a defect, he would often receive pushback from production personnel and first level managers. For example, first level manager Robbin Ketterman would become very frustrated, lose her temper, and yell if FE1 identified a defect. FE1 almost always found "tags" (meaning significant defects that had to be fixed) on his final walk through a completed fuselage. FE1 was told not to find "tags" at the end of the line, because Spirit wanted to ship its completed products as quickly as possible.

181.    According to FE1, there was significant friction between Spirit's quality inspectors and the production department. Production frequently failed to check for and fix their own mistakes as required, so when the quality department conducted inspections they often

found many defects. The numerous defects found during inspections complicated the quality inspectors' task and took considerable time to document, creating additional time pressures and friction with the production teams. Production managers frequently pressured quality inspectors to simply approve work even if it contained defects. If FE1 or other quality personnel refused to approve defective work, production managers would complain to the quality inspector's respective manager, who would in turn assign other quality personnel to approve the defective work.

182.   In FE1's experience, the production department did not try to prevent problems, but was just focused on pushing products out. This dynamic made it difficult to get defects documented properly. According to FE1, Spirit was primarily concerned with costs and did not want too many defects to be written up.

183.   FE1 also recalled problems arising due to Spirit's failure to hire sufficient personnel. FE1 attended a production managers' meeting in which a manager advocated for Spirit maintaining its output with fewer employees by analogizing to a situation in which a leg was removed from a four-legged table, stating that people would simply adapt to using it as a three-legged table. FE1 recalled that Spirit frequently pushed employees to "do more with less." According to FE1, he and other Spirit personnel repeatedly told managers that they needed to promptly hire additional people for Spirit to be able to achieve its planned production rate increases, but Spirit failed to hire the necessary people in time for FE1 and his colleagues to properly train the new hires. FE1 also stated that Spirit experienced high turnover due to its hostile environment and the excessive demands placed on its workers. Sometimes Spirit required employees to work 12 to 18 hours in a row, and then come back to work again the following day. For example, FE1 recalled working from Friday afternoon until Saturday morning.

184.    In FE1's experience, Spirit employees often rushed work and ignored defects to try to save money. FE1 recalled instances in which he was told that a fuselage had to be shipped to the customer the same day, "no matter what." Due to its rushed production process, Spirit's products frequently contained defects. FE1 informed Spirit coworkers that he believed it was just a matter of time until a major defect escaped to a customer.

185.    FE1 believes that there frequently are defects in Spirit products, due in part to the pressure that Spirit puts on its employees. In FE1's experience, Spirit treats moving products down the line as more important than quality. FE1 stated that in his former employment at Cessna, inspectors would not let a product continue moving through the production process with a defect, whereas Spirit just tried to keep moving products through the process while trying to address defects at the end of the line once the product was already assembled.

186.    FE1 recalled an instance when Spirit managers wanted him to combine two different processes: the final inspection referred to internally at Spirit as the "final shake," and the foreign object debris ("FOD") walk. FE1 believes that combining these two tasks was problematic and not conducive to ensuring quality because doing so increases the likelihood that Spirit would miss defects and FOD, which would then be present in products shipped to customers.

187.    FE1 stated that issues such as FOD were routinely missed, with customers such as Boeing providing frequent feedback about the occurrence of FOD in the delivered fuselages. FE1 was told to just "look over" things rather than actually "inspect" them.

188.    FE1 stated that Boeing periodically conducted audits at Spirit, however FE1 viewed these audits as "a joke" because Spirit was given advance notice of what would be

audited and when. As such, Spirit simply addressed any issues in the area and production units to be audited shortly before the audit, thereby concealing the true extent of problems from Boeing.

189.    FE1 recalled that beginning in approximately 2018 Boeing placed Spirit on probation, due to the large number of escapements found in fuselages that Spirit had shipped to Boeing. Such escapements included commonly recurring issues such as FOD, missing fasteners, peeling paint, and poor skin quality. These issues slowed down Boeing's production process, as it had to spend time identifying and fixing defects created by Spirit. That Boeing had put Spirit on probation was widely known to employees in Spirit's quality department, and FE1 believes that Spirit's leadership was likely aware of this as well. The probation was the subject of meetings at Spirit, and exiting probation required Spirit to pass additional audits by Boeing.

190.    FE1 stated that during the probation, Spirit could not ship any product to Boeing without the approval of a manager. Boeing also sent Spirit weekly or even daily emails with PowerPoint presentations containing pictures of escapements that Boeing found on fuselages received from Spirit. Boeing would send these emails to high level Spirit managers, and the leadership of Spirit's quality department would send the emails out to all quality managers and some team leaders (such as FE1).

191.    At a point after Spirit's mass layoffs during the COVID pandemic, Ryan Clark became FE1's first level manager. Clark told FE1 that his second level manager, Steve Aubuchon, did not want FE1 to document every defect he found, and did not want him to record the quantities or precise locations of defects found, but rather to simply note that the broad fuselage "zone" in question contains a defect. According to FE1 this violated the rules and policies that required Spirit to document a precise, 3-point location for all defects, and the

precise quantity of such defects, so that the defects could be traced through the production process and addressed as necessary.

192.    Aubuchon discussed his request with FE1 at FE1's desk, explaining it as an attempt to save money, and said that it was coming from Aubuchon's boss Scott Grabon. FE1 responded that this was not the right thing to do and that Aubuchon was asking him to do things incorrectly. Aubuchon told FE1 that if he refused to do as he was told, Aubuchon would fire him on the spot. FE1 asked Aubuchon to put his request in writing. Aubuchon told FE1 that he would receive an email from Clark (his direct superior).

193.    On February 22, 2022, Clark emailed FE1 and his entire team relaying Aubuchon's request. FE1 responded to Clark, copying Aubuchon, as follows:

> I respect your direction and the team and I will follow the directions given as instructed however I would like to voice the way the team and my self feel about the situation. You are asking us to record in a inaccurately way the number of defects, using the zone box (that is for a drawing reference) will be asking us to falsify the proper documentation with regards to the amount of defects being found on the plane. This make us and put us in a very uncomfortable situation where we have to question our integrity and our ability to follow directions.
>
> I find it unethical and in violation of FAA regulations along with the proper regulations in place by Spirit Aerosystems of properly documenting the amount of defects being found.
>
> We will follow the direction given to us but we are not comfortable with it.

A redacted copy of the email chain is attached as **Exhibit 3**.

194.    Soon after FE1 sent this email, Aubuchon asked him to meet in Spirit's quality department conference room. In that meeting, Aubuchon demoted FE1 from his Team Lead position.

195.    Later on that same day, February 22, 2022, FE1 submitted an ethics complaint to Spirit concerning this incident. FE1's complaint stated:

The inspection team and myself have been put on a very unethical place. As part of our process we are to find and document the defects we find on our daily tasks. There has been too much tension lately with managers and the amount of defects being found on our FOD walks that we were instructed by our leadership to write pickups properly with the correct number of defects as its written per our procedures.

This has become an issue and has risen a very high level of attention due to the excessive amount of defects, today around 9 o'clock in the morning our manager Ryan Clark instructed us to change the way we wrote the defects and no longer document the amount of defects on the quantity box but change it and log it on the zone box which would be falsifying the documentation. I raised my concerns because this challenges our integrity because we are being asked to purposely record inaccurate information. As a team lead i asked my manager to please send a e-mail to inform this to the team because i felt uncomfortable to to instruct them the direction given.

I have attached the email send out along with my response to the situation and around 12:45PM i was called to the office by Steve Aubuchon, in the conference room i was informed that i will be moved to pre-integration (different area) and that i will no longer be a team lead de to my inability to follow instructions and being border line subordinate at times. this was informed to me in the presence of second level manager Jon Louia, and first level manager Paula Hall. this happened within minutes of my reply to the email reply i send about the direction of how we document our defects and feel like my leadership is retaliating towards me for trying to do the right thing and do what is best for my team. The whole inspection team in the shipping center is involved and can concur with what i have said and will appreciate with the support being presented to us.

A redacted copy of FE1's ethics complaint is attached as **Exhibit 4**.

196.    After days and weeks passed with no action taken on his complaint, on Thursday March 10, 2022, FE1 followed up through Spirit's ethics complaint system to request an update and was told that they planned to "wrap it up" that week. *See* **Exhibit 4**.

197.    On Wednesday March 16, 2022, FE1 emailed Gentile, with the subject line "Failure to Follow Company Policies," explaining the situation and attaching a copy of his ethics complaint. FE1 wrote:

Hello,

I am reaching out about clarification of the policies in place. Everywhere I go throughout the factory I see signs about "Quality Matters" and if there is something wrong to stop and raise a concern, however recently I been reprimanded for doing my job correctly accordingly to the policies in place. PRO-4005, POL-1271 support my allegations. and I have attached the reports I have made to HR in an attempt to call for help. It's been three weeks since the compliance was filed and i have not seen any response. Since then I been stripped from my team lead position and my team has been left intimidated and without a voice to speak up. I reached out to the investigator from HR and she is out for this whole week, mean while everything is a a stand still.

This is my last resort and I apologize to take time out of your busy schedule but I have lost faith on the quality organization here at spirit and this is my last cry for help into resolving this issue that violates the guide lines stablished by the AS9100 which governs our certification to build aircraft and which has been in question and even put on probation by Boeing on previous years. If I cannot do my job according to the policies in place then change them so I can perform my job within the guidelines in place.

