**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HANG LI, et al., <br><br> Plaintiffs, <br><br> v. <br><br> SPIRIT AEROSYSTEMS HOLDINGS, INC., TOM GENTILE III and MARK J. SUCHINSKI, <br><br> Defendants. | No. 1:23-cv-03722-PAE |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS**

CRAVATH, SWAINE & MOORE LLP
2 Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

*Attorneys for Defendants*

May 13, 2024

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

I.      Background ...................................................................................................................... 2

        A.      Spirit Disclosed Quality Issues and the Business Risks They Posed. ................... 4

        B.      Spirit Disclosed Risks Connected to Its Relationship with Boeing. ...................... 6

        C.      In 2023, Spirit Remediated Two Separate Quality Issues Related to Tail-
                Fin Fitting and Mis-Drilled Holes. ........................................................................ 7

LEGAL STANDARD ............................................................................................................... 9

ARGUMENT ............................................................................................................................ 9

II.     Plaintiffs Fail To Plead Any False or Misleading Statements. ....................................... 9

        A.      Statements Regarding Spirit's Quality and Customer Service Goals Are
                Not Actionable (Stmts 6, 7, 10-12, 19-21, 23, 25, 28) ....................................... 10

        B.      Spirit's Risk Factors (Stmts 2, 4, 8, 13, 15, 17) Were Not False or
                Misleading ............................................................................................................ 15

        C.      The COVID-19 Statement (Stmt 1) Was Not False or Misleading. ..................... 18

        D.      Statements Regarding the Tail-Fin Fitting Issue (Stmts 21-38) Were Not
                False or Misleading. ............................................................................................. 18

        E.      The Statement Confirming the Mis-Drilled-Holes Issue (Stmt 29) Was Not
                False or Misleading. ............................................................................................. 19

III.    Plaintiffs Plead No Duty for Spirit To Disclose Any Additional Information. ............. 20

        A.      Plaintiffs Fail To Plead a Duty Arising Under the Securities Laws. .................... 20

        B.      Plaintiffs Fail To Plead a Separate Duty To Speak. ............................................ 20

IV.     Plaintiffs Fail To Plead a Scheme Claim. ..................................................................... 21

V.      Plaintiffs Fail To Plead Scienter. ................................................................................. 22

        A.      Plaintiffs Fail To Plead That the Individual Defendants' Had a Motive To
                Defraud. ............................................................................................................... 22

B.      Plaintiffs Fail To Plead Conscious Misbehavior or Recklessness by the
        Individual Defendants. ................................................................................... 23

C.      Plaintiffs Fail To Plead Corporate Scienter Against Spirit, Generally. ................. 28

VI.     Plaintiffs Fail To Plead Loss Causation. ............................................................. 29

A.      Plaintiffs Fail To Plead Any Corrective Disclosures. ........................................ 29

B.      Plaintiffs Fail To Plead Materialization of a Concealed Risk. .............................. 30

VII.    Plaintiffs' Section 20(a) Claim Must Be Dismissed. ............................................. 30

CONCLUSION .................................................................................................................. 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anschutz Corp. v. Merrill Lynch & Co.*,
690 F.3d 98 (2d Cir. 2012)........................................................................................9

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir.2007)..................................................................................2, 9, 22

*Boluka Garment Co. v. Canaan Inc.*,
547 F. Supp. 3d 439 (S.D.N.Y. 2021).....................................................................29

*Buhrke Fam. Revocable Tr. v. U.S. Bancorp*,
2024 WL 1330047 (S.D.N.Y. Mar. 28, 2024) ..........................................2, 17, 19, 25

*Carpenters Pension Tr. Fund v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014)....................................................................................29

*Chapman v. Mueller Water Prods., Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020)................................................................16, 17

*Chiarella v. United States*,
445 U.S. 222 (1980) ...............................................................................................20

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
957 F. Supp. 2d 277 (S.D.N.Y. Mar. 22, 2013) ....................................................25

*City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*,
565 F. Supp. 3d 478 (S.D.N.Y. 2021)......................................................................1

*Denny v. Barber*,
576 F.2d 465 (2d Cir. 1978).....................................................................................9

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005).............................................................................................9, 29

*ECA & Local 134 IBEW v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)............................................................................11, 22, 23

*Foley v. Transocean Ltd.*,
861 F.Supp.2d 197 (S.D.N.Y. 2012).......................................................................11

*Gamm v. Sanderson Farms, Inc.*,
944 F.3d 455 (2d Cir. 2019).....................................................................................15

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000).....................................................................................22

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011).................................................................................9

*Halperin v. Ebanker Usa.com, Inc.*,
  295 F.3d 352 (2d Cir. 2002)..............................................................................................18

*Hutchison v. Deutsche Bank Sec.*,
  647 F.3d 479 (2d Cir. 2011)..............................................................................................21

*In re AppHarvest Sec. Litig.*,
  2023 WL 4866233 (S.D.N.Y. July 31, 2023) ....................................................................17

*In re Banco Bradesco S.A. Sec. Litig.*,
  277 F. Supp. 3d 600 (S.D.N.Y. 2017)................................................................................11

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
  980 F. Supp. 2d 564 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014) ....................16, 17

*In re Barrick Gold Corp. Sec. Litig.*,
  341 F. Supp. 3d 358 (S.D.N.Y. 2018)................................................................................27

*In re Braskem S.A. Sec. Litig.*,
  246 F. Supp. 3d 731 (S.D.N.Y. 2017)............................................................................1, 13, 20

*In re DraftKings Inc. Sec. Litig.*,
  650 F. Supp. 3d 120 (S.D.N.Y. Jan. 10, 2023) ................................................................21

*In re FBR Inc. Sec. Litig.*,
  544 F. Supp. 2d 346 (S.D.N.Y. 2008)................................................................................17

*In re Garrett Motion Inc. Sec. Litig.*,
  20 Civ. 7992 (JPC), (S.D.N.Y. Mar. 31, 2022)................................................................26, 27

*In re IPO Sec. Litig.*,
  544 F. Supp. 2d 277 (S.D.N.Y. 2008)................................................................................30

*In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*,
  859 F. Supp. 2d 572 (S.D.N.Y. 2012)................................................................................11

*In re Keyspan Corp. Securities Lit.*,
  383 F. Supp. 2d 358 (E.D.N.Y. 2003) ..............................................................................25

*In re Liberty Tax, Inc. Sec. Litig.*,
  435 F. Supp. 3d 457 (E.D.N.Y. 2020) ..............................................................................15

*In re Lululemon Secs. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014)..............................................................................1, 9, 13

*In re Nielsen Holdings PLC Sec. Litig.*,
  510 F. Supp. 3d 217 (S.D.N.Y. 2021)................................................................................27

*In re Omega Healthcare Invs, Inc. Sec. Litig.*,
  375 F. Supp. 3d 496 (S.D.N.Y. 2019)..........................................................................19, 29

*In re Sanofi Sec. Litig.*,
  155 F. Supp. 3d 386 (S.D.N.Y. 2016)................................................................................30

*In re Tempur Sealy Int'l, Inc. Sec. Litig.*,
  2019 WL 1368787 (S.D.N.Y. Mar. 26, 2019) ................................................................9, 20

*In re UBS AG Sec. Litig.*,
  2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012)...............................................................27, 29

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016)................................................................................................21

*Jackson v. Abernathy*,
  960 F.3d 94 (2d Cir. 2020)................................................................................................28

*Jiajia Luo v. Sogou, Inc.*,
  465 F. Supp. 3d 393 (S.D.N.Y. 2020)................................................................................19

*Lehmann v. Ohr Pharm., Inc.*,
  830 F. App'x 349 (2d Cir. 2020)........................................................................................23

*Lentell v. Merrill Lynch Co., Inc.*,
  396 F.3d 161 (2d Cir. 2005)..............................................................................................30

*Loc. No. 38 IBEW v. Am. Exp. Co.*,
  724 F. Supp. 2d 447 (S.D.N.Y. 2010), *aff'd*, 430 Fed. Appx. 63 (2d Cir. 2011).......................24

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
  601 U.S. 257 (2024) ...............................................................................................2, 20, 21

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
  518 F. Supp. 3d 772 (S.D.N.Y. 2021)................................................................................27

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)...........................................................................................................20

*McIntire v. China MediaExpress Holdings, Inc.*,
  927 F. Supp. 2d 105 (S.D.N.Y. 2013)................................................................................25

*Nandkumar v. AstraZeneca PLC*,
  2023 WL 3477164 (2d Cir. May 16, 2023) ........................................................................28

*Novak v. Kasaks*,
　216 F.3d 300 (2d Cir. 2000)........................................................................................1, 24

*Okla. Law Enf't Ret. Sys. v. Papa John's Int'l*,
　444 F. Supp. 3d 550 (S.D.N.Y. 2020)................................................................................17

*Ong v. Chipotle Mexican Grill, Inc.*,
　294 F. Supp. 3d 199 (S.D.N.Y. 2018)....................................................................11, 13, 19

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
　11 F.4th 90 (2d Cir. 2021).................................................................................................22

*Plumbers & Steamfitters v. Canadian Imp. Bank of Com.*,
　694 F. Supp. 2d 287 (S.D.N.Y. 2010)...............................................................................24

*Plymouth Cnty. Ret. Ass'n v. Array Techs.*,
　21 Civ. 4390 (VM), 2023 WL 3569068 (S.D.N.Y. May 19, 2023)..................................14, 21

*Rombach v. Chang*,
　355 F.3d 164 (2d Cir. 2004).....................................................................................14, 15, 30

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
　573 F.3d 98 (2d Cir. 2009)................................................................................................23

*Sachsenberg v. Irsa Inversiones y Representaciones Sociedad Anónima*,
　339 F. Supp. 3d 169 (S.D.N.Y. 2018)..............................................................................28

*Schaffer v. Horizon Pharma PLC*,
　2018 WL 481883 (S.D.N.Y. Jan. 18, 2018)....................................................................23, 24

*Sec. & Exch. Comm'n v. Rio Tinto*,
　41 F.4th 47 (2d Cir. 2022).................................................................................................22

