**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HANG LI, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> SPIRIT AEROSYSTEMS HOLDINGS, INC., TOM GENTILE III, and MARK J. SUCHINSKI, <br><br> Defendants. | Case No. 1:23-cv-03722-PAE <br><br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF FACTS ................................................................................ 2

        A.      Background leading to the Class Period ................................................ 2

        B.      Spirit falsely emphasized the quality and safety of its products. ........... 3

        C.      Widespread manufacturing quality failures pervade Spirit. ................... 3

        D.      Spirit identified the mis-drilled bulkhead holes defect in October 2022. ............... 4

        E.      Boeing disclosed Spirit's tail fin fittings defect in April 2023, but Spirit
                continued to conceal the mis-drilled bulkhead holes. ............................ 5

        F.      Spirit's quality failures continued to come to light after the Class Period,
                culminating in multiple resignations and government investigations. .................... 6

III.    LEGAL STANDARDS .................................................................................... 7

IV.     DEFENDANTS ISSUED MATERIALLY FALSE AND MISLEADING
        STATEMENTS ................................................................................................ 8

        A.      Defendants concealed chronic defects and the resulting Boeing probation
                while misleadingly touting Spirit's product quality. .............................. 9

        B.      Defendants' statements were not puffery. ............................................. 12

        C.      Defendants falsely claimed that Spirit was producing conforming products
                while concealing the mis-drilled holes defect. ...................................... 15

        D.      Defendants did not disclose Spirit's widespread quality failures. ......... 18

        E.      Defendants misled investors by inaccurately presenting quality failures as
                merely hypothetical possibilities. ......................................................... 20

V.      DEFENDANTS ACTED WITH SCIENTER ................................................ 23

        A.      The SAC alleges Gentile and Suchinski knew about Spirit's quality
                failures while misleading investors. ...................................................... 23

        B.      Defendants' scienter is supported by their direct involvement in Spirit's
                core operations. .................................................................................... 26

        C.      Widespread knowledge of systemic manufacturing problems within Spirit
                contributes to the strong inference of Gentile's and Suchinski's scienter. ............ 28

|  | D. | Spirit acted with corporate scienter. | 30 |
|---|---|---|---|
|  | E. | Additional facts further support the strong inference of Defendants' scienter. | 32 |
| VI. |  | THE SAC ALLEGES LOSS CAUSATION | 33 |
| VII. |  | GENTILE AND SUCHINSKI ARE ALSO LIABLE AS CONTROL PERSONS | 35 |
| VIII. |  | PLAINTIFFS REQUEST LEAVE TO AMEND, IF NECESSARY | 35 |
| IX. |  | CONCLUSION | 35 |

# TABLE OF AUTHORITIES

## CASES

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012) ........................................................................................ 8

*Bayshore Cap. Advisors, LLC v. Creative Wealth Media Fin. Corp.*,
  667 F. Supp. 3d 83 (S.D.N.Y. 2023) ............................................................................ 31

*Bricklayers and Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
  866 F. Supp. 2d 223 (S.D.N.Y. 2012) .......................................................................... 13

*Buhrke Fam. Revocable Tr. v. U.S. Bancorp*,
  2024 WL 1330047 (S.D.N.Y. Mar. 28, 2024) ........................................................ 17, 21

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014) ...................................................................................... 34

*Chapman v. Mueller Water Prod., Inc.*,
  466 F. Supp. 3d 382 (S.D.N.Y. 2020) .......................................................................... 22

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
  957 F. Supp. 2d 277 (S.D.N.Y. 2013) ............................................................... 18, 19, 26

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012) .......................................................................... 23

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*,
  587 F. Supp. 3d 56 (S.D.N.Y. 2022) ............................................................................ 33

*Cornwell v. Credit Suisse Grp.*,
  689 F. Supp. 2d 629 (S.D.N.Y. 2010) .......................................................................... 28

*Dobina v. Weatherford Int'l Ltd.*,
  909 F. Supp. 2d 228 (S.D.N.Y 2012) ........................................................................... 25

*Dodona I, LLC v. Goldman, Sachs & Co.*,
  847 F. Supp. 2d 624 (S.D.N.Y. 2012) .......................................................................... 20

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005) ................................................................................................... 34

*Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
  794 F.3d 297 (2d Cir. 2015) ................................................................................... passim

*Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
   367 F. Supp. 3d 16 (S.D.N.Y. 2019).................................................................................... 26

*Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*,
   268 F. Supp. 3d 526 (S.D.N.Y. 2017)............................................................................ 24, 26

*Freudenberg v. E\*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010).................................................................... 33, 34, 35

*Galestan v. OneMain Holdings, Inc.*,
   348 F. Supp. 3d 282 (S.D.N.Y. 2018).................................................................................. 29

*Ganino v. Citizens Utilities Co.*,
   228 F.3d 154 (2d Cir. 2000) ................................................................................................ 19

*Hall v. Johnson & Johnson,*
   2019 WL 7207491 (D.N.J. Dec. 27, 2019) ..........................................................................11

*In re Am. Int'l Grp. 2008 Sec. Litig.*,
   741 F. Supp. 2d 511 (S.D.N.Y. 2010).................................................................................. 18

*In re AppHarvest Sec. Litig.*,
   684 F. Supp. 3d 201 (S.D.N.Y. 2023)............................................................................ 10, 21

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004).................................................................................. 32

*In re Banco Bradesco S.A. Sec. Litig.*,
   277 F. Supp. 3d 600 (S.D.N.Y. 2017).................................................................................. 13

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
   980 F. Supp. 2d 564 (S.D.N.Y. 2013).................................................................................. 21

*In re Barclays PLC Sec. Litig.*,
   2024 WL 757385 (S.D.N.Y. Feb. 23, 2024)................................................................... 26, 28

*In re Barrick Gold Sec. Litig.*,
   2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015) ....................................................................... 24

*In re BHP Billiton Ltd. Sec. Litig.*,
   276 F. Supp. 3d 65 (S.D.N.Y. 2017)..............................................................................11, 13

*In re Braskem S.A. Sec. Litig.*,
   246 F. Supp. 3d 731 (S.D.N.Y. 2017)............................................................................ 31, 33

*In re Eletrobras Sec. Litig.*,
   245 F. Supp. 3d 450 (S.D.N.Y. 2017).................................................................................. 13

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
   986 F. Supp. 2d 487 (S.D.N.Y. 2013).................................................................................. 20

*In re Facebook, Inc. Sec. Litig.*,
   87 F.4th 934 (9th Cir. 2023) ............................................................................................... 20

*In re FBR Inc. Sec. Litig.*,
   544 F. Supp. 2d 346 (S.D.N.Y. 2008).................................................................................. 21

*In re Henry Schein, Inc. Sec. Litig.*,
   2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) .............................................................. 30, 31

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
   251 F. Supp. 3d 596 (S.D.N.Y. 2017).................................................................................... 9

*In re OSG Sec. Litig.*,
   12 F. Supp. 3d 622 (S.D.N.Y. 2014).................................................................................... 26

*In re Petrobras Sec. Litig.*,
   116 F. Supp. 3d 368 (S.D.N.Y. 2015).................................................................................. 13

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) ............................................................................................. 8, 32

*In re Signet Jewelers Ltd. Sec. Litig.*,
   2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ..................................................................... 13

*In re Silvercorp Metals, Inc. Sec. Litig.*,
   26 F. Supp. 3d 266 (S.D.N.Y. 2014).................................................................................... 31

*In re Vale S.A. Sec. Litig.*,
   2020 WL 2610979 (E.D.N.Y. May 20, 2020) ......................................................................11

*In re: EZCorp, Inc. Sec. Litigations*,
   181 F. Supp. 3d 197 (S.D.N.Y. 2016).................................................................................. 29

*Jackson v. Abernathy*,
   960 F.3d 94 (2d Cir. 2020) .................................................................................................. 31

*Jiajia Luo v. Sogou, Inc.*,
   465 F. Supp. 3d 393 (S.D.N.Y. 2020).................................................................................. 17

*Law Enf't Ret. Sys. v. Papa John's Int'l*,
   444 F. Supp. 3d 550 (S.D.N.Y. 2020)..................................................................... 21

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) ................................................................................... 34

*Litwin v. Blackstone Grp., L.P.*,
   634 F.3d 706 (2d Cir. 2011).................................................................................... 9

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015) ............................................................................ 34, 35

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
   601 U.S. 257 (2024) ........................................................................................ 16, 22

*Mateo v. Bristow*,
   2013 WL 3863865 (S.D.N.Y. July 16, 2013) ......................................................... 8

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ............................................................................................. 8, 9

*Meyer v. Jinkosolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014) ........................................................................... *passim*

*Mulligan v. Impax Laboratories, Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014).................................................................... 12

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
   455 F. App'x 10 (2d Cir. 2011)............................................................................. 26

*Nguyen v. New Link Genetics Corp.*,
   297 F. Supp. 3d 472 (S.D.N.Y. 2018)................................................................... 25

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ................................................................................. 23

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015) .............................................................................................11

*Ong v. Chipotle Mexican Grill, Inc.*,
   294 F. Supp. 3d 199 (S.D.N.Y. 2018).............................................................. 12, 17

*Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*,
   595 F.3d 86 (2d Cir. 2010) ..................................................................................... 8

*Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*,
  2023 WL 3569068 (S.D.N.Y. May 19, 2023) ............................................................ 19

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000) ................................................................................... 32

*SEC v. Gabelli*,
  653 F.3d 49 (2d Cir. 2011) ..................................................................................... 9

*Set Cap. LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021) ............................................................................. 20, 22

*Spitzberg v. Houston Am. Energy Corp.*,
  758 F.3d 676 (5th Cir. 2014) ................................................................................ 20

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
  531 F.3d 190 (2d Cir. 2008) ............................................................................ 30, 32

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) ...................................................................................... 7, 23, 27

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ................................................................................. 10

*Wandel v. Gao,*
  590 F. Supp. 3d 630 (S.D.N.Y. 2022) ................................................................... 19

*Wang v. Cloopen Grp. Holding Ltd.*,
  661 F. Supp. 3d 208 (S.D.N.Y. 2023) ................................................................... 27

## RULES

FED. R. CIV. P. 12(g) ............................................................................................. 8
FED. R. CIV. P. 15(a)(2) ........................................................................................ 35
Fed. R. Civ. P. 9(b) ............................................................................................... 8

## REGULATIONS

17 C.F.R. § 229.105 ............................................................................................. 22

Lead Plaintiff and the additional plaintiffs (collectively, "Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants' motion to dismiss (ECF 30) ("Motion" or "Mtn.") the Second Amended Complaint (ECF 37) ("SAC" or "Complaint").[1]

## I.    INTRODUCTION

Spirit's obligation to manufacture high quality airplane parts is critical not only to the Company and its shareholders, but also to every person that flies on a Boeing airplane assembled with Spirit fuselages. Spirit failed to live up to its duty. Defendants concealed Spirit's failure from investors and the public, until the problems became so severe they could no longer be hidden.

