**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HANG LI, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>SPIRIT AEROSYSTEMS HOLDINGS, INC., TOM GENTILE III and MARK J. SUCHINSKI,<br><br>    Defendants. | No. 1:23-cv-03722-PAE |

**DEFENDANTS' REPLY IN FURTHER SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS**

CRAVATH, SWAINE & MOORE LLP
2 Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

*Counsel for Defendants*

August 12, 2024

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ......................................................................................................ii

ARGUMENT .......................................................................................................................... 1

I.      Plaintiffs Fail To Plead Any False or Misleading Statements. ........................................... 1

        A.      Plaintiffs Identify No False or Misleading Statements. .......................................... 1

        B.      Plaintiffs Incorrectly Argue That Spirit's Puffery Is Actionable............................. 4

        C.      Plaintiffs Identify Nothing False or Misleading in the Statements
                Revealing the Tail-Fin-Fitting or Misdrilled Holes Problems. ............................... 6

        D.      Spirit's Risk Disclosures Were Not False or Misleading. ...................................... 8

II.     Plaintiffs Fail to Plead Scienter as to Mr. Gentile, Mr. Suchinski or Spirit...................... 10

        A.      Allegations of Knowledge of Quality Issues Cannot Show Scienter as to
                Mr. Gentile or Mr. Suchinski. ............................................................................. 10

        B.      The Core Operations Theory Does Not Apply. ..................................................... 12

        C.      Knowledge of Low Level Employees Cannot Establish Scienter for Mr.
                Gentile or Mr. Suchinksi..................................................................................... 13

        D.      Plaintiffs Do Not Otherwise Plead Corporate Scienter........................................ 14

III.    Plaintiffs Fail To Plead Loss Causation............................................................................ 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arnold v. KPMG LLP*,
    334 F. App'x 349 (2d Cir. 2009)...................................................................................15

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007).........................................................................................10

*Chapman v. Mueller Water Prods., Inc.*,
    466 F. Supp. 3d 382 (S.D.N.Y. 2020)..........................................................................7

*City of Austin Police Ret. Sys. V. Kinross Gold Corp.*,
    957 F. Supp. 2d 277 (S.D.N.Y. Mar. 22, 2013) ........................................................13

*City of Taylor Gen. Emps. Ret. Sys. Ex rel. Situated v. Magna Int'l Inc.*,
    967 F. Supp. 2d 771 (S.D.N.Y. 2013)..........................................................................4

*ECA & Local 134 Ibew Joint Pension Trust v. Jp Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)....................................................................................4, 11

*Emps.' Ret. Sys. Of Gov't of the Virgin Islands v. Blanford*,
    794 F.3d 297 (2d Cir. 2015)........................................................................................11

*Freudenberg v. E\*TRADE Financial Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)........................................................................15

*Hall v. Johnson & Johnson*,
    2019 WL 7207491 (D.N.J. Dec. 27, 2019) ..................................................................3

*In re Banco Bradesco S.A. Sec. Litig.*,
    277 F. Supp. 3d 600 (S.D.N.Y. 2017)..........................................................................5

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
    980 F. Supp. 2d 564 (S.D.N.Y. 2013)..........................................................................8

*In re BHP Billiton Ltd. Sec. Litig.*,
    276 F. Supp. 3d 65 (S.D.N.Y. 2017).............................................................................3

*In re Centerline Holdings Co. Sec. Litig.*,
    613 F. Supp. 2d 394 (S.D.N.Y. 2009), *aff'd*, 380 F. App'x 91 (2d Cir. 2010) .........13

*In re Eletrobras Sec. Litig.*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017)..........................................................................5

*In re Lululemon Secs. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014).........................................................................1, 4

*In re Petrobras Sec. Litig.*,
 116 F. Supp. 3d 368 (S.D.N.Y. 2015)........................................................................................5

*In re Signet Jewelers Ltd. Sec. Litig.*,
 2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ...........................................................................4

*In re UBS AG Sec. Litig.*,
 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012)..........................................................................12

*In re Vale S.A. Sec. Litig.*,
 2020 WL 2610979 (E.D.N.Y. May 20, 2020) ...........................................................................3

*Jackson v. Abernathy*,
 960 F.3d 94 (2d Cir. 2020)........................................................................................................14

*Lentell v. Merrill Lynch & Co.*,
 396 F.3d 161 (2d Cir. 2005).....................................................................................................15

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
 601 U.S. 257 (2024) ...................................................................................................................1

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
 518 F. Supp. 3d 772 (S.D.N.Y. 2021)......................................................................................12

*McIntire v. China MediaExpress Holdings, Inc.*,
 927 F. Supp. 2d 105 (S.D.N.Y. 2013)......................................................................................13

*Mulligan v. Impax Laboratories*,
 Inc., 36 F. Supp. 3d 942 (N.D. Cal. 2014) ................................................................................3

*Nguyen v. New Link Genetics Corp.*,
 297 F. Supp. 3d 472 (S.D.N.Y. 2018)......................................................................................11

*Novak v. Kasaks*,
 216 F.3d 300 (2d Cir. 2000)..................................................................................................9, 10

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
 575 U.S. 175 (2015) ...................................................................................................................1

