**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HANG LI, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SPIRIT AEROSYSTEMS HOLDINGS, INC., TOM GENTILE III, and MARK J. SUCHINSKI,<br><br>Defendants. | Case No. 1:23-cv-03722-PAE |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION**
**SETTLEMENT AND PLAN OF ALLOCATION**

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ...................................................................................... 1

II.     PROCEDURAL AND FACTUAL HISTORY .................................................................. 5

III.    THE STANDARDS FOR FINAL APPROVAL UNDER RULE 23(e) AND
        *GRINNELL*.................................................................................................................... 5

IV.     ARGUMENT.................................................................................................................... 7

        A.      The Settlement is Fair, Reasonable, and Adequate in Light of the Factors
                Outlined by Rule 23(e)(2) and the Remaining *Grinnell* Factors ........................... 7

                1.      Plaintiffs and Lead Counsel Adequately Represented the Class ................ 7

                2.      The Settlement is the Result of Arm's Length Negotiations ...................... 8

                3.      The Settlement is a Very Good Result in Light of its Benefits and
                        the Risks of Continued Litigation ................................................................. 9

                        a.      Complexity, Expense and Duration of Litigation ........................... 9

                        b.      Establishing Liability .................................................................... 10

                        c.      Risks to Proving Loss Causation and Damages............................ 12

                        d.      Risks of Maintaining Class Action Status .................................... 14

                        e.      Range of Reasonableness in Light of the Best Possible
                                Recovery and Attendant Risks of Litigation................................. 15

                4.      Rule 23(e)(2)(C)(ii)-(iv)............................................................................ 16

                5.      The Settlement Treats all Settlement Class Members Equitably.............. 18

                6.      The Remaining *Grinnell* Factors Weigh in Favor of Final Approval....... 18

        B.      Certification of the Settlement Class is Warranted............................................... 20

        C.      The Court Should Approve the Plan of Allocation................................................ 21

        D.      The Notice Program Satisfies the Requirements of Due Process, Rule 23
                and the PSLRA ..................................................................................................... 24

V.      CONCLUSION.............................................................................................................. 25

## TABLE OF AUTHORITIES

### CASES

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
222 F.3d 52 (2d Cir. 2000).................................................................................................. 7

*Beach v. JPMorgan Chase Bank, N.A.*,
2020 WL 6114545 (S.D.N.Y. Oct. 7, 2020) ....................................................................... 6

*Becker v. Bank of New York Mellon Trust Co., N.A.*,
2018 WL 6727820 (E.D. Pa. Dec. 21, 2018) .................................................................... 16

*Chatelain v. Prudential-Bache Sec., Inc.*,
805 F. Supp. 209 (S.D.N.Y. 1992) .................................................................................... 14

*Chavarria v. New York Airport Serv., LLC*,
875 F. Supp. 2d 164 (E.D.N.Y. 2012) ............................................................................... 21

*Christine Asia Co., Ltd. v. Yun Ma*,
2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019) ........................................... 12, 18, 21, 24

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974)............................................................................................ 6, 9

*D'Amato v. Deutsche Bank*,
236 F.3d 78 (2d Cir. 2001)................................................................................................. 8

*Davenport v. Elite Model Mgmt. Corp.*,
2014 WL 12756756 (S.D.N.Y. May 12, 2014) ................................................................. 16

*Dura Pharms., Inc., v. Broudo*,
544 U.S. 336 (2005).......................................................................................................... 12

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
594 U.S. 113 (2021).......................................................................................................... 14

*In re "Agent Orange" Prods.* Liab. Litig.,
597 F. Supp. 740 (E.D.N.Y. 1984) ................................................................................... 15

*In re Advanced Battery Techs., Inc. Secs. Litig.*,
298 F.R.D. 171 (S.D.N.Y. 2014) ...................................................................................... 25

*In re AOL Time Warner, Inc.*,
2006 WL 903236 (S.D.N.Y. Apr. 6, 2006)........................................................................ 19

*In re Bear Stearns Cos., Inc. Sec. Derivative & ERISA Litig.*,
909 F. Supp. 2d 259 (S.D.N.Y. 2012)...................................................................... 9, 18, 21

*In re Blech Sec. Litig.*,
2000 WL 661680 (S.D.N.Y. May 19, 2000) ............................................................. 20

*In re Boeing Co. Sec. Litig.*,
2025 WL 2428481 (E.D. Va. Mar. 7, 2025)............................................................. 14

*In re China Sunergy Sec. Litig.*,
2011 WL 1899715 (S.D.N.Y. May 13, 2011) ........................................................... 20

*In re Citigroup, Inc. Sec. Litig.*,
965 F. Supp. 2d 369 (S.D.N.Y. 2013)...................................................................... 18

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
2007 WL 2230177 (S.D.N.Y. July 27, 2007) ........................................................... 7

*In re Facebook, Inc. IPO Sec. and Derivative Litig.*,
2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015)............................................................ 13

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009)...................................................................................... 12

*In re Gilat Satellite Networks, Ltd.*,
2007 WL 2743675 (E.D.N.Y. Sept. 18, 2007) ........................................................ 12

*In re GSE Bonds Antitrust Litig.*,
414 F. Supp. 3d 686 (S.D.N.Y. 2019)................................................................. 9, 10, 15

*In re Heritage Bond Litig.*,
2005 WL 1594403 (C.D. Cal. June 10, 2005) ......................................................... 24

*In re IMAX Sec. Litig.*,
283 F.R.D. 178 (S.D.N.Y. 2012) ......................................................................... 19, 21

*In re IPO Sec. Litig.*,
544 F. Supp. 2d 277 (S.D.N.Y. 2008)...................................................................... 13

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ...................................................... 13, 22

*In re Metlife Demutualization Litig.*,
689 F. Supp. 2d 297 (E.D.N.Y. 2010) ..................................................................... 19

iii

*In re Millennial Media, Inc. Sec. Litig.*,
  2015 WL 3443918 (S.D.N.Y. May 29, 2015) .................................................................... 3

*In re Mut. Funds Inv. Litig.*,
  2010 WL 2342413 (D. Md. May 19, 2010) ...................................................................... 25

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
  187 F.R.D. 465 (S.D.N.Y. 1998) ...................................................................................... 8

*In re Omnivision Tech.,* Inc.,
  559 F. Supp. 2d 1036 (C.D. Cal. 2008) ......................................................................... 21

*In re Patriot Nat'l, Inc. Sec. Litig.*,
  828 Fed. Appx. 760 (2d Cir. 2020)................................................................................... 7

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
  330 F.R.D. 11 (E.D.N.Y. 2019)........................................................................................ 6

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2020 WL 4196468 (S.D.N.Y. July 21, 2020) .................................................................. 9

*In re Splunk Inc. Sec. Litig.*,
  2024 WL 923777 (N.D. Cal. Mar. 4, 2024)..................................................................... 18

*In re Stable Road Acquisition Corp.*,
  2024 WL 3643393 (C.D. Cal. Apr. 23, 2024) ....................................................... 16, 18, 21

*In re Telik, Inc. Sec. Litig.*,
  576 F. Supp. 2d 570 (S.D.N.Y. 2008)............................................................................. 21

*In re Veeco Instruments Inc. Sec. Litig.*,
  2007 WL 4115809 (S.D.N.Y. 2007)................................................................................ 24