I also know that and internal audit was reported that confirms what i stood up for yet the information has not been passed down?

Thank you for your time and help!

A redacted copy of FE1's email to Gentile is attached as **Exhibit 5**.

198.    Gentile replied to FE1's email a few days later. Roughly, one month later, FE1 was told that the allegations in his ethics complaint were sustained, his prior position was reinstated, and he was given backpay.

199.    Similar to the above-described incident with Steve Aubuchon, FE1 recalled an instance where a second level manager Mahmoud Hamed told inspectors not to write up defects.

200.    Around July 2022, FE1 gave notice that he would leave Spirit and left shortly thereafter.

**B.    Product and Process Verification Core Quality Auditor Joshua Dean Identified and Reported The Mis-Drilled Holes Defect Months Before It Was Publicly Disclosed**

201.    Joshua Dean was formerly employed by Spirit in Wichita, Kansas. Dean has a mechanical engineering degree and substantial experience in manufacturing and engineering

related roles. Dean was initially employed by Spirit for approximately 1.5 years as a Liaison Engineer beginning in approximately March 2019, and was let go in or about May 2020 during Spirit's mass layoffs during the COVID pandemic. Dean returned to Spirit on or about May 25, 2021 as a PPV [Product and Process Verification] Core Quality Auditor, and held this position until on or about November 22, 2022, when his role changed to Level 2 Stress Engineer. Dean remained in this position until Spirit terminated him on or about April 26, 2023.

202.    As a PPV Core Quality Auditor, Dean performed audits on section 48 (extending from approximately the aft pressure bulkhead to the tail end of the fuselage) of the 737 MAX ("Section 48"). As a PPV Core Quality Auditor, Dean reported to Senior PPV Quality Manager Jaime Hanson. Hanson in turn initially reported to Richard Cassube, Senior Manager, Quality Engineering, Root Cause and Corrective Action, until Cassube's role changed to Director of Quality in September 2022. Hanson then reported to Amie Emerson, Vice President, Core and Supplier Quality. Dean believes that Emerson reported to Spirit's executive team.

203.    According to Dean, based on his experiences working for the Company, Spirit has a culture of not wanting to look for or to find problems, which has led to poor decisions about quality and manufacturing issues.

204.    Dean states that during the COVID pandemic Spirit laid off or voluntarily retired a large number of senior engineers and mechanics, leaving a disproportionate number of new and less experienced personnel. Dean states Spirit had similar problems with inexperienced quality auditors and inspectors, resulting in more rework and repairs that had to be performed.

205.    When Dean first joined Spirit in approximately March 2019, Boeing had placed Spirit on probation. Dean's understanding is that the probation was due to Boeing finding many defects in Spirit products, and that the probation lasted multiple years. Shortly after Dean

rejoined Spirit as a PPV Core Quality Auditor in May 2021, he was in meetings with PPV personnel where his superior, Jaime Hanson, discussed Spirit's probation. Hanson stated that Spirit was trying to get off probation with Boeing, and that as conditions of exiting probation, Boeing had demanded Spirit decrease the amounts of defects in its products, implement the PPV program, and create Visual Work Instructions (or "VWI"). According to Dean, Spirit's probation with Boeing was common knowledge in Spirit's PPV group.

206.    According to Dean, in or around November 2021 Spirit presented information to Boeing showing a purported significant reduction in defect numbers as part of its effort to exit probation. In Dean's experience, however, Spirit did not materially decrease the amounts of defects in its products as required by Boeing, but simply undercounted or manipulated the documentation of defects to create the appearance of quality improvement. Dean recalls discussing with other Spirit employees that Spirit was undercounting defects instead of actually reducing defects.

207.    In October 2022, while auditing Section 48, Dean identified the mis-drilled bulkhead holes issue recently announced by Spirit and began to alert people throughout Spirit at that time.

208.    From on or about October 1, 2022 until he left his auditor role around November 22, 2022, Dean's primary focus, at the direction of his manager, Jaime Hanson, was conducting and writing up the audit of Section 48. Dean worked with Spirit design engineer Jim Ruschen on the Section 48 audit.

209.    Dean wrote up and submitted to Hanson three audit findings identifying mis-drilled holes on the aft pressure bulkhead (also referred to as the "1016 bulkhead" due to its

location at station 1016 of the fuselage) and related improper procedures being used by Spirit personnel.

210.    First, Dean identified mis-drilled holes on the aft pressure bulkhead break rings. The aft pressure bulkhead has two break rings, with one in front of the bulkhead and one behind, both forming a ring around the bulkhead at its maximum diameter. The break rings connect the bulkhead to the fuselage, and they are connected to both the bulkhead and the skin of the fuselage with fasteners. Dean observed mis-drilled holes where the break rings connect to the aft pressure bulkhead.

211.    Second, Dean identified an improper rework process being used by a mechanic to attempt to fix misaligned holes on the pie webs of the aft pressure bulkhead. The pie webs are pie slice-shaped sections that join together in a circle to form the rounded shape of the bulkhead. Dean identified this issue when he saw a mechanic doing additional, unplanned drilling to try to line up misaligned fastener holes on the pie webs.

212.    Third, Dean identified that Spirit was not properly labelling the aft pressure bulkhead break rings and certain other match drilled parts, which contributed to misalignment of holes drilled on the break rings.

213.    Dean believes that the mis-drilled holes issue recently announced by Spirit pertains to both his audit findings concerning the break rings and the pie webs.

214.    Dean identified the mis-drilled bulkhead holes defect at some point between approximately October 5, 2022 and mid-October 2022. Upon identifying the defect, Dean immediately reported it to Section 48 managers Sean McVickers and Justin Hoch, and to design engineer Jim Ruschen, informing them that this was a very significant problem. Dean also discussed these issues with Senior PPV Quality Manager Jaime Hanson, Senior Quality Manager

Steve Aubuchon, Manufacturing Engineering Manager Bruce Hysom, quality manager Michelle Butler, PPV Core Quality Auditor Lance Thompson, and lead mechanic Chris Coons. Lance Thompson and Dean sat next to each other, and held the same position as PPV Core Quality Auditors. As Dean worked on his audit and the mis-drilled bulkhead holes defect, he frequently discussed the issue with Thompson and Ruschen.[6]

215.    Dean made a formal write up of the mis-drilled bulkhead holes defect, which he completed between approximately October 17, 2022 and November 1, 2022, and submitted his findings to Hanson. According to Dean, Spirit's procedure for handling such reports required the responsible parties for each part of the process at issue to be notified of the report and to submit responses within 30 days to the relevant manager. Dean's findings regarding the mis-drilled holes defect were submitted to the design, planning, quality, and manufacturing departments for response, and their responses would have been submitted to Hanson.

216.    Dean stated that quality manager Michelle Butler, who reported to Senior Quality Manager Steve Aubuchon, was responsible for addressing his mis-drilled bulkhead holes findings for the quality department. Dean showed Butler the mis-drilled holes in the break rings and in the pie webs.

217.    Justin Hoch and Sean McVickers were also involved in responding to Dean's mis-drilled holes audit findings. At some point between approximately November 22, 2022 and December 5, 2022, Hanson sent Dean to help Justin Hoch and Sean McVickers with their

---

[6] Lance Thompson, who is no longer employed by Spirit, has confirmed that Joshua Dean told him about misaligned holes in the pie webs and break rings of the aft pressure bulkhead. Thompson believes Dean first told him of these issues around October or November of 2022. Thompson also recalls Dean telling him around that time that Dean had informed first level manager Jaime Hanson that this was a very important issue and that Dean was very concerned about it.

responses to his audit findings. Dean told Justin Hoch that the mis-drilled holes defect was the worst finding that Dean had made in his entire time in his auditor role.

218.    From the beginning of Dean's Section 48 audit on or about October 1, 2022, Hanson wanted Dean to complete the audit before Dean's transition to his new role as Level 2 Stress Engineer, which was scheduled to take place on or about November 22, 2022. Dean explained to Hanson that to complete the entire Section 48 audit before leaving his auditor position, he would need to work over 10-hour days and on the weekends. Hanson responded that Dean was not approved to work overtime and had to complete the entire audit before starting his new position without working any overtime.

219.    Dean conducted an audit of the part of Section 48 that contains the tail fin fittings, approximately two to three weeks after he conducted the portion of the audit in which he found the mis-drilled bulkhead holes defects. Dean did not identify the tail fin fittings defect at the time. According to Dean, this was due in whole or in substantial part to the fact that Hanson did not allow him to observe all relevant parts of the manufacturing process.

220.    Roughly two months after Dean submitted his report on the mis-drilled bulkhead holes defect to Hanson, Dean again raised the issue with Hanson in an in-person discussion in Hanson's office, around the December 2022 holidays. Dean told Hanson that the mis-drilled holes defect was the worst issue that he had found in one and a half years in his audit role, and that it should be carefully investigated further.

221.    Dean is informed that in mid-March 2023, Spirit found several parts with cracks, and Director of Quality Richard Cassube called an emergency, closed door meeting with high-ranking Spirit personnel to try to figure out what caused the cracks. This led Spirit to identify the

tail fin fittings defect. Dean is informed that persons present included Cassube, Steve Aubuchon, Gregg Howard, and Aime Emerson.