*Singh v. Cigna Corp.*,
　918 F.3d 57 (2d Cir. 2019)..................................................................................................9

*Steamfitters Local 449 Pension Plan v. AT&T Inc.*,
　2022 WL 17587853 (2d Cir. Dec. 13, 2022) .................................................................10, 11

*Teams. Local 445 v. Dynex Cap., Inc.*,
　531 F.3d 190 (2d Cir. 2008).............................................................................................28

*Tellabs v. Makor Issues Rights*,
　551 U.S. 308 (2007).........................................................................................................2, 22

*Wandel v. Gao*,
　590 F. Supp. 3d 630 (S.D.N.Y. 2022).............................................................................14

*Woolgar v. Kingstone Cos.*,
  477 F. Supp. 3d 193 (S.D.N.Y. 2020)..................................................................14, 23, 24, 26

**Statutes & Rules**

17 CFR § 240.10b-5...........................................................................................................9, 20, 22

17 C.F.R. § 229.105 ...............................................................................................................2, 21

17 C.F.R. § 229.303 ...............................................................................................................2, 21

Fed. R. Civ. P. 9(b) ....................................................................................................................9

Fed. R. Civ. P. Rule 12(b)(6) ................................................................................................2, 9

Private Securities Litigation Reform Act.............................................................................9, 27

Section 10(b) (codified in 15 U.S.C. § 78j) ........................................................................9, 30

**PRELIMINARY STATEMENT**

It is well established that "[a]llegations of corporate mismanagement" are not actionable under the securities laws. *In re Lululemon Secs. Litig.*, 14 F. Supp. 3d 553, 574 (S.D.N.Y. 2014). Nor do the securities laws permit recovery for "fraud by hindsight". *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000). "Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Id.* Spirit AeroSystems ("Spirit") disputes Plaintiffs' allegations. But even accepting Plaintiffs' allegations as true for purposes of this motion to dismiss, they do not state a claim for securities fraud. The Second Amended Complaint ("SAC") should be dismissed.

*First*, Plaintiffs do not plausibly allege any false or misleading statement. Even where there are allegations of "undisclosed corporate malfeasance" by Plaintiffs, they cannot overcome the principle that "disclosure [is] not required except where doing so was necessary to prevent the corporation's **other** statements from being misleading". *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 752 (S.D.N.Y. 2017) (emphasis in original). Here, Plaintiffs rely principally on general statements about Spirit's quality goals and generic risk disclosures in an attempt to impose on Spirit a duty to disclose the specific manufacturing problems Plaintiffs allege. But no reasonable investor could find those generic statements misleading because they did not guarantee that quality issues did not exist or would not arise. To the contrary, Spirit expressly disclosed that quality issues had occurred before and that there was a risk that quality issues would happen again. "[A] securities fraud claim for misrepresentations or omissions does not lie when the company 'disclosed the very . . . risks about which [a plaintiff] claim[s] to have been misled.'" *City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*, 565 F. Supp. 3d 478, 493 (S.D.N.Y. 2021). (*Infra* § II.A, II.B.)

Plaintiffs assert a single misstatement related to the possible impact of COVID-19 on Spirit's workforce—but Spirit disclosed that risk too. (*Infra* § II.C.) Plaintiffs further allege that statements by which Spirit updated the public about its progress remediating one quality issue, a tail-fin fitting issue, were false or misleading because Spirit did not simultaneously disclose a

1

separate issue, mis-drilled holes in the aft pressure bulkhead.  (*Infra* § II.D, II.E.)  But Plaintiffs allege no temporal or other connection between those two manufacturing issues, and there can be no liability where, as here, "a sufficiently close nexus between the statements in question and the allegedly omitted information" is absent.  *Buhrke Fam. Revocable Tr. v. U.S. Bancorp*, 2024 WL 1330047, at *15 (S.D.N.Y. Mar. 28, 2024).

*Second*, Plaintiffs' omission theory under 17 C.F.R. § 229.303 ("Item 303") or 17 C.F.R. § 229.105 ("Item 105") is foreclosed by recent Supreme Court authority.  "Disclosure is required under these provisions ***only*** when necessary 'to make []statements made, in the light of the circumstances under which they were made, not misleading'."  *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 264 (2024).  (*Infra* § III.)

*Third*, Plaintiffs' scheme theory is an impermissible repackaging of its misstatements and omissions allegations—and fails to state a claim just as they do.  (*Infra* § IV.)

*Fourth*, Plaintiffs fail to plead scienter.  There are no facts alleged plausibly suggesting that any Defendant knew any statement to be false or misleading when made.  (*Infra* § V.)

*Fifth*, Plaintiffs fail to plead loss causation because no alleged misstatement (or omission) was corrected (or revealed) on any corrective disclosure date.  (*Infra* § VI.)

As set forth in more detail below, the Second Amended Complaint should be dismissed.

## I.     Background[1]

Spirit "design[s], engineer[s], and manufacture[s] large, complex, and highly engineered commercial aerostructures", like plane fuselages.  (Ex. 1, 2019 10-K at 3.)  Boeing is Spirit's largest customer.  (SAC ¶ 2.)  Spirit balances a "focus on safety and quality while working to meet [its] customers' requirements for production rate changes".  (Ex. 2, 2018 10-K at 33; *see also* Ex. 1, 2019 10-K at 37.)  As the Complaint acknowledges, Spirit's complex manufacturing operations include a multilayered quality assurance system.  (SAC ¶¶ 9, 83, 201-205.)  Spirit

---

[1] "Courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs v. Makor Issues Rights*, 551 U.S. 308, 322 (2007).; *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.2007) ([W]e may consider ... legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.").).

employs mechanics, like Former Employee ("FE") 3, whose role was to troubleshoot problems related to metal sheeting. (*Id.* ¶ 246.) It also employs "inspectors", like FE1 and Robert Hurt, who inspected products prior to them being shipped to a customer. (*Id.* ¶¶ 179, 228.) It also employs auditors, like Joshua Dean and FE2, whose role was to audit sections of a plane or discrete manufacturing processes. (*Id.* ¶¶ 201, 261.)

Showing that the system worked as intended, those former employees identified quality issues during their work, which were remediated. (*See*, *e.g.*, *id.* ¶¶ 186, 234, 329-32.) The SAC catalogs a number of alleged defects, most undated (with the notable exception of a lost door plug on an Alaska Airlines flight, which post-dates the class period (*id.* ¶¶ 287-305)). Rather than supporting a misstatement claim, those allegations in the SAC undermine the notion that Spirit and the Individual Defendants failed to disclose that which they had a duty to disclose. Finding and remediating manufacturing issues is a routine part of the job for any aerostructures manufacturer, and there is no duty to disclose that day-to-day work, nor could that day-to-day work render misleading broad statements about an overall commitment to quality.

For example, the SAC confirms that even after a manufacturing issue is detected, further steps may be needed to reach any conclusions about its scale, cause, and any safety or financial impacts. (*Id.* ¶ 222.) Problems may not be visible to the naked eye, and more elaborate systems of inspection, like x-rays, may be required, and were used. (*Id.* ¶ 171.) Even experienced auditors may not detect a defect. (*Id.* ¶ 224.) Further inspections or investigations were a common additional step to remediate or understand better the root cause or scope of an issue that had been detected. (*Id.* ¶¶ 219-222 (mid-March 2023 inspection of sample of tail-fin fittings after cracks were found); 249 (audit that detected improper storage of tools); 265 (audit to remove uncalibrated tools found during inspection); 232 (inspection of 22 planes by Mr. Hurt, when Boeing found missing rivets to attach skin to plane); 241 (inspection by Mr. Hurt who concluded door would not shut due to improper sealant).) Boeing was an active participant in Spirit's quality assurance process. It engaged in site visits (*id.* ¶¶ 188; 249) and provided regular reports to Spirit on quality (*id.* ¶ 230). As part of Boeing's oversight, from 2018, Boeing placed

Spirit on a "probationary status". (*Id.* ¶¶ 7, 205.)  Plaintiffs plead no facts to show this caused any material financial risk, and the probationary status ended during 2021.  (*Id.* ¶¶ 7.)

Accepting the SAC's allegations as true, disputes also arose from time to time about what constituted a quality issue, with inspectors alleging pressure to approve work they did not believe should be approved or to cut corners on documentation of quality issues.  (*Id.* ¶¶ 181, 236, 238.) The SAC alleges that FE1 filed an ethics complaint on February 22, 2022, when, he alleges, he refused to fill out paperwork in a manner he considered improper and was initially punished.  (*Id.* ¶ 195.)  It is further alleged that after the report was forwarded to Mr. Gentile, and an investigation was completed, FE1 was restored to his position and awarded backpay, demonstrating effective oversight by Mr. Gentile and an effective process at Spirit.  (*Id.* ¶ 198.) The discrete quality issues that Plaintiffs allege ***do not*** adequately plead that widespread, systemic quality issues existed, let alone that they were known to the Individual Defendants or to any other executive of Spirit.  Nor, critically, do Plaintiffs plead facts showing that the discrete quality issues referenced in the SAC rendered Spirit's public statements misleading.

The SAC also cites criticism from former employees, directly and by news articles, of various business practices of Spirit, including long hours (*id.* ¶ 183), fewer and less experienced engineers (*id.* ¶¶ 6, 183, 229), too much emphasis on timely deliveries (*id.* ¶¶ 182, 185), the design of the quality processes (*id.* ¶ 185), the pace with which ethics complaints were adjudicated (*id.* ¶¶ 196-198, 256), and how Spirit handled specific personnel decisions (*id* ¶¶ 226, 260).  But Plaintiffs plead (i) no connection between those criticisms and Spirit's disclosures; (ii) no connection between those criticisms and the tail-fin fitting or mis-drilled holes issues; and (iii) no public disclosure of those criticisms on the alleged corrective disclosure dates.  Plaintiffs do not allege that anyone, including Mr. Gentile or Mr. Suchinski (together, "Individual Defendants"), believed the quality issues caused a material risk to Spirit's financials or to the Boeing contracts, or that any quality issues rendered any public statement misleading.