The Class Period begins shortly after two Boeing 737 MAX airplanes crashed, after which regulators worldwide grounded the planes pending lengthy safety reviews. In this context, Defendants reassured everyone that, following "the recent situation involving the 737 MAX," "[i]n our industry, safety is the most important priority," and that Spirit has "a great quality system that ensures our parts are inspected and controlled and go out FOD [foreign object debris] free and defect free" because "[w]e can't risk our products ever being involved in an incident or accident."

Defendants defined the basic principle of quality as "do not create, do not pass and do not accept a defect." Yet, a multitude of former employees and public whistleblowers have confirmed that, throughout the Class Period, Spirit prioritized short-term financial results and avoidance of production delays over safety and quality, including by knowingly creating and passing defective parts to Boeing, with the hope of fixing fuselages after delivery without garnering public attention.

---

[1] Lead Plaintiff is Hang Li, and the additional plaintiffs are Mike Drumright and Marco Amiotti. ¶¶22-24. Defendants are Spirit AeroSystems Holdings, Inc. ("Spirit" or the "Company"), Tom Gentile III ("Gentile"), and Mark Suchinski ("Suchinski"). ¶¶25-27. References to "¶__" are to the Complaint's paragraphs, unless otherwise specified. References to the "Spencer Decl." and "Ex. __" are to the Declaration of Garth Spencer and its exhibits, filed herewith. Unless otherwise indicated all emphasis has been added, and all cites are cleaned up. The "Class Period" is April 8, 2020 to September 7, 2023.

These witnesses confirm that Boeing placed Spirit on probation because its products routinely failed to meet minimum standards, and Spirit identified mis-drilled holes on the 737 MAX aft pressure bulkhead ten months before Boeing publicly revealed the defect.

The Complaint pleads a strong inference of Defendants' scienter through mutually reinforcing allegations including an ethics complaint from the leader of an inspection team that was forwarded directly to CEO Gentile alleging an "excessive amount of defects" and instructions from a supervisor to "falsify[] the documentation" of these defects. Rather than disclosing and addressing the root cause of this and other complaints, Defendants continued to conceal Spirit's systemic quality problems from the public, made misleading statements about Spirit's quality control system, and falsely lauded its ability to produce conforming products.

Defendants attempt to avoid accountability for their misrepresentations by portraying Spirit's pervasive quality failures as a few "discrete" issues that were promptly "remediated." Defendants' argument is belied by the Complaint's detailed allegations and the fact that this action is proceeding in parallel with multiple governmental investigations into Spirit's quality failures, including a criminal investigation by the DOJ and civil investigations by the FAA and SEC, as well as a steady drumbeat of national news concerning Spirit's chronic quality problems. This case deserves to proceed beyond the pleadings. Defendants' motion should be denied.

## II.    STATEMENT OF FACTS

### A.    Background leading to the Class Period

Spirit's business depends on producing fuselages for Boeing aircraft, including the 737 MAX. ¶31. In 2018, Boeing placed Spirit on probation for widespread quality failures, including recurring issues such as FOD, missing fasteners, peeling paint, and poor skin quality in fuselages it delivered to Boeing. ¶¶36, 189. Spirit had to station a team of employees at Boeing's Renton, Washington factory to address the "alarming number" of defects. ¶298. Spirit's probation was

widely known among employees but was not disclosed publicly. ¶¶189, 205.

In October 2018 and March 2019, two 737 MAX aircraft crashed, killing hundreds. ¶40. The FAA and regulators worldwide grounded the 737 MAX pending lengthy safety reviews. ¶41. Defendants sought to reassure investors and the public by emphasizing their purported focus on safety and quality. ¶¶43-45. Boeing directed Spirit to suspend all 737 MAX production beginning January 1, 2020. ¶47. COVID travel restrictions began in early 2020 and exacerbated the financial strain on Spirit as flights were halted, forcing Spirit to incur significant debt to survive. ¶¶46-48.

**B.      Spirit falsely emphasized the quality and safety of its products.**

In this context, Defendants focused on convincing investors and the public that Spirit was committed to, and capable of, manufacturing safe, quality products after the two crashes and the MAX grounding. The Class Period begins on April 8, 2020, when Defendants announced Spirit was instituting mass layoffs due to the 737 MAX production suspension, while emphasizing Spirit's work "to maintain the health and viability of its supply chain," despite knowing that the layoffs meant the loss of numerous experienced mechanics and quality personnel. ¶¶51-53. In November 2020, the FAA lifted its grounding order. ¶¶41-42. In December 2020, Spirit resumed 737 MAX production, but by this time had slashed its workforce by half. ¶48.

Despite remaining on probation with fewer and less qualified employees, Spirit intensified its campaign to reassure investors. For example, in a June 17, 2021 Sustainability Report, Spirit touted its efforts to "ensure impeccable product quality and safety," and told investors it was "dedicated to a Zero-Defect target, with no escapements to our customers." ¶¶67-70.

**C.      Widespread manufacturing quality failures pervade Spirit.**

First-hand accounts from former Spirit employees show that Spirit suffered from systemic quality failures, contradicting Defendants' statements. *See* ¶¶179-268. For example, shortly after May 2021, Product and Process Verification ("PPV") Core Quality Auditor Joshua Dean discussed

Spirit's probation, which was a well-known fact within the PPV group, with Senior PPV Quality Manager, Jamie Hanson. ¶205. Hanson explained that to exit probation Spirit had to satisfy several conditions, such as decreasing the number of defects. *Id*. However, as Dean observed, Spirit was not reducing defects but rather manipulating documentation to undercount those defects. ¶206.

In February 2022, Former Employee 1 ("FE1"), Team Lead for quality inspectors conducting "end of the line" inspections, was instructed by Senior Quality Manager Steve Aubuchon to undercount defects. ¶¶191-92. Aubuchon told FE1 that the measures were designed to save Spirit money and that FE1 would be fired if he refused to comply. ¶192. FE1 then submitted an internal ethics complaint, stating that inspectors continued to observe an "excessive amount of defects" and had been directed to misreport the defects in a way that "challenges our integrity because we are being asked to purposefully record inaccurate information." ¶¶193-95. Aubuchon demoted FE1 soon thereafter, and his complaint went unanswered. ¶¶194, 196.

On March 16, 2022, FE1 emailed Gentile explaining that he was ordered to misreport defects, stating he had "lost faith on the quality organization here at spirit" and attaching a copy of his still-unaddressed ethics complaint. ¶197. Gentile replied to FE1, and one month later Spirit sustained the complaint. ¶198. But Spirit did nothing to correct the quality problems identified by FE1 and continued to conceal pervasive defects while publicly touting Spirit's product quality.

**D.    Spirit identified the mis-drilled bulkhead holes defect in October 2022.**

On October 1, 2022, Dean began auditing a portion of the 737 MAX fuselage spanning the aft pressure bulkhead to the tail. ¶208. The aft pressure bulkhead is a critical part of an airplane necessary to maintain cabin pressure during flight. ¶9. Dean identified mis-drilled holes in the bulkhead and promptly notified his supervisors and multiple other employees throughout Spirit, submitting a written report on approximately November 1, 2022. ¶¶208-15. Dean continued to inform managers about the mis-drilled holes defect and stressed the seriousness of the problem,

4

describing it as "the worst issue" he had found since joining the PPV department. ¶¶220-221.

Other former employees confirm Spirit knew of the mis-drilled bulkhead holes well before Boeing disclosed the defect to the public in August 2023. FE3, a former Metals Mechanic at Spirit, learned about a problem with bulkhead holes toward the end of 2022 and stated it was common knowledge in his work building. ¶247. Former Inspector Team Lead Robert Hurt first learned of problems with the aft pressure bulkhead in February 2023. ¶235. Spirit asked Hurt to work on the aft pressure bulkhead, but he declined because it was common knowledge in his work area that it was drilled and installed incorrectly, and he did not want to be responsible for it. *Id.*

**E.    Boeing disclosed Spirit's tail fin fittings defect in April 2023, but Spirit continued to conceal the mis-drilled bulkhead holes.**

In March 2023, Spirit found cracks in several parts, leading to an investigation that revealed a potentially widespread problem with tail fin fittings. ¶¶221-222. Dean's superiors asked him about the issue since he had audited that section of the fuselage. Dean again called attention to the mis-drilled holes defect and its importance. ¶224. On April 13, 2023, Boeing announced that it was pausing deliveries of some 737 MAX planes after learning of the tail fin fitting defect. ¶¶111-13. Spirit's stock price fell by over 20% the next trading day. ¶¶115-18. Defendants attempted to control the damage, telling investors that Spirit had "processes in place to address these types of production issues upon identification, which we are following." ¶120.

On May 3, 2023, Defendants revealed certain financial impacts of the tail fin fittings defect with their first quarter earnings results, sending Spirit's stock down an additional 12%. ¶¶122-29. On Spirit's earnings call, Defendants continued to conceal the mis-drilled holes, while Gentile stated that Spirit was shipping "conforming units" to Boeing "with no defects." ¶¶135, 138.