*Ong v. Chipotle Mexican Grill, Inc.*,
 294 F. Supp. 3d 199 (S.D.N.Y. 2018).......................................................................................4

*Plumbers & Steamfitters v. Canadian Imp. Bank of Com.*,
 694 F. Supp. 2d 287 (S.D.N.Y. 2010)......................................................................................13

*Sachsenberg v. Irsa Inversiones y Representaciones Sociedad Anónima*,
 339 F. Supp. 3d 169 (S.D.N.Y. 2018)......................................................................................12

*Schiro v. Cemex, S.A.B. de C.V.*,
  396 F. Supp. 3d 283 (S.D.N.Y. 2019) ......................................................................................14

*Security and Exchange Commission v. Solar Winds*,
  2024 WL 3461952 (S.D.N.Y. July 18, 2024) .........................................................7, 9, 10, 13

*Set Capital LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021) ........................................................................................................8

*The Buhrke Family Revocable Tr. v. U.S. Bancorp*,
  2024 WL 1330047 (S.D.N.Y. Mar. 28, 2024) ...........................................................................6

*Vaccaro v. New Source Energy Partners L.P.*,
  2016 WL 7373799 (S.D.N.Y. Dec. 19, 2016) ............................................................................8

*Woolgar v. Kingstone Companies, Inc.*,
  477 F. Supp. 3d 193 (S.D.N.Y. 2020) .....................................................................................12

**Statutes & Rules**

Private Securities Litigation Reform Act.......................................................................................12

Plaintiffs' opposition underscores why the Second Amended Complaint should be dismissed.  They do not dispute that they must show more than "[a]llegations of corporate mismanagement" to have an actionable claim.  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 574 (S.D.N.Y. 2014).  It is likewise undisputed that Spirit had no freestanding duty to disclose the specifics of the quality issues it encountered during its complex manufacturing process.  *See Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024).  Accordingly, Plaintiffs must identify a statement from Spirit that was misleading but for the disclosures Plaintiffs allege Spirit had to make.  As set forth below, Plaintiffs fail entirely to do so.

Plaintiffs impermissibly try to manufacture a misleading statement, placing a few words "in a vacuum" divorced of their context to suggest that Spirit made guarantees it never did.  *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015).  They also try to invoke narrow exceptions that have no application here to the general rules that statements about compliance goals are non-actionable puffery.  Plaintiffs try to argue that risk disclosures that revealed past quality issues and future risk actually concealed them.  These arguments, along with those Plaintiffs offer on scienter and loss causation, must fail.

## ARGUMENT

### I.    Plaintiffs Fail To Plead Any False or Misleading Statements.

As Spirit argued in its motion to dismiss, each category of misstatement alleged by Plaintiffs fails.  Spirit's statements about quality and customer service goals are neither false nor misleading and are largely puffery (Mot. at 10–14), and Plaintiffs allege nothing false or misleading about the remaining statements, which are risk factors in SEC filings (Mot. at 14–17) or relate to COVID-19, the tail-fin fitting issue or mis-drilled holes issue (Mot. at 18–20).

#### A.    Plaintiffs Identify No False or Misleading Statements.
Plaintiffs argue that Spirit "made demonstrably false factual assertions" about its compliance programs.  (Opp. at 11.)  But Plaintiffs' examples cherry-pick words out of context, which shows not only that the statements were not false, but also that Spirit was transparent about its efforts to fix quality issues.  For example, Plaintiffs repeatedly cite that in March 2022,

1

Kailash Krishnaswamy, Senior VP, Aftermarket said: "we build product that is the right quality, the first time that don't break". (Opp. at 9, 11.) But they ignore the immediate context, which is about the distinct aftermarket segment of Spirit's business (Mot. at 12), and all of the other statements that day, where Spirit's executive discussed its efforts to improve quality.

- Mr. Gentile referred to steps to improve quality at least three times. (Ex. 15 (2022 Investor Day Tr.) at 8 (describing changes to 737 fuselage process flow to "improve quality, delivery and productivity"); 9 (describing automation to "improve quality and productivity" and use of visual instructions for mechanics to "improve[] quality and productivity").)
- Sam Marnick, the former COO, explained changes in process that would yield "less opportunity for quality issues" and "bring much more accuracy, higher quality, less labor hours, less rework". (Ex. 15 at 16.) She further stated that while "dents and scratches" in the skin of the plane may seem like "minor issues", they are nonetheless "issues for [Spirit's] customers". (Ex. 15 at 18.)
- Kevin Mathies, Spirit's former Chief Technology and Quality Officer, explained that "the amount of things that maybe we have to necessarily rework, come down significantly" and "customer satisfaction [has] go[ne] up higher". (Ex. 15 at 31.) He also said: "[W]hen we have a quality failure, we typically don't see that as a mechanic made that failure" but "as the fact that the production system let him or her down." (Ex. 15 at 32.)

In its proper context, Mr. Kailash's comment could not possibly mislead any investor.