*In re WorldCom, Inc. Sec. Litig.*,
  388 F. Supp. 2d 319 (S.D.N.Y. 2005).............................................................................. 21

*Lea v. Tal Educ. Grp.*,
  2021 WL 5578665 (S.D.N.Y. Nov. 30, 2021).................................................................. 24

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
  601 U.S. 257 (2024)........................................................................................................... 2

*Maley v. Del Glob. Techs. Corp.*,
  186 F. Supp. 2d 358 (S.D.N.Y. 2002).............................................................................. 17

*Mauss v. NuVasive, Inc.*,
2018 WL 6421623 (S.D. Cal. Dec. 12, 2018)................................................................... 25

*Moses v. New York Times Co.*,
79 F.4th 235 (2d Cir. 2023) ............................................................................................. 8

*Pearlstein v. BlackBerry Ltd.*,
2022 WL 4554858 (S.D.N.Y. Sept. 29, 2022).................................................................. 12

*Sec. & Exch. Comm'n v. Solarwinds Corp.*,
741 F. Supp. 3d 37 (S.D.N.Y. 2024)................................................................................. 10

*Shapiro v. JPMorgan Chase & Co.*,
2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) .................................................................. 2

*Steamfitters Local 449 Pension Plan v. AT&T Inc.*,
2022 WL 17587853 (2d Cir. Dec. 13, 2022) .................................................................... 10

*Vaccaro v. New Source Energy Partners L.P.*,
2017 WL 6398636 (S.D.N.Y. Dec. 14, 2017) .................................................................. 19

## STATUTES

15 U.S.C. § 78u-4(a)(7) ......................................................................................................... 25

## RULES

FED. R. CIV. P. 23(c)(2)(B) ..................................................................................................... 24, 25

FED. R. CIV. P. 23(e)(2)........................................................................................................... 5, 6, 7, 18

FED. R. CIV. P. 23(e)(2)(C)(ii)-(iv) ........................................................................................ 16

Fed.R.Civ.P. 23(a) and 23(b)(3) .......................................................................................... 21

Rule 23 ................................................................................................................................... 9, 24, 25

Rule 23 (e)(2)(C)(ii)............................................................................................................... 16

Rule 23(b)(3)........................................................................................................................... 24

Rule 23(e) of the Federal Rules of Civil Procedure.............................................................. 1

Rule 23(e)(2)(A) .................................................................................................................... 7

Rule 23(e)(2)(B)..................................................................................................................... 8

Rule 23(e)(2)(C)..................................................................................................... 9

Rule 23(e)(2)(C)(i).................................................................................................. 9

Rule 23(e)(2)(C)(iii)............................................................................................... 17

Rule 23(e)(2)(C)(iv)............................................................................................... 17

Rule 23(e)(2)(D) .................................................................................................... 18

Rule 23(e)(3)............................................................................................................ 6

Rule 23(f) ................................................................................................................. 9

Rules 23(a) and (b)(3)............................................................................................. 21

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Court-appointed lead plaintiff Hang Li ("Lead Plaintiff") and additional named plaintiffs Mike Drumright and Marco Amiotti (collectively, with Lead Plaintiff, "Plaintiffs"), on behalf of themselves and the Settlement Class, respectfully submit this memorandum in support of their motion for: (i) final approval of the proposed Settlement set forth in the Stipulation and Agreement of Settlement dated August 4, 2025 (the "Stipulation") (ECF No. 64-1); and (ii) approval of the proposed plan of allocation for the Settlement proceeds (the "Plan of Allocation").[1]

## I.    PRELIMINARY STATEMENT

Plaintiffs and Defendants[2] have agreed to settle all claims in the Action in exchange for a non-reversionary, all cash payment of $29,200,000 (the "Settlement Amount") for the benefit of the Settlement Class.  This is a very good result for the Settlement Class under the circumstances, and it was secured in a procedurally fair manner.

The $29.2 million represents a recovery of approximately 1.9% of the *maximum* recoverable damages related to the pending claims, or 2.9% of Lead Counsel's estimate of reasonably recoverable damages when taking into account certain confounding information released on some of the alleged corrective disclosure dates that could discount damages attributable to Spirit's stock price declines.  ¶¶83-84.  Under either scenario, the recovery exceeds the 1.3% median settlement value for securities class actions with comparable maximum damages.

---

[1] Unless otherwise defined herein, all capitalized terms herein have the same meaning as set forth in the Stipulation, or the concurrently filed Joint Declaration of Garth Spencer and Corey D. Holzer in Support of: (I) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Joint Declaration" or "Joint Decl.").  Citations herein to "¶__" and "Ex. __" refer, respectively, to paragraphs in, and exhibits to, the Joint Declaration.

[2] Defendants are Spirit AeroSystems Holdings, Inc. ("Spirit" or the "Company"), Tom Gentile III and Mark J. Suchinski (collectively, "Individual Defendants"; together with Spirit, "Defendants"; and together with Plaintiffs, the "Parties").

*See* Ex. 1, NERA Report excerpts at p. 27 (Fig. 23-24).

The Settlement is all the more favorable when balanced against the many risks of continued litigation. While Plaintiffs and their counsel believe the claims are meritorious, they recognize the substantial challenges to establishing liability, proving damages, and achieving (and collecting upon) a greater recovery. Among the many risks to Plaintiffs' case were that: (i) Defendants had raised numerous non-frivolous arguments challenging the pleadings (ECF Nos. 37, 43); (ii) the case was being litigated under the discovery stay and heighted pleading standards of the PSLRA; (iii) 61% of motions to dismiss in PSLRA cases are granted in full (with or without prejudice), and an additional 20% are granted in part (Ex. 1, at 17 (Fig. 15)); (iv) Spirit has twice previously obtained dismissal of securities fraud class action lawsuits relating to production issues (¶52); (v) neither of the Individual Defendants are alleged to have made suspicious sales of Spirit stock during the Settlement Class Period (Joint Decl., ¶26 n.3); (vi) following Plaintiffs' filing of the operative complaint, the Supreme Court issued a decision that negatively impacted the case (¶53);[3] (vii) Joshua Dean, one of Plaintiffs' most important witnesses, if not the most important, suddenly and unexpectedly died (¶61); (viii) each of the May 3, August 2, and September 7, 2023 corrective disclosures was accompanied by potentially significant confounding information (¶¶67-73); and (viii) Spirit has incurred hundreds of millions of dollars in net losses per year since the beginning of the Settlement Class Period, and since the third quarter of 2024 Spirit's financial statements have included a warning expressing "substantial doubt about the Company's ability to continue as a going concern." ¶82; *see generally* Joint Decl. at Sec. III. Considering the risks, costs, and delays of continued litigation, including the substantial risk of no recovery whatsoever and potential ability-to-pay issues, the Settlement is substantively fair. *See Shapiro v. JPMorgan*

---

[3] *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257 (2024).