222.    After this meeting, Sean McVickers and Justin Hoch were assigned to remove and check the tail fin fittings (also known as dagger fittings) on a sample of 10 production units. After approximately one week this process revealed 4-5 cracks in the sample, *i.e.* roughly 40% of units were affected, indicating that the issue was potentially widespread.

223.    In late March 2023, Dean saw design engineers walking around carrying tail fin fittings in their hands.

224.    Approximately 1.5 weeks after Dean saw design engineers carrying tail fin fittings, in late March or early April 2023, RCCA [Root Cause and Corrective Action] Core Quality Manager Gregg Howard had a meeting with Dean. Howard reported to Cassube at this time. This meeting with Howard was the first time that Dean learned of the tail fin fitting defect. Howard asked what Dean knew about the tail fin fitting defect from conducting his audit. Dean explained to Howard that he did not identify that defect, and that one reason why that could be was he had discovered the mis-drilled bulkhead holes defect shortly before conducting the portion of the audit containing the tail fin fittings, and he was focused on the mis-drilled holes defect at the time due to its high importance. Dean described the nature of the mis-drilled bulkhead holes defect to Howard.

225.    Approximately one week after meeting with Howard, Dean was called into a meeting with Emerson and Hanson, who inquired about Dean's audit of the part of Section 48 containing the tail fin fittings. Dean discussed his concerns about this meeting with many people including Howard, Ruschen, Thompson, and with Dean's manager at the time, Stress Engineer

William Saguto, explaining that he felt he was being unfairly blamed for not identifying the tail fin fittings issue.

226.    Approximately one week after the meeting with Emerson and Hanson, Spirit terminated Dean on or about April 26, 2023. According to Dean, Spirit attempted to justify his termination on demonstrably false grounds that Dean had falsified paperwork concerning his audit. Dean maintains that Spirit wrongly claimed Dean never conducted an audit of the part of Section 48 that contains the tail fin fittings, and that Dean's report indicating that he performed that part of the audit was therefore, supposedly, untrue. Dean believes this false justification was a pretext to scapegoat and silence him and intimidate other Spirit employees so that they would not speak out as Dean had done about the mis-drilled bulkhead holes defect.

227.    Dean believes that Boeing first identified the mis-drilled bulkhead holes defect while disassembling fuselage parts to fix the tail fin fittings defect. The defectively installed tail fin fittings are located in close proximity to the aft pressure bulkhead.

### C.    Inspector Team Lead Robert Hurt Observed Numerous Quality Problems And Confirmed Spirit's Prior Knowledge Of The Mis-Drilled Holes Defect

228.    Robert Hurt joined Spirit in 2018 as a Mechanic, and he was promoted to Team Lead in that role. In or about 2021 Hurt was promoted to Inspector, and within a year he was promoted to Team Lead in that role. In his position as an inspector, Hurt worked primarily in the "integration" area of Spirit's production line, where various sections of the fuselage are integrated together before continuing on for final inspection and shipping. For the last part of his tenure at Spirit, Hurt reported to first level manager John McKay, and second level manager Vance Van Buskirk. Spirit terminated Hurt's employment in January 2024.

229.    According to Hurt, at most times throughout his employment at Spirit, the Company imposed an unsustainable workload on its employees. Many employees did not return

after Spirit's mass layoffs during the COVID pandemic, resulting in a huge loss of knowledge to Spirit's workforce. Spirit resorted to hiring replacements with no experience, who would require significant time and effort to properly train. Some such newly hired mechanics did not even know how to read or locate drawings that instructed them how to perform their work.

230.    According to Hurt, Boeing frequently identified defects in Spirit's products. Hurt recalled that Boeing and end users (such as airlines) submitted various types of reports to Spirit concerning defects in Spirit products. These included SERs (supplier evaluation reports), CARs (corrective action reports, which related to frequently recurring quality issues), and NCRs (non-conformance records). Among the quality problems repeatedly noted by Boeing were use of expired sealant, the presence of high amounts of FOD, missing bolts in seat tracks, and bulges or protrusions in aircraft skin.

231.    Hurt described the process in which Boeing would notify Spirit of quality problems. A Boeing liaison would inform a designated Spirit employee, and Spirit management would then decide which Spirit employees (such as relevant managers, team leads, and inspectors) would be responsible for addressing the problem.

232.    Hurt worked on many problems that had been reported to Spirit by Boeing. For example, one such problem was a significant escapement related to Spirit's failure to secure stringers to frames as required. A stringer is a structural component of the fuselage that attaches to the skin and runs in the direction from the plane's front (cockpit) to back (tail). A frame is a structural component of the fuselage that fits inside and gives shape to the skin, in an open cylindrical shape, similar to a rib bone in a skeleton. Frames and stringers are supposed to connect at "clips" secured by rivets. However, Spirit had failed to install rivets in many clips as required. Hurt recalls working on an inspection of clips in 22 airplanes after Boeing identified

this problem. The planes inspected had varying numbers of missing clips, ranging from approximately 20 to 30, out of approximately 400 clips in the plane's section 46.

233.    As another example of problems that had been reported to Spirit by Boeing, Hurt recalled that Boeing wrote up a tag (a significant defect that had to be fixed) concerning bulges in the fuselage skin at station 360, which applied to 90 units (*i.e.*, 90 fuselages delivered to Boeing by Spirit).

234.    Hurt recalled that in 2023 Spirit was operating under a Boeing CAR relating to FOD, a very significant issue. Spirit attempted to implement certain steps to address the issue, but quickly stopped because Spirit operations personnel complained that they could no longer get their work approved. Hurt recalled an instance when a large amount of FOD that Boeing had found in a unit and sent back to Spirit was put on display at the end of the line for Spirit employees to see.

235.    Hurt first learned of problems with the aft pressure bulkhead in February 2023. Spirit asked Hurt to work on the aft pressure bulkhead, but he declined because it was common knowledge in integration that it was drilled and installed incorrectly, and he did not want to be responsible for it. Spirit improperly told employees that if the elongated holes on the aft pressure bulkhead were not visible, then they did not need to be fixed. Hurt believes that many Spirit employees knew of the aft pressure bulkhead mis-drilled holes and this defect was widely known in integration.

236.    In Hurt's experience, if he or another inspector would not sign off on work performed to correct tags, Spirit managers would just get other inspectors to approve the work. Spirit managers would instruct employees, including Hurt, to approve work without looking at it. Spirit hired contractors with no experience to serve as inspectors, and these contractors signed

off from their desks on work performed to correct tags without even looking at the parts in question.

237.    Hurt recalled several instances in which Spirit managers pressured Hurt and other quality inspectors to overlook defects. For example, in the fall of 2023 Hurt's director Richard Cassube initiated a heated exchange concerning a tag Hurt had written about seat tracks (tracks that connect seats to the floor of the plane) being built out of the proper order, which had resulted in gapping that could cause a seat to fail and possibly result in injury or death to a passenger. While Hurt was inspecting a fuselage he took measurements and began to mark up some issues that needed to be fixed. Hurt was first questioned about this by VP of Operations Scott Grabon, and Cassube then approached Hurt. Cassube was upset that Hurt was trying too hard to identify defects, which Hurt believed was simply doing his job to ensure quality. This exchange was also witnessed by Hurt's second level manager Vance Van Buskirk.

238.    As another example of Spirit managers pressuring Hurt to overlook defects, Hurt recalled writing a tag for multiple units, concerning a lack of required shims (a thin strip of material used to fill space between parts to make the parts align properly) at stringer 17 (on the floor of the plane), near station 360 of the fuselage. In response to the tags on these units, first level manager John McKay and Hurt's other superiors became very upset, cancelled his tags, and found other inspectors to approve the work in question.

239.    As yet another example of Spirit managers pressuring Hurt to overlook defects, Hurt wrote a tag concerning a bent part that could lead to stress fracture in a critical area of the fuselage near the wing and the fuel tank. Hurt's superiors McKay, Cassube, and Grabon "got in his face" about the tag, and McKay cancelled it. Hurt submitted ethics complaints to Spirit concerning John McKay's efforts to conceal defects. In one such complaint submitted in early

December 2023, Hurt wrote that McKay had improperly cancelled a tag that had not been fixed. McKay cancelled multiple tags that Hurt wrote in the shipping center.

240.    In addition to working in integration, Hurt's work also at times involved the "shipping center" area of Spirit's production line, where completed fuselages are supposed to be held before delivery to customers. Spirit personnel at times use "shipping center," "rail pit," and "end of the line," interchangeably to refer to the final area of Spirit's production line. According to Hurt, although Spirit frequently uses the slogan "quality without compromise," it was common knowledge among inspectors at the end of the line that this did not apply to the shipping center. Spirit managers, including second level manager Kyle Smith, told Hurt and other employees "don't f*** with shippers." Hurt's second level manager Van Buskirk texted and emailed him not to work escapements or write tags in the shipping center. From approximately September 2023 until his termination in January 2024, Spirit banned Hurt from working at the end of the line.