## A.      Spirit Disclosed Quality Issues and the Business Risks They Posed.

Spirit repeatedly disclosed to investors that it had experienced—and might continue to

experience—problems in its complex manufacturing process: "[f]rom time-to-time the Company has experienced, and may continue to experience, quality or delivery timing disruptions", which "could have a material adverse impact on the Company's ability to meet commitments to its customers and on its future financial results". (Ex. 3, 2021 10-K at 19; Ex. 4, 2022 10-K at 19; Ex. 5, 2023 10-K at 21.)

It also disclosed that "from time to time the Company receives, or is subject to, customer and vendor claims arising in the ordinary course of business, including, but not limited to, those related to product quality and late delivery", and, while it was the opinion of the Company that, when finally resolved, no current claims will "have a material adverse effect on the Company's long-term financial position or liquidity", it was "possible that the Company's results of operations in a period could be materially affected by one or more of these other matters". (Ex. 2, 2018 10-K at 93; Ex. 1, 2019 10-K at 102; Ex. 6, 2020 10-K at 115; Ex. 3, 2021 10-K at 116.) In its 2022 10-K, Spirit also disclosed a June 25, 2022 notice of a claim "from a key customer seeking cost recovery primarily related to alleged product quality issues associated with the Company's performance from 2018 through 2020 as well as onsite manufacturing support costs incurred by the customer", which the Company was still evaluating. (Ex. 4, 2022 10-K at 121.)

In addition, Spirit warned of the ongoing risks that quality issues posed:

- Were its "products [] found to be defective and lacking in quality, or if one of [its] products causes an accident, [its] reputation could be damaged and [its] ability to retain and attract customers could be materially adversely affected". (Ex. 7, 2017 10-K at 15; Ex. 2, 2018 10-K at 15; Ex. 1, 2019 10-K at 18; Ex. 6, 2020 10-K at 19; Ex. 3, 2021 10-K at 23; Ex. 4, 2022 10-K at 23; Ex. 5, 2023 10-K at 26.)

- Its results might differ materially from expectations based on its "ability to timely deliver quality products, under existing supply contracts with our two major customers, Boeing and Airbus, and other customers, and the risk of nonpayment by such customers". (Ex. 2, 2018 10-K at 1; *see also* Ex. 6, 2020 10-K at 1; Ex. 3, 2021 10-K at 1; Ex. 4, 2022 10-K at 1; Ex. 5, 2023 10-K at 1.)

- Should it fail to "successfully perform under revised design and manufacturing plans", to "successfully resolve claims and assertions" from customers, or "if a new or maturing program in which [Spirit] had made a significant investment . . . experienced weak demand, delays or technological problems", Spirit's "business, financial condition and results of operations could be materially adversely affected". (Ex. 8, 2016 10-K at 19-20; Ex. 7, 2017 10-K at 14; Ex. 2, 2018 10-K at 14; Ex. 1, 2019 10-K at 17-18; Ex. 6, 2020 10-K at 20; Ex. 3, 2021 10-K at 22; Ex. 4, 2022 10-K at 22; Ex. 5, 2023 10-K at 25.)

- "Some of these risks ha[d] affected [Spirit's] maturing programs" and it would "continue to face similar risks as well as the potential for default" and "quality problems". (Ex. 8, 2016 10-K at 20; Ex. 7, 2017 10-K at 14; Ex. 2, 2018 10-K at 14; Ex. 1, 2019 10-K at 18; Ex. 6, 2020 10-K at 20; Ex. 3, 2021 10-K at 22; Ex. 4, 2022 10-K at 22; Ex. 5, 2023 10-K at 25.)

- "The Company's ability to meet production rate increases is dependent upon several factors, including without limitation, expansion and alignment of its production facilities, tooling, and equipment; improved efficiencies in its production line; on-time delivery of component parts from the Company's suppliers; adequate supply of skilled labor; and implementation of customer customizations upon demand. If the Company fails to meet the quality or delivery expectations or requirements of its customers, disruptions in manufacturing lines could result, which could have a material adverse impact on the Company's ability to meet commitments to its customers and on its future financial results." (Ex. 2, 2018 10-K at 12; Ex. 1, 2019 10-K at 14; Ex. 6, 2020 10-K at 18; Ex. 3, 2021 10-K at 19; Ex. 4, 2022 10-K at 19; Ex. 5, 2023 10-K at 21.)

In its 10-Ks, Spirit consistently listed "safety and quality" as an area that would get "Management's Focus". (Ex. 8, 2016 10-K at 40-41; Ex. 7, 2017 10-K at 34; Ex. 2, 2018 10-K at 33; Ex. 1, 2019 10-K at 37; Ex. 6, 2020 10-K at 39; Ex. 3, 2021 10-K at 38; Ex. 4, 2022 10-K at 38; Ex. 5, 2023 10-K at 41.) Spirit—like any large manufacturing company—did not and could not disclose in detail each and every operational challenge it faced. But any reasonable investor would understand that "[q]uality 'escapes' as the aerospace industry calls them, and the resulting analyses and fixes are a normal part of manufacturing". (Ex. 9, The Air Current, "*Boeing and Spirit Grapple with Newly Discovered 737 Max Quality Issue*", at 4 (cited in SAC ¶ 160) (the "Air Current Article").) As Spirit told investors, "[i]f you think about it, there's 80,000 parts on a fuselage and 450,000 fasteners, it can happen. It's not routine, but we do see escapes. And we work with Boeing to get those fixed." (Ex. 10, Earnings Call Tr., November 3, 2022, at 21-22.)

### B.    Spirit Disclosed Risks Connected to Its Relationship with Boeing.

Spirit disclosed that its "revenues are substantially dependent on Boeing" and "in large part, on sales of components for a single aircraft program, the B737 MAX". (Ex. 1, 2019 10-K at 6, 12; Ex. 6, 2020 10-K at 6, 14; Ex. 3, 2021 10-K at 6, 14; Ex. 4, 2022 10-K at 6, 14.) Spirit disclosed that under a supply agreement governing the 737 and other programs, Spirit "fail[ing] to maintain the required system of quality assurance" would constitute an "event of default". (Ex. 7, 2017 10-K at 8.) If the event of default were "material" and had an "operational or

6

financial impact on Boeing", Boeing could cancel orders; in the event of "repeated, material events of default" plus other conditions, Boeing could terminate the contract. (*Id.*) Spirit also disclosed that its "revenues are substantially dependent on Boeing and Airbus" and the "loss of either of either of these customers would have a material adverse effect on the Company". (Ex. 2, 2018 10-K at 6; Ex. 1, 2019 10-K at 6; Ex. 6, 2020 10-K at 6; Ex. 3, 2021 10-K at 7; Ex. 4, 2022 10-K at 7; Ex. 5, 2023 10-K at 7.)

Spirit disclosed when Boeing's operations had an adverse impact on Spirit. In March 2019, regulators grounded the 737 MAX due to two tragic plane crashes (SAC ¶ 41), which authorities concluded were caused by software and crew errors unrelated to Spirit. (Ex. 11, National Transportation Safety Board Report at 2-3.) Spirit disclosed that a prolonged 737 MAX grounding and production reduction "may have a material adverse impact on Spirit's business, financial condition, results of operations, and cash flows". (Ex. 1, 2019 10-K at 12-13.) When the COVID-19 pandemic compounded the financial impact of the 737 MAX grounding, Spirit again alerted the public: COVID-19 "has had and is expected to continue to have a material negative impact on our industry and business" and "presents significant challenges to [Spirit's] liquidity"; "the B737 MAX situation continues to present challenges to our liquidity" that "are exacerbated by the COVID-19 pandemic as other programs that alleviate the strain of the lower B737 MAX production rate are now suspended or producing at lower rates"; and if those issues continued longer than anticipated, it may "take actions with longer-term impact, [like] changes to [Spirit's] production plans, employment reductions and/or the expenditure of significant resources to support our supply chain and/or Boeing". (Ex. 12, April 2020 8-K, at 16-18.)

**C.    In 2023, Spirit Remediated Two Separate Quality Issues Related to Tail-Fin Fitting and Mis-Drilled Holes.**

During an October 2022 audit, Mr. Dean identified mis-drilled holes in the aft pressure bulkhead. (SAC ¶ 207.) Consistent with policy, he wrote a report summarizing his findings. (*Id.* ¶¶ 207-215.) After Mr. Dean transferred to another division, other Spirit employees, including some in FE3's shop that specialized in problems related to sheet metal, worked on the

issue. (*Id.* ¶¶ 246, 247.) Plaintiffs plead virtually no other facts about what Spirit learned of the issue; they plead no facts about what was known to the Individual Defendants and when.

In mid-March 2023, an emergency meeting was called to discuss an entirely separate issue, namely cracks in certain airplane parts related to tail-fin fitting. (*Id.*¶ 221.) Mr. Dean had not detected this tail-fin fitting issue during his October 2022 audit in which he reported the drilling issue, and, in late March or early April, Mr. Dean was terminated for allegedly falsifying his inspection report. (*Id.*¶¶ 225-26.) On April 13, 2023, Boeing announced that, a day prior, Spirit had notified it of the tail-fin fitting issue. (*Id.*¶ 112.) Plaintiffs allege no facts suggesting that Spirit or Boeing knew of the tail fin fitting issue prior to those meetings. On April 14, 2023, Spirit's shares fell 20.7% to close at $28.22. (*Id.*¶ 115.)

As Spirit released information about remediation efforts related to the tail-fin fitting issue, its stock declined further. On a May 3, 2023, earnings call, Mr. Suchinski described the anticipated financial impact of the issue. (*Id.*¶¶ 122-23.) Mr. Gentile said that Spirit's "strong quality team, operations team, [and] engineering team" had been "working in close association with Boeing to address the issue and get execution back on track to get production flowing again and also to recover some of the units that we lost". (*Id.*¶ 141.) That day, Spirit's shares fell 12.3% to $26.28. (*Id.*¶ 129.) On August 2, 2023, Mr. Suchinski reported that due to the tail fin fitting issue and an employee strike, Spirit would not "be able to generate significant cash flow in 2024 and 2025" (*Id.*¶ 153), and Spirit's shares fell 27.3% to close at $22.86. (*Id.*¶ 154.)