On August 2, 2023, Defendants revealed Spirit's second quarter results and additional details about the number of planes affected, the expected cost of the tail fin fittings defect, and the

5

resulting disruption to Spirit's production schedule, sending Spirit's stock down 27%. ¶¶146-54. Defendants told investors that "all the rework on the available 737 fuselages in Wichita was completed" and that "the quality issue" was "resolved in our factory." ¶158.

On August 23, 2023, Boeing disclosed the mis-drilled holes defect. ¶¶160-62. Spirit's stock price dropped more than 12%. ¶¶164-65. Finally, at a September 7, 2023 investor conference, Boeing and Spirit revealed more details concerning the number of affected planes and the expense of fixing the problem, sending Spirit's stock down another 7%. ¶¶169-76. Boeing's CFO stated "[i]n terms of our focus with our supplier, it is 100% the most important thing we're working on right now." ¶171. Gentile downplayed the mis-drilled holes issue, admitting that "escapes happened, and they happen on all programs. They usually don't get this much attention," and that "we were already actively working on fix when the escape was found." ¶173.

### F. Spirit's quality failures continued to come to light after the Class Period, culminating in multiple resignations and government investigations.

Three weeks after Gentile's September 7, 2023 admissions, Spirit removed him as President, CEO, and director. ¶¶269-71. On October 18, 2023, Boeing made Spirit enter a "Stability Plan" to address its quality failures, requiring Spirit to create a plan that "demonstrates reductions in nonconformances, foreign object debris, customer sensitive items, [and] significant repair log items." ¶¶278-81. On November 28, 2023, Spirit terminated its Commercial COO, Samantha Marnick, who was responsible for overseeing Boeing programs. ¶¶272-74.

On January 5, 2024, Alaska Airlines Flight 1282 operating a 737 MAX experienced an exit door plug blowout causing decompression and forcing an emergency landing. ¶287. The next day the FAA temporarily grounded certain 737 MAX aircraft pending inspections. ¶288. Subsequent reporting revealed that Spirit was partially responsible and had improperly installed the door plug, which then had to be reworked prior to the incident. ¶¶289, 293, 296-300. On January 17, 2024,

the FAA announced an investigation of Boeing and Spirit and capped Boeing's production volume one week later. ¶¶290-91. On February 20, 2024, Spirit's Senior Vice President for Quality, Bill Brown, who in March 2023 had publicly claimed "our parts are inspected and controlled and go out FOD free and defect free," agreed to resign from his position. ¶107; Ex. A.

Boeing recently agreed to reacquire Spirit, hoping to address Spirit's chronic quality problems. On March 1, 2024, The Wall Street Journal first reported the negotiations, noting Spirit "has been plagued by production problems and quality lapses," and that "Spirit parts frequently arrive at the [Boeing] factory with defects." Ex. B. On March 4, 2024, the FAA announced that its audit of Spirit and Boeing "found multiple instances where the companies allegedly failed to comply with manufacturing quality control requirements." ¶303. Reporting revealed that Spirit failed 7 of 13 FAA product audits and that the DOJ had commenced a criminal investigation. ¶¶304-05. On May 30, 2024, Suchinski tendered his resignation. Ex. C.

In its quarterly report recently filed with the SEC, Spirit stated it "has received information and document requests related to . . . safety and quality processes in the B737 MAX line production," including "grand jury subpoenas from the Department of Justice, and subpoenas or examination requests from the SEC and the Attorney General of the State of Texas." Ex. D. Texas' requests covered key issues in this case, including "the Mis-Drilled Aft Pressure Bulkhead Holes Defect" and "the issues that led to Spirit being placed on probation by Boeing." Ex. E. Texas stated in a legal filing seeking to compel Spirit's compliance: "[t]here are now serious reasons to believe that [Spirit's] representations" about product quality "were *false when made*." Ex. F. at 3.

## III.    LEGAL STANDARDS

On a Rule 12(b)(6) motion, courts must "consider the complaint in its entirety" and "accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.,* 551 U.S. 308, 322 (2007). Courts must also "draw all reasonable inferences in the plaintiff's favor." *Emps.'*

*Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015). "[F]act-specific question[s] cannot be resolved on the pleadings." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012).

To state a claim for securities fraud under §10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5(b),[2] a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).[3]

Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), while requiring fraud to be pled with particularity, "do not require the pleading of detailed evidentiary matter in securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001). The pleading of scienter is subject to a strong inference standard, and all other elements of securities fraud are subject to a plausibility standard. *See Blanford*, 794 F.3d at 304, 307 (applying plausibility standard to falsity). The SAC meets these standards in all respects.

## IV.  DEFENDANTS ISSUED MATERIALLY FALSE AND MISLEADING STATEMENTS

A complaint adequately pleads falsity when it specifies the false statement, identifies the speaker, states where and when the statement was made, and explains why the statement was false. *Blanford*, 794 F.3d at 305. The "veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Operating*

---

[2] Plaintiffs are not asserting claims under Rule 10b-5(a) or (c).

[3] Defendants' Motion contests only falsity, scienter, and loss causation, thus waiving any arguments regarding the remaining elements. *See* FED. R. CIV. P. 12(g); *Mateo v. Bristow*, 2013 WL 3863865, at *8 (S.D.N.Y. July 16, 2013) (improper to consider issues first raised in reply).

*Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010). "[S]o-called 'half-truths' – literally true statements that create a materially misleading impression – will support claims for securities fraud." *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds*, 568 U.S. 442 (2013). Disputes concerning falsity should not be decided on a motion to dismiss, "unless the Court, drawing all reasonable inferences in favor of the plaintiff, determines that reasonable minds could not differ on the question of whether the statements alleged in the complaint were misleading in light of the circumstances under which they were made." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017).

A fact is material "when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx*, 563 U.S. at 38. Materiality is an "inherently fact-specific finding," imposing a low bar on a plaintiff on a motion to dismiss. *Litwin v. Blackstone Grp.*, L.P., 634 F.3d 706, 718 (2d Cir. 2011). A court may not dismiss a statement as immaterial unless "the alleged omissions and misstatements are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* at 718.

### A. Defendants concealed chronic defects and the resulting Boeing probation while misleadingly touting Spirit's product quality.

Defendants made numerous false statements, such as claiming: "we have a great quality system that ensures our parts are inspected and controlled and go out FOD [foreign object debris] free and defect free" (¶107); "we build product that is the right quality, the first time that don't break" (¶79); "[w]e are going above and beyond what the requirements ask of us to make sure that our customers are successful when it comes to quality" (¶81); "[t]he basic principles of quality are do not create, do not pass and do not accept a defect" (¶105); and Spirit was "dedicated to a Zero-Defect target, with no escapements to our customers" (¶70).

These statements were materially misleading for failing to disclose that Spirit suffered from pervasive quality failures so severe that Spirit's largest customer had placed it on probation, which was one step away from terminating the relationship. *E.g.*, ¶¶38-38, 189-90, 205. Spirit's chronic defects are amply shown by the accounts of the five former employees discussed at length in the SAC (*see* ¶¶179-268),[4] which are corroborated by numerous other sources including media reports and statements from the FAA. *See, e.g.*, ¶¶294-95, 298, 301-04. Spirit's probation meant that it routinely did not manufacture products to Boeing's minimum quality requirements. ¶¶36-38. Spirit's exit from probation around 2022 does not show that its quality improved, because Spirit undercounted defects, concealed defects from Boeing (¶188, 197, 206, 249), and continued to suffer chronic quality failures throughout the Class Period. *E.g.*, ¶¶120, 162, 195 230-45, 278-79, 304. Even after exiting probation, FE1 directly informed Gentile of the *ongoing* "excessive amount of defects," which he had been ordered to misreport. ¶¶195-97.[5] That Spirit never fixed its chronic quality problems is further shown by Boeing requiring Spirit to enter a "Stability Plan" to reduce defects shortly after the Class Period. *See* ¶¶278-82. Such allegations reinforce the former employees' accounts of pervasive defects and pressure from managers to overlook them or face demotion or termination. *E.g.*, ¶¶197, 226, 236-40, 244-45, 259-60, 268, 295.

Similar statements touting safety or quality have been found actionable where, as here, they

---

[4] This level of confirmation more than suffices as "[a] comprehensive survey of employees is not needed at the pleading stage." *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 262 (S.D.N.Y. 2023) (finding falsity alleged based in part on allegations of six former employees).

[5] That FE1's complaint was sustained is *not* evidence of Spirit's quality controls working. Mtn. 13-14. Acknowledging that FE1 was wrongfully demoted did nothing to resolve the systemic quality failures he raised. Moreover, FE1's complaint is only one of numerous allegations showing Spirit's pervasive quality failures, which continued well after FE1's reinstatement and throughout the Class Period. *E.g.*, ¶¶169, 207, 237-44, 251-58, 278-81. Therefore, Defendants' citation to *Rombach v. Chang* is inapposite. *See* 355 F.3d 164, 173-74 (2d Cir. 2004) (allegations that company failed to pay a mere handful of vendors did not establish a broader "liquidity crisis").

are made in response to specific investor concerns and conceal significant problems. *See In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, \*12 n.5 (E.D.N.Y. May 20, 2020) ("we are driven by our commitment to safety to people and to preserve the environment"); *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 80 (S.D.N.Y. 2017) ("Our overriding commitment is to ensuring the safety of our people, and respecting our environment and the communities in which we work."); *Hall v. Johnson & Johnson,* 2019 WL 7207491, at \*16 (D.N.J. Dec. 27, 2019) ("quality and safety [are] our number-one priority in dealing with patients and consumers").