Plaintiffs also misleadingly claim that Spirit's Senior Vice President for Quality, Bill Brown, said Spirit's parts "go out FOD free and defect free" (Opp. at 14.) But, Mr. Brown said:

> "It's that time of year again when we come out with a video to talk to you about what can you do differently to make quality better at Spirit. . . Colleagues and coworkers work for the same company. Partners work for each other. My request in this video for all of you is to partner with me and partner with everybody around you to make quality a priority this year. Our slogan is Quality Matters. It's quality without compromise. Why? We can't risk our products ever being involved in an incident or accident. And to protect that, *we have a great quality system that ensures our parts are inspected and controlled and go out FOD free and defect free*. That's a pretty simple process. But if each of you own that process as a partner, we can make a huge difference in our quality system."

(Ex. 16 ("Raising the Bar on Quality" Video) at 1 (emphasis added).) No reasonable investor could take away from these remarks the alleged guarantee Plaintiffs trumpet.

Plaintiffs also argue that Spirit's statements were materially misleading because Spirit (i) failed to disclose that its quality issues were "so severe that Spirit's largest customer had

2

placed it on probation, which was one step away from terminating the relationship", and (ii) "actively undermined its procedures by pressuring quality personnel to ignore problems and approve defective products". (Opp. at 10–11.) But Plaintiffs identify no statements that would be shown false by omitting these alleged truths. (Mot. at 9–14.) Nor do Plaintiffs even plead that these were **concealed** truths. Spirit disclosed the risk of losing its Boeing contract, and no allegations suggest that Boeing was one step away from terminating or that anyone at Spirit made an assessment inconsistent with its risk disclosures. (Mot. at 14.) And Spirit disclosed its efforts to meet its customer demands, including by discussing efforts to improve quality in the very remarks Plaintiffs say were misleading. (*See supra* p. 2 ; Mot. at 12.)

Plaintiffs incorrectly compare this case to ones where a company knew of a **specific** problem for many years, took steps to prevent its disclosure to the public, and falsely touted the compliance systems that the company knew had not prevented the issue to assuage public concern that they knew to be valid. (*See* Opp. at 10–12.) This case does not follow that fact pattern. *See e.g.*, *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017) (holding safety assurances actionable where there was public concern about safety of specific dams, company knew the dams were dangerous, and assurances were "not mere generalities," but "quite specific representations or guarantees of some concrete fact or outcome") (internal quotation marks omitted); *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *15 (D.N.J. Dec. 27, 2019) (holding unactionable "general value-oriented statements" regarding a "commitment to consumer safety" that "do not even specifically address" or make "specific claims about the Company's quality assurance process and procedures" related to talc products, but finding actionable assurances specific to talc products when allegedly J&J knew talc products contained asbestos for decades, avoided tests that would detect asbestos and pressured regulators to keep talc off list of carcinogens); *Mulligan v. Impax Lab'ys*, Inc., 36 F. Supp. 3d 942, 946-48 (N.D. Cal. 2014) (holding assurance that issues identified by FDA would resolve promptly not puffery where defendants made changes to their process ahead of inspections but reverted, had done "little in response" to the FDA's warnings); *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, *10-

3

11 (E.D.N.Y. May 20, 2020) (holding that "vague language about Vale's general attention to risk management" was not material but holding that, after a government agency ordered an inspection, statement that dams were "impeccable" and the company had "conducted extraordinary audits on the stability conditions of our upstream dams, and no anomalies were identified" despite specific, internal safety concerns, were misleading).  Here, at most, Plaintiffs allege that Spirit's manufacturing system had quality issues; Spirit publicly and timely acknowledged those quality issues; Spirit disclosed measures to improve; and Spirit accurately reported its investigations of two specific quality issues when they became public.  "[F]ederal securities laws simply does not require the pessimism or granular information that plaintiff's theory demands."  *City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 797 (S.D.N.Y. 2013).

**B.      Plaintiffs Incorrectly Argue That Spirit's Puffery Is Actionable.**

Many of the statements on which Plaintiffs predicate their claim are non-actionable puffery.  (Mot. at 10–12.)  Spirit's statements are virtually indistinguishable from statements held to be puffery in *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 232–33 (S.D.N.Y. 2018), *Lululemon*, 14 F. Supp. 3d at 577, and many other cases.  (Mot. at 11.)

The arguments offered by Plaintiffs to the contrary do not pass muster.  Plaintiffs argue that statements about quality and safety must be material due to "greater scrutiny on quality in general, post the MAX grounding and post the pandemic and particularly on the MAX".  (Opp. at 13.)  That is wrong.  As the Second Circuit has held, it does not follow that when a metric is "undeniably important" any particular statement about it is "per se material".  *ECA, Loc. 134 IBEW Joint Pension Tr. v. Jp Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (rejecting same argument in the context of statements on a bank's reputation for integrity).

Next, Plaintiffs' argue that the fact of repetition of statements about quality moved them from mere puffery to material.  (Opp. at 13–14.)  Here too, Plaintiffs rely on a narrow line of cases (mainly relating to statements in the wake of Brazilian bribery investigation "Operation

4

Carwash")[1] in which these allegations do not fit. (Opp. at 13.) Those cases held that it is not mere puffery when a company touts internal controls to assuage concern about specific wrongdoing that has become public when the company knows that the very controls they have touted did not and are not preventing the wrongdoing. *See In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (holding statements about strength of internal controls were actionable because "for years" Petrobras awarded inflated contracts to a cartel of construction and engineering firms that made "hundreds of millions of dollars in improper and undisclosed payments to corrupt Petrobras executives and Brazilian political parties", an internal investigation uncovered this and the responsible parties were not fired, and the president of the company knew of the exact issue); *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463–64 (S.D.N.Y. 2017) (holding that assurances about code of ethics were actionable when made to reassure pubic after announcement that "Operation Car Wash" had "widened to include Eletrobras projects" and Electrobras knew of its own history of bid-rigging and bribery); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 658-60 (S.D.N.Y. 2017) (holding code of conduct not actionable because "it simply cannot be that every time a violation of that code occurs, a company is liable under federal law for having chosen to adopt the code at all" but holding actionable statements that "were not merely about compliance with the law or ethical norms, in general" but "spoke about bribery and corruption specifically" where executives took part in corrupt scheme and thus knew monitoring program touted to the public was ineffective.)