*Chase & Co.*, 2014 WL 1224666, at *11 (S.D.N.Y. Mar. 24, 2014) (settlement amount must be judged "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case").[4]

The Settlement was also negotiated through a procedurally fair process. Prior to reaching the Settlement, Lead Counsel had, *inter alia*:

- drafted and filed the initial complaint in the Action (ECF No. 1);

- successfully moved for the appointment of Lead Plaintiff pursuant to the PSLRA (ECF No. 22);

- conducted a comprehensive investigation of the claims asserted in the Action, which included, among other things: (a) reviewing and analyzing numerous sources of public information, including (i) Spirit's filings with the SEC, (ii) reports prepared by securities and financial analysts, and news articles concerning Spirit, and (iii) Spirit's investor call transcripts, press releases and other public statements made by Defendants prior to, during, and after the Settlement Class Period; (b) locating and interviewing former employees with the assistance of an investigator to obtain relevant witness information in accordance with the best practices set forth in the Court's opinion in *In re Millennial Media, Inc. Sec. Litig.*, 2015 WL 3443918 (S.D.N.Y. May 29, 2015); and (c) consulting with an expert in loss causation and damages;

- utilized the comprehensive investigation and additional research to draft and file the Amended Class Action Complaint for Violations of the Federal Securities Laws ("FAC") (ECF No. 25);

- reviewed Defendants' motion to dismiss the FAC, and continued the investigation, which included interviewing additional former Spirit employees, monitoring Company-related news and SEC filings, and submitting and pursuing a Freedom of Information request that involved, *inter alia*, initiating a lawsuit against the FAA (*see Glancy Prongay & Murray LLP v. Federal Aviation Administration*, Case No. 23-cv-8119 (C.D. Cal.));

- drafted and filed the detailed 100-page Second Amended Class Action Complaint for Violations of the Federal Securities Laws (the "SAC") (ECF No. 30);

- researched, drafted and filed an opposition to Defendants' motion to dismiss;

---

[4] Unless otherwise indicated, all emphasis is added, and all internal quotation marks and citations are omitted from citations herein.

- exchanged mediation briefs containing detailed analyses of the strengths, risks, and potential issues in the litigation with Defendants, participated in an unsuccessful full-day mediation session with a well-respected mediator of complex cases—former U.S. District Court Judge Layn R. Phillips—and engaged in weeks of further negotiations that culminated in an agreement to settle the Action for $29.2 million;[5]

- drafted, negotiated, and executed a confidential settlement Term Sheet, including a provision enabling Plaintiffs' counsel to conduct informal discovery to further evaluate the fairness, reasonableness, and adequacy of the Parties' agreement in principle and that provided a mechanism by which Plaintiffs could withdraw from the Settlement;

- drafted, negotiated and entered into a stipulation providing for confidential treatment of the discovery materials produced by Defendants;

- conducted informal discovery, which consisted of reviewing over 59,000 pages of material produced by Spirit and an interview with a senior Spirit employee;

- drafted and then negotiated the terms of the Stipulation (including the exhibits thereto) and Supplemental Agreement with Defendants' Counsel; and

- worked with a damages expert to craft a plan of allocation that treats Plaintiffs and all other members of the proposed Settlement Class fairly. *See generally* Joint Decl. at Sec. II.

The Settlement is, therefore, the result of arms-length negotiations, conducted by informed and experienced counsel, in conjunction with a well-respected neutral. In other words, there was no collusion, and the process by which the Settlement was reached was procedurally fair. Because the Settlement is substantively fair, and was achieved in a procedurally fair manner, final approval is appropriate.

Plaintiffs also move for approval of the proposed Plan of Allocation of the Net Settlement Fund. The Plan of Allocation was developed in conjunction with Plaintiffs' consulting damages expert and is designed to distribute the proceeds of the Net Settlement Fund fairly and equitably to Settlement Class Members while taking into account Lead Counsel's assessment of the strengths

---

[5] *See* Declaration of Layn R. Phillips in Support of Final Approval of Class Action Settlement ("Phillips Decl."), filed herewith as Ex. 5, at ¶¶9-15.

4

and weaknesses associated with the alleged corrective disclosures. No Settlement Class Member

is favored over another under the proposed Plan; rather, all Settlement Class Members—including

Plaintiffs—are treated in the same manner. *See generally* Joint Decl. at Sec. V. Since the Plan of

Allocation is fair and reasonable, it too should be approved.

Lastly, Plaintiffs seek final certification of the Settlement Class. The Court provisionally

certified the Settlement Class in its Preliminary Approval Order (*see* ECF No. 67; "Preliminary

Approval Order"), and no pertinent changes have transpired that would upset or alter the Court's

earlier findings and determinations. The Court should, therefore, certify the Settlement Class for

settlement purposes.

## II.     PROCEDURAL AND FACTUAL HISTORY

The Joint Declaration is an integral part of this submission. For the sake of brevity, the

Court is respectfully referred to it for a detailed discussion of, *inter alia*: the Action's history; the

nature of the claims asserted; the negotiations leading to the Settlement; the risks and uncertainties

of continued litigation; a summary of the services Plaintiffs' Counsel provided for the benefit of

the Settlement Class; and additional information on the factors that support final approval of the

Settlement and the Plan of Allocation.

## III.    THE STANDARDS FOR FINAL APPROVAL UNDER RULE 23(e) AND *GRINNELL*

A class action settlement must be presented to the Court for approval, and it should be

approved if the Court finds it "fair, reasonable, and adequate." FED. R. CIV. P. 23(e)(2). Rule

23(e)(2)—which governs final approval—requires courts to consider, in determining whether a

proposed settlement is fair, reasonable, and adequate, whether:

(A)     the class representatives and class counsel have adequately represented the
        class;

(B)     the proposal was negotiated at arm's length;

(C)    the relief provided for the class is adequate, taking into account:

  (i)    the costs, risks, and delay of trial and appeal;

  (ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

  (iii)    the terms of any proposed award of attorneys' fees, including timing of payment; and

  (iv)    any agreement required to be identified under Rule 23(e)(3); and

(D)    the proposal treats class members equitably relative to each other.

These Rule 23(e)(2) factors "add to, rather than displace, the *Grinnell* factors" traditionally considered by courts within the Second Circuit. *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 330 F.R.D. 11, 29 (E.D.N.Y. 2019). The Second Circuit's traditional factors utilized to evaluate the propriety of a class action settlement (certain of which overlap with Rule 23(e)(2)) are still relevant:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974); *see also Beach v. JPMorgan Chase Bank, N.A.*, 2020 WL 6114545 (S.D.N.Y. Oct. 7, 2020) (evaluating settlement based on factors set forth in FED. R. CIV. P. 23(e)(2) and *Grinnell*).[6] As set forth below, the proposed Settlement satisfies the criteria for final approval under the Rule 23(e)(2) factors, as well as the relevant, non-duplicative *Grinnell* factors.

---

[6] Plaintiffs will address the Settlement Class's reaction in their reply brief, which is due after the objection and opt-out deadlines have passed.

6

## IV.    ARGUMENT

### A.    The Settlement is Fair, Reasonable, and Adequate in Light of the Factors Outlined by Rule 23(e)(2) and the Remaining *Grinnell* Factors

#### 1.    Plaintiffs and Lead Counsel Adequately Represented the Class

Rule 23(e)(2)(A) requires the Court to consider whether the "class representatives and class counsel have adequately represented the class." In assessing adequacy, "the primary factors are whether the class representatives have any interests antagonistic to the interests of other class members and whether the representatives have an interest in vigorously pursuing the claims of the class." *In re Patriot Nat'l, Inc. Sec. Litig.*, 828 Fed. Appx. 760, 764 (2d Cir. 2020) (citing cases); *see also Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) ("Generally, adequacy of representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and; 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation.").