241.    Hurt recalled multiple instances where Spirit failed to properly address known quality issues. For example, during the summer of 2023, Hurt observed a quality defect involving the emergency exit door plug. The door plug remains open until the end of the line, where Spirit is supposed to close and seal the plug in place before delivering it to Boeing. Hurt was asked to figure out why a door plug at the end of the line would not close. Hurt observed that the seal was warped and coming off. Spirit had used polysulfide and silicone together on the seal, which are incompatible and do not stick to each other, and had failed to clean off excess sealer. As such, the seal did not form properly, and could be removed by hand, which should not be the case.

242.    As another example of Spirit failing to properly address known quality issues, in August 2023 Hurt wrote up a tag concerning improperly installed seat tracks on line unit 8806 (a "line unit" is a unique production number given to each fuselage manufactured by Spirit). The improper installation of the seat tracks negatively affected two traverse beams (which run from the left side to the right side of the fuselage under the cabin floor), which then should have been scrapped. However, another inspector "bought" (approved the defect as being corrected) Hurt's tag on this issue, even though there was no documentation in Spirit's systems of the traverse beams having been replaced, and the damaged traverse beams never entered Spirit's material review board crib (a "crib" is a parts storage area) as they should have if they were in fact removed from the plane.

243.    Use of illegal materials that were not properly issued through Spirit's internal procedures was a common practice during Hurt's tenure at Spirit. Hurt believes that "almost every shop" within Spirit probably has an illegal materials crib used to hide and improperly store discarded or leftover parts for potential later use on other orders.

244.    As yet another example of Spirit failing to properly address known quality issues, in or about August 2023 Hurt wrote up a tag concerning defectively installed sealant at station 360 of a fuselage (approximately the separating line between the crew cabin and the passenger cabin) on line unit 8873. The sealant in question had a cure time of 80 hours and pressure needed to be applied to the parts in question while curing, but the seal had been applied 11 days earlier with no pressure applied. This resulted in micro gaps in the seal, which can lead to corrosion, water entering the gaps, and other problems. Spirit quality managers bullied another inspector into cancelling Hurt's tag. Hurt told second level manager Ricky Lee that if he canceled the tag

again Hurt would inform the FAA. One month later Spirit suspended Hurt for this incident, on the pretextual grounds that he was cursing and acting in a hostile manner.

245.    Hurt found that Spirit's defective sealant installation at station 360 continued after this incident. Hurt discovered that Spirit had switched from using 80-hour sealant in this location as required, and was now using 7-day sealant in an effort to avoid having to respond to Hurt's tags concerning expired sealant. Spirit was also having a first shift inspector approve this work, so that Hurt's second shift would not look at it. In December 2023 Hurt again wrote a tag concerning expired sealant at station 360.  Spirit terminated Hurt's employment in January 2024. Hurt believes that the true reason for his termination is that he reported too many quality defects.

### D.    Metals Mechanic Former Employee 3 Notified Gentile of Violations of Boeing and FAA Standards and Confirmed Spirit's Prior Knowledge of The Mis-Drilled Holes Defect

246.    Former Employee 3 ("FE3") worked at Spirit from July 2006 until Spirit terminated his employment in March 2023. FE3 worked in the fabrication department at Spirit. He was a Metals Mechanic, Level A. He worked in the sheet metal shop (known internally as "Bluestreak") handling special order requirements. If there was a non-conformance in assembly, engineers would discuss with FE3's shop to come up with a solution. FE3's shop supported all Spirit production lines, including the Boeing 737 MAX. FE3 reported to first level manager Jasen Venn. His second level manager was initially Justin Frickey, who was later replaced by Sean Winterburg. FE3's second level manager reported to director of fabrication Kristina Baldwin, who reported to EVP of fabrication Mandy Trainer.

247.    Toward the end of 2022, FE3 heard from his team lead that something was wrong with bulkhead holes. FE3 learned of this issue because some related work was done in the building where he worked. Although FE3 did not work on the bulkhead holes, the issue was

common knowledge in his work building at that time. FE3 believes that since the issue was common knowledge in his building, management was also aware of it.

248.    According to FE3, Spirit had procedures that were supposed to be followed when employees were building parts to be incorporated into aircraft. Spirit would issue an internal order for the part to be built, and necessary materials would be obtained from a designated source at Spirit, known as a fill center. The employee building the part had to follow step by step instructions to build it. If an error was made at any step, the part being built was supposed to be scrapped and disposed of. The employee would then need to have a new part order issued, obtain new materials from the fill center, and begin building the part again. However, instead of following this process, when an error was made that should have resulted in scrapping a part, Spirit employees often did not scrap the part and begin a new order, but simply "backed up" the existing part order to the step before the error, and reworked the part with illegally sourced replacement materials that did not come from the proper sources at Spirit.

249.    FE3 recalled that Spirit's factory in Wichita has an illegal materials crib that its employees use to obtain materials outside of Spirit's proper, documented channels. At one point during FE3's tenure, Spirit moved its internal fill centers off site to remote locations. FE3's shop then began keeping and documenting spare materials to save time and money, instead of having to obtain new materials from an off-site fill center whenever additional material was needed. An audit conducted by Boeing discovered this practice and determined that Spirit was not permitted to keep spare material in this manner. According to FE3, Spirit employees continued using illegally retained materials and simply moved the location where they were stored to conceal this ongoing practice from Boeing. The illegal materials crib contains leftover or discarded parts and is frequently used to bypass required procedures that govern how materials must be obtained,

and materials from this crib are used, for example, by employees performing illegal rework on parts that should have been scrapped, or to quickly obtain materials for rushed part orders, according to FE3.

250.    According to FE3, the illegal materials crib was widely known at Spirit, including to management and was discussed in emails with managers. For example, FE3 recalled one email in which a team lead told a manager that he had "found" additional material to use in connection with work being performed for a Boeing audit. "Finding" additional material to fix production mistakes was known internally as "bootlegging" and was a common practice, according to FE3. The illegal materials crib was known to, among others, FE3's first and second level managers, union representatives, project planners, and the director of fabrication Kristina Baldwin.

251.    In or about October 2023, FE3 began leading a new employee who repeatedly compromised the work of FE3's shop by scrapping parts, performing illegal rework, and deleting computer files. The new employee also repeatedly threatened FE3 and other Spirit employees, and damaged their personal property. Although FE3 reported these issues to Spirit management on multiple occasions, Spirit failed to address these issues.

252.    FE3 observed that the new employee repeatedly used materials from the illegal materials crib to rework parts in violation of Spirit's procedures. For example, in one instance the new employee was supposed to use 0.045 inch thick aluminum to build a part but substituted illegally obtained 0.40 inch thick aluminum, which was not in conformance with manufacturing requirements.   When FE3 reported the new employee's use of illegal materials he was admonished by his first level manager, Jasen Venn. Spirit never addressed FE3's concerns about the new employee using illegal materials to improperly rework parts.

253.    On or about December 14, 2022, FE3 reported the new employee's conduct to first level manager, Jasen Venn. Venn stated that he reported the issue to Spirit's human resources department. However, Spirit did not act on FE3's complaint.

254.    On December 19, 2022, FE3 submitted an internal complaint through Spirit's EthicsPoint online reporting system. In that complaint, FE3 reported threats made by the new employee and stated that "[h]e has been making numerous mistakes in the course of his work duties, including scraping [sic] and substituting wrong/illegal material and falsifying documents. He has also been deleting our work files from the computer." FE3 further wrote that "we cannot guarantee the quality of work coming out of the shop with him in it."

255.    Later, on December 19, 2022, Spirit Ethics and Compliance Manager Craig Holloway responded through the EthicsPoint system, asking FE3 to provide, among other things, "specifics regarding improper jobs being covered up or concealed" and information relating to "falsifying documents." FE3 responded to Holloway's questions, stating "[w]e have one of the scrap parts that material was substituted on still in the shop, but not the order number. We also have about half a dozen witnesses that can back up its validity, including management." FE3 also wrote that "falsifying documents would pertain to confirming work orders where illegal material was substituted and not documented in the work orders."

256.    As Spirit failed to act on FE3's complaint over the following weeks, FE3 submitted additional information through EthicsPoint to follow up on his complaint. On January 12, 2023, he wrote that the new employee was "sabotaging my work" and that FE3 could not "trust that he has not altered tools, equipment, or other things that would cause harm to myself or others." On January 18, 2023, FE3 wrote that the new employee "has now gone in and edited other people's files in the computer once more."

67

257.    On February 6, 2023, as Spirit continued to fail to appropriately address FE3's concerns, he wrote an email with the subject line "More of the same" to Chris Anderson (Director, Global EHS [Environment, Health and Safety] and Security), Jason Neal (head of security), and first level manager Jasen Venn, about the new employee destroying more items in the shop. Anderson told FE3 that HR was reviewing the situation. FE3 responded to Anderson stating that "[w]e've been hearing that HR is handling this case for the last few months and nothing  has happened except for more of our things being vandalized and destroyed," and that "[t]his is on top of all the sabotage, scrap, illegal rework, destruction of company property, concealment of defective work, and hindering production that he does as well."