On August 23, 2023, Air Current published an article on the separate mis-drilled holes issue, reporting that "Boeing ha[d] identified a potentially widespread manufacturing quality issue on the 737 Max stemming from structural assembly work on the jet's aft pressure bulkhead conducted by supplier Spirit AeroSystems". (*Id.*¶ 160.) Air Current reported that Boeing had begun "x-ray inspections", and that Spirit and Boeing were "still trying to understand the full scope of the issue across their respective factories". (Ex. 9, Air Current Article, at 3-4.) The next day, Spirit's share price fell 12.7%. (SAC ¶ 163.) Plaintiffs allege no facts to suggest that Spirit was aware that any units with mis-drilled holes had been delivered to Boeing (or even how

8

the remediation work at Spirit resolved), nor that anyone at Spirit, including Mr. Gentile or

Mr. Suchinski, had ever assessed the mis-drilled holes issue as likely to have a material impact

on Spirit's financials, let alone prior to August 23, 2023.

## LEGAL STANDARD

"To avoid dismissal under Section 10(b) and Rule 10b-5, a complaint must plausibly

allege: (1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind;

(3) a connection with the purchase or sale of a security; (4) reliance . . . ; (5) economic loss; and

(6) loss causation." *Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019). On a motion to

dismiss under Rule 12(b)(6), the Court must accept well-pled factual allegations as true, but "it

does not credit 'mere conclusory statements'". *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 585

(S.D.N.Y. 2011). A "complaint alleging securities fraud must satisfy Rule 9(b) . . . , which

requires that the circumstances constituting fraud . . . shall be stated with particularity", *ATSI*

*Comms.*, 493 F.3d at 99, mandating dismissal if the allegations "permit no reasonable inference

stronger than the 'mere possibility of misconduct'". *Glaser*, 772 F. Supp. 2d at 585.

## ARGUMENT

**II.    Plaintiffs Fail To Plead Any False or Misleading Statements.**

"Under Rule 9(b) and the PSLRA, a plaintiff must identify with particularity the

statement or statements alleged to be false or misleading and . . . why that is so." *In re Tempur*

*Sealy Int'l, Inc. Sec. Litig.*, 2019 WL 1368787, at \*6 (S.D.N.Y. Mar. 26, 2019).[2] A statement is

actionable if it "was false at the time it was made. A statement believed to be true when made,

but later shown to be false, is insufficient." *Lululemon*, 14 F. Supp. 3d at 571. Plaintiffs cannot

plead "fraud by hindsight". *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978). Plaintiffs allege

misstatements in (i) quality and customer service goals (Stmts[3] 6, 7, 10-12, 19-21, 23, 25, 28);

(ii) risk factors in quarterly or annual reports (Stmts 2, 4, 8, 13, 15, 17); (iii) the impact of

---

[2] Plaintiffs state that "[f]or the sake of brevity, Plaintiffs only allege herein certain key and/or representative misleading statements". (SAC 12 n.4.) That is not permitted. Under both Rule 9(b) and the PSLRA, Plaintiffs must "specify each misleading statement". *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005); *see also Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012). Thus, Plaintiffs' claim must be limited to the statements they have specifically pled.

[3] Attached hereto is Appendix A, which collects and numbers the statements challenged by Plaintiffs. Each reference to a "Stmt" refers to Appendix A.

COVID-19 (Stmt 1); and (iv) statements from April 13 to August 23, 2023, about the tail-fin

fitting (Stmt 21-28) and mis-drilled holes (Stmt 29) issues.[4]

### A. Statements Regarding Spirit's Quality and Customer Service Goals Are Not Actionable (Stmts 6, 7, 10-12, 19-21, 23, 25, 28).

The statements regarding quality and customer service are puffery, not false or

misleading, and/or not actionable because Spirit fully disclosed the risks allegedly concealed.

***Nonactionable Puffery.*** "It is well-established that general statements about reputation,

integrity, and compliance with ethical norms are nonactionable puffery, meaning that they are

too general to cause a reasonable investor to rely upon them." *Steamfitters Local 449 Pension*

*Plan v. AT&T Inc.*, 2022 WL 17587853, at *1 (2d Cir. Dec. 13, 2022). Here, at least the

following statements are inactionable puffery:

- "Spirit is dedicated to the production of high quality and safe products for our customers and ultimately the end user . . . ." (Stmt 6);

- "Spirit is dedicated to a Zero-Defect target, with no escapements to our customers. . . ." (Stmt 7);

- "We are going above and beyond what the requirements ask of us to make sure that our customers are successful when it comes to quality so that they can enable the sale of that product to their customers efficiently and effectively. . . ." (Stmt 11);

- "The other thing we realized is that we needed to perpetually ensure that when we're building the product, we're building it per specification, per engineering, per the planning. . . ." (Stmt 12);

- "The basic principles of quality are do not create, do not pass and do not accept a defect. Think about it in order: If you create a defect, that creates an opportunity that could be expensive all the way to the customer. If you pass a defect or accept a defect . . . we can pass an expensive problem to our customer. Work it in that order. Do not create a defect and remember no one does anyone a favor by accepting or passing a defect down the line. We are in a role of continuously reinventing ourselves. Sometimes it might not seem that way if you are a mechanic building the same thing over and over again . . . (but) we need to challenge the status quo and raise the bar. That is the foundational piece of quality." (Stmt 19);

- "Our slogan is quality matters. It's quality without compromise. Why? We can't risk our products ever being involved in an incident or accident. And to protect that we have a great quality system that ensures our parts are inspected and controlled and go out FOD [foreign object debris] free and defect free. That's a pretty simple process." (Stmt 20);

- ". . . We are committed to strengthening and continuously improving our safety and quality culture as a trusted partner to our customers." (Stmt 23);

- "But we have a strong quality team, operations team, engineering team. . . In challenging

---

[4] Plaintiffs' related pure omission theory based on Items 105 and 303 (Stmts 3, 5, 9, 14, 16, 18) fails for similar reasons. (*See infra* III.B.)

times like this, our two companies have really come together in terms of program, operations, supply chain, engineering, to help address the issue." (Stmt 25);

- ". . . [O]ur entire focus is directed towards executing on our customer commitments, including the upcoming production rate increases." (Stmt 28.)

Those statements are neither "guarantees" nor "supported by specific statements of fact"; nor do Plaintiffs allege that the speaker did "not genuinely or reasonably believe them"; as a result, they are nonactionable puffery as a matter of law. *Steamfitters Local*, 2022 WL 17587853, at \*1; *see also Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 232-33 (S.D.N.Y. 2018) (statements that company was "committed to serving safe, high quality food to [its] customers" and that its "food safety programs are also designed to ensure that [the Company] compl[ies] with applicable federal, state and local food safety regulations" were inactionable puffery); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 647 (S.D.N.Y. 2017) ("The quintessential examples of such inactionable puffery" are "general statements about reputation, integrity, and compliance with ethical norms", particularly when such statements are "explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should'".) (cleaned up); *Foley v. Transocean Ltd.*, 861 F. Supp. 2d 197, 204 n.7 (S.D.N.Y. 2012) (noting that company's "commitment to safety and training" "would likely be considered expressions of 'puffery' that cannot form the basis of a securities fraud claim"); *ECA & Local 134 IBEW v. JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009) (statements that company had "'highly disciplined' risk management", "standard-setting reputation for integrity" and would "continue to reposition and strengthen [its] franchises with a focus on financial discipline" were inactionable puffery); *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 580 (S.D.N.Y. 2012) (holding that statements that school was "focused on the outcomes for the students" and had a "single internal focus" on "maximizing students' success" were inactionable puffery).

Plaintiffs also take a statement at Spirit's March 2, 2022 Investor Day, by Kailash Krishnaswamy, Spirit's SVP of Aftermarket Services, (Stmt 10), entirely out of context. During remarks on the aftermarket business—*i.e.*, Spirit repairing used parts already in service (not its contracts with Boeing for new parts at issue in this case)—Mr. Krishnaswamy said:

> So what exactly are repairs? . . . In this case, it's a damaged sleeve that happened because a slack got extended at a time when the thrust reversal was still open, or sometimes you could have ground handling equipment just run into the nacelle. ***So yes, we build product that is the right quality, the first time that don't break, however, others break it. And so, we really do have to fix it, which we're thankful for***. (Ex. 13, 2022 Investor Day Tr. at 23-24 (Stmt 10 emphasized).)

A reasonable investor would understand that the entire point of the aftermarket business is to repair broken parts and would not misunderstand that statement to be a quality guarantee about new equipment under the Boeing contracts. As a result, that statement is simply irrelevant.

*Not False or Misleading.* The statements about quality are inactionable for the independent reason that Plaintiffs fail to plead any facts to show that they were false or misleading. Plaintiffs challenge statements such as the following:

- ". . . To ensure impeccable product quality and safety, Spirit has a dedicated Quality Department that uses a variety of assessment and audit tools." (Stmt 6);

- ". . . To ensure product quality and safety, daily compliance audits are conducted internally, while independent organizations review items that could negatively affect safety and quality, including Foreign Object Debris, Product Protection, Proper Tools (calibrated, inspected, and safe to use), and conformance to Spirit's standard work instructions and regulatory requirements. These audits are completed in partnership with our customers to provide real-time feedback." (Stmt 7);

- ". . . And so we've deployed a technique that we refer to as 3 lines of defense. . . . So when the mechanics and the inspectors are responsible for making sure that the product is done every day, but we also have our engineering team out auditing that process and product to make sure that indeed it is actually being built per specification. And where it's not, we can actually make adjustments or update the planning. And we've seen a lot of value by doing this, we can actually update the planning to make it a little bit more clear for the mechanics and inspectors so that they get it right. And then finally, we have a, what I would call that audit function, making sure that all of this works and is behaving, we're randomly selecting areas to dig in deeper." (Stmt 12; *see similar* Stmt 20);

- ". . . We have processes in place to address these of types of production issues upon identification, which we are following. Spirit is working to develop an inspection and repair for the affected fuselages. We continue to coordinate closely with our customer to resolve this matter and minimize impacts while maintaining our focus on safety." (Stmt 21);

- ". . . We have revised our assembly process in production, have restarted production and have resumed shipments of conforming fuselages to Boeing." (Stmt 22);

- "As part of our quality management system, we have processes in place to address issues like the Vertical Fin Attached Fittings, which we followed in this case. We also have an extensive root cause corrective action process and are implementing additional protocols to reinforce our quality systems to prevent similar occurrences in the future. . . " (Stmt 23; *see similar* Stmt 25.)