Defendants argue that their statements were not misleading because Spirit did have quality "systems and procedures." Mtn. 13.[6] But Spirit made demonstrably false factual assertions that were not limited to merely stating that it employed procedures. *E.g.*, ¶79 ("we build product that is the right quality, the first time that don't break")[7]; ¶107 (Spirit's "great quality system . . . ensures *our parts . . . go out FOD free and defect free*"). And Spirit actively undermined its procedures by pressuring quality personnel to ignore problems and approve defective products. *See* ¶¶180-82, 184-86, 191-95, 199, 203, 235, 236-40, 244, 268. Therefore, it was misleading to tout that Spirit had "deployed teams to go verify" conformance with engineering requirements "which is mitigating any potential for future escapes" (¶83), and to laud the role of "daily compliance audits" and "independent" reviews in supporting Spirit's "dedicat[ion] to a Zero-Defect target, with no escapements" (¶70), when Spirit was thwarting those very processes and routinely allowing quality

---

[6] While Defendants do not argue any of their statements were mere opinions, even if any statements were opinions they would still be actionable because they did not "fairly align" with the undisclosed information in Defendants' possession. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188-89 (2015).

[7] Defendants' attempt to spin this statement as unrelated to manufacturing new products fails. Mtn. 11-12 ("we build product that is the right quality, the first time that don't break, however, others break it. And so, we really do have to fix it"). The claim that Spirit builds products "the right quality, *the first time* that don't break" described the initial manufacturing process, with the part of the statement about repairs limited to what happens after "others break it." *See id.*; ¶79.

11

escapements in an effort to boost short-term financial performance.[8]

Spirit's chronic quality failures, and efforts to conceal problems and evade quality controls, align closely with the facts in *Mulligan v. Impax Laboratories, Inc.*, 36 F. Supp. 3d 942, 946 (N.D. Cal. 2014). In *Impax*, the defendant manufacturer sought to reassure investors following its receipt of FDA warning letters identifying quality problems by emphasizing its product quality and manufacturing procedures. *See id.* at 957-59. The court found falsity was sufficiently alleged with respect to statements such as "Impax remains committed to providing the highest quality products to our customers and working with the FDA to diligently resolve any issues," based on confidential witness allegations demonstrating "recurring and pervasive problems with the manufacturing and quality control processes," and Impax's efforts to mislead the FDA to pass inspections without fixing the underlying problems. *Id.* at 957, 960. Similarly, the Complaint establishes that Spirit knew of systemic quality problems by 2018 when Boeing placed it on probation (*e.g.*, ¶¶36, 189), continually pressured personnel to overlook defects (¶¶180-82, 184-86, 191-95, 199, 203, 235, 236-40, 244, 268), and misled Boeing to exit probation without addressing the underlying problems (*e.g.*, ¶188, 206, 249).

### B.    Defendants' statements were not puffery.

Defendants' statements about the quality of critically important airplane parts, in the context of public concern over safety following two widely publicized crashes, were not puffery.

---

[8] Defendants' statements here do not equate to those rejected in *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199 (S.D.N.Y. 2018). In addition to the vastly different context in which the statements were made, Chipotle merely expressed a "commitment" to food safety, but Defendants here said Spirit was "dedicated to a Zero Defect target, with no escapements to our customers"— a defined, quantitative objective that Spirit was intentionally sidestepping. Defendants also claimed Spirit's quality system was not just "*designed to* ensure" compliance, as Chipotle did, but in fact "*ensures* that our parts are inspected and controlled and go out FOD free and defect free"— a false statement of fact. Thus, Defendants' claims were not puffery and are proven false by allegations showing Spirit knowingly accepted and passed defective products to Boeing, rather than *Ong*'s quibbles about the adequacy of compliance with nebulous goals. *See* Mtn. 11, 13.

12

As Gentile acknowledged in 2019, following "the recent situation involving the 737 MAX," "[i]n our industry, safety is the most important priority." ¶44. In 2023 Gentile admitted that there was still "greater scrutiny on quality in general, post the MAX grounding and post the pandemic and particularly on the MAX, for obvious reasons." ¶173. These admissions show why Defendants' repeated quality claims were material. *See Bricklayers and Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012) ("In an industry as dangerous as deepwater drilling, it is to be expected that investors will be greatly concerned about an operator's safety and training efforts. The Court cannot say, as a matter of law, that Transocean's representation that such efforts were extensive was obviously unimportant.").

Even if certain statements might be considered puffery in isolation, "when the statements are made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors, those statements may become material to investors." *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *11 (S.D.N.Y. Nov. 26, 2018); *BHP Billiton*, 276 F. Supp. 3d at 69 (similar). Where context makes it such that "a reasonable investor could rely on [statements] as reflective of the true state of affairs at the Company," courts routinely hold that such statements are not puffery. *See In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015); *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463–64 (S.D.N.Y. 2017).

Here, reasonable investors relied on Defendants' repeated statements emphasizing the purported quality and safety of Spirit's products during a time when the two 737 MAX crashes and the grounding of the 737 MAX were still fresh in investors' minds. These statements were directly aimed at reassuring investors at a time of intense concern. *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 659-60 (S.D.N.Y. 2017) (statements about anti-corruption policies were actionable because "they were made in an effort to reassure the investing public about the

13

Company's integrity, specifically with respect to bribery, during a time of concern.").[9] In this context, the commitment to a "Zero-Defect target, with no escapements" was not a vague, aspirational goal: it was critical to the survival of the Company. And this conclusion applies *a fortiori* with respect to Defendants' statements made after Boeing disclosed the tail fin fittings defect in April 2023. At that time serious concerns remained about the safety of the 737 MAX, and investors' confidence was shaken again with evidence of a new defect. In that context, statements such as "[w]ith *the quality issue resolved in our factory* . . . our entire focus is directed towards executing on our customer commitments" were not mere puffery.[10]

Spirit's claim that its parts "go out FOD free and defect free" was a demonstrably false factual assertion. *See* ¶107.[11] Defendants argue that they did not "guarantee" Spirit's products would be free from defects, but guarantees are not required for a statement to be actionably misleading. *See Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) (defendants' descriptions of compliance measures "did not guarantee 100% compliance," but were misleading for failing to disclose ongoing substantial compliance failures). Furthermore, the reactions of analysts, the press, and markets, show that investors were materially misled. *See* ¶313 (Bank of America aerospace analyst stating "How could they have missed this after four years when they were supposed to have looked at everything with a fine-tooth comb?"); Ex. G ("Every inch of the

---

[9] The level of detail in the statements, which define the principles of "quality" (¶105), and claim that Spirit's systems "ensure" defect-free production (¶107), go far beyond the "general statements about reputation, integrity and compliance with ethical norms" in Defendants' cases. Mtn. 11.

[10] Defendants' brief omits the part stating that "the quality issue" was "resolved." Mtn. 11. Defendants similarly omit factual assertions from the challenged statements to argue that they did not contain statements of fact. *Compare* Mtn. 10-11 *with* ¶¶70, 83, 135. Defendants' argument that various statements were not misleading also omits key text. *Compare* Mtn. 12 *with* ¶¶70, 83, 133.

[11] This conclusion is strengthened by the statement's context—Spirit's Senior Vice President for Quality speaking in a video from the factory floor, wearing safety glasses, and backed by workers and aircraft parts—which conveyed the speaker's knowledge of Spirit's product quality. *See* ¶108.

plane was supposedly meticulously analyzed during a nearly two-year global grounding, so it remains mind-blowing that Boeing could still be unearthing fresh glitches"); ¶¶115, 129, 154, 163, 176 (large stock price declines following defect disclosure after defect disclosure).

### C.    Defendants falsely claimed that Spirit was producing conforming products while concealing the mis-drilled holes defect.

On April 13, 2023, Boeing announced that it would halt some 737 MAX deliveries due to a non-standard manufacturing process used to install fittings in the aft fuselage of certain aircraft, and media reports quickly identified Spirit as the supplier. ¶¶111-14. This news was catastrophic for Spirit as investors were keenly focused on Spirit's claims that it manufactured quality products. *See* ¶114-15 (press scrutiny and 20% share price decline). Defendants downplayed the defect as an isolated occurrence and stressed that Spirit's systems worked to identify and fix any problems. *See, e.g.,* ¶¶120, 133, 135, 142, 156. All the while, knowledge of the mis-drilled holes defect was widespread among Spirit employees and senior managers. ¶¶214-17, 220, 224, 235, 247.[12]

Defendants argue their post-April 13, 2023, statements could not have misled investors because "[n]o reasonable investor would conclude that a statement expressly about remediating the tail fin fitting issue could amount to a general guarantee against there being any other unrelated quality issue." *See* Mtn. 18-19. But Defendants' statements were not "expressly about remediating the tail fin fitting issue." Defendants made much broader statements about Spirit's overall quality, and whether fuselages contained *any* defects, without limiting their statements to tail fin fittings. *E.g.*, ¶135 (Spirit is "implementing additional protocols to reinforce our quality systems to prevent *similar occurrences* in the future"); ¶138 (Spirit "is taking units that are *with no defects* out of the

---

[12] These allegations are not "fraud-by-hindsight." Mtn. 19. Dean identified the mis-drilled holes in October 2022 (¶207) and by February 2023 many Spirit employees, including high-ranking personnel, knew of the defect (¶¶214-17, 235, 247), well before Spirit sought to reassure investors about its product quality following Boeing's disclosure of the tail fin fitting defect in April 2023.

stored units and also producing new *conforming units*"). And as discussed *supra*, "guarantees" are not required for a statement to be materially misleading. *See Jinkosolar*, 761 F.3d at 251.