There are no comparable allegations here. Plaintiffs have alleged neither a public problem nor repeated assurances by Spirit to deny the problem. Plaintiffs point to two tragic 737 Max crashes in 2018 and subsequent groundings. (Opp. at 13–14.) But there are no allegations that Spirit bore any responsibility for those crashes or the resulting grounding; it warned extensively of the possible negative fallout and updated the public about it; and there are no

---

[1] Plaintiffs cite one case from another context, *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *12 (S.D.N.Y. Nov. 26, 2018) ("Once Defendants conveyed to the market with dogged insistence that Signet's credit portfolio was carefully managed and of a high quality, they had a duty to speak about any developments so as to render their earlier statements not misleading.") The statements in *Signet* are also nothing like those at issue here.

allegations that any of the quality issues that are at the heart of this case, the tail-fin-fitting and mis-drilled holes issues, were known at Spirit in 2018 or during the grounding.  (Mot. at 7–8.) No allegation supports the inference that Spirit was trying to reassure the public in connection with the crash and its aftermath—Plaintiffs must do more.[2]  *See The Buhrke Fam. Revocable Tr. v. U.S. Bancorp*, 2024 WL 1330047, at *10 (S.D.N.Y. Mar. 28, 2024) (rejecting argument that statements about integrity were to assuage public after another bank's scandal absent allegations to show that UBS's statements "were responding to that scandal").

### C.    Plaintiffs Identify Nothing False or Misleading in the Statements Revealing the Tail-Fin-Fitting or Misdrilled Holes Problems.

Plaintiffs fail to plead that statements related to the tail-fin fitting issue were false or misleading by virtue of not also disclosing the mis-drilled hole issue.  (Mot. at 18–19.)  Plaintiffs offer two unpersuasive responses that both fail.

*First*, Plaintiffs dispute the plain text of the statements showing that they were cabined to discussion of the tail-fin-fitting issue.  (Opp. at 15.)  For example, Plaintiffs refer to statements that Spirit "is taking units that are with no defects out of the stored units and also producing new conforming units".  (Opp. at 15–16.) (cleaned up).  But the full context shows that Spirit gave a detailed report on its inventory (including how many fuselages still needed to be repaired to remedy the tail-fin-fitting issue), none of which Plaintiffs allege to be false.  (*See* Ex. 17 (Q1 2023 Earnings Call) at 12 (explaining that Spirit had "65 units in Wichita", "35 of those are not available for current delivery because they're destined for customers that aren't taking delivery right now", and of the remaining 30, "19 do require repairs, but 11 were available to deliver".).)  No reasonable investor would interpret this as other than a report on the matter at hand, the tail-fin-fitting issue.

*Second*, Plaintiffs argue that "[b]y speaking about whether fuselages being delivered to Boeing contained defects, Defendants were required to disclose the mis-drilled holes defect".  (Opp. at 16.)  But Spirit said nothing to imply that detecting the tail-fin fitting issue somehow

---

[2] Plaintiffs cite analyst, press and market reactions (Opp. at 14), but those show surprise at bad news, not falsity.

ensured that no other defects could possibly exist. (Mot. at 18–19.) And accepting as true the allegation that Mr. Dean found an instance of the issue in October 2022 and that Spirit was already remediating it, Plaintiffs have not pleaded any facts to support an inference that Spirit believed fuselages being shipped to Boeing in fact were affected by the mis-drilled holes problem.[3] If Plaintiffs' argument were accepted, Spirit would have been required to give a list of every single defect that might be impacting fuselages, even if the defects were being fixed before shipment, to avoid misleading the public. That is not the law.

Here, this Court's recent decision in *Security and Exchange Commission v. Solar Winds* is instructive. 2024 WL 3461952 (S.D.N.Y. July 18, 2024). The Court concluded that an 8-K filed "at an early stage of [Solar Winds'] investigation, and when its understanding of that attack was evolving" was not misleading for failing to disclose that "threat actors had 'successfully exploited' the vulnerability" in its customers' products or compromised their servers when it was not pleaded that Solar Winds had reached any such conclusion. *Id.* at *45. So too here. Plaintiffs plead virtually ***no facts*** about what Spirit knew about the mis-drilled-hole issue at any time, much less when the tail-fin-fitting issue was discussed publicly.[4]

Plaintiffs' response seems to be that Spirit should have known about both problems because "both defects are located in the same 737 aft fuselage section, and both relate to improper processes used to connect structural components to the fuselage". (Opp. at 16.) But Plaintiffs hindsight pleading about what should have been known during a complicated manufacturing process do not establish what Spirit actually knew. One need look no further than Plaintiffs own allegation that Mr. Dean did not detect the tail-fin-fitting issue because he was focused on the mis-drilled-hole issue. (SAC ¶ 224.) Plaintiffs cannot urge an inference that their own pleading contradicts.