First, Plaintiffs' claims are typical of and coextensive with the claims of the Settlement Class, and they have no antagonistic interests. Plaintiffs suffered substantial losses as a result of Defendants' allegedly wrongful conduct, and their interest in obtaining the largest possible recovery is, therefore, aligned with the other Settlement Class Members. *See Patriot*, 828 Fed. Appx. at 764 (finding adequacy where "lead plaintiffs were sufficiently motivated to recover as much as possible for each class member."). In addition, Plaintiffs diligently oversaw the litigation and communicated with Plaintiffs' Counsel concerning case developments, including settlement. *See* Ex. 2, ¶¶3-7; Ex. 3, ¶¶3-7; Ex. 4, ¶¶3-7. Plaintiffs' active participation in the Action reinforces the reasonableness of the Settlement. *See In re EVCI Career Colls. Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *4 (S.D.N.Y. July 27, 2007) ("[U]nder the PSLRA, a settlement reached under the supervision of appropriately selected lead plaintiffs is entitled to an even greater presumption

7

of reasonableness.").[7]

Second, Plaintiffs retained counsel who are highly experienced in securities litigation, and who have a long and successful track record of representing investors in such cases. *See* Exs. 19-C and 20-C (Glancy Prongay & Murray LLP ("GPM") and Holzer & Holzer LLC ("H&H") firm résumés). As noted above and discussed in detail in the Joint Declaration, Plaintiffs' Counsel vigorously prosecuted the Settlement Class's claims. The Parties were acutely aware of the strengths and weaknesses of the case, including the motion to dismiss arguments and the key factual issues that would determine the outcome if the case proceeded to summary judgment or trial, prior to settling the Action. *See* Joint Decl., Secs. II-III (detailing Lead Counsel's extensive investigation into Spirit, briefing on the motion to dismiss, hard-fought mediation efforts, and risks of continued litigation); *see also In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998) (courts have consistently given "great weight . . . to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation").

### 2.    The Settlement is the Result of Arm's Length Negotiations

Rule 23(e)(2)(B) requires the Court to consider whether "the proposal was negotiated at arm's length." Here, the Parties engaged in a thorough mediation process with Judge Phillips. *See* Phillips Decl., ¶¶9-15; Joint Decl., ¶¶36-39. The arm's-length nature of the settlement negotiations, and the involvement of a mediator with substantial experience mediating complex securities class actions, support the conclusion that the Settlement is fair and was achieved free of collusion. *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (a "mediator's involvement in . . . settlement negotiations helps to ensure that the proceedings were free of

---

[7] While arm's-length negotiations no longer entitle a settlement to a *presumption* of reasonableness, "the arms-length quality of the negotiations remain a factor in favor of approving the settlement." *Moses v. New York Times Co.*, 79 F.4th 235, 243 (2d Cir. 2023).

collusion and undue pressure"); *see also In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at *3 (S.D.N.Y. July 21, 2020) (approving settlement that was the "product of a mediator's recommendation by Judge Phillips"); *In re Bear Stearns Cos., Inc. Sec. Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 265 (S.D.N.Y. 2012) (finding a settlement fair where the parties engaged in "arm's length negotiations," including mediation before "retired federal judge Layn R. Phillips, an experienced and well-regarded mediator of complex securities cases").

### 3. The Settlement is a Very Good Result in Light of its Benefits and the Risks of Continued Litigation

Under Rule 23(e)(2)(C), the Court must also consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal" along with other relevant factors.[8]  As discussed below, each of these factors supports final approval.

#### a. Complexity, Expense and Duration of Litigation

This action involved alleged violations of the federal securities laws, and Plaintiffs and Lead Counsel believe the claims asserted against Defendants have merit.  They acknowledge, however, the expense and duration of continued proceedings necessary to pursue their claims against Defendants through trial and appeals, as well as the very substantial risks they would face in establishing liability and damages (as discussed below).  Assuming that Plaintiffs overcame the pending motion to dismiss, that the class was certified under Rule 23 (and not successfully reversed on a Rule 23(f) interlocutory appeal), and that Plaintiffs' claims survived summary judgment,

---

[8] Rule 23(e)(2)(C)(i) essentially incorporates six of the traditional *Grinnell* factors: the complexity, expense, and likely duration of the litigation (first factor); the risks of establishing liability and damages (fourth and fifth factors); the risks of maintaining class action status through the trial (sixth factor); and the range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks of litigation (eighth and ninth factors).  *See Grinnell*, 495 F.2d at 463; *see also In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 693 (S.D.N.Y. 2019) ("This inquiry overlaps significantly with a number of *Grinnell* factors, which help guide the Court's application of Rule 23(e)(2)(C)(i).").

litigating the case through trial and post-trial appeals would have undoubtedly been a long and expensive endeavor. Were the litigation to continue, a potential recovery—if any—would occur years from now, substantially delaying payment to the Settlement Class. *GSE*, 414 F. Supp. 3d at 693 ("even if plaintiffs were to prevail at trial, post-trial motions and the potential for appeal could prevent the class members from obtaining any recovery for several years, if at all."). By contrast, the Settlement provides an immediate and substantial recovery for the Settlement Class, without exposing the Settlement Class to the risk, expense, and delay of continued litigation.

### b.    Establishing Liability

In considering these factors, "a court should balance the benefits afforded the Class, including immediacy and certainty of recovery, against the continuing risks of litigation." *Id.* at 694. While Lead Counsel believes Plaintiffs' claims have merit, they also recognize substantial obstacles to proving liability. When compared to the certainty of the significant benefit conferred by the Settlement, these risks militate against further litigation and support a determination that the Settlement is fair, reasonable and adequate.

At the time the Settlement was reached, the Court had not yet ruled on Defendants' motion to dismiss. While Plaintiffs believe they sufficiently alleged that Defendants violated the federal securities laws, Defendants argued their statements were not materially false and misleading and/or amounted to inactionable corporate puffery. ECF No. 37 at 10-11 (citing *Steamfitters Local 449 Pension Plan v. AT&T Inc.*, 2022 WL 17587853, at *1 (2d Cir. Dec. 13, 2022)). They also contended that Spirit fully disclosed the risk that it might not meet its quality goals. ECF No. 37 at 14. In their Reply, Defendants cited the Court's recently issued decision in *Securities and Exchange Commission v. SolarWinds* as further precedent to support their arguments that Plaintiffs' falsity allegations were insufficient and that dismissal was appropriate. ECF No. 43 at 13 (citing *Sec. & Exch. Comm'n v. Solarwinds Corp.*, 741 F. Supp. 3d 37 (S.D.N.Y. 2024)).

Moreover, Defendants argued that scienter was not adequately alleged and that Plaintiffs' allegations rested on two alleged facts for which Defendants' knowledge was insufficiently pled: (i) the existence of "mis-drilled holes on the 737 MAX aft pressure bulkhead"; and (ii) the existence of "severe and persistent quality problems" at Spirit.  ECF No. 37 at 24.  Defendants also claimed that Plaintiffs failed to plead a link between the managers who allegedly knew of various issues and the senior officers of Spirit.  *Id.* at 28.  Further, Defendants argued that "[f]inding and remediating manufacturing issues is a routine part of the job for any aerostructures manufacturer" (*id.* at 3), and "[q]uality 'escapes' as the aerospace industry calls them, and the resulting analyses and fixes are a normal part of manufacturing" (*id.* at 6 (quoting an article from leading aviation industry publication *The Air Current*, *see* ECF No. 38-9)).  Therefore, the Parties were likely to present conflicting evidence and dueling expert testimony concerning whether Spirit merely experienced routine defects that arise in the ordinary course of any complex manufacturing business, or whether Spirit's quality issues were in fact unusually elevated. Such conflicting evidence as to the existence of excessive defects would make it even more difficult to show that Defendants *knew* Spirit suffered from excessive defects.