258.    On Sunday, February 12, 2023, as Spirit still failed to appropriately address FE3's concerns, he wrote an email with the subject line "Threats" to multiple Spirit employees including Anderson, Neal, Venn, Kristina Baldwin (director of fabrication), and Sean Winterburg (second level manager) about personal threats that the new employee had recently made toward the families of FE3 and another employee. After describing the threats, FE3's email noted that "[t]hese are all issues just with personal attacks and provocations, this doesn't even include the sabotage and illegal work practices that the guy has been doing." The same day, Baldwin responded that she would "ensure this situation is addressed immediately," and that she would "also make sure my immediate manager and our HR business partner are aware." On February 14, 2023, FE3 responded to Baldwin, in the same email chain including the February 12 emails from FE3 and Baldwin, bcc'ing Gentile and Spirit's head of HR, Justin Welner.

259.    On March 2, 2023, as Spirit still failed to take appropriate action, FE3 wrote an email with the subject line "Help!!!" to multiple senior Spirit personnel including Gentile and Human Resource Business Partner, Kim Brown, urging them to act on his repeated complaints.

FE3 stated, "I have tried to follow every procedure and company resource available to me and nothing is happening. It appears this company has policies and procedures, but nobody knows how to use them in any way. You obviously don't use them to help or discipline anyone, or to ensure anyone's safety." FE3's email continued "[s]o, do I just reach out to OSHA and the FAA along with local law enforcement now to see that this is properly handled? There have been so many violations, to our code of conduct, to our policies, to FAA and Boeing standards, and to the law." FE3 also wrote that "I am tired of being yelled at by my manager when I have to report something."

260.    Eventually, after repeatedly trying to get Spirit management to address his internal complaints without success, FE3 filed complaints with the local sheriff's office relating to the new employee's conduct. Two hours after filing those complaints, FE3 was called into the office at Spirit and suspended pending investigation. Although under the rules for FE3's union Spirit was supposed to provide paperwork relating to his suspension, it never did. No one provided a reason for FE3's suspension. Ten days after being walked out of Spirit by security, FE3 received a termination notice in the mail. Although the notice said he was terminated for throwing away a hot part that caused a work stoppage, that is false. FE3 did not throw away a hot part, which is corroborated by Spirit's records documenting the work history for the part in question.

### E.    Internal Quality Auditor Former Employee 2 Observed Quality Problems Including Many Mechanics Using Out-Of-Calibration Tools

261.    Former Employee 2 ("FE2") was employed by Spirit as an Internal Quality Auditor in Wichita, Kansas from October 2017 to February 2021. FE2 reported to First Level Manager Tina Leep, who in turn reported to Production Line Manager (which position was also known in Spirit as a Second Level Manager) Garrett Powell. Powell reported to Senior Director

of Global Quality Marki Huston. As an Internal Quality Auditor, FE2 conducted audits on Spirit's production process for sections of 737s and other aircraft.

262.    According to FE2, the mechanics who performed Spirit's manufacturing were overworked and repeatedly required to work mandatory weekend overtime, and 60-70 hour weeks.

263.    In the role of Internal Quality Auditor, FE2 received assignments from his manager Leep to observe specific parts of the manufacturing process. FE2 was required to compile reports of his observations in Power Point form, including photographs. During FE2's time auditing different aspects of the manufacturing process, FE2 encountered issues in multiple parts of the production process.

264.    FE2 recalled that auditors repeatedly found torque wrenches in mechanics' toolboxes that were not properly calibrated. This was potentially a serious problem, as a torque wrench that is out of calibration may not torque fasteners to the correct levels, resulting in over-tightening or under-tightening that could threaten the structural integrity of the parts in question.

265.    After auditors found a significant number of out-of-calibration torque wrenches, Spirit required FE2 and other auditors to audit mechanics' toolboxes and to remove any out-of-calibration tools.

266.    As another example, FE2 recalled an instance in which he was inspecting the nose of an assembled fuselage just prior to its shipment via train to Boeing. FE2 found a large amount of foreign object debris in the fuselage such as metal shavings, rags, paper towels, rivets, and other items.

267.    As yet another example of Spirit employees failing to perform their work as required, FE2 observed a mechanic drilling a hole for a fuselage floor beam. Such holes must be

drilled straight, but the mechanic was drilling at an angle, which can make a rivet placed in such an improperly drilled hole not properly secured. FE2 took pictures of the defective drilling and reported his findings, however, months later he witnessed the same mechanic repeating this improper angled drilling.

268.     On multiple occasions, such as those described above, FE2 witnessed Spirit employees exhibiting blatant disregard for the safety and structural integrity of the aircraft they were working on. In FE2's experience, when he spoke up to identify problems, not much changed at Spirit, which contributed to his decision to leave the company.

## VIII.   POST CLASS PERIOD EVENTS CONFIRM DEFENDANTS' FALSE AND MISLEADING STATEMENTS WERE MADE WITH SCIENTER

### A.     Spirit Replaced Gentile as CEO

269.     On October 2, 2023, Spirit issued a press release and filed a Form 8-K with the SEC announcing that it had replaced Gentile as President and CEO, effective September 30, 2023, and that Gentile had resigned from Spirit's board of directors. The press release was titled "Spirit AeroSystems Announces Leadership Transition" and prominently featured the sub-heading "Thomas C. Gentile III No Longer Serves as President, Chief Executive Officer and Director." Spirit named an interim CEO, Patrick Shanahan, and stated that it would conduct a search for a permanent CEO. No explanation was given for Gentile's departure.

270.     Spirit and Gentile entered into a Separation Agreement dated October 1, 2023, under which Spirit would pay Gentile cash severance equal to his $1.3 million base salary, and an additional $2,500 per hour for his consulting services. Spirit also waived requirements under its Long-Term Incentive Plan for Gentile to be employed on the vesting date for tens of thousands of certain Spirit restricted stock units, which were worth potentially more than $1 million. As a condition of receiving this consideration, Spirit required Gentile to agree to release it and its

personnel from all claims, and to agree not to sue them. Spirit also required Gentile to agree not to make any disparaging statements about Spirit, its employees, or its products or services.

271.    Gentile's departure from Spirit was not a planned retirement. When Spirit filed its annual report with the SEC on February 17, 2023, Gentile was only 58 years old, and had worked at Spirit for almost seven years.

**B.    The Head Of Spirit's Commercial Division, Samantha Marnick, left Spirit, and its Senior Vice President and General Manager, Boeing Programs Kevin Matthies Was Abruptly Fired**

272.    On November 28, 2023, Spirit issued a press release titled "Spirit AeroSystems Makes Changes to Strengthen Operational Alignment and Program Execution." The press release "announced the departure of Sam Marnick, Executive Vice President and Chief Operating Officer, President, Commercial from the Company." The press release further stated that "[a]s part of this transition, Spirit is making organizational changes to strengthen its focus on quality and operational performance."  As President of Spirit's Commercial Division Marnick oversaw Spirit's programs with Boeing.

273.    Marnick's departure from Spirit was not a planned retirement. When Spirit filed its annual report with the SEC on February 15, 2022, Marnick was only 52 years old, and had worked at Spirit for approximately 17 years. Spirit named an interim replacement for Marnick. The press release quoted Spirit's interim CEO as stating "[w]e wish Sam well on future endeavors." Spirit provided no explanation for Marnick's departure.

274.    In connection with her departure, Marnick agreed to enter into a non-disparagement agreement and to release all claims in exchange for over $1 million in compensation.

275.    In addition, during the Class Period, on January 24, 2023, Spirit's Board abruptly terminated Kevin Matthies, with his separation to be effective as of January 26, 2023. At the time

of his termination, Matthies' title was Senior Vice President and General Manager, Boeing Programs. His previous roles at Spirit included Chief Technology and Quality Officer, and Senior Vice President of Quality.

276.   Matthies's departure from Spirit was not a planned retirement. When Spirit filed its annual report with the SEC on February 15, 2022, Matthies was only 52 years old, and had worked at Spirit for approximately nine years. Spirit announced Matthies' termination on January 27, 2023, but provided no explanation of the reasons for his departure.

277.   In connection with his termination, Matthies agreed to enter into a non-disparagement agreement and to release all claims in exchange for more than $1 million in compensation.

### C. Spirit and Boeing Entered A "Stability Plan" Requiring Spirit To Reduce Defects And Increase Quality Staffing

278.   On October 18, 2023, Spirit issued a press release and filed a Form 8-K with the SEC announcing that it had entered into an agreement with Boeing on October 12, 2023 to support Spirit's production quality. Spirit's press release was titled "Spirit AeroSystems, Boeing Reach Agreement to Support Production Stability" and stated that "[t]he agreement enables greater collaboration to achieve improved quality and higher deliveries in the future." In the press release, Spirit quoted itself as saying "Boeing and Spirit will continue to work shoulder to shoulder to mitigate today's operational challenges."

279.   The agreement included pricing changes for Spirit products delivered to Boeing, a mutual release of claims, and for Boeing to provide Spirit $100 million within 10 business days for "tooling and capital through 2025 for certain planned and potential 737 and 787 rate increases."

280.   Under the heading "Stability Plan," the agreement stated:

Spirit will create and implement, to Boeing's satisfaction, an operational stability plan that:

    A.  demonstrates reductions in nonconformances, foreign object debris, customer sensitive items, significant repair log items, and sub tier shortages;

    B.  increases staffing (as jointly agreed) in support functions, including engineering, quality, lean, and supply chain;

    C.  provides maintenance plans for all major equipment and facilities;

    D.  provides work transfer plans (as required by the Agreements) that include key milestones and demonstrate qualified and capable rate performance prior to full reliance on any new supplier; and

    E.  provides jointly-coordinated buffer-stock plans (which may include ship in place) for all programs (including two weeks' worth of finished goods for 737).