12

Plaintiffs argue that those statements were false or misleading because of alleged quality issues, but that argument fails because Plaintiffs do ***not*** allege that the referenced systems and procedures did not exist or were misdescribed to investors. *See Ong*, 294 F. Supp. 3d at 232 (statements describing quality assurance measures were "not demonstrably false" where allegations were not that the company "failed to undertake such endeavors, but merely that Chipotle failed to do so 'adequately'"); *see also Braskem*, 246 F. Supp. 3d at 755-56 (holding that because ethics code is "inherently aspirational[,] it simply cannot be that every time" a company falls short it is "liable under federal law"; *Lululemon*, 14 F. Supp. 3d at 577 (statements "it's our job to ensure every product is made to its truest form" and "[i]f a garment doesn't pass our standards at any point in production, it's back to the drawing board" not false or misleading where "[i]n context, the company's website posits a belief in high quality compared to unnamed others in the 'industry,' along with clear acknowledgements that product defects do occur").

*Ong v. Chipotle Mexican Grill, Inc.* is instructive. There, the court held that statements that Chipotle's "quality assurance department establishes and monitors [its] quality and food safety programs" and its "training and risk management departments develop and implement operating standards for food quality, preparation, cleanliness and safety" were not actionable because the "SAC [did] not allege that Chipotle failed to undertake such endeavors, but merely that Chipotle failed to do so 'adequately'". *Id.* at 232. So, too, here. Plaintiffs have not pled that Spirit did not have the quality assurance programs described in the challenged statements. To the contrary, Plaintiffs' own allegations confirm that (i) Spirit had a dedicated quality department that followed specific quality processes; (ii) those processes included multiple layers of audits; and (iii) Boeing audited and provided feedback to Spirit. (*See supra* § I.) As in *Ong*, Plaintiffs critique Spirit's execution of its procedures, but, as in *Ong*, that does not render Spirit's statements that it had the procedures false or misleading.

Plaintiffs cite a February 2022 ethics complaint by FE1 to suggest that Spirit was "actively working to manipulate downward the defect count". (SAC ¶ 82; *see similar* ¶¶ 75, 85.) But FE1 alleges that in 2022, for the first time since his employment began at Boeing in 2010

13

and after the alleged probationary status had already ended, he was asked to complete paperwork in a way he deemed improper and was punished; he filed an ethics complaint; and the issue was elevated and resolved in FE1's favor.[5]  (*Id.* ¶¶ 7, 179, 191-98.)  This appropriate resolution is fully consistent with the challenged statements.  *See Rombach v. Chang*, 355 F.3d 164, 173-74 (2d Cir. 2004) (holding that "a handful of incidents" at a complex company that is "bound to have problems", *e.g.*, "disputes over payments with vendors and landlords" or bills unpaid due to "contested amounts or spot episodes of illiquidity" do not show materialized risk because they are "consistent with unremarkable circumstances short of financial peril or instability").

  ***Spirit Disclosed the Risks.***  Spirit fully disclosed the risk that it might not meet its quality goals, including that it "***has experienced***, and ***may continue to experience***, quality" disruptions (Ex. 3, 2021 10-K at 19) (emphases added); "[s]ome of these risks ***have affected*** [its] maturing programs" (Ex. 1, 2019 10-K at 17) (emphasis added); and Spirit "***continues to face*** similar risks as well as the potential for default [and] quality problems" (Ex. 2, 2018 10-K at 14) (emphasis added).  (*See similar supra* § I.A.)  It also disclosed the risk of claims from customers should such issues arise, that the claims could have a material impact on its business, that Boeing could terminate the contract for repeated quality issues, and that such an event would cause material harm to Spirit.  (*See supra* § I.A, I.B.)  Spirit, thus, warned of the very risks Plaintiffs claim were not disclosed; as a result, no reasonable investor could be misled by the challenged statements. *See Plymouth Cnty. Ret. Ass'n v. Array Techs.*, 21 Civ. 4390 (VM), 2023 WL 3569068, at *12 (S.D.N.Y. May 19, 2023) (holding statements not misleading in light of "sufficient disclosures about the pressure [company] was facing from increased commodity costs"); *Wandel v. Gao*, 590 F. Supp. 3d 630, 644–45 (S.D.N.Y. 2022) (statements not misleading where company "warned investors of exactly the risk the plaintiffs claim was not disclosed").

  In light of those extensive risk disclosures, Plaintiffs have not pled (and cannot plead)

---

[5] Plaintiffs also allege that in the experience of Mr. Dean, "Spirit did not materially decrease the amounts of defects in its products as required by Boeing, but simply undercounted or manipulated the documentation of defects to create the appearance of quality improvement".  (SAC ¶ 206).  This conclusory allegation, which is not supported by any specific allegations or personal knowledge of Mr. Dean and refers to discussions with unspecified "other Spirit employees" (*id.*) is entitled to no weight. *See Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d 193, 227 (S.D.N.Y. 2020) (disregarding allegations from former employees "not alleged to have any particular insights into" issues).

with particularity omissions that would make Spirit's statements half-truths. "[P]laintiffs in securities fraud actions must plead material misstatements and omissions with particularity when making allegations on information and belief." *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 458 (2d Cir. 2019). Plaintiffs allege Spirit should have disclosed allegedly "pervasive quality issues". (SAC ¶ 14.) But Plaintiffs do not allege facts establishing "pervasive quality issues", as opposed to discrete problems that Spirit disclosed had occurred and might continue to occur. Plaintiffs rely on former employees' accounts of discrete issues over their tenures at Spirit, ranging from 2006 to 2024, an eighteen-year period over which any investor would expect there to be some manufacturing challenges. (*Id.* ¶¶ 245-46.) That is precisely the risk that Spirit disclosed. (*See supra* § I.A.) In sum, Plaintiffs fail not only to plead (i) actual pervasive defects at the time of any statement; but also (ii) that any such pervasive defects were known to the Individual Defendants at the time of any statement; (iii) what specific facts were necessary to have been disclosed to make a statement made not misleading; (iv) when those supposed facts were known relative to the statements made; or (v) how any statement about quality could be misleading given the robust quality risk disclosures Spirit routinely made.

### B.       Spirit's Risk Factors (Stmts 2, 4, 8, 13, 15, 17) Were Not False or Misleading.

A risk disclosure is actionable only if it is (a) misleading and (b) "specific enough that a reasonable investor would rely on the risk disclosure as an assurance that a certain bad outcome has not already occurred". *In re Liberty Tax, Inc. Sec. Litig.*, 435 F. Supp. 3d 457, 466 (E.D.N.Y. 2020). This is not the rare case where risk factors are actionable.

*First*, the test for whether a statement is misleading is "whether the defendants' representations, taken together and in context, would have misled a reasonable investor". *Rombach*, 355 F.3d at 172 n.7. The broad risk factors at issue here expressly refer to product defects and warned that such defects had occurred:

- "Our business depends on our ability to maintain a healthy supply chain and timely deliver products that meet or exceed stringent quality standards, which are negatively impacted by the COVID-19 pandemic. ***Operational issues, including delays or defects in supplier components*** relating to government mandated production shutdowns or otherwise, ***could result in significant out-of-sequence work and increased production costs, as well as***

15

*delayed deliveries to customers*." (Stmt 2) (emphases added);

- "Our **business depends on our ability** to maintain a healthy supply chain, meet production rate requirements, **and timely deliver products that meet or exceed stringent quality standards**. If the Company fails to meet the quality or delivery expectations or requirements of its customers, disruptions in manufacturing lines could result, which could have a material adverse impact on the Company's ability to meet commitments to its customers and on its future financial results." (Stmt 4) (emphases added);

- Our business depends on our ability to maintain a healthy supply chain, meet production rate requirements, and timely deliver products that meet or exceed stringent quality standards . . . . **From time-to-time the Company has experienced, and may continue to experience, quality or delivery timing disruptions**. This includes common carrier disruptions and other disruptions that affect manufacturing lines, any of which could have a material adverse impact on the Company's ability to meet commitments to its customers and on its future financial results." (Stmt 8, 17) (emphasis added).

Plaintiffs' allegations of discrete quality issues do not plead that a "material adverse impact on Spirit's ability to meet commitments to its customers" or on its "future financial results", warned of in Stmts 4, 8 and 17, had materialized and not been disclosed. Taken together with Spirit's disclosures that quality issues had occurred, no reasonable investor could have been misled. (*See* § I.A; *see also* Ex. 3, 2021 10-K at 19 ("[o]perational issues, including delays or defects in supplier components, **have resulted and could continue to result** in significant out-of-sequence work and increased production costs, as well as delayed deliveries to customers" (emphasis added)); *see e.g.*, *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 579 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014) (holding "risk disclosures could not have misled a reasonable investor" in light of "information communicated to the market about BoA's exposure" and because the "possibility of such increasing litigation was explicitly disclosed, as was the fact that lawsuits could have a material adverse effect on BoA's financial condition").

*Second*, the statements are not "guarantee[s]" against "defects or deficiencies". *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 406 (S.D.N.Y. 2020). Just the opposite. *Mueller* is instructive. There, the court found statements that "[t]he success of [] new products and systems will depend on" the "ability to manage the risks . . . including the risk that new products and systems may have quality or other defects" were not actionable because it "would have been evident to the ordinary investor that Mueller was not warranting that every one of its newer technologies was defect-free or would not incur a warranty charge". *Id.* at 405-06.