Even if Defendants' statements had been limited to the tail fin fitting defect (they were not), "[t]he literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context." *Id.* at 250. Therefore, "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Id.* By speaking about whether fuselages being delivered to Boeing contained defects, Defendants were required to disclose the mis-drilled holes defect. *See* ¶¶120, 133, 135, 138, 158; *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 264 (2024) ("Rule 10b–5(b) requires disclosure of information necessary to ensure that statements already made are *clear and complete*").[13]

On April 14, 2023, after the tail fin fitting defect was revealed, Spirit stated it had "identified a quality issue on the aft fuselage section of certain models of the 737" and had "processes in place to address *these types of production issues* upon identification, which we are following." ¶120. But by this time there was widespread knowledge within Spirit of a similar "production issue" also in the 737's "aft fuselage section." The tail fin fittings attach the vertical tail to the rear end of the fuselage and were improperly installed by Spirit. ¶¶112-13. The aft pressure bulkhead is located in close proximity to the defectively installed tail fin fittings, and the purpose of the (mis-drilled) bulkhead holes is to be filled with fasteners that connect the bulkhead to the fuselage. ¶¶210-11, 227. That is, both defects are located in the same 737 aft fuselage section, and both relate to improper processes used to connect structural components to the fuselage. To

---

[13] Defendants acknowledge a duty to speak exists "when necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading." Mtn. 20. Defendants' lack of duty argument depends on their assertion that the challenged statements were not misleading, which, as shown herein, is incorrect.

acknowledge one defect and claim there are processes in place to remedy similar failures while knowing about an undisclosed, ongoing defect of even greater importance is misleading.[14]

On May 3, 2023, Gentile said that Spirit had "turned our attention to ensuring our *ongoing production meets manufacturing standards*" and "[w]e have . . . *resumed shipments of conforming fuselages* to Boeing." ¶133. Gentile touted Spirit's "extensive root cause corrective action process" and emphasized it was "implementing additional protocols to reinforce our quality systems to *prevent similar occurrences in the future*." ¶135. Gentile further stated Spirit was "shipping units to Boeing and we're completing units, *conforming units*" and "taking units that are *with no defects* out of the stored units and also producing new *conforming units*." ¶138. These statements were false—Spirit continued to deliver defective fuselages with mis-drilled aft pressure bulkhead holes.

On the same May 3, 2023 call, Gentile emphasized that Spirit was "*working in close association with Boeing*" to "address the issue and get execution back on track." ¶141. Gentile also claimed "[w]e've *shared a lot of information*" with Boeing." ¶142. But Spirit still had not informed Boeing of the mis-drilled holes defect despite knowing about it for months. *See* ¶160 (Boeing later independently discovered the defect). On August 2, 2023, Gentile told investors that "*all the rework* on the available 737 fuselages in Wichita *was completed during the second quarter*." ¶156. Suchinski said "[w]ith *the quality issue resolved* . . . our entire focus is directed toward executing on our customer commitments." ¶158. These details again falsely "gave comfort to investors that

---

[14] Defendants' cases are distinguishable because here, their statements about producing conforming fuselages were closely related to, and contradicted by, the undisclosed mis-drilled holes defect. In *Chipotle*, 294 F. Supp. 3d at 233-234, the company did not have to disclose the "intricacies of investigating an outbreak" because it truthfully said that "no cause for the outbreak" had been determined. In *Jiajia Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 409 (S.D.N.Y. 2020), the company did not need to disclose details of its efforts to comply with PRC laws where it never discussed its compliance processes. *Buhrke Fam. Revocable Tr. v. U.S. Bancorp* in fact found a "sufficiently close nexus" between statements about governmental investigations and the omitted fact of an ongoing CFPB investigation. 2024 WL 1330047, at *17 (S.D.N.Y. Mar. 28, 2024).

reasonably effective steps were being taken to comply" with manufacturing standards, while concealing another known defect. *See Jinkosolar*, 761 F.3d at 251.

On August 23, 2023, Boeing disclosed Spirit's mis-drilled holes defect, causing a 12.7% decline in Spirit's stock price. ¶¶160-63. Even then Spirit misleadingly deflected blame, stating that "[b]ecause Spirit uses multiple suppliers for the aft pressure bulkhead, only some units are affected," thereby indicating that the problem was caused by one of Spirit's suppliers. ¶167.[15] As Gentile later admitted, Spirit caused the defect. ¶173.

### D.    Defendants did not disclose Spirit's widespread quality failures.

Defendants argue that Spirit "fully disclosed the risks that it *might* not meet is quality goals." Mtn. 14-15. Not so. Warning of a generic risk while concealing "ongoing and serious" problems that significantly increase the probability of that risk "will not suffice." *Jinkosolar*, 761 F.3d at 251; *see also In re Am. Int'l Grp. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010). ("[w]arnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks"). Spirit's ongoing and widespread quality failures contradicted Defendants' misleading statements, and their falsity is not dispelled by Spirit's misleading, hypothetical risk disclosures (*see infra* Part IV.E). *See City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 305 (S.D.N.Y. 2013) (Engelmayer, J.) ("it is well-settled that cautionary language cannot protect against the omission

---

[15] Defendants argue that this statement was not misleading because Spirit also stated that it "has implemented changes to its manufacturing process to address this issue." Mtn. 19-20. But Spirit could certainly implement changes to address a defect introduced by a supplier. And the facts show reasonable investors would understand Spirit to be claiming that the defect originated with a supplier. *See* Ex. G (August 24, 2023 Bloomberg article citing Jefferies analyst Sheila Kahyaoglu for the statement that "Spirit had multiple suppliers for the aft pressure bulkhead, and just one failed to conform to specifications . . . so only some Max jets are affected").

of present fact").[16] Stating that unspecified quality disruptions occurred in the past and *may* occur in the future, while omitting that Spirit currently suffered from pervasive quality failures, materially misled investors about the probability and magnitude of the risk.[17]

Defendants argue that Gentile's statement that quality escapes "can happen" disclosed the truth to investors. *See* Mtn. 6. But in context, what Gentile said was "it can happen. It's not routine, but we do see escapes . . . So it's nothing systemic. I think it was isolated to one of our suppliers." ECF 38-10. This did not disclose the truth to investors about Spirit's systemic and routine quality failures, it is yet another example of Defendants' misleading statements.

And while Defendants cite an article to argue that quality escapes "are a normal part of manufacturing," *see* Mtn. 6,[18] even if credited, this does not establish that the extreme level of Spirit's quality escapes (almost every fuselage contained significant defects, *see* ¶¶180, 190, 298) was "normal." Regardless, Defendants' argument is a premature attempt to assert the "truth-on-the-market" defense, whereby certain publicly known information is deemed immaterial. However, "[t]he truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d

---

[16] Defendants' cases are inapposite because, unlike here, the relevant information was fully disclosed. *See Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*, 2023 WL 3569068, at *13 (S.D.N.Y. May 19, 2023) (defendant admitted that the "cost of steel [was] becoming a problem"); *Wandel v. Gao,* 590 F. Supp. 3d 630, 644-45 & n.9 (S.D.N.Y. 2022) (company "thoroughly explained" the complained of conduct and resulting risks, which had not yet materialized).

[17] Defendants cite a 2018 risk factor stating Spirit "continue[s] to face" certain risks (*not* including quality) "as well as the *potential* for . . . quality problems." Mtn. 14. But this again misleadingly presented quality problems as a mere possibility. Defendants cite Spirit's 2017 10-K to argue they disclosed that Boeing "could" terminate its contract for repeated events of default, but that was only a summary of contract provisions, not a disclosure that Spirit routinely provided Boeing defective products. Mtn. 14, 6-7. None of Spirit's disclosures accurately conveyed the risks.

[18] Plaintiffs do not oppose Defendants' request for judicial notice to the extent it is limited to establishing that certain statements were published, but Defendants' exhibits cannot be used to establish the "truth of the matters asserted." *Kinross Gold*, 957 F. Supp. 2d at 289.

Cir. 2000); *cf. Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 690 (5th Cir. 2014) (rejecting argument that investors had to know certain information, because "such an industry-specific and inherently fact-bound proposition cannot be verified on the face of the pleadings").

### E. Defendants misled investors by inaccurately presenting quality failures as merely hypothetical possibilities.

Risk disclosures must fully and accurately convey the known risks when made. *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 647 (S.D.N.Y. 2012). Risk disclosures are actionable half-truths when the company warns about a risk that could have an impact on its business when, in fact, that risk has already materialized. *See Jinkosolar*, 761 F.3d at 251; *see also In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013). "[T]here is a critical distinction between disclosing the risk a future event *might* occur and disclosing actual knowledge that the event *will* occur." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021). Risk disclosures that defendants do not change in response to material new information are insufficient. *See id.* at 86.[19]

Here, Spirit's risk warnings disguised a critical fact: when Defendants warned quality problems had occurred in the past and *may* occur in the future (some of the risk factors even failed to disclose that quality problems had occurred in the past), Spirit's products were plagued by consistent quality escapes such that it was unable to meet Boeing's minimum standards. *Compare* ¶¶73, 99 (risk disclosures) *with* ¶¶7, 37-38, 189-90 (Boeing probation). Therefore, based on Defendants' disclosure "[a] reasonable investor . . . would have understood the risk" of ongoing or additional quality failures "to be merely conjectural." *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 949 (9th Cir. 2023). Such an investor would have been misled because defects were

---

[19] Defendants' argument that "[n]ot changing appropriate disclosures cannot be actionable under the securities laws," Mtn. 17, if understood to mean defendants are free to repeat old disclosures despite obtaining information that renders them misleading, is contrary to *Credit Suisse*.

widespread, routinely went unaddressed, and were unreported or under-reported to avoid production delays. *E.g.*, ¶¶7, 180, 186, 188, 206, 239-43, 248-50, 35. No case cited by Defendants calls for a different conclusion on these facts.[20]

On May 6, 2020, Defendants stated: "[o]perational issues, including delays or *defects in supplier components . . . could result in significant out-of-sequence work* and increased production costs, as well as delayed deliveries." ¶55. But Spirit was already performing significant out-of-sequence work, since 2018 it stationed employees at Boeing's factory to fix widespread problems in delivered fuselages. ¶¶298, 187-90. And this problem was not due merely to failures by Spirit's *suppliers*, but rather due to Spirit's own chronic quality failures.

On February 25, 2021, Defendants said: "*If* the Company fails to meet the quality . . . requirements of its customer, disruptions in manufacturing lines *could* result which could have a material adverse impact on the Company's ability to meet commitments to its customers." ¶62. But Spirit was *already* failing to meet Boeing's minimum quality requirements, meaning it was not meeting its commitments to customers. ¶¶35-38, 56, 63, 187-90, 205-06, 230-34, 259.