---

[3] Plaintiffs imply Mr. Gentile falsely stated that Spirit "*shared a lot of information*" (Opp. at 17), but plead no contrary facts.

[4] Plaintiffs cite an undated statement by an unnamed person that "if the elongated holes on the aft pressure bulkhead were not visible, then they did not need to be fixed". (Opp. at 30 n.27 (citing SAC ¶ 235).) Although Plaintiffs insist that this shows an effort to deceive Boeing, they plead nothing (not even who said this, or if their approach was adopted) that suggests this was anything but technical advice.

7

**D.      Spirit's Risk Disclosures Were Not False or Misleading.**

Spirit's risk disclosures are not actionable because they are of a general nature and do not "guarantee" against "defects or deficiencies". (Mot. at 16–17 (citing *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 406 (S.D.N.Y. 2020).) In addition, where, as here, "there is disclosure that is broad enough to cover a specific risk, the disclosure is not misleading simply because it fails to discuss the specific risk". (Mot. at 17 (citing *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 579 (S.D.N.Y. 2013).)

Plaintiffs argue that Spirit's risk factors concealed that "Spirit's products were plagued by consistent quality escapes such that it was unable to meet Boeing's minimum standards" and that investors would have considered quality issues "merely conjectural". (Opp. at 20.) But Spirit's risk factors warned that problems had occurred and could continue to occur. (Mot. at 17.) Such disclosures could not suggest that quality issues were merely hypothetical. *Vaccaro v. New Source Energy Partners L.P.*, 2016 WL 7373799, at *7 (S.D.N.Y. Dec. 19, 2016) ("[W]hen disclosures are clear that current events both negatively affect, and could continue to negatively affect, business, such disclosures are not mere speculation concerning future risk.").

Plaintiffs next argue that the risk factors concealed that defects were "widespread, routinely went unaddressed, and were unreported or under-reported to avoid production delays"[5]. (Opp. at 21.) But the suggestion that Spirit concealed the fact of defects is untenable in the face of Spirit's own statements publicly discussing such problems and the risk warnings explaining that issue had occurred and could occur again. (See *supra* § II.A; Mot. at 15–16, 19.) And Courts have routinely held that broad risk factors such as those challenged by Plaintiffs cannot reasonably read as guarantees on which a reasonable investor would rely. (Mot. at 17.)

Plaintiffs argue that even if Spirit's risk factors were not a "guarantee", they may still be

---

[5] As set forth in the motion, Spirit has not pleaded widespread defects that were routinely unaddressed. (Mot. at 4, 26.) In opposition, Plaintiffs cite FE1's February 2022 complaint that ***for the first time*** he was ordered to change how he reported defects on certain forms, which complaint Spirit sustained in his favor. (SAC ¶¶ 180, 186, 188, 195.) Spirit cites a vague allegation from Mr. Dean who is not alleged to work on the production line yet cites "his experience" and undated discussions with unnamed Spirit employees to allege underreporting in 2021—when FE1 alleges no such thing. (SAC ¶ 206.) Plaintiffs cite Mr. Hurt's disagreements with his supervisors and a complaint about a mechanic with a prohibited stash of supplies—noticeably absent are allegations about the resolution of any complaint by Mr. Hurt. (SAC ¶¶ 239-43, 250.)

misleading because the risks had materialized.  (Opp. at 20.)  But Plaintiffs have not pleaded a materialized risk.[6]  For instance, Plaintiffs argue that the disclosure that "*If* the Company fails to meet the quality . . . requirements of its customer, disruptions in manufacturing lines *could* result which could have a material adverse impact on the Company's ability to meet commitments to its customers" is misleading because "Spirit was *already* failing to meet Boeing's minimum quality requirements, meaning it was not meeting its commitments to customers".  (Opp. at 21.)  But alleged quality issues that required remediation does not plead that this risk had materialized.  (Mot. at 2–4.)  And as the Court's recent *Solar Winds* decision instructs, "the adequacy" of Spirit's "risk disclosure must be evaluated based on the information the company had in real time and the conclusions it reasonably drew from that information".  *SolarWinds Corp.*, 2024 WL 3461952, at *38.  Like in *Solar Winds*, Plaintiffs fail to plead that Spirit reached the conclusions of a material adverse impact.[7]  *Id.* (holding that complaint did not plausibly plead that defendant concluded there was " a systematic intrusion apt to materially damage" the company or its customers or that its "failure to so conclude reflected either a deliberate or reckless ignorance to that reality").