Defendants were also likely to challenge Plaintiffs' evidence that they ignored quality problems and underreported defects.  For example, while Plaintiffs alleged that Former Employee 1 was ordered to underreport defects and then demoted for objecting to the practice, Defendants argued that when FE1 raised the issue to Defendant Gentile, "the allegations in [FE1's] ethics complaint were sustained, his prior position was reinstated, and he was given backpay," which "demonstrates Mr. Gentile's support and enforcement of Spirit's reporting process, is an example of quality controls working, and contradicts Plaintiffs' theory of alleged quality problems."  ECF No. 37 at 26. Defendants argued that "Spirit's complex manufacturing operations include a

multilayered quality assurance system" that "worked as intended" to identify and remediate defects. *Id.* at 2-3. Plaintiffs expect that Defendants would produce substantial evidence to support those contentions, further heightening the risks to Plaintiffs' case at summary judgment or trial.

While Plaintiffs and Lead Counsel strongly disagreed with Defendants' arguments, they were not meritless, and had the litigation continued there is simply no guarantee that the Court or a jury would have adopted Plaintiffs' view of the case. Indeed, the scienter requirement is commonly regarded to be the most difficult element to prove in a securities fraud claim. *See Christine Asia Co., Ltd. v. Yun Ma*, 2019 WL 5257534, at *12 (S.D.N.Y. Oct. 16, 2019) ("Proving scienter is hard to do."); *Pearlstein v. BlackBerry Ltd.*, 2022 WL 4554858, at *5 (S.D.N.Y. Sept. 29, 2022) ("proof of state of mind is inherently difficult"). And, the fact that neither of the Individual Defendants were alleged to have made suspicious sales of Spirit stock during the Settlement Class Period would have made Plaintiffs' task even harder. *See* Joint Decl., ¶26 n.3; *see also In re Gilat Satellite Networks, Ltd.*, 2007 WL 2743675, at *11 (E.D.N.Y. Sept. 18, 2007) ("Establishing scienter is a difficult burden to meet and proving it will be especially challenging in this case where, apparently, neither the individual defendants nor any other Gilat executive profited from their Gilat investments.").

### c.     Risks to Proving Loss Causation and Damages

Even if Plaintiffs established liability, they faced significant risks in proving loss causation and damages. *See Dura Pharms., Inc., v. Broudo*, 544 U.S. 336, 345-46 (2005) (plaintiffs bear "the burden of proving that the defendant's misrepresentations caused the loss for which the plaintiff seeks to recover"); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) ("It is well-established that plaintiffs alleging claims under Section 10(b) of the '34 Act must prove loss causation."). For example, Defendants argued that Plaintiffs may not recover for stock declines on three of the five alleged disclosure dates (*i.e.*, May 3, 2023, August 2, 2023, and

12

September 7, 2023) because nothing new about the purported fraud was reported on those days. ECF No. 37 at 30.  Rather, according to Defendants, the particular defects at issue had already been fully disclosed.  Thus, any stock price impact from those events occurred on the earlier disclosure dates because "the price of a security in a functioning market accurately reflects its value, given the information available to the public."  *Id.* (quoting *In re IPO Sec. Litig.*, 544 F. Supp. 2d 277, 288 (S.D.N.Y. 2008)).  Had Defendants prevailed on this loss causation argument, potential class-wide damages would have been significantly reduced.  ¶65.

Further compounding the risks to Plaintiffs' ability to prove damages, each of the May 3, August 2, and September 7 disclosures was accompanied by potentially significant confounding information concerning matters such as supply chain challenges, the Airbus production schedule, Spirit's financial results and guidance, losses on aircraft programs other than the 737 MAX, and labor disruptions.  *See* ¶¶67-73.  Plaintiffs' Counsel expects that Defendants would produce evidence, including analyst reports, to support the argument that the stock price declines on those dates were attributable to such other issues, and not the disclosure of previously concealed information about the defects at issue in this case.  *See* Exs. 6-9, 11-14, 16 (analyst reports).

Of course, in order to resolve all disputed issues regarding damages and loss causation, the Parties would have relied on expert testimony.  This creates further litigation risk because Plaintiffs could not be certain whether a jury would accept the views of their experts or of the well-qualified experts that Defendants would no doubt be able to present at trial.  *See In re Facebook, Inc. IPO Sec. and Derivative Litig.*, 2015 WL 6971424, at *5 (S.D.N.Y. Nov. 9, 2015) ("[D]amages would be subject to a battle of the experts, with the possibility that a jury could be swayed by experts for Defendants, who could minimize or eliminate the amount Plaintiffs' losses. Under such circumstances, a settlement is generally favored over continued litigation."); *In re Marsh &*

13

*McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at *6 (S.D.N.Y. Dec. 23, 2009) ("If there is anything in the world that is uncertain when a case like [a securities class action] is taken to trial, it is what the jury will come up with as a number for damages.").

### d.     Risks of Maintaining Class Action Status

While Plaintiffs and Lead Counsel are confident that the Settlement Class meets the requirements for certification (*see* ECF No. 63 (preliminary approval motion), at Sec. V.B.), the class had not yet been certified, and Plaintiffs are aware that if the case continued to be litigated there is a risk the Court could disagree, or that the class period could be shortened based on decisions related to falsity, scienter, loss causation, or price impact.[9]   Defendants argued in their motion to dismiss that certain alleged misrepresentations were "general statements about Spirit's quality goals and generic risk disclosures" that lacked specific statements of fact, and "the market did not react to any revelation that Spirit's prior statements were false, but instead to decreased production and the cost of remediation from newly discovered issues." ECF No. 37 at 1, 29.   As such, Lead Counsel expects that Defendants would raise similar arguments to attempt to defeat class certification. *See Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 123 (2021) (generic misstatements weigh against finding price impact).

Even if the Court were to certify the class for litigation, there is always a risk that the class could be decertified at a later stage in the proceedings. *See Chatelain v. Prudential-Bache Sec., Inc.*, 805 F. Supp. 209, 214 (S.D.N.Y. 1992) ("Even if certified, the class would face the risk of decertification.").   Thus, the risks and uncertainty surrounding class certification also support final

---

[9] For example, in *In re Boeing Co. Sec. Litig.*, the court certified the class but shortened the class period because, *inter alia*, "alleged corrective events after January 8, 2024 reflected the consequences of, and reactions to, the Alaska Airlines incident as opposed to the correction of prior misstatements." 2025 WL 2428481, at *3 (E.D. Va. Mar. 7, 2025). The *Boeing* class certification decision is currently being appealed on other issues. *See* 4th Cir. Case No. 25-1492.

approval of the Settlement, as Defendants likely would have challenged class certification. *See*

*GSE*, 414 F. Supp. 3d at 694 ("Although the risk of maintaining a class through trial is present in

[every] class action . . . this factor [nevertheless] weighs in favor of settlement where it is likely

that defendants would oppose class certification if the case were to be litigated.").