281.    Under the heading "Supply Chain Health," the agreement provided that "[t]he Parties agree to work together on systemic, rate constraining, and shared supply chain challenges. Prior to the end of calendar year 2023, the Parties will jointly establish a collaborative working team and agreed-to cadence with a shared objective to monitor and mitigate risk and strengthen a supply chain capable of meeting Boeing's future desired production rates."

282.    The agreement was signed by Suchinski on behalf of Spirit.

**D.    Reporting By The Air Current Revealed An Expanded Scope Of The Mis-Drilled Holes Defect**

283.    On October 12, 2023, The Air Current published an article titled "Boeing And Spirit Expand Scope Of 737 MAX Aft Pressure Bulkhead Inspections." Citing "two people familiar with the issue," The Air Current reported:

Boeing and Spirit have previously focused their search and replacement efforts on hundreds of misdrilled fasteners installed with an automated laser-guided fastening machine at Spirit's Wichita, Kansas operations. Six weeks after the issue was first reported by The Air Current, Boeing and its largest supplier have now begun examining hand-drilled fasteners on the critical structure, as well.

284.    According to The Air Current:

The aft pressure bulkhead is made up of pie-shaped slices that together form the dome that sits behind the aft galley and creates the fuselage's aft structural seal. The manually drilled fasteners in question run along the seams of each slice of the substructure, according to one person familiar with the expanded quality checks.

285.    The Air Current further reported that "The company earlier this week notified the Federal Aviation Administration of its initial findings" and quoted an FAA spokesman as confirming that the agency is "aware of the issue and are working it through our regular oversight process."

286.    On October 25, 2023, Boeing held its earnings call for the third quarter of 2023. On the call, Boeing's Executive Vice President and CFO, Brian West, stated, "Since our early September update, additional areas of the aft pressure bulkhead were identified that require further inspection and rework, which you likely read about. This additional scope impacts units that had already gone through the initial rework and will take us more time to stabilize production and deliveries."

**E.    Spirit's Defective Manufacturing Contributed To The 737 MAX Door Plug Blowout, Which Has Resulted In Governmental Investigations Of Spirit**

287.    On January 5, 2024, shortly after takeoff on Alaska Airlines Flight 1282 operating a 737 MAX 9 from Portland, Oregon to Ontario, California, a door plug blew out causing uncontrolled decompression of the aircraft and forcing it to return to Portland for an emergency landing. A door plug is a structure installed in the plane's fuselage in place of an emergency exit door. The different seating configurations used on the 737 MAX 9 require different numbers of emergency exit doors. If fewer than the maximum number of emergency exit doors are needed by Boeing's end customer (in this case, Alaska Airlines) for a given plane, then Spirit assembles the fuselage with door plugs in place of the unneeded emergency exits.

288.    The door plug blowout received widespread scrutiny from regulators, airplane operators, the media, and the public. On January 6, 2024, the FAA issued an Emergency Airworthiness Directive temporarily grounding certain 737 MAX 9 aircraft and requiring inspections.

289.    In a January 10, 2024 interview on CNBC, Boeing CEO David Calhoun responded to a question about Spirit interim CEO Pat Shanahan, stating that "[w]e're not going to point fingers there because, yes, it escaped their factory but then it escaped ours, too," in reference to the defect that caused the door plug blowout. On January 12, 2024, the FAA announced that it was conducting "[a]n audit involving the Boeing 737-9 MAX production line *and its suppliers* to evaluate Boeing's compliance with its approved quality procedures" (emphasis added).

290.    On January 17, 2024, the FAA announced that it "is now investigating Boeing's manufacturing practices and production lines, including those involving subcontractor Spirit AeroSystems, bolstering its oversight of Boeing, and examining potential system change." The same announcement also stated that "[a]ll 737-9 MAX aircraft with door plugs will remain grounded pending the FAA's review and final approval of an inspection and maintenance process that satisfies all FAA safety requirements."

291.    On January 24, 2024, the FAA announced that it would "not agree to any request from Boeing for an expansion in production or approve additional production lines for the 737 MAX until we are satisfied that the quality control issues uncovered during this process are resolved." In this context, the announcement also discussed "the FAA's investigation and ramped up oversight of Boeing *and its suppliers*" (emphasis added).

292.    Spirit's annual report on Form 10-K, filed with the SEC on February 22, 2024, confirms that it is now responding to governmental investigations relating to safety and product

quality, and that these investigations are beyond those encountered in the ordinary course of its business. As stated by Spirit:

> From time to time, the Company receives requests for information from government agencies in connection with their regulatory or investigational authority. While certain requests of this type are received in the ordinary course of business, the Company has also received information and document requests related to the January 5, 2024 Alaska Airlines incident, the B737 MAX 9 door plug, and safety and quality processes in B737 MAX line production. These include requests to assist the government in investigations or audits.

**F.      Reporting Following The Door Plug Blowout Confirms Pervasive Quality Problems At Spirit**

293.     After the door plug blow out, numerous media reports were published regarding the causes of the blow out, and recounting and providing new details about Spirit's history of quality failures. For example, on January 6, 2024, Bloomberg published an article titled, "Boeing 737 Max Blowout Points to Pervasive Flaws," noting repeated problems with Boeing and Spirit products, and reporting that the plane in Flight 1282 was brand new, having been delivered to Alaska Airlines in October 2023. On January 11, 2024, the Washington Post published an article titled, "Jet Accident probe expands to include Boeing supplier," noting that the National Transportation Safety Board's investigation of the incident now included Spirit and stating, "Spirit said its work on the fuselage includes completing the initial installation of the panel that broke off the Alaska Airlines flight."

294.     On January 13, 2024, the Wall Street Journal published an article titled, "This Has Been Going on for Years.' Inside Boeing's Manufacturing Mess." The article noted that Spirit "has been plagued by production problems and quality lapses" and that "[s]ome Spirit employees said production problems were common and internal complaints about quality were ignored." The article quoted the FAA's Administrator (*i.e.*, the head of the FAA), Michael Whitaker, as stating

"[w]hatever's happened over the previous years—because this has been going on for years—has not worked" and "[a]ll indications are it's manufacturing" that led to the blowout.

295. The Wall Street Journal article cited employees as stating that, as a result of Boeing's demands for Spirit to cut costs over the years, Spirit became "a factory where workers rush to meet unrealistic quotas and where pointing out problems is discouraged if not punished" and that "[i]ncreasingly . . . planes have been leaving Wichita with so-called escapements, or undetected defects." The article further stated that "[u]nion representatives complained to leaders last fall that the company removed inspectors from line jobs and replaced them with contract workers after they flagged multiple defects" and quoted an email from a representative to union officials as stating "[t]his is leaving them with great quality and safety concerns" while "[a]lso feeling retaliated against for doing their jobs." The article quoted Cornell Beard, president of the International Association of Machinists and Aerospace Workers chapter representing workers at Spirit's Wichita factory, as stating "[w]e have planes all over the world that have issues that nobody has found because of the pressure Spirit has put on employees to get the job done so fast."

296. On January 24, 2024 the Seattle Times published an article titled, "Boeing, not Spirit, mis-installed piece that blew off Alaska MAX 9 jet, industry source says," which reported that although Boeing had performed the final work on the door plug, Spirit had shipped the door plug to Boeing in defective condition requiring it to be removed and reworked at Boeing's Renton, Washington factory. The article reported that "Spirit AeroSystems, . . . originally installed the [door plug] panel into the 737 MAX 9 fuselage in Wichita, Kan."

297. The Seattle Times article cited comments from an anonymous Boeing whistleblower (posted by the whistleblower on January 16, 2024 to the January 15, 2024 online article "'Unplanned' removal, installation inspection procedure at Boeing" by aviation industry

publication Leeham News).[7] Although the identity of the whistleblower is not known, The Seattle

Times found his account highly credible, stating:

> [T]he details provided about the manufacturing process failures that led to the door plug blowout appear authentic and authoritative. The Seattle Times confirmed with a Renton mechanic and a former 737 MAX production line manager that the whistleblower's description of how this kind of rework is performed and by whom is accurate.
>
> The Times also confirmed that the whistleblower accurately described the computer systems Boeing uses to record and track 737 assembly work, systems that mechanics and engineers sign into every day when they begin work.

The Seattle Times offered Spirit and Boeing the opportunity to comment on the details in its

article, but both companies declined and neither disputed the whistleblower's account.

298.    The Seattle Times reported that since at least 2018 a team of Spirit employees has

been stationed at Boeing's Renton, Washington factory, where Boeing completes final assembly

of the 737 MAX, citing both the whistleblower's comments and an interview with Ed Pierson, a

former manager of Boeing's 737 MAX production line. The article quoted Pierson as stating that

the Spirit employees were there to fix "defects or non-conformances." As stated in the

whistleblower's comments, "[b]ecause there are so many problems with the Spirit build in the

737, Spirit has teams on site in Renton performing warranty work for all of their shoddy quality."