16

Broad risk disclosures do not guarantee that specific risks have not materialized; indeed, here, Spirit disclosed that it had in fact experienced quality issues. Where, as here, "there is disclosure that is broad enough to cover a specific risk, the disclosure is not misleading simply because it fails to discuss the specific risk". *Bank of Am.* 980 F. Supp. 2d at 79. Statements 2, 4, 8 and 17 disclose, generally, that Spirit depends on its "ability to maintain a healthy supply chain and timely deliver products that meet or exceed stringent quality standards". (SAC ¶¶ 55-56, 62-63, 73-74, 99-100.) That indisputably is true and warns investors that, if Spirit fails to meet its quality standards, adverse financial results may follow. Those statements cannot be read to imply that Spirit had not—or would not—experience quality problems. *See Mueller*, 466 F. Supp. 3d at 406; *see also In re AppHarvest Sec. Litig.*, 2023 WL 4866233, at *41 (S.D.N.Y. July 31, 2023) (statement that company "may not be able to fully recover costs and expenses" could not be understood by "ordinary investor" to mean that defendant "had been able to retain all of its employees or that all of its products were flawless"); *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 362 (S.D.N.Y. 2008) (risk disclosures that regulatory action "may" have adverse impact not actionable absent statement of "full compliance with all regulations, or that [defendant] had no outstanding regulatory issues" which was not implied by "touting. . . compliance policies"); *U.S. Bancorp*, 2024 WL 1330047, at *17 (where "disclosures informed investors about the risks of financial loss that USB faced if there was a failure to safeguard personal information", "[n]o reasonable investor would have interpreted such a warning to imply that USB had never failed to safeguard personal information").

Nor is the conclusion different for Statements 13 and 15, which represent that there has been no material change to the earlier risk warnings. (SAC ¶¶ 87-88, 93-94.) The earlier risk warnings were broad, comprehensive and appropriate. They provided no guarantee but instead expressly disclosed that quality issues had happened and might happen again. Not changing appropriate disclosures cannot be actionable under the securities laws. *Okla. Law Enf't Ret. Sys. v. Papa John's Int'l*, 444 F. Supp. 3d 550, 563 (S.D.N.Y. 2020) (holding risk factor not misleading because "[a]n increase in a risk does not mean the risk has already come to pass").

C.      **The COVID-19 Statement (Stmt 1) Was Not False or Misleading.**

Spirit's statement describing cost-cutting and safety measures due to COVID-19 (Stmt 1) is not false or misleading.  Plaintiffs argue that Spirit concealed that the measures "resulted in Spirit's loss of many experienced mechanics and quality personnel, thereby materially reducing Spirit's ability to maintain operations to support its customers or the health and viability of its supply chain".  (SAC ¶ 53.)  But Spirit expressly warned of the very risks that Plaintiffs claim were concealed, including:  (a) that "to be successful, [it] must attract, retain, train, motivate, develop, and transition qualified executives and other key employees, including those in managerial, manufacturing, and engineering positions" (Ex. 1, 2019 10-K at 19); (b) that Spirit could not predict "whether, after a 21-day unpaid furlough, a sufficient part of our workforce will return to work to support Boeing production"; (c) that "the effect of significant salary cuts across our workforce . . may result in critical employee departures" (Ex. 12, April 2020 8-K at 16); and (d) that it was difficult to predict "the impact remote working arrangements, salary reductions, and shortened work weeks for salaried employees will have on the health and productivity of management and our employees" (*Id.*).  Spirit likewise disclosed that COVID-19 "has had and is expected to continue to have a material negative impact on our industry and business" and "presents significant challenges to [Spirit's] liquidity".  (*Id.* at 16-17; *see supra* § I.B.)  Plaintiffs' claim must be dismissed because Spirit disclosed the very risks about which Plaintiffs complain.  *See Halperin v. Ebanker Usa.com, Inc.*, 295 F.3d 352, 360 (2d Cir. 2002) (affirming dismissal where "cautionary language addresses the relevant risk directly").

D.      **Statements Regarding the Tail-Fin Fitting Issue (Stmts 21-38) Were Not False or Misleading.**

Plaintiffs also fail to plead that statements related to the tail-fin fitting issue were false or misleading by virtue of not also disclosing the mis-drilled hole issue.  As an initial matter, Plaintiffs do not allege that any of the facts embedded in the tail-fin fitting statements— pertaining to the pace of remediation efforts, what processes Spirit used, whether and when it began supplying Boeing again, or the nature of its communications with Boeing—were false. Moreover, each statement is expressly (and in context) limited only to a discussion of the tail-fin

18

fitting issue. No reasonable investor would conclude that a statement expressly about remediating the tail-fin fitting issue could amount to a general guarantee against there being any other unrelated quality issue that had not been referenced. *See U.S. Bancorp*, 2024 WL 1330047, at \*15; *see also Ong*, 294 F. Supp. 3d at 233-34 (holding no duty to disclose details about investigation arose when "Defendants did not purport to speak—and no reasonable investor would have understood them to speak—to the intricacies of investigating an outbreak, but only to the simple fact (undisputed by Plaintiffs) that no cause for the outbreak had yet been discovered"); *Jiajia Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 409 (S.D.N.Y. 2020) (holding no actionable omission where defendant "did not disclose any particular steps it was taking to comply with PRC law such that the omission of facts regarding those measures made the description of the measures misleading").

In all events, Plaintiffs fail to plead what Spirit knew about the mis-drilled holes issue ***at the time that it*** disclosed the tail-fin fitting issues. Absent allegations about what Spirit knew at the time, Plaintiffs have, at best, "impermissible allegations of fraud by hindsight". *In re Omega Healthcare Invs, Inc. Sec. Litig.*, 375 F. Supp. 3d 496, 508 (S.D.N.Y. 2019).

**E.     The Statement Confirming the Mis-Drilled-Holes Issue (Stmt 29) Was Not False or Misleading.**

Plaintiffs fail to allege that an August 23, 2023 statement about the scope of the mis-drilled-holes problem was false or misleading. That day, Spirit announced: "We are aware of a quality issue involving elongated fastener holes on the aft pressure bulkhead on certain models of the 737 fuselage produced by Spirit AeroSystems. Because Spirit uses multiple suppliers for the aft pressure bulkhead, only some units are affected. Spirit will continue to deliver units to Boeing." (Stmt 29.) Plaintiffs only contend that this statement was false or misleading because "the mis-drilled holes defect originated with Spirit, and not one of its suppliers". (SAC ¶ 168.) But the portion of the statement cited by Plaintiffs is cherrypicked to avoid Spirit's clear statement that it "has implemented changes to ***its manufacturing process*** to address this issue". (Ex. 14, Press Release, August 23, 2023 at 1) (emphasis added). The actual statement

19

included—rather than omitted—the information Plaintiffs say was concealed.

### III.    Plaintiffs Plead No Duty for Spirit To Disclose Any Additional Information.

####        A.    Plaintiffs Fail To Plead a Duty Arising Under the Securities Laws.

Companies have no duty to disclose all material information. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). Rather, under Rule 10b-5, "[w]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak". *Chiarella v. United States*, 445 U.S. 222, 235 (1980). There is a duty to speak "only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading'". *Macquarie*, 601 U.S. at 264. That requirement does not "automatically render statements of fact on a certain topic misleading due to the omission of another fact concerning the same topic". *In re Tempur Sealy*, 2019 WL 1368787, at *12. In the "specific context here— of undisclosed corporate malfeasance or allegations of the same—[courts] have held that disclosure was not required except where doing so was necessary to prevent the corporation's *other* statements from being misleading". *Braskem*, 246 F. Supp. 3d at 752 (collecting cases). Spirit had no duty to disclose additional facts because, as explained above, none of the challenged statements was false or misleading. (*See supra* § II.)

####        B.    Plaintiffs Fail To Plead a Separate Duty To Speak.

Plaintiffs also repackage their allegations as violations of SEC Items 303 and 105, arguing, on a theory of pure omission, that because Spirit did not make required disclosures, several SEC filings in their entirety are misleading. (*See*, *e.g.*, SAC ¶¶ 57-60, 64-66, 76-78, 89-91, 95-97, 101-103; Stmt Nos. 3, 5, 9, 14, 16, 18.) That argument fails under Rule 10b-5(b), as well as on the terms of the regulations themselves.

As the Supreme Court recently held, "Rule 10b-5(b) does not proscribe pure omissions". *Macquarie*, 601 U.S. at 264. Because "it requires disclosure of information necessary to ensure that statements already made are clear and complete", a plaintiff must "identify[] affirmative assertions (*i.e.*, 'statements made') before determining if other facts are needed to make those statements 'not misleading'". *Id.* Plaintiffs have not even tried to identify any statement that is

rendered misleading by the lack of a disclosure under Item 303 or 105, and, thus, have failed to state a claim.

Item 303 "imposes a disclosure duty [when] a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations". *Hutchison v. Deutsche Bank Sec.*, 647 F.3d 479, 485 (2d Cir. 2011). A filer must "actually know[] of" the existing trend, event, or uncertainty at the time of the SEC filing—"[i]t is not enough that it should have known". *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016). Here, Plaintiffs have not pled facts to show that the issues they identify were trends or uncertainties actually known by Spirit executives that were reasonably likely to have had material effects on Spirit's net sales, revenues or income from continuing operations, let alone when or how Spirit's executives knew of or could have predicted those consequences. (*See infra* § V.) And Spirit *did disclose* the risk of quality issues, which is all Item 303 requires. *See Plymouth*, 2023 WL 3569068, at *19.