On February 15, 2022, and again on February 17, 2023, Defendants misrepresented the extent of the risks Spirit faced, stating: "[f]rom time-to-time the Company *has experienced*, and *may* continue to experience, quality or delivery timing disruptions." ¶73, 99. But Spirit suffered

---

[20] Defendants' cited cases are inapposite because the risks had not yet materialized, and the relevant information was fully disclosed. *See U.S. Bancorp*, 2024 WL 1330047, at *17 ("the specific risk that USB warned against. . . had not materialized at that point"); *Okla. Law Enf't Ret. Sys. v. Papa John's Int'l*, 444 F. Supp. 3d 550, 563 (S.D.N.Y. 2020) (risk had not materialized at time of disclosures); *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 577 (S.D.N.Y. 2013) ("The magnitude and risk of that potential exposure was extensively disclosed"). Furthermore, Spirit's risk disclosures discussed information specific to the Company (*e.g.*, ¶73 discussing Spirit's operations), and therefore, unlike the abstract risk factors at issue in Defendants' cited cases, conveyed information to reasonable investors about the state of the Spirit's quality procedures. *See In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 362 (S.D.N.Y. 2008); *AppHarvest*, 684 F. Supp. 3d at 268.

from severe, *ongoing* quality "disruptions." For example, in November 2021 Spirit was underreporting defects as part of its effort to exit probation. ¶206. In March 2022, FE1 informed Gentile of Spirit's "excessive amount of defects," and that his team was instructed to "falsify[] the documentation." ¶¶195-97. In October 2022, Joshua Dean discovered and reported the mis-drilled holes defect. ¶¶208-212. Given the importance of quality manufacturing to Spirit, investors were misled by the disclosure of hypothetical quality issues, that were in fact pervasive and ongoing.[21]

Finally, Spirit's quarterly reports for the first and third quarters of 2022 (filed May 4, 2022 and November 3, 2022) misleadingly stated that "[t]here have been no material changes from the risk factors described in our 2021 Form 10-K." ¶¶87, 93. But, as described above, new developments after the filing of Spirit's 2021 Form 10-K on February 15, 2022 required changes to Spirit's risk factors. Spirit's "no material changes" statements were also misleading because the 2021 risk factors failed to disclose required information. While the Supreme Court recently held that "pure omissions" of required information are not actionable under Rule 10b-5(b),[22] Spirit's affirmative statements (¶¶87, 93) distinguish this case. *See Macquarie*, 601 U.S. at 265. Item 105 of SEC Regulation S-K required Spirit to disclose "the material factors that make an investment in the [company] speculative or risky," and to "explain how each risk affects the [company]." 17 C.F.R. § 229.105. Spirit violated Item 105 by failing to disclose in its 2021 10-K that it suffered from chronic quality problems and was on probation with Boeing. *E.g.*, ¶¶36-38, 189-90, 205. That Spirit's quality was so poor as to jeopardize its relationship with its largest customer made

---

[21] Defendants cite *Chapman v. Mueller Water Prod., Inc.*, to once again argue that their statements did not "guarantee" a lack of defects. 466 F. Supp. 3d 382 (S.D.N.Y. 2020). But as discussed, no such guarantee is required for a statement to be misleading. *See Jinkosolar*, 761 F.3d at 251; *Credit Suisse*, 996 F.3d at 85 (misleading to state event *might* occur when it *will* occur).

[22] The Complaint's falsity allegations included pure omissions required to be disclosed under Item 105 and Item 303. Plaintiffs no longer pursue their pure omissions theory in light of *Macquarie*.

investment in Spirit speculative and risky. Spirit's assertions in its 2022 quarterly reports that there were "no material changes" to its deficient 2021 risk factors misleadingly conveyed that those prior risk factors disclosed all required material information. *See* ¶¶87, 93.

## V.    DEFENDANTS ACTED WITH SCIENTER

Scienter is sufficiently alleged when, accepting the allegations as true and considering them collectively, a reasonable person would deem the inference of scienter at least as strong as an opposing inference. *Tellabs*, 551 U.S. at 324. "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking gun' genre, or even the most plausible of competing inferences." *Id*. "[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff." *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012). Scienter may be shown with "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).

### A.    The SAC alleges Gentile and Suchinski knew about Spirit's quality failures while misleading investors.

The Complaint raises a strong inference that Gentile and Suchinski knew of, or at least consciously and recklessly disregarded, Spirit's chronic quality failures, probation, and the mis-drilled holes defect. This is established through mutually reinforcing allegations including internal emails, Gentile's admissions, their financial motives, and the suspect timing of their departures.

First, the SAC identifies emails Gentile received from employees describing Spirit's quality failures. On February 22, 2022, FE1 submitted an internal ethics complaint about the "excessive amount of defects" and efforts to "falsify[] the documentation" of defects. ¶195. On March 16, 2022, FE1 emailed Gentile as a "last cry for help" to resolve an "issue that violates the guide lines stablished by the AS9100 which governs our certification to build aircraft and which has been in question and even put on probation by Boeing on previous years," stating that he had

23

"lost faith on the quality organization here at spirit," and attaching his ethics complaint. ¶197.[23] On March 2, 2023, FE3 sent Gentile an email (subject line: "Help!!!") stating that "[t]here have been so many violations, to our code of conduct, to our policies, to FAA and Boeing standards, and to the law." ¶259. Such communications show Gentile's knowledge of Spirit's excessive defects and probation with Boeing and raise a strong inference of his scienter. *See Blanford*, 794 F.3d at 306 (scienter can be alleged by showing defendants "knew facts or had access to information suggesting that their public statements were not accurate"); *e.g.*, *In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at *12 (S.D.N.Y. Apr. 1, 2015) (scienter pled based on allegations including employee's communications to executives about undisclosed adverse facts).

Second, Gentile's own statements bolster scienter. While discussing the mis-drilled holes, Gentile admitted that quality "escapes happened, and they happen on all programs. They usually don't get this much attention," and that "[w]e were already actively working on a fix when the escape was found." ¶173. The clear import of the former statement is that Gentile knew of *many* other quality escapes that had not been disclosed. The latter statement shows that Spirit identified the mis-drilled bulkhead holes *before* Boeing (after all, Spirit could not be "actively working on a fix" before *Spirit* "found" the problem). These admissions support an inference that Gentile's prior statements were made with scienter. *See Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 545 (S.D.N.Y. 2017) (later admission of accounting misconduct showed

---

[23] AS9100 is the quality management system standard for the aviation industry. Boeing requires suppliers to comply with AS9100. ¶8 n.3. While Spirit belatedly reinstated FE1's team lead position, it failed to redress the systemic problems FE1 cited. *See supra* note 5. Defendants' brief badly mischaracterizes FE1's email to Gentile and attached ethics complaint. Mtn. 26. FE1 was not just raising a minor disagreement over "paperwork" and his mention of Spirit's "Quality Matters" signs was meant to draw attention to the fact that Spirit's *actions* showed exactly the opposite. As FE1 told Gentile, he was instructed to falsify documentation of defects and had lost faith in Spirit's quality organization. ¶¶195-97.

defendants "made misrepresentations with intent to deceive, manipulate, or defraud"); *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 244-48 (S.D.N.Y 2012) (similar).[24]

Similarly, Gentile's inability to explain the reason for Spirit's $280 million cash advance from its customers supports scienter. An analyst pointedly asked about the unexplained advance during the May 3, 2023 earnings call: "*what do we not know here that could be a big risk to cash*?" ¶143. Gentile responded that Spirit wanted "between 300 million and $500 million to run the business. And the $280 million gave us some cushion." ¶144. But the advance would leave Spirit with over *$698 million* in cash, well above the range Gentile cited. *See* ¶¶143. Gentile merely called the move "prudent" and stated there was no "other underlying reason." ¶¶144, 214, 235, 247. Gentile's failure to explain this large, highly unusual advance gives rise to an inference of his knowledge of a pressing need for cash not known to the market—*i.e.* additional, serious, and undisclosed quality problems including the aft pressure bulkhead holes defect.

Third, Gentile's and Suchinski's generous incentive compensation was based in part on a "quality factor," described as "how our customers measure compliance with specifications." ¶323; *see also* ¶¶325-27. Because this bonus was a substantial part of overall compensation (exceeding Gentile's base salary in 2020-2021) Defendants can be inferred to have monitored "how our customers measure compliance with specifications," and had a motive to create the appearance of reduced defects, supporting their scienter. *See Blanford*, 794 F.3d at 306 (that defendants "benefitted in a concrete and personal way from the purported fraud" supports scienter); *Nguyen*

---

[24] Defendants argue that Gentile may have only learned of the mis-drilled holes during his preparation for the earnings call. Mtn. 25. But that is not supported by any allegation or fact subject to judicial notice, and would be an unwarranted inference in Defendants' favor. Defendants' argument fails to negate the fact that the mis-drilled holes were common knowledge within Spirit months before the earnings call (¶¶214-17, 220, 224, 235, 247), and the admission that Spirit was already working on the mis-drilled holes defect before Boeing found it. ¶173.

*v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 498 (S.D.N.Y. 2018) (bonuses tied to goal that amounted to nearly 60% and 49% of defendants' base salaries supported scienter), *aff'd in part, vacated in part, sub nom. Abramson v. Newlink Genetics Corp.*, 965 F.3d 165 (2d Cir. 2020).

Fourth, Gentile and Suchinski both left Spirit shortly after the Class Period, with Gentile departing only three weeks after he admitted that quality escapes "happen on all programs," and that "[w]e were already actively working on a fix when the escape was found." ¶173. The most plausible explanation for this timing is that Gentile's and Suchinski's departures were linked to the revelations, further adding to the strong inference of their scienter. *See In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 633 (S.D.N.Y. 2014); *comScore*, 268 F. Supp. 3d at 553.[25]

Given the totality of the allegations, and Defendants' direct involvement in Spirit's quality operations (*see infra* Part V.B), the strongest inference is that Spirit's CEO and CFO knew of Spirit's systemic quality failures, probation, and mis-drilled holes defect. *See In re Barclays PLC Sec. Litig.*, 2024 WL 757385, at *19 (S.D.N.Y. Feb. 23, 2024) (defendants' "managerial role[s]" and "direct involve[ment]" with relevant matters contributed to strong inference of scienter).