Plaintiffs take issue with the statement that Spirit "[f]rom time-to-time . . . *has experienced*, and *may* continue to experience, quality or delivery timing disruptions" because, according to Plaintiffs, Spirit should have said it had "severe, *ongoing* quality disruptions".  (Mot. at 24–25; Opp. at 22.) (internal quotations omitted).  There is no substantive difference between what Spirit disclosed and what Plaintiff say should have been disclosed—nor is an accurate disclosure actionable merely for lack of pessimism:  "[a]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects".  *Novak v. Kasaks*, 216

---

[6] This case is unlike *Set Capital LLC v. Credit Suisse Group AG*, which Plaintiffs cite.  (Opp. at 20, 22.)  There, Credit Suisse said it could not guarantee that its hedging activity would not impact the price of an index **but also** that it "ha[d] no reason to believe" that there would be a "material impact", when it allegedly knew just that.  996 F.3d 64, 85 (2d Cir. 2021).  The latter part, for which there is no corollary here, is what was misleading.

[7] Spirit disclosed the risk of termination by Boeing and Plaintiffs plead no change in that risk.  (Mot. at 21.)  Arguments that Spirit failed to disclose such a risk or any changes are wrong.  (Opp. at 22.)

F.3d 300, 309 (2d Cir. 2000).

Plaintiffs highlight another risk factor:  "[o]perational issues, including delays or *defects in supplier components . . . could result in significant out-of-sequence work* and increased production costs, as well as delayed deliveries".  (Opp. at 21.)  But Spirit disclosed that it had been doing out-of-sequence work during the class period.  (Ex. 18, 2021 10-K at 19.)  Plaintiffs cannot stake a securities fraud claim on an allegation that Spirit merely should have made that disclosure sooner.  *Novak*, 216 F.3d at 309 ("[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.")  Plaintiffs fail to identify any deficiency in Spirit's risk factors that could mislead a reasonable investor as to the state of the company.

**II.    Plaintiffs Fail to Plead Scienter as to Mr. Gentile, Mr. Suchinski or Spirit.**

Lack of scienter is an independent basis to dismiss Plaintiffs' claim.  Plaintiffs plead only generic "motive and opportunity to commit the fraud", not "strong circumstantial evidence of conscious misbehavior or recklessness", as they must.  (Mot. at 22, citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).)

> **A.    Allegations of Knowledge of Quality Issues Cannot Show Scienter as to Mr. Gentile or Mr. Suchinski.**

Plaintiffs argue that they can plead scienter if Gentile and Suchinski "knew of, or at least consciously and recklessly disregarded, Spirit's chronic quality failures, probation, and the mis-drilled holes defect".  (Opp. at 23, 27, 29.)  Not so—for the simple fact that no statement misleadingly suggested otherwise.  *SolarWinds Corp.*, 2024 WL 3461952, at *47 (holding that because "lack of a reference to these incidents did not make the Form 8-Ks materially misleading, it follows that Brown cannot be found to have 'recklessly failed' to disclose" them).

Next, Plaintiffs argue that they can show scienter as to Mr. Gentile and Mr. Suchinski "through mutually reinforcing allegations including internal emails, Gentile's admissions, their financial motives, and the suspect timing of their departures".  (Opp. at 23.)  But each of these alone and together do not support scienter.

10

*FE-1's Internal Emails*.  Plaintiffs argue that because FE-1's email included the phrase "excessive amount of defects", Mr. Gentile has knowledge of excessive defects.  (Opp. at 24.) That argument is at odds with a fair reading of FE-1's complaint, which was a report of an alleged policy violation related to documenting defects.  (See Dkt. 30-5 (complaining that "we were instructed by our leadership to write pickups properly with the correct number of defects as its written per our procedures" but "[O]ur manager Ryan Clark instructed us to change the way we wrote the defects" in a manner FE-1 believed "would be falsifying the documentation.").) That FE-1's complaint was sustained contradicts any suggestion that Gentile knew of and condoned improper documentation of defects, or even acquiesced in it.  (Mot. at 26.)

*Mr. Gentile's Alleged Admissions*.[8]  Plaintiffs next argue that Mr. Gentile's statements at an August 23, 2023 press conference that "escapes happened, and they happen on all programs" and Spirit was "already actively working on a fix when the escape was found" shows scienter. (Opp. at 24.)  According to Plaintiffs, "[t]he clear import of the former statement" is that Mr. Gentile "knew of *many* other quality escapes that had not been disclosed".  (Opp. at 24.)  That leap is unwarranted and it does nothing to advance Plaintiffs' case because:  (i) Spirit has no freestanding duty to disclose quality escapes; (ii) no statement anywhere in the Amended Complaint suggests that Spirit never had quality escapes; (iii) Spirit disclosed that it faced quality issues and that it was improving its processes to address them; and (iv) Plaintiffs plead no facts about when Mr. Gentile knew what about the mis-drilled holes issue.

*Financial Motives*.  Plaintiffs cursorily argue that a bonus that incorporated quality was an incentive for Mr. Gentile or Mr. Suchinski to make misstatements.  (Opp. at 25.)  But Plaintiffs plead nothing that distinguishes quality being a metric in a bonus from profit motive that is common to any businessperson and cannot support scienter.[9]  *See ECA*, 553 F.3d at 198.

---

[8] Plaintiffs attempt to rely on Mr. Gentile's statement that Spirit needed "between $300 million and $500 million to run the business" and "$280 million gave us some cushion".  (Opp. at 25.)  There are no facts alleged that contradict this statement, which suggests only that Spirit did not yet understand the scope and cost of the issue.