> e.    **Range of Reasonableness in Light of the Best Possible Recovery and Attendant Risks of Litigation**

The adequacy of the amount offered in settlement must be judged "not in comparison with

the possible recovery in the best of all possible worlds, but rather in light of the strengths and

weaknesses of plaintiffs' case." *In re "Agent Orange" Prods. Liab. Litig.*, 597 F. Supp. 740, 762

(E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987).  Here, the proposed Settlement provides for

a cash payment of $29,200,000 for the benefit of the Settlement Class.  This is a very good result

considering the significant risks of continued litigation.  Plaintiffs' damages expert estimates that

if Plaintiffs had fully prevailed on all their claims at summary judgment and after a jury trial, if

the Court certified the same class period as the Settlement Class Period, and if the Court and jury

accepted Plaintiffs' damages theory—*i.e.*, Plaintiffs' best case scenario—the total *maximum*

damages potentially available in this Action would be approximately $1.5 billion.  *See* ¶83.  Thus,

the $29.2 million Settlement represents a recovery of 1.9%, which exceeds the 1.3% median

settlement value for securities class actions with comparable maximum damages.  *See* Ex. 1

(NERA Report) at 26-27 (Fig. 23-24).  Moreover, the Settlement Amount is approximately 2.9%

of Lead Counsel's estimate of $1.0 billion of reasonably recoverable damages under an approach

that takes into account confounding information released on certain alleged corrective disclosure

dates to discount damages attributable to stock price declines on those dates, as reflected in the

proposed Plan of Allocation set forth in the Notice. *See* ¶84; Ex. 17-B, at ¶¶56-58.

15

####     4.        Rule 23(e)(2)(C)(ii)-(iv)

Under Rule 23(e)(2)(C), courts also must consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" "the terms of any proposed award of attorney's fees, including timing of payment;" and "any agreement required to be identified under Rule 23(e)(3)." FED. R. CIV. P. 23(e)(2)(C)(ii)-(iv).  Each of these factors either supports approval of the Settlement or is neutral and does not suggest any basis for inadequacy of the Settlement. Even factors that are "neutral" do "not preclude the Court from granting final approval." *Davenport v. Elite Model Mgmt. Corp.*, 2014 WL 12756756, at *7 (S.D.N.Y. May 12, 2014).

**Rule 23 (e)(2)(C)(ii):**  The method for processing Settlement Class Members' claims and distributing relief to eligible claimants includes well-established, effective procedures.  Here, Epiq Class Action & Claims Solutions, Inc., ("Epiq"), the Claims Administrator selected by Lead Counsel and approved by the Court, is processing claims under the guidance of Lead Counsel, will allow claimants an opportunity to cure any claim deficiencies or request the Court to review their claim denial, and, lastly, will mail or wire Authorized Claimants their *pro rata* share of the Net Settlement Fund (per the Plan of Allocation), after Court approval.  Claims processing, like the method proposed here, is standard in securities class action settlements.  It has been long found to be effective, as well as necessary, insofar as neither Plaintiffs nor Defendants possess the individual investor trading data required for a claims-free process to distribute the Net Settlement Fund.  *See In re Stable Road Acquisition Corp.*, 2024 WL 3643393, at *7 (C.D. Cal. Apr. 23, 2024) (approving nearly identical distribution process and granting final approval); *see also Becker v. Bank of New York Mellon Trust Co., N.A.*, 2018 WL 6727820, at *7 (E.D. Pa. Dec. 21, 2018) (holding that "[t]he requirement that class members submit documentation to substantiate their holdings of the bonds as of the record date will facilitate the filing of legitimate claims, yet is not

16

overly demanding given the range of permissible documentation.").[10]

**Rule 23(e)(2)(C)(iii):**  The relief provided for the Settlement Class is also adequate when the terms of the proposed award of attorneys' fees are considered.  As detailed in the accompanying fee and expenses memorandum, a proposed attorneys' fee of 25% the Settlement Fund net of Litigation Expenses (or $7,260,914.63, plus interest at the same rate as the Settlement Fund) is reasonable in light of the work performed and the results obtained.  The proposed attorneys' fee is also: (i) below the 30% of the gross Settlement Fund listed in the Notice (*see* Ex. 17-B, at ¶¶5, 76); and (ii) consistent with awards in similar complex class action cases.  *See  Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, No. 19-cv-10067-PAE, ECF No. 242 at 56:8-10 ("a 25 percent fee award of [nearly] $7.5 million [from the $29.75 million settlement] comfortably aligns . . . with the range of attorneys' fees awarded in securities fund class actions") (S.D.N.Y. Aug. 1, 2024 hearing transcript) (Ex. 23); *id.* at 60:19-20 ("a 25 percent fee, before costs, falls squarely within the mainstream of securities class action fees approved in this district"); *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002) (finding 33⅓% fee request "falls comfortably within the range of fees typically awarded in securities class actions"); *see also* Ex. 1 (NERA Report) at p. 30 (from 1996 to 2024, the median attorneys' fee award for securities class action settlements between $25 million and $100 million was 25%); Ex. 18 (collecting select Second Circuit cases with fee awards of 25% or more).  More importantly, approval of the requested attorneys' fees is separate from approval of the Settlement, and the Settlement may not be terminated based on any ruling with respect to attorneys' fees.  *See* Stipulation ¶16.

**Rule  23(e)(2)(C)(iv):**   The  Parties  have  entered  into  a  confidential  agreement  that

---

[10] This is not a claims-made settlement.  If the Settlement is approved, Defendants will not have any right to the return of a portion of the Settlement based on the number or value of the claims submitted.  *See* Stipulation ¶13.

establishes certain conditions under which Defendants may terminate the Settlement if Settlement Class Members who collectively purchased over a certain threshold of Spirit Class A common stock request exclusion from the Settlement. "This type of agreement is standard in securities class action settlements and has no negative impact on the fairness of the Settlement." *Christine Asia*, 2019 WL 5257534, at \*15; *In re Splunk Inc. Sec. Litig.*, 2024 WL 923777, at \*6 (N.D. Cal. Mar. 4, 2024) ("The existence of a termination option triggered by the number of class members who opt out of the settlement does not by itself render the settlement unfair.").

### 5. The Settlement Treats all Settlement Class Members Equitably

Rule 23(e)(2)(D) requires courts to evaluate whether the settlement treats class members equitably relative to one another. The Settlement easily satisfies this standard. Under the proposed Plan of Allocation, detailed in the Notice (Ex. 17-B, at ¶¶55-75), each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund. Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. Courts have repeatedly approved similar plans. *See In re Citigroup, Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 386-87 (S.D.N.Y. 2013); *Stable Road*, 2024 WL 3643393, at \*7.

### 6. The Remaining *Grinnell* Factors Weigh in Favor of Final Approval

*Grinnell* also outlined several factors that are not coextensive with Rule 23(e)(2)'s factors. These factors also support final approval.