The Seattle Times reported the whistleblower's comments that Spirit produces "a hideously high

and very alarming number" of defects.  For example, "Boeing's records for just the past year

document a total of 392 nonconforming findings at the location where the door plug is installed."

299.    The Seatle Times further reported that, according to the whistleblower's

comments, "mechanics found 'damaged and improperly installed rivets' on the left door plug"

---

7    https://leehamnews.com/2024/01/15/unplanned-removal-installation-inspection-procedure-at-boeing/#comment-509962

that later blew out, and that "the Spirit team repaired the rivets and sent it back to a Boeing quality inspector." However, the Boeing inspector recorded that "the repair was not done properly, that the Spirit team 'just painted over the defects.'" Further, "the Spirit mechanics then discovered that, in addition to the problematic rivets, the pressure seal sandwiched between the plug and the airframe was damaged and needed [to be] replaced." Therefore, Spirit's defective work on the door plug substantially contributed to the blow out by requiring Boeing to remove and rework the door plug.

300.    In a January 24, 2024 article titled "127 Days: The anatomy of a Boeing quality failure," The Air Current, citing "interviews with directly knowledgeable people, and confirmed by those briefed on the situation," confirmed many of the facts reported by the whistleblower and The Seattle Times. For example, The Air Current Reported that "[r]ivets installed at Spirit in the fuselage structure just forward of the plug exit door frame weren't installed properly in five locations and required rework," and that "Spirit's warranty obligations to its product meant that responsibility for fixing the rivets on [the affected fuselage] would fall to Spirit and its staff working in Boeing's factory." The Air Current further reported that "the plug exit was opened by Boeing to give Spirit contracted staff access to fix the rivets."

301.    In a February 6, 2024 article titled, "Why the FAA Still Can't Fix Boeing," The Wall Street Journal reported that in the summer of 2023, "the FAA assigned two senior inspectors to keep tabs on Spirit AeroSystems." The article further reported that following the door plug blowout, "[t]he FAA said it is sending 20 more inspectors to Boeing's Renton factory and six more to Spirit's facility in Wichita, and that it could add more as needed." The article quoted FAA Administrator Michael Whitaker as stating that "the manufacturing problems had 'gone on

for too long, and I think we need to have a more intensive effort to get this resolved, immediately.'"

302.    On February 28, 2024 the FAA published on its website "Updates on Boeing 737-9 MAX Aircraft," stating that "Boeing also must integrate its [Safety Management System] program with a Quality Management System, which will ensure the same level of rigor and oversight is applied to the company's suppliers and create a measurable, systemic shift in manufacturing quality control."

303.    On Monday, March 4, 2024, the FAA published on its website "Updates on Boeing 737-9 MAX Aircraft," stating that the FAA's "six-week audit of Boeing and Spirit AeroSystems, prompted by the January 5 incident involving a new, Boeing 737-9 MAX aircraft, found multiple instances where the companies allegedly failed to comply with manufacturing quality control requirements." The FAA indicated that it has provided a summary of those findings to the companies. The FAA further stated that it "will continue its increased onsite presence at Boeing's facility in Renton, Washington, and Spirit AeroSystems' facility in Wichita, Kansas."

304.    On March 11, 2024, The Seattle Times reported that the FAA audit conducted after the Alaska Airlines door plug blowout found that Spirit failed 7 of 13 product audits. According to the report, FAA officials observed mechanics at Spirit using a hotel key card to check a door seal and observed a Spirit mechanic applying liquid soap as a lubricant on a door seal.

305.    According to The Seattle Times article, the full audit results are not available because of the ongoing FAA investigation.   The report also confirmed that the National

Transportation Safety Board is investigating the door blowout and the Department of Justice has commenced a criminal investigation.

## IX.     ADDITIONAL SCIENTER ALLEGATIONS

306.     As alleged herein, Defendants acted with scienter because Defendants: knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

307.     As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Spirit, their control over, and/or receipt and/or modification of Spirit's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Spirit, participated in the fraudulent scheme alleged herein.

### A.     Defendants' Own Statements Show They Knew Of And Concealed The Mis-Drilled Holes Defect

308.     Spirit's mis-drilling of holes on the aft pressure bulkhead was publicly identified by Boeing. The public was not aware of the issue until Boeing issued press statements on the subject that were published on August 23, 2023. Gentile's statements during the September 7, 2023 Jefferies Industrials Conference show that Spirit had knowledge of the problem before it was "found" by Boeing:

> Okay. This came up. But one of our quality processes actually found this. So our quality management system includes a process where we encourage employees to speak up if they see a manufacturing process that could be fixed or improved. One employee came up and told us about this, we were already actively working on a fix when the escape was found.

309.    Spirit's August 23, 2023 press release similarly indicates that Defendants were previously aware of the issue. For example, in the press release Spirit states that "Spirit has implemented changes to its manufacturing process to address this issue." Because changes to manufacturing processes necessarily require time to design and implement, this statement confirms that Spirit was aware of the mis-drilled holes defect substantially in advance of its August 23, 2023 public disclosure.

**B.      Manufacturing And Quality Control For 737 MAX Components Were Core Operations For Spirit**

310.    Leading up to and during the Class Period, work relating to the Boeing 737 MAX was Spirit's core operation. As stated in Spirit's SEC filings, "Our business depends largely on sales of components for a single aircraft program, the B737 MAX." 53% of Spirit's net revenues were generated from sales of components to Boeing for the 737 in 2019, and 45% in 2022.

311.    Moreover, in light of the two widely publicized crashes of 737 MAX airplanes in October 2018 and March 2019, subsequent worldwide grounding of the 737 MAX, related governmental investigations and congressional hearings, and the revelation that a defect in the 737 MAX flight systems caused the crashes, quality control for the 737 MAX came under intense scrutiny, both in public and within the 737 MAX supply chain, including at Spirit.

312.    As stated by Gentile during the September 7, 2023 Jefferies Industrials Conference, "I would say there's greater scrutiny on quality in general, post the MAX grounding and post the pandemic and particularly on the MAX, for obvious reasons."

313.    This intense scrutiny made quality control for the 737 MAX a core operation for Spirit. For example, on April 13, 2023, The Seattle Times published an article titled, "Boeing 737 MAX production hit by a new defect in supplier part," stating:

Ron Epstein, a financial analyst with Bank of America who has an aerospace engineering degree, expressed amazement at yet another defect belatedly surfacing now despite all the scrutiny on the MAX since the two crashes.

"How could they have missed this after four years when they were supposed to have looked at everything with a fine-tooth comb?" Epstein said.

### C.   Defendants Held Themselves Out As Knowledgeable About The 737 MAX And Quality Issues, And Had Access To The Concealed Facts

314.   As alleged herein, the Individual Defendants repeatedly held themselves out as knowledgeable regarding the operational details of Spirit and the subject matter of Defendants' misrepresentations and omissions.

315.   The positions of the Individual Defendants, as Spirit's CEO and CFO, gave them responsibility for and access to information concerning issues relating to Spirit's deficient quality controls and known manufacturing defects, and the financial impact of these defects.

316.   Spirit's March 2, 2022 slide deck titled "Welcome, Investor Day 2022," contained the following slide, which Kevin Matthies, Spirit's CTO and Chief Quality Officer, presented in connection with his Investor Day remarks. As shown in the slide, Spirit represented to investors that its Executive Leadership Team oversaw Spirit's quality control efforts, with the Product & Process Verification Project Management Team directly reporting to the Executive Leadership Team, which includes Defendants Gentile and Suchinski:



317.    During the Investor Day presentation, Matthies also stated:

[W]e have a quality excellence council, and we have a safety council. Tom personally spends his time in the safety council with us every other week. That's the priority level that Tom puts on safety and quality. He is demonstrating and leading the company in all aspects of this.

318.    Defendants also repeatedly stated in Spirit's annual reports that quality was, and would continue to be, a key focus for Spirit's management.

319.    Spirit's Form 10-K for 2020 stated under the heading "Management's Focus":

For the year ended December 31, 2020, management's focus revolved around preserving and enhancing liquidity and reducing costs in light of the significant impacts of the B737 MAX grounding and COVID-19 pandemic. Additionally, management focused on operational execution, with a focus on safety and quality, while working to meet our customers' requirements, and pursuing and completing organic and inorganic growth opportunities.

For the year ended December 31, 2021, management's focus is expected to be on continued preservation and enhancement of our liquidity and cost reduction in light of the continuing impacts of the COVID-19 pandemic; revenue growth and diversification, integrating the Belfast, Morocco and Dallas sites; repaying and/or restructuring debt; and operational execution, with a continuing focus on safety and quality.

320.    Spirit's 10-K for 2021 stated under the heading "Management's Focus":

For the year ended December 31, 2021, management's focus was on:
*    continued preservation and enhancement of our liquidity and cost reduction in light of the continuing impacts of the COVID-19 pandemic;
*    revenue growth and diversification;
*    integrating the Belfast, Morocco and Dallas sites;
*    repaying and/or restructuring debt; and
*    operational execution, with a continuing focus on safety and quality.

For the year ending December 31, 2022, management's focus is on:
*    continued management of the impacts of the COVID-19 pandemic;
*    internal and external rate readiness preparedness;
*    growth, diversification, and operational execution; and
*    safety and quality in the key markets that we serve.