Item 105 requires that, "under the caption 'Risk Factors'" a filer include "a discussion of the material factors that make an investment in the registrant or offering speculative or risky". 17 C.F.R. § 229.105(a). Here, Spirit *did* disclose every risk that Plaintiffs contend was concealed: quality risks, quality issues, costs associated with remediating quality issues and claims, the impact of COVID-19, the importance of the Boeing contract, and the risk of termination by Boeing from quality issues. (*See supra* §§ I.A, I.B.) Plaintiffs fail to plead omitted risk factors. *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 180 (S.D.N.Y. Jan. 10, 2023) (finding no duty under Item 105 when argument relied on "same ill-pled factual premise as the claims of material misrepresentations and omissions found wanting above"); (*see supra* §§ I.A, I.B, II.)

## IV.    Plaintiffs Fail To Plead a Scheme Claim.

A scheme must "be premised on deceptive acts that are distinct from misstatements and omissions that underlie an accompanying Rule 10b-5(b) claim". *Plumber & Steamfitters Loc.*

*773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 n.6 (2d Cir. 2021).  "[M]isstatements and omissions can form **part** of a scheme liability claim, but an actionable scheme liability claim also requires something **beyond** misstatements and omissions, such as dissemination."  *Sec. & Exch. Comm'n v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022).  Moreover, "[a]bsent some sort of enumeration of which specific acts constituted an alleged scheme in connection with the purchase or sale of securities, [a] claim does not comply with the applicable heightened pleading standard and cannot go forward".  *Danske Bank A/S*, 11 F.4th at 105.  Here, Plaintiffs bring a single count alleging Defendants violated Rule 10b-5(a)-(c).  (SAC ¶¶ 352-362.)  But they allege no specific acts beyond the purported misstatements and omissions, which is fatal to their "scheme" claim.

## V.    Plaintiffs Fail To Plead Scienter.

Plaintiffs' 10b-5 claim also should be dismissed because their allegations do not satisfy the necessary strong inference of scienter.  To plead scienter, Plaintiffs must allege facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness".  *ATSI Comms.*, 493 F.3d at 99.  "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences" and, ultimately, "a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged".  *Tellabs*, 551 U.S. at 324.

### A.    Plaintiffs Fail To Plead That the Individual Defendants' Had a Motive To Defraud.

To plead motive, Plaintiffs must allege "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged".  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000).  "General allegations that the defendants acted in their economic self-interest are not enough."  *Id.*  "Motives that are common to most corporate officers . . . do not constitute 'motive'" to commit securities fraud.  *ECA*, 553 F.3d at 198.

Here, Plaintiffs seek to plead motive by alleging that "Spirit's executive compensation

22

plans" gave Mr. Gentile and Mr. Suchinski "motives to conceal defects that had the potential to impact the Company's performance or share price" (SAC ¶ 322), because their incentive compensation was based on the company's performance in achieving its goals (*id.* ¶ 323), high in absolute terms (*id.* ¶ 326), high compared to their salaries (*id.* ¶ 327) and high compared to the typical Spirit employee (*id.* ¶ 328).  But "[t]he Second Circuit has made clear . . . that 'it is not sufficient to allege goals that are possessed by virtually all corporate insiders, such as . . . the desire to maintain a high stock price in order to increase executive compensation'".  *Schaffer v. Horizon Pharma PLC*, 2018 WL 481883 at *11 (S.D.N.Y. Jan. 18, 2018) (quoting *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009)).  Because Plaintiffs' allegations show, at most, that the Individual Defendants' motives were no different from those "common to most corporate officers", *ECA*, 553 F.3d at 198, Plaintiffs have failed to plead motive to commit securities fraud.

### B.    Plaintiffs Fail To Plead Conscious Misbehavior or Recklessness by the Individual Defendants.

Having failed to plead motive or direct evidence of intentional misstatements, Plaintiffs may plead scienter only through "strong circumstantial evidence of conscious misbehavior or recklessness", *Lehmann v. Ohr Pharm., Inc.*, 830 F. App'x 349, 352 (2d Cir. 2020), and "the strength of the circumstantial allegations must be correspondingly greater", due to the lack of allegations directly showing scienter.  *ECA*, 553 F.3d at 199.  Plaintiffs must plead that defendants either "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor".  *Id.*  Plaintiffs focus on the third prong.  There, "Second Circuit cases uniformly rely on allegations that (1) *specific* contradictory information was available to the defendants (2) *at the same time* they made their misleading statements"; moreover, Plaintiffs "must specifically identify the reports or statements containing this information".  *Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 237 (S.D.N.Y. 2020) (emphases in original).

23

"[A]ccusations founded on nothing more than a defendant's corporate position are entitled to no weight." *Plumbers & Steamfitters v. Canadian Imp. Bank of Com.*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010).

Plaintiffs attempt to plead scienter based on two alleged facts:  (1) the existence of "mis-drilled holes on the 737 MAX aft pressure bulkhead"; and (2) the existence of "severe and persistent quality problems" at Spirit.  (SAC ¶¶ 9, 109.)  Neither is sufficiently pled.

*First*,  as explained above, Plaintiffs do not allege that the Individual Defendants ever said anything to investors that was—let alone that they knew to be—false or misleading. Plaintiffs fail to allege "*specific contradictory* information was available to the defendants" compared to that which was disclosed, and, thus, fail to allege scienter.  *Woolgar*, 477 F. Supp. 3d at 237

*Second*, on the alleged mis-drilled bulkhead issue, Plaintiffs allege that "in October 2022 . . .  Dean identified that Spirit had mis-drilled holes on the 737 aft pressure bulkhead" (SAC ¶ 9), and that rank-and-file Spirit employees knew of this issue (*id.* ¶¶ 207-212, 214-220, 247). Those allegations do not contradict or render misleading any public statement made by the Individual Defendants or Spirit.  As a result, there can be no scienter.  *See Novak*, 216 F.3d at 308 (requiring plaintiffs to "specifically allege[] defendants' knowledge of facts or access to information contradicting their public statements").

Moreover, Plaintiffs "provide [no] specific instances in which [Individual] Defendants received information" about the alleged mis-drilled bulkhead issue.  *Canadian Imp. Bank*, 694 F. Supp. 2d at 299.  Accepting Plaintiffs' allegations as true, the only employees who knew about the mis-drilled holes worked in "rank-and-file positions" and "had no contact with the Individual Defendants".  *Loc. No. 38 IBEW v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010), *aff'd*, 430 Fed. Appx. 63 (2d Cir. 2011).  "[A]llegations that [defendant's] lower-level managers monitored the [alleged misconduct] are . . . certainly insufficient with respect to the Company's senior executives." *Horizon*, 2018 WL 481883, at *12.  Because Plaintiffs fail to allege that *any* rank-and-file employees had *any* contact with the Individual Defendants—let alone

communicated the issue to the Individual Defendants—dismissal is warranted. *See City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 299 (S.D.N.Y. Mar. 22, 2013) (holding scienter not pled because "even stark differences [of opinion] between employees do not reveal scienter", in particular "where, as here, no pleading specifically alleges that the contrary views were communicated to the company or its officers").

Plaintiffs suggest that it is significant that on August 23, 2023 Mr. Gentile stated on an earnings call that Spirit was "already actively working on a fix when" the mis-drilled holes issue became public. (SAC ¶¶ 308-09.)  But that statement has no bearing on scienter.  None of the earlier challenged statements relate to the mis-drilled hole issue. (*See supra* § II.D.)  And Mr. Gentile's awareness, as of August 23, 2023, that it was among the issues Spirit was working on in its complex manufacturing processes, does not support an inference that he or any other senior executive of Spirit knew of the issue earlier or formed a belief that it could or would have a material impact on Spirit's finances.  It "only prompt[s] the inference that" he "prepared" prior to the earnings call and "as part of that preparation, he likely collected relevant information and familiarized himself with" the newly public issue.  *U.S. Bancorp*, 2024 WL 1330047, at *25.

***Third***, Plaintiffs' allegation that the Individual Defendants knew of "severe and persistent quality problems" that led to Spirit's probation (*see*, *e.g.*, SAC ¶¶ 107-109), is also insufficient to plead scienter.  Plaintiffs allege that the Individual Defendants "held themselves out as knowledgeable" about the 737 MAX and quality issues. (*Id.* ¶¶ 314-321.)  But all Plaintiffs point to is the mention of quality in the "Management's Focus" section of Spirit's 10-K's (which appeared even before the class period) and a slide showing that the executives oversee quality. (SAC ¶ 315-316.)  Those "are precisely the sort of vague conclusions that courts have rejected" in the scienter context.  *In re Keyspan Corp. Securities Lit.*, 383 F. Supp. 2d 358, 388 (E.D.N.Y. 2003).  Likewise, "boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their . . . executive positions are insufficient to plead scienter".  *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 128 (S.D.N.Y. 2013).  Such general allegations cannot suffice because they do not plead "specific contradictory

25

information [that] was available to the defendants" when "they made their misleading statements". *Woolgar*, 477 F. Supp. 3d at 237.

Plaintiffs' allegation that FE1's email informed Mr. Gentile of "widespread quality failures" (SAC ¶ 8) is contradicted by the email itself. Allegedly, the email informed Mr. Gentile that FE1's manager told him "to change the way [h]e wrote the defects and no longer document the amount of defects on the quantity box but change it and log it on the zone box" in paperwork. (*Id.* ¶ 195.) That does not suggest that Spirit had poor quality or was concealing defects; rather, it suggests a Spirit manager at one time instructed employees to modify their recording of defects. In fact, FE1's very email on which Plaintiffs rely suggests that Spirit maintains a culture of quality, as FE1 told Mr. Gentile that "[e]verywhere I go throughout the factory I see signs about 'Quality Matters' and if there is something wrong to stop and raise a concern". (*Id.* ¶ 197.) FE1 allegedly did that here. (*Id.* ¶ 198.) Thereafter, "the allegations in [FE1's] ethics complaint were sustained, his prior position was reinstated, and he was given backpay". (*Id.*) If anything, this demonstrates Mr. Gentile's support and enforcement of Spirit's reporting process, is an example of quality controls working, and contradicts Plaintiffs' theory of alleged quality problems. [6]

Plaintiffs' scienter arguments based on allegations of unrelated pre and post-class period quality issues fare no better. Pre-class-period fines imposed on Boeing by the FAA (*id.* ¶¶ 329-332), a post-class period stability plan imposed by Boeing (*id.* ¶¶ 278-82), and the Alaska Airlines incident (*id.* ¶¶287-305) have no bearing on the Individual Defendants' knowledge during the Class Period at the time of the alleged misstatements. As a result, they cannot establish scienter. *In re Garrett Motion Inc. Sec. Litig.*, 2022 WL 976269, at *26-27 (S.D.N.Y. Mar. 31, 2022) (rejecting attempts to use "bankruptcy proceedings to impute knowledge onto the Garrett Defendants *before* those proceedings took place" because any "knowledge about

---

[6] The SAC also alleges that Mr. Gentile received an ethics complaint about an employee who allegedly threatened co-workers and did not follow Spirit's policies. (SAC ¶¶ 258-60.) But the SAC (i) contains no allegations concerning how that complaint was resolved; (ii) alleges no facts suggesting that it was anything other than an isolated human resources incident; and (iii) does not even attempt to connect it to any of the supposedly false or misleading statements.