## B.     Defendants' scienter is supported by their direct involvement in Spirit's core operations.

"[A]llegations of a company's core operations . . . can provide supplemental support for allegations of scienter." *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011); *see also Kinross Gold*, 957 F. Supp. 2d at 296, 307 (considering core operations inference as supplemental evidence of scienter). Operations that "affect[] a significant source of revenue" are routinely considered core. *E.g., Okla. Firefighters Pension & Ret. Sys. v. Lexmark*

---

[25] Spirit removed multiple senior executives who were responsible for overseeing quality and Boeing programs, adding to the strong inference of widespread knowledge among Spirit's senior management of its chronic quality failures. *See* ¶272 (Samantha Marnick, COO responsible for Boeing programs); ¶275 (Kevin Matthies, responsible for Boeing programs and previously Chief Technology and Quality Officer); Ex. A (Bill Brown, Senior Vice President for Quality).

*Int'l, Inc.*, 367 F. Supp. 3d 16, 37 (S.D.N.Y. 2019). Spirit admits that its business largely depends on the sales of 737 MAX components. ¶35. Spirit's sales of 737 components to Boeing accounted for roughly half of its net revenue. *See id*. Following the 737 MAX crashes, Gentile stated that "focusing on the recent situation involving the 737 MAX," "[i]n our industry, safety is the most important priority. We focus every day on safety . . . in the products we build." ¶44. Spirit repeatedly told investors that "management's focus" was on "safety and quality." ¶¶319-21.[26]

Defendants' close involvement in these core operations further reinforces their scienter. As members of the Executive Leadership Team, Gentile and Suchinski directly oversaw the PPV Management Team that was responsible for ensuring quality procedures were followed. ¶¶83-84, 316. Gentile attended Spirit's bi-weekly safety council meetings (¶317) and held himself out as intimately involved in quality and safety. ¶¶44-45, 133, 135, 141, 173. Suchinski held himself out as knowing about the financial impacts of Spirit's quality failures. ¶¶27, 122-23, 147-48, 152-53, 158. Prior to becoming CFO, Suchinski was VP of Quality from August 2019 to January 2020 and VP for the Boeing 787 Program from February 2018 to August 2019—that is, he oversaw quality and certain Boeing programs for almost two years while Spirit was on probation with Boeing. ¶27.

Given the core importance of quality, Boeing, and the 737 MAX to Spirit, and Defendants' close involvement in such matters, the inference that Defendants knew Boeing placed Spirit on probation and that Spirit's 737 MAX fuselages frequently contained defects (including the mis-drilled bulkhead holes) is far stronger than the competing inference that they were somehow unaware of these key issues harming Spirit's business. *See Wang v. Cloopen Grp. Holding Ltd.*,

---

[26] Defendants do not contest that quality control for B737 MAX components was a core operation; they merely deny that core operations, standing alone, can supply a strong inference of scienter. *See* Mtn. 22. But Plaintiffs do not rely on core operations alone, rather it supplements Plaintiffs' other allegations, as part of the required "holistic[]" scienter analysis. *See Tellabs*, 551 U.S. at 326.

661 F. Supp. 3d 208, 234 (S.D.N.Y. 2023) (reasonable to infer that CFO, as the officer responsible for the corporation's finances, knew facts related to the company's issuance of warrants).

**C.    Widespread knowledge of systemic manufacturing problems within Spirit contributes to the strong inference of Gentile's and Suchinski's scienter.**

Former employee witnesses can establish that information, which defendants had a duty to monitor, was widely known in a company so as to create a strong inference of executives' scienter. *See Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 638 (S.D.N.Y. 2010); *Blanford*, 794 F.3d at 306 (scienter can be alleged where defendants "failed to check information they had a duty to monitor"). A strong inference of defendants' conscious recklessness is also supported where defendants could easily (and so either did, or recklessly failed to) learn information revealing the falsity of their statements. *See Barclays*, 2024 WL 757385, at *20. As the top executives for a manufacturer of critically important aircraft parts who oversaw and were directly involved in its quality operations (*see supra* Part V.B), Gentile and Suchinski had a duty to monitor the safety and quality of Spirit's products. Multiple witnesses described at length in the SAC establish that widespread disregard of quality was common knowledge within Spirit. *See generally* ¶¶179-268.

Multiple former employees establish that Spirit's probation was widely known, that it was common knowledge throughout the Class Period that unapproved processes were being used for repairs, and that slowing production for repairs was against management's directives. *See, e.g.,* ¶¶186, 189, 2015, 240, 243, 250. These witnesses stated that managers directed employees to undercount or ignore defects, which FE1 reported to Gentile. ¶¶191-99; *see also* 235-40. The SAC also identifies documents in Spirit's possession confirming the pervasive quality failures. Robert Hurt stated that Boeing and airlines consistently provided notice of defects to Spirit via Supplier Evaluation Reports, Corrective Action Reports, and Non-Conformance Records. ¶230. Commonly reported issues addressed in such notices included FOD, using expired sealant, missing bolts, and

28

skin defects. *Id*. FE1 recalls daily or weekly emails from Boeing with PowerPoint presentations outlining escapements. ¶190. The emails were sent to high-level Spirit managers who distributed the emails to all quality managers and some team leaders. *Id*.

Given the facts alleged, it would defy credulity for Defendants to argue that they were somehow unaware that Boeing placed Spirit on probation, that Spirit had to station a team of employees in *Boeing*'s factory to fix defects *after* delivery (¶¶298, 300), or that Spirit's 737 MAX fuselages routinely contained defects. And if Defendants somehow managed to *avoid* knowing these facts, it was only through conscious recklessness and deliberate failure to learn adverse information. Plaintiffs' allegations align with *Galestan v. OneMain Holdings, Inc.*, where the plaintiff successfully pled scienter through confidential witnesses who established it was common knowledge that integration initiatives were negatively affecting operations and financial performance. *See* 348 F. Supp. 3d 282, 287-290, 301 (S.D.N.Y. 2018) ("information from FEs from several geographic areas and who span different levels of the Company hierarchy, thus provid[e] corroboration from multiple sources to support an inference of scienter"); *see also, In re: EZCorp, Inc. Sec. Litigations*, 181 F. Supp. 3d 197, 209 (S.D.N.Y. 2016) (witness allegations collectively showing "a culture of unscrupulous lending practices and lax oversight that was so widespread as to be a matter of course" supported scienter).

The SAC also shows that the mis-drilled holes defect was common knowledge when Defendants claimed Spirit had resumed defect free deliveries following Boeing's disclosure of the tail fin fitting defect. Dean informed several colleagues and superiors of the mis-drilled holes beginning in October 2022, including in a written report. *E.g.,* ¶¶214-217, 220. Metals Mechanic FE3 states he learned of the mis-drilled holes defect from his team lead "toward the end of 2022" and that the defect was "common knowledge in his work building at the time." ¶247. Inspector

29

Team Lead Robert Hurt, who worked in a different department than FE3, learned of the aft pressure bulkhead issue in February 2023 and similarly stated the defect was "common knowledge" in his work area. ¶235. Moreover, Spirit's investigation into the tail fin fittings defect in March 2023, the similarities between (and close proximity of) the mis-drilled holes and the tail fin fitting defects, and Dean's repeated warnings over the course of several months regarding the importance of the mis-drilled holes, further support the inference that the mis-drilled holes defect was common knowledge within Spirit. ¶¶214-24, 227. Therefore, if Gentile and Suchinski did not undertake the minimal effort to inquire whether more defects (in addition to the tail fin fitting defect) existed when telling investors that Spirit was delivering fuselages to Boeing "with no defects" and that the "quality issue [was] resolved," they were at least consciously reckless. ¶¶138, 158.[27]

### D.    Spirit acted with corporate scienter.

To plead Spirit's scienter, Plaintiffs must allege a strong inference "that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008). Spirit's scienter is established through Gentile and Suchinski, and via other officers and managers as well. *See id.* ("it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant."). "There is no formulaic method or seniority prerequisite for employee scienter to be imputed to the corporation, but scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants." *In re Henry*

---

[27] Defendants incorrectly argue that no facts show Spirit knew any fuselages with mis-drilled holes were delivered to Boeing. Mtn. 8. Boeing was the only customer for Boeing 737 MAX fuselages. According to Robert Hurt, Spirit improperly told employees that if the elongated holes on the aft pressure bulkhead were not visible, then they did not need to be fixed. ¶235. The most logical inference is that Spirit decided to deliver the defective units to Boeing, so long as Boeing would not be able to visually detect the mis-drilled holes without first taking apart the fuselage. What other reason could there be for fixing visible defects, but not *the same* hidden ones?

*Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at \*22 (E.D.N.Y. Sept. 27, 2019); *see also Bayshore Cap. Advisors, LLC v. Creative Wealth Media Fin. Corp.*, 667 F. Supp. 3d 83, 147 (S.D.N.Y. 2023) (collecting cases imputing scienter from, *inter alia*, assistant vice president, department head, subsidiary unit's officer "below the corporate level," managing director). Furthermore, "the individual whose knowledge is imputed to the company need not be the individual who made the alleged misstatements or omissions." *Henry Schein*, 2019 WL 8638851, at \*23 (collecting cases); *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 765 n.14 (S.D.N.Y. 2017) (Engelmayer, J.).