[9] In the cases cited by Plaintiffs, scienter was pleaded based on uncharacteristic stock sales, *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015), or paired stock sales with a specific goal linked to a bonus, *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 498 (S.D.N.Y. 2018) (bonuses were linked to enrolling 722 patients before the end of 2013 such that concealment would yield a concrete benefit of "bonuses amounting to nearly 60% and 49% of their base salaries, respectively").

*Suspect Timing*.  Plaintiffs argue that fraud can be inferred because the departures of Mr. Gentile and Mr. Suchinksi coincided with the "revelation" of the tail-fin-fitting issues.  (Opp. at 26.)  That turns the law on its head.  It is well established that "absent additional factual allegations linking the executives' resignation to the alleged fraud, such allegations are insufficient to raise a strong inference of scienter".  (Mot. at 27 (quoting *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at \*18 (S.D.N.Y. Sept. 28, 2012).)  Plaintiffs make no such showing.

As stated in Spirit's motion, "any reasonable shareholder would deem the inference of scienter to be far less compelling than an inference of, at most, non-actionable mismanagement and negligence on the part of Defendants".  (Mot. at 28 (citing *Sachsenberg v. Irsa Inversiones y Representaciones Sociedad Anónima*, 339 F. Supp. 3d 169, 185 (S.D.N.Y. 2018).)

### B.    The Core Operations Theory Does Not Apply.

Plaintiffs try to invoke the "core operations theory" to argue scienter for Mr. Gentile and Mr. Suchinski.  But, as Spirit has explained, this theory likely did not survive the Private Securities Litigation Reform Act and cannot be a basis for scienter on its own.  (Mot. at 27 (citing *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021).)  Regardless, even if Plaintiffs were correct that Mr. Gentile and Mr. Suchinski "knew Boeing placed Spirit on probation and that Spirit's 737 MAX fuselages frequently contained defects (including the mis-drilled bulkhead holes)", Plaintiffs have not pleaded any specific facts of which the men would have been aware at any particular time that contradict their public statements.  (Opp. at 27.)  For instance, even if Plaintiffs were entitled to an inference that individual defendants knew that Mr. Dean found instances of the mis-drilled hole issue in October 2022 (Compl. ¶ 106), Plaintiffs may not skip over specific allegations of how the problem was understood after the alleged initial discovery and open attempts to remediate the issue and simply rely on hindsight to argue that Mr. Gentile and Mr. Suchinski must have known that the problem had not been resolved and was impacting  products shipped to Boeing—a fact that ***not even*** Mr. Dean is alleged to have known.  Such general allegations cannot suffice because they do not plead "specific contradictory information [that] was available to the

12

defendants" when "they made their misleading statements".  *Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 237 (S.D.N.Y. 2020) (cleaned up).[10]

### C. Knowledge of Low Level Employees Cannot Establish Scienter for Mr. Gentile or Mr. Suchinksi.

Plaintiffs relatedly argue that they can allege scienter because the "mis-drilled holes defect was common knowledge when Defendants claimed Spirit had resumed defect free deliveries following Boeing's disclosure of the tail fin fitting defect."  (Opp. at 29.)  But, as explained in Spirit's motion, that argument is a non-starter where Plaintiffs do not allege that any specific information was actually transmitted to the executives.  (Mot. at 23–25 (citing, *inter alia*, *Plumbers & Steamfitters v. Canadian Imp. Bank of Com.*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010); *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 299 (S.D.N.Y. 2013) (holding scienter not pled because "even stark differences [of opinion] between employees do not reveal scienter", in particular "where, as here, no pleading specifically alleges that the contrary views were communicated to the company or its officers")).)

Plaintiffs pivot to argue that they have pleaded "conscious disregard" because Mr. Gentile and Mr. Suchinski "did not undertake the minimal effort to inquire whether more defects (in addition to the tail fin fitting defect) existed" before saying that Spirit was delivering fuselages to Boeing "with no defects" and that the "quality issue [was] resolved".  (Opp. at 30.)  But, as set forth above, Mr. Gentile and Mr. Suchinski's comments about a lack of defects and resolving the quality are fairly read to pertain only to the tail-fin-fitting issue that was the subject of their remarks.  (*See supra* § II.C.)  It cannot be "conscious disregard" that they did not seek out information on a topic that was not under discussion and about which they had no duty to disclose.  *See SolarWinds Corp.*, 2024 WL 3461952, at *47 ("[W]hen it is arguable that [defendants] did not have a duty to disclose such information, [d]efendants' conduct cannot be described as 'highly unreasonable,' nor can it be said that their conduct 'represents an extreme departure from the standards of ordinary care.") (cleaned up); *see also In re Centerline Holdings*

---

[10] Likewise, "boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their. . .executive positions are insufficient to plead scienter".  *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 128 (S.D.N.Y. 2013).