**The Stage of the Proceedings and the Amount of Discovery Completed**: This factor examines "whether the parties had adequate information about their claims such that their counsel can intelligently evaluate the merits of plaintiff's claims, the strengths of the defenses asserted by defendants, and the value of plaintiffs' causes of action for purposes of settlement." *Bear Stearns*, 909 F. Supp. 2d at 267. Here, Plaintiffs conducted an extensive investigation into Spirit prior to

filing the SAC, including, *inter alia*: interviewing former employees; analyzing the Company's myriad SEC filings; and consulting with a loss causation and damages expert. The Parties submitted substantial briefing relating to the motion to dismiss, and exchanged detailed mediation briefs. Moreover, before finalizing the Stipulation, Plaintiffs obtained over 59,000 pages of documents from Defendants concerning the matters alleged in the SAC, which Lead Counsel analyzed and used to interview a senior Spirit employee, to further evaluate the fairness, reasonableness, and adequacy of the Parties' agreement in principle to resolve the Action. The fact that there has been no formal discovery in the action does not weigh against final approval, especially given the PSLRA discovery stay in securities class actions. *See, e.g., Vaccaro v. New Source Energy Partners L.P.*, 2017 WL 6398636, at \*5 (S.D.N.Y. Dec. 14, 2017) ("Although the action did not proceed to formal discovery, Lead Plaintiffs (i) reviewed vast amounts of publicly available information, (ii) conducted interviews of numerous individuals, and (iii) consulted experts on the . . . industry. The Court finds that Lead Plaintiffs were well-informed to gauge the strengths and weaknesses of their claims and the adequacy of the settlement."); *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 190 (S.D.N.Y. 2012) ("The threshold necessary to render the decisions of counsel sufficiently well informed, however, is not an overly burdensome one to achieve—indeed, formal discovery need not have necessarily been undertaken yet by the parties.").

**The Ability of Defendants to Withstand a Greater Judgment**: "Courts have recognized that the defendant's ability to pay is much less important than other factors, especially where the other *Grinnell* factors weigh heavily in favor of settlement approval." *In re Metlife Demutualization Litig.*, 689 F. Supp. 2d 297, 339 (E.D.N.Y. 2010); *In re AOL Time Warner, Inc.*, 2006 WL 903236, at \*12 (S.D.N.Y. Apr. 6, 2006) ("the mere ability to withstand a greater judgment does not suggest that the Settlement is unfair.").

19

Spirit has incurred hundreds of millions of dollars in net losses per year since the beginning of the Settlement Class Period, Plaintiffs' calculation of maximum damages significantly exceeds Defendants' insurance available to contribute to this Action, and since the third quarter of 2024 Spirit's financial statements have included a warning expressing "substantial doubt about the Company's ability to continue as a going concern." *See* ¶82; *see also* Ex. 33 (excerpts of Spirit SEC Form 10-Q filed November 5, 2024, at 12).[11] Therefore, and given the significant time required to get to trial and resolve all appeals, Lead Counsel believe ability to pay considerations favor the Settlement. *See In re Blech Sec. Litig.*, 2000 WL 661680, at *5 (S.D.N.Y. May 19, 2000) ("While additional years of litigation might well have resulted in a higher settlement or verdict at trial, continued litigation could also have reduced the amount of insurance coverage available and not necessarily resulted in a greater recovery."); *In re China Sunergy Sec. Litig.*, 2011 WL 1899715, at *5 (S.D.N.Y. May 13, 2011) ("The Court finds that Defendants' ability to withstand a judgment greater than the Settlement weighs in favor of approval. The Company was under tremendous financial pressure, and there was a likelihood not only that the Company would not withstand a greater judgment at trial, but that the Company would not remain a going concern, so that the potential for any recovery would be completely eroded.").

B.    **Certification of the Settlement Class is Warranted**

In granting preliminary approval, the Court found this case appropriate for class certification for settlement purposes, and appointed Plaintiffs as the class representative and GPM and H&H as class counsel. *See* ECF No. 67 at ¶¶1-3. Nothing has changed since preliminary approval that would undermine the Court's conclusion, and class certification for settlement

---

[11] While on July 1, 2024 Spirit announced its agreement to be acquired by Boeing, the transaction was subject to various closing conditions, including receipt of regulatory approvals, and did not close until December 8, 2025. *See* ¶82 n.4.

purposes remains appropriate. *See Bear Stearns*, 909 F.Supp.2d at 264 ("Since there have been no material changes to alter the propriety of these findings regarding the Settlement Class, this action is hereby finally certified, for the purposes of settlement only, as a class action pursuant to Fed.R.Civ.P. 23(a) and 23(b)(3) . . . In addition, the determinations in the Preliminary Approval Orders regarding Lead Plaintiff and Class Counsel are affirmed."); *Stable Road*, 2024 WL 3643393, at *11 ("Since there have been no changes to alter the propriety of class certification for settlement purposes, the Court affirms its determinations in the Preliminary Approval Order certifying the Settlement Class under Rules 23(a) and (b)(3).").

## C.      The Court Should Approve the Plan of Allocation

"To warrant approval, the plan of allocation must also meet the standards by which the settlement was scrutinized – namely, it must be fair and adequate." *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005). "As numerous courts have held, a plan of allocation need not be perfect." *Christine Asia*, 2019 WL 5257534, at *15. Rather, "[w]hen formulated by competent and experienced counsel, a plan for allocation of net settlement proceeds need have only a reasonable, rational basis." *IMAX*, 283 F.R.D. at 192 ; *see also Christine Asia*, 2019 WL 5257534, at *15-16. A plan that allocates settlement funds to class members based on the extent of their injuries or the strength of their claims is fair and reasonable. *See, e.g., In re Telik, Inc. Sec. Litig.,* 576 F. Supp. 2d 570, 580 (S.D.N.Y. 2008) ("A reasonable plan may consider the relative strength and values of different categories of claims."); *In re Omnivision Tech.,* Inc., 559 F. Supp. 2d 1036, 1045 (C.D. Cal. 2008) ("It is reasonable to allocate the settlement funds to class members based on . . . the strength of their claims on the merits."). Thus, "as a general rule, the adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information." *Chavarria v. New York Airport Serv., LLC,* 875 F. Supp. 2d 164, 175 (E.D.N.Y.

21

2012); *Marsh & McLennan*, 2009 WL 5178546, at *13 ("In determining whether a plan of allocation is fair, courts look largely to the opinion of counsel.").

The proposed Plan of Allocation was developed by one of Plaintiffs' damages consultants working in conjunction with Lead Counsel.[12]  It is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act, and reflects an assessment of the damages that Plaintiffs contend could have been recovered under the theories of liability and damages asserted in the Action. ¶99.  More specifically, the Plan of Allocation is predicated on Plaintiffs' allegation that the price of Spirit Class A common stock was artificially inflated during the Settlement Class Period due to Defendants' alleged materially false and misleading statements and omissions, and that the decreases in the stock price that followed the alleged corrective disclosures that occurred on April 14, 2023, May 3, 2023, August 2, 2023, August 24, 2023, and September 7, 2023, may be used to measure the alleged artificial inflation in the price of Spirit's Class A common stock prior to the disclosures.  ¶100; Ex. 17-B (Notice), at ¶58.  The estimated alleged artificial inflation in the price of Spirit Class A common stock also reflects Lead Counsel's assessment of the strengths and weaknesses associated with the alleged corrective disclosures, including difficulties of proof and potential loss causation defenses, that justify an adjustment under the Plan of Allocation of the per-share Recognized Loss Amounts resulting from such disclosures.  ¶101; Ex. 17-B (Notice), at ¶¶57-58.[13]

---

[12] The Plan of Allocation is set forth in the Notice (Ex. 17-B, at ¶¶55-75), and discussed in paragraphs 97-109 of the Joint Declaration.