321.    Spirit's 10-K for 2022 stated under the heading "Management's Focus":

For the year ended December 31, 2022, management's focus was on:

*    *    *

*    safety and quality in the key markets that we serve.

For the year ending December 31, 2023, management's focus is on:
*    realizing production rate increases across all our programs while maintaining a safe workplace and improving quality;

**D.    Defendants' Incentive Compensation Provided A Motive To Conceal Quality Defects**

322.    Spirit's executive compensation plans gave the Individual Defendants motives to conceal defects that had the potential to impact the Company's performance or share price.

323.    Spirit's annual cash incentive plan was designed to allow executives, including the Individual Defendants, to earn annual cash bonuses equal to or exceeding their base salaries.

During the Class Period, payouts under the annual cash incentive plan were based on factors including EBIT [earnings before interest and taxes], free cash flow, revenue, and quality. Spirit's SEC filings explain the quality factor as "how our customers measure compliance with specifications and has direct financial impact. Our quality index uses key customer metrics."

324.    Spirit's long-term incentive plan was designed to allow executives to receive annual awards of Spirit stock (or restricted stock units) equal to a multiple of their base salary. During the Class Period, payouts under the long-term incentive plan were based on factors including total stockholder return, free cash flow, and revenue growth. Spirit's SEC filings explain the total stockholder return factor as "measuring the Company's TSR percentile rank against its peers over a three-year performance period."

325.    Spirit's compensation to the Individual Defendants during the Class Period, through 2022, the last year for which complete information is available, is summarized in the following table:

| | 2022 | 2021 | 2020 |
|---|---|---|---|
| **Gentile** | | | |
| Base Salary | $1,300,000 | $1,300,000 | $1,300,000 |
| Cash Incentive Award | $339,300 | $1,497,053 | $1,410,494 |
| Long-Term Incentive Award | $7,150,000 | $7,150,000 | $7,150,082 |
| Total compensation[8] | $11,728,900 | $10,849,938 | $10,454,350 |
| | | | |
| **Suchinski** | | | |
| Base Salary | $619,863 | $525,000 | $500,000 |

[8] This table does not present all components of the Individual Defendants' total compensation, so the figures in the "Total compensation" rows are greater than the sum of base salary, cash incentive award, and long-term incentive award.

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Cash Incentive Award | $122,055 | $427,839 | $363,696 |
| Long-Term Incentive Award | $1,437,500 | $1,050,000 | $875,064 |
| Total compensation | $2,622,267 | $2,051,367 | $1,695,552 |

326.   The incentive compensation available to the Individual Defendants under these programs was exceedingly high in absolute terms, in comparison to their base salaries, and in comparison to wages for average Spirit employees.

327.   Gentile's combined 2022 Cash Incentive Award and Long-Term Incentive Award was 5.7 times his salary. Suchinski's combined 2022 Cash Incentive Award and Long-Term Incentive Award was 2.5 times his salary.

328.   The 2022 annual total compensation of the median Spirit employee (excluding the CEO) was $64,171. Therefore, Gentile's combined 2022 Cash Incentive Award and Long-Term Incentive Award was over 116 times the median employee's total compensation. Similarly, Suchinski's combined 2022 Cash Incentive Award and Long-Term Incentive Award was over 24 times the median employee's total compensation.

**D.    The FAA Levied Fines Totaling Millions Of Dollars Against Boeing For Using Defective Parts Supplied By Spirit**

329.   On June 29, 2018, Southwest United Industries (SUI) processed slat tracks, which are located on the leading edge of the wings of a Boeing 737 and are used to guide the movement of panels known as slats, and shipped the parts to Spirit, which then delivered the parts to Boeing.

330.   On or about August 3, 2018, Spirit was informed that a batch of those slat tracks had failed a quality test due to the presence of hydrogen embrittlement. According to the FAA, Spirit informed Boeing of the situation on or about September 11, 2018, and subsequently

proposed that Boeing accept the parts as delivered. On October 9, 2018, Boeing rejected that proposal and instructed Spirit to submit a Notice of Escapement. Spirit filed that notice on February 14, 2019.

331.    On December 6, 2019, the FAA announced a proposed civil penalty of $3.9 million against Boeing for installing nonconforming components, provided to Boeing by Spirit, on approximately 133 aircraft. The affected planes were Boeing 737 NG aircraft.

332.    On January 10, 2020, the FAA announced a proposed civil penalty of $5.4 million against Boeing, in addition to the previous $3.9 million penalty, this time relating to Boeing's installation of nonconforming slat tracks, also obtained from Spirit, on approximately 178 Boeing 737 MAX aircraft.

### E.    Defendant Spirit Acted With Corporate Scienter

333.    The scienter of the Individual Defendants is imputable to Spirit because they were officers of Spirit acting within the scope of their authority.

334.    The misrepresentations and omissions of Spirit as alleged herein are of such a nature that they would have been approved by corporate officials sufficiently knowledgeable about Spirit to know that those statements and omissions were misleading.

## X.    LOSS CAUSATION

335.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

336.    During the Class Period, Plaintiffs and the Class purchased Spirit's shares at artificially inflated prices and were damaged thereby. The price of the Company's shares significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## XI.    CLASS ACTION ALLEGATIONS

337.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities who purchased or otherwise acquired the Class A common stock of Spirit between April 8, 2020 and September 7, 2023, both dates inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

338.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Spirit's shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of Spirit shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Spirit or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

339.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

340.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

341.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Spirit; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

342.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.   UNDISCLOSED ADVERSE FACTS

343.     The market for Spirit's shares was open, well-developed and efficient at all relevant times. As a result of Defendants' materially false and/or misleading statements, and/or failures to disclose, Spirit's shares traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Spirit's shares relying upon the integrity of the market price of the Company's shares and market information relating to Spirit and have been damaged thereby.

344.     During the Class Period, Defendants materially misled the investing public thereby inflating the price of Spirit's shares, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false

and/or misleading for the reasons set forth herein and because they failed to disclose material adverse information and/or misrepresented the truth about Spirit's business, operations, and prospects as alleged herein.

345.   At all relevant times, the material misrepresentations and omissions and undisclosed scheme particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Spirit's prospects and engaged in a scheme to do the same. These material misstatements and/or omissions and/or conduct had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its prospects, thus causing the Company's shares to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements and/or conduct during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's shares at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## XIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

346.   The market for Spirit's shares was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Spirit's shares traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's shares relying upon the integrity of the market price of Spirit's shares and market information relating to Spirit, and have been damaged thereby.

347. During the Class Period, the artificial inflation of Spirit's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Spirit's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Spirit and its business, operations, and prospects, thus causing the price of the Company's shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's shares at such artificially inflated prices, and each of them has been damaged as a result.

348. At all relevant times, the market for Spirit's shares was an efficient market for the following reasons, among others:

(a) Spirit shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Spirit filed periodic public reports with the SEC and/or the NYSE;

(c) Spirit regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Spirit was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

349.    As a result of the foregoing, the market for Spirit's shares promptly digested current information regarding Spirit from all publicly available sources and reflected such information in Spirit's share price. Under these circumstances, all purchasers of Spirit's shares during the Class Period suffered similar injury through their purchase of Spirit's shares at artificially inflated prices and a presumption of reliance applies.

350.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material omissions set forth above, that requirement is satisfied here.

## XIV.  NO SAFE HARBOR

351.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when

made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Spirit who knew that the statement was false when made.

## XV.     FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5(a) — (c) Promulgated Thereunder
### <u>Against All Defendants</u>

352.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

353.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (iii) cause Plaintiffs and other members of the Class to purchase Spirit's shares at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

354.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for Spirit's shares in violation of Section 10(b) of the

Exchange Act and Rule 10b-5(a) — (c). All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

355.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Spirit's financial well-being and prospects, as specified herein.

356.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Spirit's value, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Spirit and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares during the Class Period.

357.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as an officer of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other

data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

358.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Spirit's prospects from the investing public and supporting the artificially inflated price of its shares. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

359.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Spirit's shares was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's shares were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the shares trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants

during the Class Period, Plaintiffs and the other members of the Class acquired Spirit's shares during the Class Period at artificially high prices and were damaged thereby.

360.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were unaware of their falsity and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding Spirit, which was not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Spirit shares, or, if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

361.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

362.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's shares during the Class Period.

## XVI.   SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

363.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

364.    Individual Defendants acted as controlling persons of Spirit within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false statements disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and

dissemination of the various statements which Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

365.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular decisions giving rise to the securities violations as alleged herein, and exercised the same.

366.    As set forth above, Spirit and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## XVII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## XVIII. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: March 12, 2024

**GLANCY PRONGAY & MURRAY LLP**

By: */s/ Garth A. Spencer*
Garth A. Spencer (GS-7623)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
gspencer@glancylaw.com

Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
glinkh@glancylaw.com

**HOLZER & HOLZER, LLC**
Corey D. Holzer (*pro hac vice*)
211 Perimeter Center Parkway, Suite 1010
Atlanta, Georgia 30346
Telephone: (770) 392-0090
Facsimile: (770) 392-0029

*Co-Lead Counsel for Lead Plaintiff Hang Li and Named Plaintiffs Mike Drumright and Marco Amiotti*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On March 12, 2024, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 12, 2024.

*s/ Garth Spencer*
Garth Spencer