Garrett's financial strains *during* the bankruptcy proceedings has little bearing on their knowledge when they made the allegedly misleading statements *prior to* those proceedings"); *In re Nielsen Holdings PLC Sec. Litig.*, 510 F. Supp. 3d 217, 232 (S.D.N.Y. 2021) (holding that "later reported unexpectedly negative results" did not support scienter because "[t]o accept that as proof of scienter would effectively convert the securities laws into insurance against unexpected losses" and "the more cogent inference is that Defendants' failure to disclose a downward trend . . . w[as] a product of negligence, not conscious recklessness"); *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 371-72 (S.D.N.Y. 2018) (holding that later oil spill did not demonstrate scienter because "fraud depends on the state of events when a statement is made, not on what happens later" and May 28 spill was "irrelevant" to whether defendants "had, as of February 16, 2017, completed 'a series of remedial works' intended to prevent further solution spills", as challenged statements said).

Plaintiffs' allegation based on Mr. Gentile's departure from Spirit is insufficient. (SAC ¶ 271.) "[A]bsent additional factual allegations linking the executives' resignation to the alleged fraud, such allegations are insufficient to raise a strong inference of scienter." *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *18 (S.D.N.Y. Sept. 28, 2012). Plaintiffs plead no such facts with respect to Mr. Gentile (or two other departed Spirit executives, discussed below, *infra* § V.C). Indeed, Plaintiffs do not plead that Mr. Gentile was terminated; they merely allege his departure was not a "planned retirement". (SAC ¶ 271.)

Plaintiffs seek to plead scienter by alleging that 737 quality and quality, generally, are "core operation[s]" of Spirit. (*Id.* ¶¶ 310-13.) The core operations doctrine—a pre-PSLRA relic that "may no longer be good law"—posited that "fraudulent intent can be inferred whenever a defendant makes false or misleading statements if those statements concern the core operations of the company". *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021). But even before the PSLRA, the core operations doctrine "at most constitute[d] supplemental support for alleging scienter but [did] not independently establish scienter". *Id.* at 781-82. Plaintiffs' core operations allegation is not "supplemental support"

27

because Plaintiffs offer no other viable scienter allegations they might "support". [7]   When viewed holistically, "any reasonable shareholder would deem the inference of scienter to be far less compelling than an inference of, at most, non-actionable mismanagement and negligence on the part of Defendants".  *Sachsenberg v. Irsa Inversiones y Representaciones Sociedad Anónima*, 339 F. Supp. 3d 169, 185 (S.D.N.Y. 2018).

### C.    Plaintiffs Fail To Plead Corporate Scienter Against Spirit, Generally.

To plead corporate scienter, Plaintiffs must allege facts to "create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter".  *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020).  "The most straightforward way [to do that is] to impute it from an individual defendant who made the challenged misstatement."  *Id.*  Because Plaintiffs fail to plead the Individual Defendants' scienter, Plaintiffs must establish that this is among the "exceedingly rare instances" in which a statement is "so dramatic that collective corporate scienter may be inferred".  *Nandkumar v. AstraZeneca PLC*, 2023 WL 3477164, at *4 (2d Cir. May 16, 2023).  That is absent here.  *Cf. Teams. Local 445 v. Dynex Cap., Inc.*, 531 F.3d 190, 195-96 (2d Cir. 2008) (explaining that corporate scienter would exist if "[GM] announced that it had sold one million SUVs . . . and the actual number was zero").

This case is like *Abernathy*, where plaintiff attempted to plead corporate scienter by alleging that employees knew of issues at the company that contradicted challenged statements.  960 F.3d at 99.  The Second Circuit upheld the complaint's dismissal because it included "no connective tissue between those employees and the alleged misstatements" through, for example, "particularized allegations that senior officers ignored those employees' warnings".  *Id.*  Here, Plaintiffs allege that a handful of managers were aware of various issues at Spirit, but, aside from the alleged March 2022 email to Mr. Gentile (which contradicts rather than supports Plaintiffs' arguments), they plead no link between those managers and senior officers at Spirit.

All Plaintiffs have left are allegations that a Commercial Division Head left Spirit after

---

[7] A flowchart showing the executive leadership team's oversight of the Product & Process Verification Project Management Team is no help.  (SAC ¶ 316.)  Plaintiffs do not plead that any particular information was transmitted to Mr. Gentile or Mr. Suchinski about the alleged quality issues.  For similar reasons, Plaintiffs' allegations about the "quality excellence council" (*id.* ¶ 317) fail to support scienter.

the class period and an SVP and General Manager was terminated during the class period (SAC ¶¶ 272-77). But, as with Plaintiffs' allegations related to Mr. Gentile's departure, Plaintiffs plead no "factual allegations linking [the executives'] . . . [departures] to the alleged fraud". *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *18.

## VI.   Plaintiffs Fail To Plead Loss Causation.

"Loss causation" is the "causal connection between the material misrepresentation and the loss". *Dura*, 544 U.S. at 342. Plaintiffs may plead loss causation by alleging (1) that "the market reacted negatively to a corrective disclosure of the fraud", or (2) "the materialization of the risk concealed by the fraudulent statement". *Carpenters Pension Tr. Fund v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014). Failure to plead loss causation requires dismissal. *See*, *e.g.*, *Boluka Garment Co. v. Canaan Inc.*, 547 F. Supp. 3d 439, 446 (S.D.N.Y. 2021). Here, Plaintiffs fail to plead either theory of loss causation.

### A.   Plaintiffs Fail To Plead Any Corrective Disclosures.

"To plead loss causation through a corrective disclosure, plaintiffs must establish that the latter disclosure 'revealed to the market the falsity' of the prior disclosure and that the market reacted negatively to the revelation that that prior disclosure had been false." *Omega*, 563 F. Supp. 3d at 267. Plaintiffs attempt to plead loss causation based on five stock drops in 2023: April 13 (the first day the tail-fin fitting issue became public); May 3; August 2; August 23 (the first day the mis-drilled hole issue became public); and September 7. "[T]here is nothing in these disclosures that suggested to the market that [Spirit] had been untruthful in making its prior statements." *Omega*, 563 F. Supp. 3d at 267. Plaintiffs' allegations show that the market did not react to any revelation that Spirit's prior statements were false, but instead to decreased production and the cost of remediation from newly discovered issues. (SAC ¶ 114 ("Boeing Max production could be slowed by issue with parts", "New Production Issue Will Delay 737 MAX Deliveries, Require Repairs", "Boeing 737 MAX production hit by a new defect in supplier part"); *id.* ¶¶ 160, 165 ("Boeing and Spirit Grapple With Newly Discovered 737 MAX Quality Issue", "Boeing and a key supplier find a new manufacturing issue that affects the 737

Max airliner"); *id.* ¶ 178 ("Boeing Warns 737 Deliveries to Be at Low End of 2023 Target").)

Plaintiffs may not recover for stock declines on May 3, August 2 and September 7 for the independent reason that nothing new about the purported fraud was reported on those days. The tail-fin fitting and mis-drilled hole issues were fully disclosed on April 13 and August 23, respectively. Any stock impact from those events occurred on those earlier dates because "the price of a security in a functioning market accurately reflects its value, given the information available to the public". *In re IPO Sec. Litig.*, 544 F. Supp. 2d 277, 288 (S.D.N.Y. 2008).

### B.    Plaintiffs Fail To Plead Materialization of a Concealed Risk.

Plaintiffs likewise fail to plead loss causation through the materialization of a concealed risk, which requires Plaintiffs to allege that "the[ ]loss was foreseeable and caused by the materialization of the risk ***concealed*** by the fraudulent statement". *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 409 (S.D.N.Y. 2016) (emphasis added). Plaintiffs have pleaded no ***concealed*** risks, and thus cannot show a foreseeable loss arising therefrom. (*See supra* § I.A, I.B, II.A, II.B.) "[W]here (as here) substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk, a plaintiff must allege (i) facts sufficient to support an inference that it was defendant's fraud—rather than other salient factors—that proximately caused plaintiff's loss; or (ii) facts sufficient to apportion the losses between the disclosed and concealed portions of the risk that ultimately destroyed an investment." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005). Plaintiffs have done neither.

### VII.   Plaintiffs' Section 20(a) Claim Must Be Dismissed.

Because Plaintiffs fail to state a claim for a primary violation under Section 10(b), their claim arising under Section 20(a) must also be dismissed. *Rombach*, 355 F.3d at 177-178.

### CONCLUSION

Defendants respectfully request that the Court dismiss the SAC with prejudice.

May 13, 2024

          Respectfully submitted,

          CRAVATH, SWAINE & MOORE LLP

          by
          /s/ *J. Wesley Earnhardt*
          J. Wesley Earnhardt
          Michael P. Addis
          Members of the Firm

          2 Manhattan West
            375 Ninth Avenue
              New York, NY 10001
                (212) 474-1000
                wearnhardt@cravath.com
                maddis@cravath.com

          *Counsel for Defendants*

31