Here, multiple high-level officers and managers, including Steve Aubuchon, Scott Grabon, Richard Cassube, and Jaime Hanson, knew of, and attempted to conceal, Spirit's pervasive defects, and their scienter is imputed to Spirit. ¶¶179, 191-93, 216 (in 2022 Senior Quality Manager Aubuchon, at the direction of Senior Director of Quality Grabon, instructed FE1 to underreport defects); ¶¶179, 237, 239 (in 2023 then-VP of Operations Grabon and Senior Director of Quality Cassube, who had assumed the role after Grabon, pressured Robert Hurt to overlook defects). Joshua Dean repeatedly reported the mis-drilled bulkhead holes defect to multiple managers including Senior PPV Quality Manager Hanson, who was involved in his wrongful termination. ¶¶202, 214-15, 220, 225-26.[28] The common practice within Spirit of firing or demoting employees who raised quality concerns further shows management's intent to conceal defects, and supports the already strong inference of scienter. *See* ¶¶194, 226, 240, 245, 260, 295; *In re Silvercorp*

---

[28] Defendants cite *Jackson v. Abernathy*, 960 F.3d 94 (2d Cir. 2020) to claim there is an insufficient link between Spirit's fraud and its managers such as Aubuchon, Grabon, Cassube and Hanson, but read in context, *Abernathy* supports Plaintiffs' position. The *Abernathy* plaintiffs based their argument on the knowledge of three employees who took steps to raise concerns about product failures, and the Second Circuit held their efforts to raise concerns negated any inference of their scienter. *Id.* at 99. At the same time, the Second Circuit recognized that "particularized allegations that senior officers ignored those employees' warnings could demonstrate that those officers acted fraudulently," while noting that no such argument was presented. *Id.* Plaintiffs here allege just that.

*Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 276 (S.D.N.Y. 2014) (company's retaliation against individual exposing fraud supported scienter).

Finally, Spirit's corporate scienter is also established because Defendants' misrepresentations were "so dramatic" that they "would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *Dynex*, 531 F.3d at 196. Defendants stated that the number of defects in their products was zero (*e.g.*, ¶¶107, 138), but in fact "escapes happened . . . on *all* programs" (¶173), and almost every fuselage contained significant defects (*e.g.*, ¶¶180, 190).

**E.      Additional facts further support the strong inference of Defendants' scienter.**

Post-Class Period reports further establish Defendants' knowledge of widespread quality failures during the Class Period. *See Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (scienter supported by post-class period events revealing facts that existed during the class period); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 491 (S.D.N.Y. 2004) (similar); *Scholastic*, 252 F.3d at 72 ("Any information that sheds light on whether class period statements were false or materially misleading is relevant."). Numerous recent developments including media reports, public whistleblower accounts, and governmental investigations, corroborate Plaintiffs' allegations of chronic quality failures at Spirit throughout the Class Period. *See supra* Part II.F.

In October 2023, Boeing made Spirit enter a "Stability Plan" to reduce defects and has recently agreed to purchase Spirit in an attempt to fix Spirit's widespread quality failures. ¶¶278-81; Ex. B. Media reports indicate that Spirit substantially contributed to the January 2024 Alaska Airlines door plug blowout by improperly installing the plug, which then had to be opened and reworked by Boeing prior to the incident. ¶¶289, 293, 296-300. The Seattle Times quoted a Boeing whistleblower stating that Spirit produces "a hideously high and very alarming number" of defects and that "Boeing's records for just the past year document a total of 392 nonconforming findings

at the location where the door plug is installed." ¶298. Spirit's quality problems are now under investigation by the DOJ, SEC, FAA, and Texas Attorney General, with reports showing Spirit failed 7 of 13 FAA product audits. ¶¶290, 304-05; Ex. D.

In a January 2024 article, The Wall Street Journal reported that "[s]ome Spirit employees said production problems were common and internal complaints about quality were ignored," and quoted the president of a Spirit employees' union stating *"[w]e have planes all over the world that have issues that nobody has found* because of the pressure Spirit has put on employees to get the job done so fast." ¶¶294-95. The Wall Street Journal further quoted the FAA's head, Michael Whitaker, as stating "[w]hatever's happened over the previous years—because *this has been going on for years*—has not worked." ¶¶294, 301. Such revelations strongly support the inference of Defendants' scienter, and render utterly implausible the competing inference that Spirit merely experienced a few "discrete" quality issues of which Defendants were innocently unaware.

## VI.    THE SAC ALLEGES LOSS CAUSATION

To plead loss causation, a plaintiff must allege "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Braskem*, 246 F. Supp. 3d at 765. "[P]laintiffs sufficiently plead loss causation when they allege that their share's price fell significantly after the truth became known." *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 100 (S.D.N.Y. 2022). Loss causation is also established through "[a] risk allegedly concealed by defendants which materialized and arguably caused the decline." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010).[29] A plaintiff need only "provide a defendant with some indication of the loss and the causal

---

[29] Defendants argue that there were no concealed risks to support a materialization theory, but their sole support is their disproven contention the statements were not misleading. *See* Mtn. 30. Defendants cite *Lentell v. Merrill Lynch & Co.*, but it is inapposite because here the relevant risks

connection that the plaintiff has in mind." *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) ("Plaintiffs' burden is not a heavy one. The complaint must simply give Defendants some indication of the actual loss suffered and of a plausible causal link.").

On April 13, 2023, Boeing revealed the tail fin fitting defect, which media reports promptly attributed to Spirit. ¶¶111-13. Spirit's stock price fell over 20% as investors began to see what Defendants already knew—that Spirit suffered from significant quality deficiencies. ¶¶115-17. This was both a partial corrective disclosure and a partial materialization of the risk concealed by Defendants' misleading statements about Spirit's product quality. *See Freudenberg*, 712 F. Supp. 2d at 202 ("partial disclosures can satisfy the loss causation requirement").

On May 3, 2023, Spirit revealed to investors for the first time certain anticipated costs of the tail fin fittings defect. ¶¶122-129. Spirit's stock price plummeted more than 12%. ¶¶129, 131. Defendants then falsely claimed Spirit had resumed shipment of conforming fuselages. ¶¶132-145. On August 2, 2023, Defendants further revealed the cash hit and disruption the tail fin fitting defect would cause for Spirit, sending its stock price down 27%, while falsely assuring investors that "all the rework" had been completed, and "the quality issue" had been "resolved." ¶¶156, 158.

On August 23, 2023, Boeing disclosed the mis-drilled holes defect. ¶¶160-162. This revealed that Defendants' prior statements, particularly those made since April 13, 2023 assuring investors that Spirit was delivering conforming fuselages, were false, and was another materialization of concealed risks relating to Spirit's chronic quality failures. ¶164. Spirit's stock

---

were not "unambiguously apparent on the face of the disclosures," and the dramatic price declines following revelations supports the inference that Defendants' fraud caused the losses rather than other factors. 396 F.3d 161, 177 (2d Cir. 2005). At the pleading stage Plaintiffs need not rule out or disaggregate other contributing causes where loss causation is plausibly alleged. *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014).

34

price dropped another 12%. ¶¶163-65.[30] Continuing to mislead investors, Spirit downplayed the problem as due to Spirit's use of "multiple suppliers" (¶167), until Gentile admitted on September 7, 2023 that Spirit itself had caused the problem, and that 70% of the fuselages already delivered to Boeing could require repairs. ¶¶169-73. Spirit's stock price dropped another 7%. ¶¶176-78.[31]

## VII.    GENTILE AND SUCHINSKI ARE ALSO LIABLE AS CONTROL PERSONS

Defendants' only argument as to the Complaint's Exchange Act Section 20(a) claims is that it fails to plead a primary violation under Section 10(b). Mtn. 30. Because the Complaint adequately pleads Section 10(b) claims, it also adequately pleads Section 20(a) claims.

## VIII.    PLAINTIFFS REQUEST LEAVE TO AMEND, IF NECESSARY

If the Court grants Defendants' motion, Plaintiffs respectfully request leave to amend. *See* FED. R. CIV. P. 15(a)(2); *Loreley*, 797 F.3d at 190 ("[w]ithout the benefit of a ruling, many a plaintiff will not . . . be in a position to weigh the practicality and possible means of curing specific deficiencies").

## IX.    CONCLUSION

For the foregoing reasons, Defendants' motion should be denied.

---

[30] Defendants argue that the market reacted to "newly discovered issues" so none of the price declines resulted from corrective disclosures. Mtn. 29. But the existence of the tail fin fittings defect began to reveal the truth about Spirit's systemic quality failures, and that Spirit was passing defective products to Boeing, contrary to Defendants' prior statements. *Freudenberg*, 712 F. Supp. 2d at 202 ("the relevant truth . . . is not that a fraud was committed per se, but that the truth about the company's underlying condition, when revealed, causes the economic loss"). Investors understood the defect was likely evidence of broader quality problems. *See* Ex. G (Bank of America analyst wrote in an April 2023 note "[w]hen you see one roach, there are likely more"). And revelation of the mis-drilled holes defect directly contradicted Defendants' prior statements.

[31] Defendants argue that Plaintiffs cannot recover for the May 3, August 2, and September 7 price declines, but on each of those dates material new information was revealed concerning the repair costs, numbers of affected planes, production delays, and financial impacts, caused by the defects. ¶¶122-28, 147-53, 170-75. These revelations "each reflected the partial materialization[s] of the concealed risk[s]," and sufficiently allege loss causation. *See Freudenberg*, 712 F. Supp. 2d at 203.

Dated: July 12, 2024

**GLANCY PRONGAY & MURRAY LLP**

By: */s/ Garth Spencer*
Garth Spencer (GS-7623)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
gspencer@glancylaw.com

Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
glinkh@glancylaw.com

**HOLZER & HOLZER, LLC**
Corey D. Holzer (*pro hac vice*)
211 Perimeter Center Parkway, Suite 1010
Atlanta, Georgia 30346
Telephone: (770) 392-0090
Facsimile: (770) 392-0029

*Co-Lead Counsel for Lead Plaintiff Hang Li and Named Plaintiffs Mike Drumright and Marco Amiotti*

36

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On July 12, 2024, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 12, 2024.


*/s/ Garth Spencer*
Garth Spencer