*Co. Sec. Litig.*, 613 F. Supp. 2d 394, 401 (S.D.N.Y. 2009), *aff'd*, 380 F. App'x 91 (2d Cir. 2010). And, as above, absent specific allegations about what was known regarding the mis-drilled holes issue–besides that the problem was known among the mechanics that would be tasked with solving it—the Complaint fails to plead what such an inquiry would have revealed and when.[11]

### D.    Plaintiffs Do Not Otherwise Plead Corporate Scienter.

Plaintiffs argue that they may plead scienter based on "multiple high-level officers and managers, including Steve Aubuchon, Scott Grabon, Richard Cassube, and Jaime Hanson, knew of, and attempted to conceal, Spirit's pervasive defects, and their scienter is imputed to Spirit". (Opp. at 31.)  But *Jackson v. Abernathy*, which Plaintiffs relegate to a footnote and badly misconstrue (Opp. at 31 n.28), forecloses that argument.  960 F.3d 94 (2d Cir. 2020).  That case holds that an allegation that some employees "knew of problems" does not provide the needed "connective tissue between those employees and the alleged misstatements".  *Id.* at 99.  On the facts there, such connective tissue could have been provided by allegations that "***senior officers***", the CEO and board members that were alleged to be involved in the making of statements, "ignored those employees' warnings".  *Id.* (emphasis added). Allegations about the employees listed by Plaintiffs, who had no alleged role in any statements, and whose position in the hierarchy is not clear from the Amended Complaint, provides no "connective tissue" to the challenged statements[12] that take this from mismanagement to fraud attributable to Spirit.

As a last ditch effort, Plaintiffs argue that corporate scienter can be found on the basis of a "dramatic" statement that "the number of defects in their products was zero" when in fact "escapes happened . . . on *all* programs" and almost every fuselage contained significant defects. (Opp. at 31–32.)  Each turn of that argument fails.  Spirit never claimed "zero" defects[13] and was

---

[11] Plaintiffs' attempt to rely on after-the-fact news reports fails for a similar reason.  (Mot. at 32–33.)  And, the news articles, like several of Plaintiffs' own allegations, show Plaintiffs' assertion that Spirit concealed defects from Boeing to be unsupported.  (Opp. at 32 (citing allegations from Boeing whistleblower that Spirit's products had "many" defects); Mot. at 3 (collecting allegations related to Boing's daily oversight of Spirit's quality processes).)

[12] Plaintiffs suggestion that these employees have a role in discipline and termination (Opp. at 31) is not sufficient either.  Because the sole disciplinary action escalated to the Individual Defendants, FE1's ethics complaint, was resolved in FE1's favor, Plaintiffs have not pleaded that Spirit was engaged in "deliberate fraud and [not] an unfortunate (yet unintentional) error caused by mere mismanagement".  *Abernathy*, 960 F.3d at 98.

[13] The only mention of "zero" in the complaint is a statement that "***Spirit is dedicated to a Zero-Defect target, with no escapements to our customers***".  (SAC ¶ 70.)  That is plainly puffery.  *See Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 298 (S.D.N.Y. 2019) (calling aspirational statements about commitments "classic puffery").

forthcoming about quality issues in its complex manufacturing process, and Plaintiffs have not pleaded that "every fuselage contained significant defects". (*See* Opp. at 19, 32.)

## III.    Plaintiffs Fail To Plead Loss Causation.

Plaintiffs' allegations show that the market did not react to any revelation that Spirit's prior statements were false, but instead to decreased production and the cost of remediation from newly discovered issues. (Mot. at 29–30.) In opposition, Plaintiffs recite the stock drops on which they rely—with little else. They argue that the drops reflect the market learning "that Spirit suffered from significant quality deficiencies" (Opp. at 34), but can point to no prior statement corrected by that supposed learning. Plaintiffs argue that the August 23, 2023 stock drop revealed that statements "made since April 13, 2023 assuring investors that Spirit was delivering conforming fuselages, were false" (Opp. at 34), but, without allegations that the statement was ***knowingly false when made***, the discovery that some fuselages did not conform is just bad news, not revelation of a concealed fraud. Nor do Plaintiffs identify any concealed risk that came to fruition on any day for which they seek damages.[14] "[W]here (as here) substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk, a plaintiff must allege []facts sufficient to support an inference that it was defendant's fraud—rather than other salient factors—that proximately caused plaintiff's loss." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005). Plaintiffs' effort to distinguish that case falls flat. (Opp. at 33 n.29.) Spirit's clear disclosures of risks that it might not meet its safety goals, which could harm its reputation and result in loss of significant customers like Boeing, mean *Lentell* forecloses Plaintiffs' claims. (Mot. at 5–6.)

Plaintiffs' complaint should be dismissed. And, because they cannot cure the complaint's deficiencies—and have not posited how they could—leave to amend should not be granted. *See Arnold v. KPMG LLP*, 334 F. App'x 349, 352 (2d Cir. 2009).

---

[14] *Freudenberg v. E*TRADE Fin. Corp*, (cited Opp. at 33-34), is inapposite because, in contrast to E*Trade's concealment of the quality of its mortgage investment, Spirit disclosed past quality issues, that they may recur and the business risks that could follow. *Compare* 712 F. Supp. 2d 171, 179 (S.D.N.Y. 2010) *with* Mot. 4-7, 14-15.

August 12, 2024

Respectfully submitted,

CRAVATH, SWAINE & MOORE LLP

by
/s/ *J. Wesley Earnhardt*
J. Wesley Earnhardt
Michael P. Addis
Members of the Firm

2 Manhattan West
    375 Ninth Avenue
        New York, NY 10001
            (212) 474-1000
            wearnhardt@cravath.com
            maddis@cravath.com

*Counsel for Defendants*

16