[13] Specifically, for the April 14, 2023 and August 24, 2023 corrective disclosure dates (news of the tail-fin fittings defect and mis-drilled holes defect were first revealed after regular market trading hours on April 13, 2023 and August 23, 2023), the Plan of Allocation considers the corresponding alleged artificial inflation to be 100% of the resulting residual (*i.e.*, net of market- and industry-wide factors) daily declines in the price of Spirit Class A common stock.  For the May 3, 2023, August 2, 2023, and September 7, 2023 corrective disclosure dates, the Plan of

*(Cont'd)*

22

Under the Plan of Allocation, a Recognized Loss Amount will be calculated for each share of Spirit Class A common stock purchased during the Settlement Class Period (including shares acquired through the exercise of a publicly traded option). ¶¶102-03; Ex. 17-B (Notice), at ¶¶61, 70. The calculation of Recognized Loss Amounts will depend upon several factors, including when the common stock was purchased during the Settlement Class Period, and in what amounts, whether the stock was sold, and if sold, when it was sold, and for what amounts. The Recognized Loss Amount is not intended to estimate the amount a Settlement Class Member might have been able to recover after a trial, nor to estimate the amount that will be paid to Authorized Claimants pursuant to the Settlement. ¶98; Ex. 17-B (Notice), at ¶55. The Recognized Loss Amount is the basis upon which the Net Settlement Fund will be proportionately allocated to the Authorized Claimants. Ex. 17-B (Notice), at ¶¶55-56.

In general, the Recognized Loss Amount for Spirit Class A common stock acquired during the Settlement Class Period will be the difference between the estimated alleged artificial inflation on the date of acquisition and the estimated alleged artificial inflation on the date of sale, or the difference between the actual purchase price and sale price, whichever is less. ¶103; Ex. 17-B (Notice), at ¶61. The Recognized Loss Amount calculation also incorporates the "90-day look back" provision of the PSLRA. ¶103; Ex. 17-B (Notice), at ¶¶59-61.

The sum of a Claimant's Recognized Loss Amounts is the Claimant's "Recognized Claim," and the Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims, subject to a $10 *de minimis* provision. ¶106; Ex. 17-B (Notice), at ¶¶62, 64, 65, 73. More precisely, an Authorized Claimant's *pro rata* share shall

---

Allocation considers the corresponding alleged artificial inflation to be 25% of the resulting residual daily declines in the price of Spirit Class A common stock, due to the presence of substantial confounding information also released on those dates. ¶101.

be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. ¶104; Ex. 17-B (Notice), at ¶65.    If a Claimant has an overall market *gain* with respect to his, her, or its transactions in Spirit Class A common stock during the relevant period, or if the stock was not held over one of the corrective disclosure dates, the Claimant is not entitled to recover under the Plan of Allocation. ¶105; Ex. 17-B (Notice), at ¶¶58, 71-72.

Lead Counsel believe the Plan of Allocation will result in a fair and equitable distribution of the Settlement proceeds among Settlement Class Members who submit valid claims. *See Lea v. Tal Educ. Grp.*, 2021 WL 5578665, at *11 (S.D.N.Y. Nov. 30, 2021) (finding substantially similar "methodology is appropriate and consistent with many other securities class action settlements' plans of allocation."); *Christine Asia*, 2019 WL 5257534, at *15-16 (approving substantially similar plan of allocation).  To date, no objections to the Plan of Allocation have been received by Lead Counsel or filed on this Court's docket.   ¶109.   Accordingly, Plaintiffs respectfully request that the Court approve the proposed Plan of Allocation. *See  In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115809, at *13-14 (S.D.N.Y. 2007) (finding that no objections supports approval of the plan of allocation); *In re Heritage Bond Litig.*, 2005 WL 1594403, at *12 (C.D. Cal. June 10, 2005) ("In light of the lack of objectors to the plan of allocation at issue, and the competence, expertise, and zeal of counsel in bringing and defending this action, the Court finds the plan of allocation as fair and adequate.").

### D.     The Notice Program Satisfies the Requirements of Due Process, Rule 23 and the PSLRA

For any class certified under Rule 23(b)(3), due process and Rule 23 require that class members be given "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." FED. R. CIV. P. 23(c)(2)(B).  The

Notice provides all the necessary information required by Rule 23(c)(2)(B) and satisfies the requirements of the PSLRA, 15 U.S.C. § 78u-4(a)(7).  This Court has already found that the proposed notice program is adequate and sufficient.  *See* ECF No. 67, ¶¶7-9.  Lead Counsel and Epiq carried out the notice program as proposed.  In sum, the notice program detailed in ¶¶86-96 of the Joint Declaration and the Declaration of Melissa Mejia (Ex. 17 at ¶¶2-20) fairly apprises Settlement Class Members of their rights with respect to the Settlement, and is the best notice practicable under the circumstances.  *See Mauss v. NuVasive, Inc.*, 2018 WL 6421623, at \*2-3 (S.D. Cal. Dec. 12, 2018) (combination of mailed notice, publication of summary notice in *Investor's Business Daily* and over a newswire, and posting of notice on settlement website satisfied requirements of "Rule 23, the [PSLRA], and due process."); *In re Advanced Battery Techs., Inc. Secs. Litig.*, 298 F.R.D. 171, 182-83 n.3 (S.D.N.Y. 2014) (collecting cases and stating that "[t]he use of a combination of a mailed post card directing class members to a more detailed online notice has been approved by courts."); *In re Mut. Funds Inv. Litig.*, 2010 WL 2342413, at \*6-7 (D. Md. May 19, 2010) (approving combination of postcard notice, summary notice, and detailed notice available online as "the best notice practical").

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court approve the proposed Settlement and Plan of Allocation as fair, reasonable, and adequate, and certify the Settlement Class for the purposes of settlement.[14]

---

[14] A proposed Judgment and Order Granting Final Approval of Class Action Settlement and a proposed Order Approving Plan of Allocation will be submitted with Plaintiffs' reply papers on January 9, 2026, after the deadline for objecting to the motion and requesting exclusion from the Settlement Class has passed.

Dated: December 12, 2025

**GLANCY PRONGAY & MURRAY LLP**

By: */s/ Garth Spencer*
Robert V. Prongay
Joseph D. Cohen (*pro hac vice*)
Garth Spencer (GS-7623)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
rprongay@glancylaw.com
jcohen@glancylaw.com
gspencer@glancylaw.com

Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
glinkh@glancylaw.com

**HOLZER & HOLZER, LLC**
Corey D. Holzer (*pro hac vice*)
211 Perimeter Center Parkway, Suite 1010
Atlanta, Georgia 30346
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
cholzer@holzerlaw.com

*Lead Counsel for Plaintiffs and the Settlement Class*

**BLOCK & LEVITON LLP**
Jeffrey C. Block  (JCB-0387)
Jacob Walker (*pro hac vice*)
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
(617) 507-6020 fax
jeff@blockleviton.com
jake@blockleviton.com

*Additional Counsel for Plaintiffs*

26