**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HANG LI, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> SPIRIT AEROSYSTEMS HOLDINGS, INC., TOM GENTILE III, and MARK J. SUCHINSKI, <br><br> Defendants. | Case No. 1:23-cv-03722-PAE |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD COUNSEL'S**
**MOTION FOR AN AWARD OF ATTORNEYS' FEES AND**
**REIMBURSEMENT OF LITIGATION EXPENSES**

## TABLE OF CONTENTS

I.  INTRODUCTION .............................................................................................................. 1

II.  ARGUMENT..................................................................................................................... 3

    A.  The Common Fund Doctrine Applies To The Settlement ...................................... 3

    B.  The Court Should Award A Reasonable Percentage Of The Common Fund......... 4

    C.  The Requested Attorneys' Fees Are Reasonable ................................................... 6

        1.  The Requested Attorneys' Fees Are Reasonable Under The Percentage-Of-The-Fund Method .................................................................. 6

        2.  The Lodestar Cross-Check Strongly Supports The Reasonableness Of The Requested Fee .................................................................................. 8

    D.  Factors Considered By Courts In The Second Circuit Confirm The Requested Fee Is Reasonable ............................................................................... 11

        1.  Time And Labor Expended Support The Requested Fee ......................... 11

        2.  The Risks Of Litigation Support The Requested Fee .............................. 13

        3.  The Magnitude And Complexity Of The Action Support The Requested Fee ........................................................................................... 18

        4.  The Quality Of Representation Supports The Requested Fee ................. 19

        5.  The Requested Fee In Relation To The Settlement Amount .................... 22

        6.  Public Policy Considerations Support The Requested Fee ...................... 23

    E.  Plaintiffs' Counsel's Expenses Are Reasonable And Were Necessary To Achieve The Settlement ...................................................................................... 24

    F.  Plaintiffs Should Be Awarded Their Reasonable Costs And Expenses Under 15 U.S.C. § 78u-4(a)(4) .................................................................................... 24

III.  CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
  572 F.3d 221 (5th Cir. 2009) ............................................................................... 1

*Bell v. Pension Comm. of ATH Holding Co., LLC*,
  2019 WL 4193376 (S.D. Ind. Sept. 4, 2019) ........................................................ 3

*Bellifemine v. Sanofi-Aventis U.S. LLC*,
  2010 WL 3119374 (S.D.N.Y. Aug. 6, 2010) .......................................................... 6

*Board of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*,
  2012 WL 2064907 (S.D.N.Y. June 7, 2012) .......................................................... 7

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980) ............................................................................................. 3

*Burns v. FalconStor Software, Inc.*,
  2014 WL 12917621 (E.D.N.Y. Apr. 10, 2014) .................................................... 10

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
  2015 WL 13639234 (S.D.N.Y. Oct. 19, 2015) ...................................................... 7

*City of Birmingham Ret. & Relief Sys. v. Credit Suisse Grp. AG*,
  2020 WL 7413926 (S.D.N.Y. Dec. 17, 2020) ................................................. 14, 23

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974) ................................................................................ 14

*City of Providence v. Aeropostale, Inc.*,
  2014 WL 1883494 (S.D.N.Y. May 9, 2014) ..................................................... 19, 23

*Davis v. J.P. Morgan Chase & Co.*,
  827 F. Supp. 2d 172 (W.D.N.Y. 2011) .............................................................. 5, 10

*Davis v. Yelp, Inc.*,
  2023 WL 3063823 (N.D. Cal. Jan. 27, 2023) ........................................................ 9

*Goldberger v. Integrated Res., Inc.*,
  209 F.3d 43 (2d Cir. 2000) ........................................................................... *passim*

*Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*,
  212 F.R.D. 400 (E.D. Wis. 2002) ........................................................................ 14

*Gross v. GFI Group, Inc.*,
  784 Fed. App'x 27 (2d Cir. 2019).................................................................................. 15

*Guevoura Fund Ltd. v. Sillerman*,
  2019 WL 6889901 (S.D.N.Y. Dec. 18, 2019) ....................................................... 10, 25

*Hicks v. Morgan Stanley,& Co.*,
  2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) .......................................................... 4

*In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*,
  2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006).......................................................... 22

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
  2006 WL 903236 (S.D.N.Y. Apr. 6, 2006).............................................................. 18

*In re Bisys Sec. Litig.*,
  2007 WL 2049726 (S.D.N.Y July 16, 2007) .......................................................... 10

*In re Bristol-Myers Squibb Sec. Litig.*,
  361 F. Supp. 2d 229 (S.D.N.Y. 2005)...................................................................... 6

*In re Colgate-Palmolive Co. ERISA Litig.*,
  36 F. Supp. 3d 344 (S.D.N.Y. 2014)........................................................................ 10

*In re Comverse Tech., Inc. Sec. Litig.*,
  2010 WL 2653354 (E.D.N.Y. June 24, 2010) .............................................. 9, 14, 23

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
  80 F. Supp. 3d 838 (N.D. Ill. 2015) .................................................................. 13, 16

*In re Deutsche Telekom AG Sec. Litig.*,
  2005 WL 7984326 (S.D.N.Y. June 14, 2005) ........................................................ 10

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
  2007 WL 2230177 (S.D.N.Y. July 27, 2007) ........................................................... 5

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
  2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015)...................................................... 7, 13

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
  343 F. Supp. 3d 394 (S.D.N.Y. 2018)............................................................... 7, 20

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009)...................................................................................... 20

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010)........................................................ 14, 15, 23, 24

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
   279 F.R.D. 151 (S.D.N.Y. 2011) ............................................................................ 15, 16

*In re Gilat Satellite Networks, Ltd.*,
   2007 WL 2743675 (E.D.N.Y. Sept. 18, 2007) .......................................................... 18

*In re Global Crossing Sec. & ERISA Litig.*,
   225 F.R.D. 436 (S.D.N.Y. 2004) ................................................................... 9, 14, 24

*In re Health Insurance Innovations Sec. Litig.*,
   2021 WL 1341881 (M.D. Fla. Mar. 23, 2021) .......................................................... 25

*In re Hi-Crush Partners L.P. Sec. Litig.*,
   2014 WL 7323417 (S.D.N.Y. Dec. 19, 2014) ............................................................ 9

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
   194 F.R.D. 166 (E.D. Pa. 2000)................................................................................. 18

*In re ImmunityBio, Inc. Sec. Litig.*,
   2025 WL 1686263 (S.D. Cal. June 16, 2025)............................................................ 21

*In re Indep. Energy Holdings PLC Sec. Litig.*,
   302 F. Supp. 2d 180 (S.D.N.Y. 2003)....................................................................... 24

*In re Interpublic Sec. Litig.*,
   2004 WL 2397190 (S.D.N.Y. Oct. 26, 2004) ........................................................... 10

*In re Lloyd's Am. Trust Fund Litig.*,
   2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002)........................................................... 6

*In re Lyft Inc. Sec. Litig.*,
   2023 WL 5068504 (N.D. Cal. Aug. 7, 2023) .......................................................... 9, 22

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
   2009 WL 5178546 (S.D.N.Y. 2009).......................................................................... 25

*In re Millennial Media, Inc. Sec. Litig.*,
   2015 WL 3443918 (S.D.N.Y. May 29, 2015) ........................................................... 11

*In re Monster Worldwide, Inc. Sec. Litig.*,
   2008 WL 9019514 (S.D.N.Y. Nov. 25, 2008)........................................................... 6, 7

*In re Qudian Inc. Sec. Litig.*,
  2021 WL 2328437 (S.D.N.Y. June 8, 2021) ............................................................. 25

*In re Rite Aid Corp. Sec. Litig.*,
  396 F.3d 294 (3d Cir. 2005).................................................................................. 5

*In re Schering-Plough Corp. Enhance Sec. Litig.*,
  2013 WL 5505744 (D.N.J. Oct. 1, 2013)................................................................ 16

*In re Signet Jewelers Limited Sec. Litig.*,
  2020 WL 4196468 (S.D.N.Y. July 21, 2020) ............................................... 2, 10, 25

*In re Sumitomo Copper Litig.*,
  74 F. Supp. 2d 393 (S.D.N.Y. 1999)............................................................... 10, 16

*In re Telik, Inc. Sec. Litig.*,
  576 F. Supp. 2d 570 (S.D.N.Y. 2008)................................................................... 11

*In re Tenaris S.A. Sec. Litig.*,
  2024 WL 1719632 (E.D.N.Y. Apr. 22, 2024) ......................................................... 9

*In re Veeco Instruments Inc. Sec. Litig.*,
  2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007)..................................................... 4, 19, 22, 25

*In re WorldCom, Inc. Sec. Litig.*,
  388 F. Supp. 2d 319 (S.D.N.Y. 2005)..................................................................... 5

*In re Xcel Energy, Inc., Sec., Deriv. & "ERISA" Litig.*,
  364 F. Supp. 2d 980 (D. Minn. 2005).............................................................. 2, 18

*Johnson v. Brennan*,
  2011 WL 4357376 (S.D.N.Y. Sept. 16, 2011)......................................................... 6

*La. Mun. Police Emps. Ret. Sys. v. Sealed Air Corp.*,
  2009 WL 4730185 (D.N.J. Dec. 4, 2009)............................................................. 18

*Lea v. Tal Educ. Grp.*,
  2021 WL 5578665 (S.D.N.Y. Nov. 30, 2021)............................................... 7, 18, 25

*Leach v. NBC Universal Media, LLC*,
  2017 WL 10435878 (S.D.N.Y. Aug. 24, 2017)....................................................... 7

*LeBlanc-Sternberg v. Fletcher*,
  143 F.3d 748 (2d Cir. 1998)................................................................................. 9

*Maley v. Del Global Techs. Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2002)............................................................... 4, 6, 9, 16

*Mills v. Elec. Auto-Lite Co.*,
    396 U.S. 375 (1970)................................................................................................. 4

*Missouri v. Jenkins*,
    491 U.S. 274 (1989)................................................................................................. 9

*Moloney v. Shelly's Prime Steak, Stone Crab & Oyster Bar*,
    2009 WL 5851465 (S.D.N.Y. Mar. 31, 2009) ........................................................ 7

*Monzon v. 103W77 Partners, LLC*,
    2015 WL 993038 (S.D.N.Y. Mar. 5, 2015) ............................................................ 5

*Savoie v. Merchants Bank*,
    166 F.3d 456 (2d Cir. 1999)..................................................................................... 9

*Schwartz v. TXU Corp.*,
    2005 WL 3148350 (N.D. Tex. Nov. 8, 2005).......................................................... 16

*Shapiro v. JPMorgan Chase & Co.*,
    2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ........................................................ 13

*Silverman v. Motorola Sols., Inc.*,
    739 F.3d 956 (7th Cir. 2013) ................................................................................... 2

*Taft v. Ackermans*,
    2007 WL 414493 (S.D.N.Y. Jan. 31, 2007) ........................................................... 19

*Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*,
    2004 WL 1087261 (S.D.N.Y. May 14, 2004) ......................................................... 14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)................................................................................................. 23

*Varljen v. H.J. Meyers & Co., Inc.*,
    2000 WL 1683656 n.2 (S.D.N.Y. Nov. 8, 2000)..................................................... 25

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005)....................................................................................... 5, 9

*Wilson v. LSB Industries, Inc.*,
    2019 WL 3542844 (S.D.N.Y. June 28, 2019) ......................................................... 21

vi

*Zeltser v. Merrill Lynch & Co., Inc.*,
  2014 WL 4816134 (S.D.N.Y. Sept. 23, 2014)..........................................................................7

## **STATUTES**

5 U.S.C. §552.....................................................................................................................12

15 U.S.C. § 78u-4 ............................................................................................................... 1

15 U.S.C. § 78u-4(a)(4) .................................................................................................. 1, 24

15 U.S.C. § 78u-4(a)(6) ..................................................................................................... 5

Court-appointed lead counsel Glancy Prongay & Murray LLP ("GPM") and Holzer & Holzer LLC ("Holzer," and with GPM, "Lead Counsel"), on behalf of all Plaintiffs' Counsel,[1] respectfully submit this memorandum of law in support of their request for attorneys' fees of 25% the Settlement Fund net of Litigation Expenses (or $7,260,914.63, plus interest at the same rate as the Settlement Fund).[2] Lead Counsel also seek reimbursement of $146,341.45 in out-of-pocket expenses advanced by counsel, as well as $10,000 in total to the three Plaintiffs, as authorized by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(a)(4).

## I.    INTRODUCTION

The proposed Settlement provides for a non-reversionary cash payment of $29,200,000 in exchange for the resolution of the Action. This is a very good result for the Settlement Class, particularly considering the significant risks Plaintiffs faced in this complex securities fraud case.

From the outset, Lead Counsel faced numerous challenges to establishing liability and damages. The risk of losing was very real, and it was greatly enhanced by opposition from highly skilled defense counsel, under the heightened pleading standard and automatic stay of discovery imposed by the PSLRA. *See* 15 U.S.C. § 78u-4; *see also Alaska Elec. Pension Fund v. Flowserve*

---

[1] Unless otherwise noted, capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement dated August 4, 2025 (ECF No. 64-1), or in the concurrently filed Joint Declaration of Garth Spencer and Corey D. Holzer ("Joint Declaration" or "Joint Decl."). Citations to "¶__" or "Ex. __" in this memorandum refer to paragraphs in, or exhibits to, the Joint Declaration. The Joint Declaration is an integral part of this submission and, for the sake of brevity, the Court is respectfully referred to it for a discussion of, *inter alia*, the history of the Action; the claims asserted; the mediation and negotiations leading to the Settlement; the risks continued litigation; the services Plaintiffs' Counsel provided; and additional information on the factors that support the fee and expense application, including the lodestar cross-check.

[2] 25% x ($29,200,000 Settlement Amount - $156,341.45 Litigation Expenses) = $7,260,914.63. The Notice informed the Settlement Class that Lead Counsel would apply for an attorneys' fee award of up to 30% of the Settlement Fund, which would have been a requested fee of $8,760,000, plus interest. Lead Counsel seeks the lesser amount of $7,260,914.63, plus interest, in recognition of the lodestar crosscheck and the stage at which this Action settled.

*Corp.*, 572 F.3d 221, 235 (5th Cir. 2009) (O'Connor, J., by designation) ("To be successful, a securities class-action plaintiff must thread the eye of a needle made smaller and smaller over the years by judicial decree and congressional action.").[3]    Indeed, a motion to dismiss was filed in 96% of the securities class actions in the last ten years, and in cases where the motion was decided, more than 80% were granted in whole or in part. *See* Ex. 1, Excerpts from Edward Flores and Svetlana Starykh, *Recent Trends In Securities Class Action Litigation: 2024 Full-Year Review* (NERA January 22, 2025) ("NERA Report") at p. 17. Even if Plaintiffs prevailed over Defendants' pending motion to dismiss, substantial risks would remain at class certification, summary judgment, trial, and on appeal. There was, therefore, a very strong possibility that the case would yield little or no recovery after many years of costly litigation.[4]

Despite these risks, Plaintiffs' Counsel worked 3,694 hours on behalf of the Settlement Class, all on a fully contingent basis with no guarantee of ever being paid.  As compensation for Plaintiffs' Counsel's significant efforts and achievements on behalf of the Settlement Class, Lead Counsel respectfully requests a fee award in the amount of 25% of the Settlement Fund after deducting Litigation Expenses.  The requested fee is consistent with attorney fee awards in comparable class action settlements, whether considered as a percentage of the Settlement Amount or in relation to Plaintiffs' Counsel's lodestar.  In fact, the requested fee represents a multiplier of 2.30 on Plaintiffs' Counsel's lodestar, which is well within the range of multipliers typically awarded in class actions with substantial contingency risks such as this one.  *See In re Signet*

---

[3] Unless otherwise indicated, all emphasis is added, and all internal quotation marks and citations are omitted from citations herein.

[4] *See In re Xcel Energy, Inc., Sec., Deriv. & "ERISA" Litig.*, 364 F. Supp. 2d 980, 994 (D. Minn. 2005) ("Precedent is replete with situations in which attorneys representing a class have devoted substantial resources in terms of time and advanced costs yet have lost the case despite their advocacy."); *Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) (observing that "Defendants prevail outright in many securities suits.").

*Jewelers Limited Sec. Litig.*, 2020 WL 4196468, at \*16 (S.D.N.Y. July 21, 2020) ("In complex litigation, lodestar multipliers between 2 and 5 are commonly awarded, and fee awards resulting in multipliers as high as 6 have also been approved.").

Lead Counsel also seek reimbursement of $146,341.45 in out-of-pocket litigation expenses. These expenses were incurred for customary costs of complex litigation, such as consulting damages experts, mediation, a private investigator, and online legal research. The expenses are reasonable in amount and were necessary to prosecute the Action.

Finally, Plaintiffs respectfully request PSLRA awards totaling $10,000 ($5,000 to Court-appointed Lead Plaintiff Hang Li, and $2,500 each to additional named Plaintiffs Mike Drumright and Marco Amiotti), to compensate them for the time and effort they expended on behalf of the Settlement Class. Each Plaintiff provided their trading records to Plaintiffs' Counsel, reviewed court filings, communicated with Plaintiffs' Counsel about the litigation and settlement, and authorized Plaintiffs' Counsel to settle the case. But for their "commitment to pursuing these claims, the successful recovery for the [Settlement] Class would not have been possible." *Bell v. Pension Comm. of ATH Holding Co., LLC*, 2019 WL 4193376, at \*6 (S.D. Ind. Sept. 4, 2019).

For the reasons set forth herein and in the Joint Declaration, Lead Counsel respectfully request the Court award fees of 25% of the Settlement Fund net of Litigation Expenses, approve reimbursement of $146,341.45 in Plaintiffs' Counsel's out-of-pocket litigation expenses, and grant PSLRA awards totaling $10,000 to the three Plaintiffs.

## II.    ARGUMENT

### A.    The Common Fund Doctrine Applies To The Settlement

The Supreme Court and the Second Circuit have long recognized that attorneys whose efforts create a "common fund" are entitled to a reasonable attorneys' fee from that fund. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). "The rationale for the doctrine is an

equitable one: it prevents unjust enrichment of those benefitting from a lawsuit without contributing to its cost." *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000). Awarding reasonable attorneys' fees from a common fund also serves an important policy goal: it encourages "skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons," and thus discourages "future misconduct of a similar nature." *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115808, at *2 (S.D.N.Y. Nov. 7, 2007); *see also Hicks v. Morgan Stanley & Co.*, 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005).

For the common fund doctrine to apply, "the applicant's efforts must confer a 'substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread costs proportionately among them,' an award of attorneys' fees must operate to shift the costs of litigation to that group." *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 369 (S.D.N.Y. 2002) (quoting *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 393-94 (1970)). All of these elements are present here. Plaintiffs' Counsel's efforts conferred a substantial benefit—$29.2 million in cash—on an ascertainable class. In addition, a fee award from the common fund will equitably shift the costs of litigation to the group benefitting from the Settlement, *i.e.*, the Settlement Class. Accordingly, the Court should award attorneys' fees from the Settlement Fund. *See Maley*, 186 F. Supp. 2d at 369.

**B.    The Court Should Award A Reasonable Percentage Of The Common Fund**

To evaluate the fee application, the Court should use the percentage-of-recovery method, with a lodestar cross-check. In the Second Circuit, "both the lodestar and the percentage of the fund methods are available to district judges in calculating attorneys' fees." *Goldberger*, 209 F.3d at 50. However, "[t]he trend in the Second Circuit is to use the percentage of the fund method . . . as it directly aligns the interests of the class and its counsel, mimics the compensation system actually used by individual clients to compensate their attorneys, provides a powerful incentive for

4

the efficient prosecution and early resolution of litigation, and preserves judicial resources." *Monzon v. 103W77 Partners, LLC*, 2015 WL 993038, at \*2 (S.D.N.Y. Mar. 5, 2015); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) ("The trend in this Circuit is toward the percentage method, which directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation.").

The percentage-of-the-fund method is also supported by the PSLRA. *See* 15 U.S.C. § 78u-4(a)(6) ("Total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a *reasonable percentage* of the amount of any damages and prejudgment interest actually paid to the class.").[5] The lodestar method, by contrast, "create[s] an unanticipated disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in a gimlet-eyed review of line-item fee audits." *Wal-Mart*, 396 F.3d at 121.

The percentage method does not render the lodestar irrelevant. Rather, part of the reasonableness inquiry is a comparison of the lodestar to the fee awarded pursuant to the percentage of the fund method "[a]s a 'cross-check.'" *Id.* at 123 (quoting *Goldberger*, 209 F.3d at 50). "[W]here [the lodestar method is] used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court." *Goldberger*, 209 F.3d at 50. "Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case," *id.*, or "[t]he district courts . . . may rely on summaries submitted by the attorneys and need not review actual billing records." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306-07 (3d Cir. 2005); *Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 2d 172, 184 (W.D.N.Y. 2011);

---

[5] *See also In re EVCI Career Colls. Holding Corp. Sec. Litig.*, 2007 WL 2230177, at \*16 (S.D.N.Y. July 27, 2007) ("[T]he PSLRA implicitly supports the use of the percentage of the fund method."); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 355 (S.D.N.Y. 2005) ("apply[ing] the percentage method" due, at least in part, to "the PSLRA's express contemplation that the percentage method will be used to calculate attorneys' fees in securities fraud class actions").

*Johnson v. Brennan*, 2011 WL 4357376, at *14-15 (S.D.N.Y. Sept. 16, 2011).

The weight of authority suggests that the Court should use the percentage-of-recovery method, with a lodestar cross-check, in determining a reasonable attorneys' fee. *See In re Bristol-Myers Squibb Sec. Litig.*, 361 F. Supp. 2d 229, 233 (S.D.N.Y. 2005) ("Typically, courts utilize the percentage method and then 'cross-check' the adequacy of the resulting fee by applying the lodestar method."); *Bellifemine v. Sanofi-Aventis U.S. LLC*, 2010 WL 3119374, at *6 (S.D.N.Y. Aug. 6, 2010) ("applying a lodestar 'cross-check'").

### C.    The Requested Attorneys' Fees Are Reasonable

#### 1.    The Requested Attorneys' Fees Are Reasonable Under The Percentage-Of-The-Fund Method

Lead Counsel's 25% fee request is well within the range of percentage fees awarded in comparable, complex class actions within this Circuit. *See Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, No. 19-cv-10067-PAE, ECF No. 242 at 56:8-10 (S.D.N.Y. Aug. 1, 2024) (settlement hearing transcript, stating that "a 25 percent fee award of [nearly] $7.5 million [from the $29.75 million settlement] comfortably aligns . . . with the range of attorneys' fees awarded in securities fund class actions") (Ex. 23) ("*Qihoo* Transcript"); *id.* at 60:19-20 ("a 25 percent fee, before costs, falls squarely within the mainstream of securities class action fees approved in this district"); *Maley*, 186 F. Supp. 2d at 370 (finding 33⅓% fee request "falls comfortably within the range of fees typically awarded in securities class actions"); *In re Lloyd's Am. Trust Fund Litig.*, 2002 WL 31663577, at *26 (S.D.N.Y. Nov. 26, 2002) (collecting cases and stating "[i]n this district alone, there are scores of common fund cases where fees alone (*i.e.,* where expenses are awarded in addition to the fee percentage) were awarded in the range of 33-1/3% of the settlement fund."); *In re Monster Worldwide, Inc. Sec. Litig.*, 2008 WL 9019514, at *1-2 (S.D.N.Y. Nov. 25, 2008) (awarding 25% of $47.5 million settlement); *In re Salomon Analyst Metromedia Litig.*, No.

6

02-cv-7966, ECF No. 93 at 1 (S.D.N.Y. Feb. 27, 2009) (awarding 27% of $35 million settlement) (Ex. 24); *In re Celestica Inc. Sec. Litig.*, No. 07-cv-00312, ECF No. 267 at 2 (S.D.N.Y. July 28, 2015) (awarding 30% of $30 million settlement) (Ex. 25).[6]

In addition, 25% is the median attorneys' fee awarded in securities class actions with settlements of a similar magnitude, which further supports Lead Counsel's request. *See* Ex. 1 (NERA Report) at p. 30 (from 1996 to 2024, the median attorneys' fee award for settlements between $25 million and $100 million was 25%).

A 25% fee award is no less appropriate because the case settled before the Court decided Defendants' pending motion to dismiss. "Class Counsel should not be penalized by a reduction of their fee request, but rather rewarded for the extent and expediency of the recovery for the Settlement Class[] that they have achieved." *Leach v. NBC Universal Media, LLC*, 2017 WL 10435878 at ¶40 (S.D.N.Y. Aug. 24, 2017). Indeed, recognizing the importance of efficient and effective advocacy, courts have repeatedly awarded similar fees where a settlement was reached during the pendency of a motion to dismiss or shortly after, and where no or limited discovery had been obtained as a result of the PSLRA discovery stay. *See Zeltser v. Merrill Lynch & Co., Inc.*,

---

[6] *See also Moloney v. Shelly's Prime Steak, Stone Crab & Oyster Bar*, 2009 WL 5851465, at *5 (S.D.N.Y. Mar. 31, 2009) (collecting cases and noting that "Class Counsel's request for 33% of the Settlement Fund is typical in class action settlements in the Second Circuit."); *Lea v. Tal Educ. Grp.*, 2021 WL 5578665, at *11 (S.D.N.Y. Nov. 30, 2021) (awarding 33⅓% settlement fund and stating: "[t]he percentage of the fund request[ed] – one-third – is a percent that has been approved as reasonable in this Circuit."); *Landmen Partners, Inc. v. The Blackstone Group, L.P. et al.*, No. 08-cv-03601, ECF No. 191 at ¶14 (S.D.N.Y. Dec. 18, 2013) (awarding 33⅓% of $85 million settlement) (Ex. 27); *Board of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 2012 WL 2064907, at *3 (S.D.N.Y. June 7, 2012) (awarding 25% of $37,500,000 settlement); *In re OSG Sec. Litig.*, No. 12-cv-07948, ECF No. 261 at 1-2 (S.D.N.Y. Dec. 2, 2015) (awarding 30% of $31.6 million settlement) (Ex. 28); *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 2015 WL 13639234 (S.D.N.Y. Oct. 19, 2015) (awarding 30% of $33 million settlement); *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 343 F. Supp. 3d 394 (S.D.N.Y. 2018) (awarding 25% of $35 million settlement), *aff'd*, 674 F. App'x 37 (2d Cir. 2016).

2014 WL 4816134, at *10 (S.D.N.Y. Sept. 23, 2014) (awarding a 33% fee, equating to a 5.1 multiplier, where settlement was reached after the amended complaint was filed and noting that plaintiff's counsel should not be "penalize[d] . . . for achieving an early settlement, particularly where . . . the settlement amount is substantial."); Ex. 23, *Qihoo* Transcript at 57:19-20 (approving 25% fee where "the case never really reached active discovery, just a bit occurred. It settled after effectively written demands for discovery had been made").[7]

The requested 25% fee is, therefore, consistent with awards in other complex cases. *See* Ex. 18 (Table of Select Second Circuit Cases with 25% or Higher Fee Awards); *e.g.*, *Cornwell v. Credit Suisse Grp.*, No. 08-cv-03758, ECF No. 117 at 4 (S.D.N.Y. July 18, 2011) (finding reasonable an award of 27.5% of $70 million settlement fund, representing a lodestar multiplier of 4.7, "[g]iven the public policy and judicial economy interests that support the expeditious settlement of cases") (Ex. 26).

### 2. The Lodestar Cross-Check Strongly Supports The Reasonableness Of The Requested Fee

A lodestar cross-check confirms the requested fee's reasonableness. *See Goldberger*, 209 F.3d at 50. The lodestar is calculated by multiplying the number of hours expended by each attorney or para-professional by their current reasonable and customary hourly rate, and totaling the amounts

---

[7] *See also In re Am. Express Fin. Advisors Sec. Litig.*, No. 04-cv-1773, ECF No. 170 at ¶16 (S.D.N.Y. July 18, 2007) (awarding 27% of $100 million, representing a 2.8 multiplier, where settlement was reached before resolution of motion to dismiss) (Ex. 29); *In re L.G. Philips LCD Co. Sec. Litig.*, No. 07-cv-00909, ECF No. 82 at ¶3 (S.D.N.Y. Mar. 17, 2011) (awarding 30% of $18 million, representing a multiplier of 3.17, where settlement reached while motion to dismiss was pending) (Ex. 30); *In re Ubiquiti Networks, Inc. Sec. Litig.*, No. 18-cv-01620, ECF No. 49 at 6 (S.D.N.Y. Mar. 27, 2020) (awarding 33.3% of $15 million settlement, representing a multiplier of 3.1, where settlement was reached prior to filing a motion to dismiss) (Ex. 31); *In re TeleTech Litig.*, No. 08-cv-00913, ECF No. 82 at 1 (S.D.N.Y. June 11, 2010) (awarding 30% of $11 million, representing a 3.78 multiplier, where settlement reached before motion to dismiss was filed) (Ex. 32).

for all timekeepers.[8]  Additionally, "[u]nder the lodestar method of fee computation, a multiplier is typically applied to the lodestar." *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 468 (S.D.N.Y. 2004).  "The multiplier represents the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors." *Id.* (citing *Goldberger*, 209 F.3d at 47); *Savoie v. Merchants Bank*, 166 F.3d 456, 460 (2d Cir. 1999).  Thus, "[w]here, as here, counsel has litigated a complex case under a contingency fee arrangement, they are entitled to a fee in excess of the lodestar." *In re Comverse Tech., Inc. Sec. Litig.*, 2010 WL 2653354, at *5 (E.D.N.Y. June 24, 2010).

Plaintiffs' Counsel (including attorneys, paralegals, and professional support staff) collectively devoted 3,694.40 hours to prosecuting this Action, resulting in a lodestar of $3,154,231.25.  ¶129.[9]  Based on a 25% fee net of Litigation Expenses (equal to $7,260,914.63 before interest), this lodestar yields a multiplier of 2.30.  This multiplier is at the lower end of the range commonly awarded in securities class actions and other complex litigation.  *See Wal-Mart*, 396 F.3d at 123 (upholding multiplier of 3.5 as reasonable on appeal); *Maley*, 186 F. Supp. 2d at 369 (awarding fee equal to a 4.65 multiplier, which was "well within the range awarded by courts in this

---

[8] "[T]he use of current rates to calculate the lodestar figure has been endorsed repeatedly by the Supreme Court, the Second Circuit and district courts within the Second Circuit as a means of accounting for the delay in payment inherent in class actions and for inflation." *In re Hi-Crush Partners L.P. Sec. Litig.*, 2014 WL 7323417, at *15 (S.D.N.Y. Dec. 19, 2014); *Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989); *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998) ("[C]urrent rates, rather than historical rates, should be applied in order to compensate for the delay in payment.").

[9] Plaintiffs' Counsel's rates range from $900 to $1,290 for partners, and $535 to $900 for non-partners (¶131), and "are comparable to peer law firms in recent years." *In re Tenaris S.A. Sec. Litig.*, 2024 WL 1719632, at *10 (E.D.N.Y. Apr. 22, 2024) (commenting on GPM's 2023 rates); *Davis v. Yelp, Inc.,* 2023 WL 3063823, at *2 (N.D. Cal. Jan. 27, 2023) (granting 33.3% fee, with lodestar cross-check incorporating Holzer's then-current rates); *In re Lyft Inc. Sec. Litig.*, 2023 WL 5068504, at *12 (N.D. Cal. Aug. 7, 2023) (finding Block's then-current hourly rates "in line with prevailing rates in this district for personnel of comparable experience, skill, and reputation"); *see also* Ex. 22 (chart of rates charged by peer plaintiff and defense counsel in complex litigation).

Circuit and courts throughout the country"); *Burns v. FalconStor Software, Inc.*, 2014 WL 12917621, at *10 (E.D.N.Y. Apr. 10, 2014) (finding 33.3% fee award "reasonable" based on cross-check multiplier of 4.75); *In re Bisys Sec. Litig.*, 2007 WL 2049726, at *3 (S.D.N.Y July 16, 2007) (awarding 30% fee, equating to a 2.99 multiplier and finding that the multiplier "falls well within the parameters set in this district and elsewhere"); *Davis*, 827 F. Supp. 2d at 185 (awarding fee representing a multiplier of 5.3, which was "not atypical").[10]

A multiplier of 2.30 is also in line with that previously awarded by the Court in the *Qihoo* securities class action, where, like here, the successful result was largely due to the independent investigation and efforts of plaintiffs' counsel (*see infra* Sec. II.D.2; ¶¶114-24). Ex. 23, *Qihoo* Transcript at 59:10-13 (that "plaintiffs' counsel were authors of their success and did not rely on the work of others . . . favors a substantial fee, consistent with a fee equating to more than two times the lodestar, 2.2 times to be more precise").

"In sum, Lead Counsel's requested fee award is well within the range of what courts in this Circuit regularly award in class actions such as this one, whether calculated as a percentage of the fund or in relation to Plaintiff's Counsel's lodestar." *Signet*, 2020 WL 4196468, at *17 (awarding 25% of $240 million settlement, equating to 1.98 lodestar multiplier, and collecting cases showing that "[i]n complex litigation, lodestar multipliers between 2 and 5 are commonly awarded"); *see also Guevoura Fund Ltd. v. Sillerman*, 2019 WL 6889901, at *18 (S.D.N.Y. Dec. 18, 2019) ("multipliers of between three and four times . . . have been routinely awarded in this Circuit.");

---

[10] *See also In re Interpublic Sec. Litig.*, 2004 WL 2397190, at *12 (S.D.N.Y. Oct. 26, 2004) ("In recent years multipliers of between 3 and 4.5 have been common in federal securities cases.") (quoting *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 399 (S.D.N.Y. 1999)); *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 353 (S.D.N.Y. 2014) (awarding fee representing a multiplier of 5.2, which was "large, but not unreasonable."); *In re Deutsche Telekom AG Sec. Litig.*, 2005 WL 7984326 at *4 (S.D.N.Y. June 14, 2005) (awarding fee representing a 3.96 multiplier).

*In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 590 (S.D.N.Y. 2008) ("In contingent litigation, lodestar multiples of over 4 are routinely awarded by courts, including this Court.").

> **D.    Factors Considered By Courts In The Second Circuit Confirm The Requested Fee Is Reasonable**

The Second Circuit has held that, under both the lodestar and percentage-of-the-fund methods, "district courts should continue to be guided by the traditional criteria in determining a reasonable common fund fee, including: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Goldberger*, 209 F.3d at 50 (cleaned up). Consideration of these factors, together with the percentage and lodestar analyses above, demonstrates that the requested fee is reasonable.

> **1.    Time And Labor Expended Support The Requested Fee**

Plaintiffs' Counsel expended considerable time and effort in independently developing the key facts and theories at issue in this case, prosecuting the Action, and achieving the Settlement. Among other things, Plaintiffs' Counsel:

- drafted the initial complaint in the Action and moved for appointment of Lead Plaintiff and Lead Counsel;

- conducted an extensive investigation of the claims asserted in the Action, which included, among other things: (a) reviewing and analyzing numerous sources of publicly available information concerning Spirit and the aircraft defects at issue in the Action; (b) retaining and working with a private investigator to identify and interview former Spirit employees, in accord with best practices set forth in the Court's opinion in *In re Millennial Media, Inc. Sec. Litig.*, 2015 WL 3443918 (S.D.N.Y. May 29, 2015); and (c) working with an expert in the fields of loss causation and damages;

- utilized the foregoing investigation and additional research to draft and file their first Amended Class Action Complaint for Violations of the Federal Securities Laws ("FAC");

- continued their investigation, interviewing additional former Spirit employees and monitoring news reports about Spirit, the Company's SEC filings, and other sources of relevant publicly available information;

11

- attempted to obtain additional information about the defects at issue pursuant to the Freedom of Information Act, 5 U.S.C. §552, including initiating a lawsuit against the FAA for failure to timely respond to Lead Counsel's FOIA requests (*see Glancy Prongay & Murray LLP v. Federal Aviation Administration*, C.D. Cal. Case No. 23-cv-8119);

- analyzed Defendants' motion to dismiss the FAC;

- utilized the information from their ongoing investigation to draft and file the comprehensive, 100-page Second Amended Class Action Complaint for Violations of the Federal Securities Laws ("SAC");

- reviewed and analyzed Defendants' motion to dismiss the SAC, conducted extensive legal research to rebut Defendants' arguments, and drafted and filed Plaintiffs' opposition brief and supporting documents;

- continued to monitor developments relating to Spirit and to analyze their potential impact on Plaintiffs' claims, such as the announcement of Boeing's planned acquisition of Spirit, and certain evidence produced in connection with the National Transportation Safety Board hearing concerning the Alaska Airlines Flight 1282 door plug separation incident;

- engaged in a rigorous mediation process overseen by a highly experienced neutral mediator, former United States District Judge Layn R. Phillips, which involved, *inter alia*: (a) an exchange of written mediation statements; (b) a full-day formal mediation session, including discussion of Judge Phillips' detailed questions to the Parties testing their arguments and positions; (c) further consultation with Lead Counsel's expert on damages and loss causation; and (d) weeks of follow up negotiations;

- drafted, negotiated, and executed the confidential settlement term sheet setting forth the Parties' agreement in principle to resolve the Action, subject to certain conditions including Defendants' production of information to enable Plaintiffs' Counsel to further assess the fairness, reasonableness, and adequacy of that agreement;

- conducted substantial informal discovery to analyze the strengths and weaknesses of the Parties' claims and defenses if the Action continued to be litigated, which included: (a) negotiating and executing a confidentiality agreement with Defendants; (b) reviewing and analyzing Defendants' initial document productions; (c) making supplemental document requests to Defendants and posing questions regarding technical issues with the production and certain redactions for responsiveness and privilege; (d) receiving additional documents from Defendants in response to Plaintiffs' Counsel's inquiries, and reviewing and analyzing in total over 59,000 pages of documents produced by Defendants relating to the facts alleged in the SAC; and (e) interviewing a knowledgeable senior Spirit employee about documents produced by Defendants and matters alleged in the SAC;

- drafted the initial versions of the Stipulation (including the exhibits thereto) and

12

Supplemental Agreement, and then negotiated the terms of those documents with Defendants' Counsel;

- worked with a damages expert to craft a plan of allocation that treats Plaintiffs and all other members of the proposed Settlement Class fairly;

- drafted and filed the preliminary approval motion and supporting papers;

- oversaw the Claims Administrator's implementation of the Court-approved notice process; and

- drafted the motion for final approval and supporting papers. ¶¶16-47.

Moreover, the legal work related to the Settlement will not end with the Court's approval of the proposed Settlement. Additional hours and resources will be expended assisting Settlement Class Members with their Claim Forms, responding to Settlement Class Members' inquiries, shepherding the claims process to conclusion, and filing a distribution motion. No additional compensation will be sought for this work, which further supports the reasonableness of Lead Counsel's fee request. *See In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 2015 WL 6971424, at *10 (S.D.N.Y. Nov. 9, 2015) ("Considering that the work in this matter is not yet concluded for Plaintiffs' counsel who will necessarily need to oversee the claims process, respond to inquiries, and assist Class Members in submitting their Proof of Claims, the time and labor expended by counsel in this matter support a conclusion that a 33% fee award in this matter is reasonable."). Accordingly, the substantial time and labor expended support the requested fee.

### 2.    The Risks Of Litigation Support The Requested Fee

"[T]he risk of success [is] perhaps the foremost factor to be considered in determining" a reasonable award of attorneys' fees. *Goldberger*, 209 F.3d at 54; *see also Shapiro v. JPMorgan Chase & Co.*, 2014 WL 1224666, at *21 (S.D.N.Y. Mar. 24, 2014) ("The Second Circuit long ago recognized that courts should consider the risks associated with lawyers undertaking a case on a contingent fee basis."); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 80 F. Supp. 3d 838, 847-48 (N.D. Ill. 2015) ("When determining the reasonableness of a fee request, courts put a

fair amount of emphasis on the severity of the risk (read: financial risk) that class counsel assumed in undertaking the lawsuit.").  This is because "[n]o one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success.  Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended."  *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974); *see also City of Birmingham Ret. & Relief Sys. v. Credit Suisse Grp. AG*, 2020 WL 7413926, at *3 (S.D.N.Y. Dec. 17, 2020) ("[G]reater risks undertaken by counsel who accept a case on a contingent fee basis support a higher settlement percentage.").  In applying this factor, "litigation risk must be measured as of when the case is filed, rather than with the hindsight benefit of subsequent events."  *Global Crossing*, 225 F.R.D. at 467.  The many substantial risks that Plaintiffs' Counsel faced in prosecuting this suit more than justify the requested fee.  *See* ¶¶48-85.

Numerous courts have recognized that "class actions confront even more substantial risks than other forms of litigation[,]" *Comverse*, 2010 WL 2653354, at *5, and that "[s]ecurities class actions such as this are notably difficult and notoriously uncertain."  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 2010 WL 4537550, at *27 (S.D.N.Y. Nov. 8, 2010).[11]  This case was no exception. Plaintiffs' Counsel understood that they were embarking on a complex, expensive, and potentially lengthy litigation with no guarantee of being compensated for their substantial investment of time and money.  In undertaking that responsibility, "plaintiffs' counsel were obligated to assure that sufficient attorney and para-professional resources were dedicated to the prosecution of the Action;

---

[11] *See also Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, 2004 WL 1087261, at *3 (S.D.N.Y. May 14, 2004) ("Little about litigation is risk-free, and class actions confront even more substantial risks."); *Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*, 212 F.R.D. 400, 409 (E.D. Wis. 2002) ("Shareholder class actions are difficult and unpredictable, and skepticism about optimistic forecasts of recovery is warranted.").

counsel also faced the responsibility of advancing litigation and overhead expenses on this case." *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 164 (S.D.N.Y. 2011).  Indeed, "[u]nlike counsel for Defendants, who are paid substantial hourly rates and reimbursed for their expenses on a regular basis, [Plaintiffs'] Counsel have not been compensated for any time or expenses since this case began." *Flag Telecom*, 2010 WL 4537550, at *27.

Plaintiffs' Counsel's commitment was substantial, *i.e.*, $3,154,231.25 in lodestar (¶129) and $146,341.45 in out-of-pocket hard costs (¶146).  Had they not obtained a recovery it would have all been lost, which Lead Counsel knew from experience was a distinct possibility despite their diligent and committed prosecution of the Action.  *See Gross v. GFI Group, Inc.*, 784 Fed. App'x 27, 28 (2d Cir. 2019) (affirming grant of summary judgment against plaintiffs in securities fraud class action, where GPM served as one of lead plaintiff's counsel, on the alternative ground that Defendant's "statement did not, as a matter of law, amount to a material misrepresentation or omission actionable under section 10(b)," despite the trial court twice finding the statement actionable); *In re: Korean Ramen Antitrust Litig.*, No. 13-cv-04115 (N.D. Cal.) (GPM lost a six-week antitrust jury trial after five years of litigation, which included many overseas depositions, the expenditure of millions of dollars of attorney and paralegal time, and the expenditure of more than a million dollars in hard costs).

This Action faced heightened risks, even as compared to the substantial risks facing securities class actions in general.[12]  One notable risk was that there was no governmental action

---

[12] For a detailed discussion of the numerous litigation risks, and thus the contingency fee risks, in this case, the Court is respectfully referred to the concurrently filed Final Approval Memorandum and Joint Declaration.  *See* Final Approval Memorandum § IV.A.3.; Joint Decl. ¶¶48-85.  While Lead Counsel believe those risks are important in assessing a reasonable attorneys' fee, for the sake of brevity, this section focuses on the heightened risk arising from the need to independently develop the claims at issue here.

that could serve as a roadmap to Plaintiffs' fraud claims. *See Dairy Farmers*, 80 F. Supp. 3d at 848 ("One proxy for assessing risk is whether the litigation followed on the heels of some prior criminal or civil proceeding involving the same parties or subject matter."). Rather, Lead Counsel performed substantial original work to develop the facts and theories at issue. Therefore, "this case (unlike many other securities class actions) was independently developed by plaintiffs' counsel, as opposed to following, or piggybacking on, a regulatory investigation or settlement," which supports the requested fee award. *Giant Interactive*, 279 F.R.D. at 164-65; *see also Maley*, 186 F. Supp. 2d at 371 (awarding one-third of settlement and noting that "[i]n this Action, Plaintiffs' Class Counsel did not 'piggy back' on any prior governmental action"); *Sumitomo Copper*, 74 F. Supp. 2d at 395 (awarding 2.5 multiplier, which equated to 27.5% of $116 million settlement fund, and noting, "[t]here was no governmental assist to ease the task with which Petitioners was confronted.").[13]

Here, when Lead Counsel initiated this Action, although the existence of the tail-fin fittings defect had been publicly revealed, there was no indication of any related governmental action other than routine FAA oversight activity. ¶115. When Lead Counsel later filed the FAC the mis-drilled holes defect was publicly known, but, as before, there was no sign of governmental action besides routine FAA oversight. *Id*. As such, the core of Plaintiffs' claims were based on Plaintiffs' Counsel's independent investigation, in particular their interviews of Spirit former employees

---

[13] Plaintiffs' Counsel also did not have the benefit of an admission of wrongdoing by Defendants or a financial restatement, further showing the risks to the case. *See In re Schering-Plough Corp. Enhance Sec. Litig.*, 2013 WL 5505744 at \*47 (D.N.J. Oct. 1, 2013) (that plaintiffs' counsel were "unaided by any other contributing factors like indictments or restatements that would be expected to enhance the likelihood of recovery—strongly supports a higher award"); *Schwartz v. TXU Corp.*, 2005 WL 3148350, at \*29 (N.D. Tex. Nov. 8, 2005) ("From the outset, this post-PSLRA action was an especially difficult and highly uncertain securities case, which did not involve restatement of TXU's previously issued financial statements or any other acknowledgments of wrongdoing.").

including Joshua Dean,[14] who allegedly discovered and reported the mis-drilled holes defect, and Former Employee 1, who emailed Defendant Gentile discussing Spirit's probation with Boeing and attaching a copy of an internal ethics complaint alleging that he was ordered to misreport defects.  ¶116.

It was not until after the January 5, 2024 Alaska Airlines Flight 1282 door plug blowout and its aftermath that relevant governmental investigations were first publicly disclosed (and very likely, began).  ¶117.  While the SAC discussed such investigations, they remained in early stages and there were no published enforcement actions or findings of fact, so these investigations provided only indirect support for Plaintiffs' claims, which remained centered on the former employee interviews conducted by Plaintiffs' Counsel.  ¶118.[15]  Indeed, despite the initiation of various investigations, to this day no civil or criminal charges have been announced by the SEC or Department of Justice relating to Defendants' conduct in this case.[16]

In short, this case lacked several strong factors that often support liability and large settlement valuations, and that can provide plaintiffs' counsel with a roadmap for proving fraud, such as a SEC or DOJ action, an accounting restatement, or insider trading.[17]  The contingency fee

---

[14] Presenting additional risk to Plaintiffs' ability to prove their claims at summary judgment and trial, Mr. Dean, who was likely to be one of Plaintiffs' most important witnesses, if not the most important, died while the case was pending.  ¶61.

[15] Far from Plaintiffs' Counsel piggybacking off governmental investigations, Plaintiffs' Counsel's work has *informed* at least one governmental investigation, by the Texas Attorney General.  ¶121.  The allegations concerning Plaintiffs' Counsel's former employee interviews have also informed a considerable amount of national media coverage (which Plaintiffs' Counsel did not solicit) relating to the events at issue in the SAC, and to aviation safety more broadly.  ¶¶120, 123.

[16] There were ongoing proceedings in the DOJ's criminal prosecution of Boeing relating to the two 737 MAX crashes in 2018 and 2019, though that subject matter is distinct from Plaintiffs' claims relating to events at Spirit during the 2020-2023 Settlement Class Period.  *See generally United States v. The Boeing Co.*, N.D. Tex. Case No. 21-cr-005.

[17] Neither Gentile nor Suchinski made suspicious sales of Spirit stock during the Settlement Class Period (¶26 n.3), and Defendants argued that "the Individual Defendants' motives were no

risk was high and, consequently, weighs strongly in favor of the requested fee. *See Xcel Energy*, 364 F. Supp. 2d at 995 (noting that attorney fee request was supported by fact that the "case did not benefit from meaningful governmental investigations" and "did not involve accounting fraud, a restatement of financials, or any allegations whatsoever of insider trading.").

###### 3.    The Magnitude And Complexity Of The Action Support The Requested Fee

Courts have repeatedly recognized the "notorious complexity" of securities class action litigation. *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 2006 WL 903236, at *8 (S.D.N.Y. Apr. 6, 2006); *TAL Educ. Grp.*, 2021 WL 5578665, at *9 ("Class action suits have a well-deserved reputation as being most complex, and securities class actions are notably difficult and notoriously uncertain to litigate."); *La. Mun. Police Emps. Ret. Sys. v. Sealed Air Corp.*, 2009 WL 4730185, at *8 (D.N.J. Dec. 4, 2009) ("securities class actions are inherently complex").  Moreover, "securities actions have become more difficult from a plaintiff's perspective in the wake of the PSLRA," and other changes in the law. *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000); *see also AOL Time Warner*, 2006 WL 903236, at *9 ("[T]he legal requirements for recovery under the securities laws present considerable challenges, particularly with respect to loss causation and the calculation of damages.").

Here, in addition to facing the heightened pleading standard and automatic discovery stay of the PSLRA—the effects of which are amply demonstrated by the high dismissal rate of securities class actions (*see supra* Section I)—Plaintiffs also had to deal with the complex subject

---

different from those common to most corporate officers," diminishing the inference of their scienter.  ECF No. 37 at 23. This too added to Plaintiffs' risks. *See In re Gilat Satellite Networks, Ltd.*, 2007 WL 2743675, at *11 (E.D.N.Y. Sept. 18, 2007) ("Establishing scienter is a difficult burden to meet and proving it will be especially challenging in this case where, apparently, neither the individual defendants nor any other Gilat executive profited from their Gilat investments.").

matter of the Action.  The focal points of Plaintiffs' claims were Spirit's manufacturing and quality control processes, its relationship with Boeing, and in particular the tail-fin fittings and mis-drilled holes defects.  Thus, to effectively prosecute the Action, Plaintiffs' Counsel needed to thoroughly research and understand these issues.  It was only by conducting a thorough independent investigation into such matters—again, without the benefit of discovery—that Plaintiffs' Counsel were able to put together a case strong enough to convince Defendants to engage in mediation and, ultimately, settle on terms fair and reasonable to the Settlement Class.

The magnitude of this Action similarly weighs in favor of Lead Counsel's fee request.  This was hard-fought litigation, with over one billion dollars of damages potentially at stake.  It required considerable skill, and Plaintiffs' Counsel's commitment of substantial resources, to litigate.  Consequently, the magnitude and complexity of the litigation support the requested fee.  *See City of Providence v. Aeropostale, Inc.*, 2014 WL 1883494, at *16 (S.D.N.Y. May 9, 2014) ("[T]he complex and multifaceted subject matter involved in a securities class action such as this supports the fee request.") *aff'd sub nom. Arbuthnot v. Pierson*, 607 F. App'x 73 (2d Cir. 2015).

### 4.    The Quality Of Representation Supports The Requested Fee

"To determine the 'quality of the representation,' courts review, among other things, the recovery obtained and the backgrounds of the lawyers involved in the lawsuit." *Taft v. Ackermans*, 2007 WL 414493, at *10 (S.D.N.Y. Jan. 31, 2007); *see also Veeco*, 2007 WL 4115808, at *7.  Both of these factors support the conclusion that a 25% fee award is reasonable here.

Plaintiffs' damages expert estimates that if they had fully prevailed on all claims, if the Court certified the same class period as the Settlement Class Period, and if the Court and jury accepted Plaintiffs' damages theory, including proof of loss causation as to 100% of the residual (*i.e.*, net of market- and industry-wide factors) stock price declines on each of the corrective disclosure dates alleged in this case—*i.e.*, Plaintiffs' best-case scenario—total *maximum* aggregate

damages were approximately $1.5 billion.  Thus, the $29.2 million Settlement Amount equates to approximately 1.9% of total *maximum* damages *potentially* available in the Action, which exceeds the 1.3% median settlement value for securities class actions with comparable maximum damages. *See* Ex. 1 (NERA Report) at 26-27 (Fig. 23-24).

Had Defendants prevailed on any of their liability or damages arguments, damages would have been substantially reduced, or eliminated.  *See Facebook,* 343 F. Supp. 3d at 414 ("Because Plaintiffs face serious challenges to establishing liability, consideration of Plaintiffs' best possible recovery must be accompanied by the risk of non-recovery."); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) ("to establish loss causation, *Dura* requires plaintiffs to disaggregate those losses caused by 'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events,' from disclosures of the truth behind the alleged misstatements.").

For instance, Defendants argued that "Plaintiffs may not recover for stock declines on May 3, August 2 and September 7" because "[t]he tail-fin fitting and mis-drilled hole issues were fully disclosed on April 13 and August 23."  ECF No. 37 at 30.  If Defendants prevailed on their arguments, it would slash Plaintiffs' damages, as May 3, August 2, and September 7 accounted for the majority of the total stock price declines.  ¶65.  Further compounding the risks, each of the May 3, August 2, and September 7 disclosures of information concerning the financial impact of the tail-fin fittings defect and/or the mis-drilled holes defect was accompanied by confounding information.  Defendants would likely produce evidence including analyst reports to argue that the stock price declines on those dates were not attributable to the defects at issue in this case, but to news concerning Spirit's supply chain challenges, labor disruptions, slowed production schedules, disappointing earnings results, and reduced financial guidance.  ¶¶67-73.

Taking into account such arguments, Lead Counsel estimates reasonably recoverable damages were approximately $1.0 billion under an approach that discounts damages attributable to the stock price declines on May 3, 2023, August 2, 2023, and September 7, 2023, to account for potentially confounding effects of other information released on those dates. ¶84.  Specifically, for those three corrective disclosures, this damages approach considers the corresponding alleged artificial inflation to be 25% of the residual daily declines in the price of Spirit Class A common stock (as opposed to 100% for the declines on April 14 and August 24, following the initial disclosures of the tail-fin fittings defect and mis-drilled holes defect).[18]  Under this damages approach, the $29,200,000 Settlement Amount represents a recovery of approximately 2.9%.

There were also many other risks to Plaintiffs' claims and damages theory that could have further reduced, or eliminated, any recovery.  ¶¶48-85.  Accordingly, the result here weighs in favor of finding that Plaintiffs' Counsel provided a high quality of representation, and supports the requested fees.  *See* Ex. 23, *Qihoo* Transcript at 59:20-24 ("Although it represented only approximately 2.45 percent of the theoretical maximum recovery, there were . . . good reasons for that discount, and the figure is within the mainstream of recoveries in securities class actions.").

Additionally, the quality of Plaintiffs' Counsel's efforts in the litigation, together with their substantial experience in securities class actions and commitment to this litigation, provided them with the leverage necessary to negotiate the Settlement.  ¶138; *see* Ex. 19-C (GPM firm résumé); Ex. 20-C (Holzer firm résumé); Ex. 21-C (Block firm résumé); *Wilson v. LSB Industries, Inc.*, 2019 WL 3542844, at *2 (S.D.N.Y. June 28, 2019) ("Lead Counsel [GPM] has conducted the litigation and achieved the Settlement with skill, perseverance and diligent advocacy."); *In re*

---

[18] This damages approach discounting the May 3, August 2, and September 7 price declines is reflected in the Plan of Allocation set forth in the Notice at ¶¶56-58, which was developed by Lead Counsel in consultation with a damages and loss causation expert.  ¶101.

*ImmunityBio, Inc. Sec. Litig.*, 2025 WL 1686263, at \*6, \*14 (S.D. Cal. June 16, 2025) ("Holzer have extensive experience prosecuting class actions under the federal securities laws," and performed "skillful work"); *Lyft*, 2023 WL 5068504, at \*9, \*12 ("Block & Leviton LLP are highly experienced lawyers with expertise in securities class actions" and "litigated this case skillfully and professionally"). Furthermore, "[n]ot only did Plaintiffs' Counsel's skill and expertise contribute to the favorable settlement for the class, it contributed to the overall efficiency of the case." *Veeco*, 2007 WL 4115808, at \*7.

Finally, Defendants were represented by experienced litigators from Cravath, Swaine & Moore LLP, among the most well-respected law firms in the nation, whose securities class action litigation defense practice has won numerous accolades. ¶139. Courts have recognized that the quality of the opposing counsel should be taken into consideration in assessing the quality of the representation plaintiffs received. ¶92; *see, e.g.*, *In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*, 2006 WL 3378705, at \*3 (S.D.N.Y. Nov. 16, 2006) ("The fact that the settlements were obtained from defendants represented by formidable opposing counsel from some of the best defense firms in the country also evidences the high quality of lead counsels' work."), *aff'd*, 272 Fed. App'x 9 (2d Cir. 2008). Cravath's lawyers skillfully represented the interests of their clients. Notwithstanding this formidable opposition, Plaintiffs' Counsel's thorough investigation, ability to present a strong case, and willingness to vigorously prosecute the Action, ultimately resulted in a resolution favorable to the Settlement Class. Consequently, this factor too weighs in favor of the requested fee. *See Veeco*, 2007 WL 4115808, at \*7 ("That Plaintiffs' Counsel was able to obtain a substantial settlement from these Defendants confirms the quality of Plaintiffs' Counsel's representation . . . and is a factor in determining the reasonableness of the fee request.").

### 5.    The Requested Fee In Relation To The Settlement Amount

Courts have interpreted this factor as requiring the review of the fee requested in terms of

the percentage it represents of the total recovery. "When determining whether a fee request is reasonable in relation to a settlement amount, the court compares the fee application to fees awarded in similar securities class-action settlements of comparable value." *Comverse*, 2010 WL 2653354, at *3. As discussed further in Section II.C.1, *supra*, the requested 25% fee is consistent with percentage fees that courts in the Second Circuit have awarded in comparable cases. Accordingly, the requested fee is reasonable in relation to the Settlement.

### 6.  Public Policy Considerations Support The Requested Fee

"[The Supreme] Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). If the "important public policy [of enforcing the securities laws] is to be carried out, the courts should award fees which will adequately compensate Lead Counsel for the value of their efforts, taking into account the enormous risks they undertook." *Flag Telecom*, 2010 WL 4537550, at *29. "[A]s a practical matter, lawsuits such as this one can only be maintained if competent counsel can be retained to prosecute them. This will occur if courts award reasonable and adequate compensation for such services where successful results are achieved." *Aeropostale*, 2014 WL 1883494, at *18.

Plaintiffs' Counsel invested substantial amounts of time and money pursuing Defendants' alleged misconduct on a fully contingent basis. Had Plaintiffs' Counsel not done so, the Settlement Class would have received no compensation. Accordingly, public policy considerations favor Lead Counsel's fee request. *See Credit Suisse*, 2020 WL 7413926, at *2 ("Protecting investors from fraudulent or misleading investments serves the public interest, and Lead Counsel's fees should reflect the important goal of serv[ing] as an inducement for lawyers to make similar efforts in the future.").

23

**E.    Plaintiffs' Counsel's Expenses Are Reasonable And Were Necessary To Achieve The Settlement**

Lead Counsel also request reimbursement of $146,341.45 in expenses incurred by Plaintiffs' Counsel while prosecuting the Action. *See Flag Telecom*, 2010 WL 4537550, at *30 ("It is well accepted that counsel who create a common fund are entitled to the reimbursement of expenses that they advanced to a class"); *In re Indep. Energy Holdings PLC Sec. Litig.*, 302 F. Supp. 2d 180, 183 n.3 (S.D.N.Y. 2003) ("Attorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were incidental and necessary to the representation of those clients.").

Here, a significant portion (68%) of the expenses were incurred for services rendered by Plaintiffs' experts, the investigator, and the mediator, and the remaining expenses are attributable to other ordinary litigation expenses, such as use of an online discovery platform, travel, and on-line legal research. ¶¶147-54.  These expenses were critical to Plaintiffs' success in achieving the proposed Settlement, are reasonable in amount, and are customary and necessary expenses for a complex securities action.  They should, therefore, be reimbursed. *See Flag Telecom*, 2010 WL 4537550, at *30; *Global Crossing*, 225 F.R.D. at 468 ("The expenses incurred – which include investigative and expert witnesses, filing fees, service of process, travel, legal research and document production and review – are the type for which 'the paying, arms' length market' reimburses attorneys.  For this reason, they are properly chargeable to the Settlement fund.").

**F.    Plaintiffs Should Be Awarded Their Reasonable Costs And Expenses Under 15 U.S.C. § 78u-4(a)(4)**

Lead Counsel also moves for PSLRA awards of $5,000 to Lead Plaintiff Hang Li, $2,500 to Plaintiff Mike Drumright, and $2,500 to Plaintiff Marco Amiotti, to compensate them for the time and effort they expended on behalf of the Settlement Class. ¶155.  "Court[s] have found that the PSLRA permits courts to award lead plaintiffs in federal securities actions reimbursement for

their time devoted to participating in and directing the litigation on behalf of the class." *Guevoura*, 2019 WL 6889901, at *22; *In re Health Insurance Innovations Sec. Litig.*, 2021 WL 1341881, at *13 (M.D. Fla. Mar. 23, 2021) (PSLRA award to lead plaintiff "for his time").    Such reimbursement "encourages participation of plaintiffs in the active supervision of their counsel." *Varljen v. H.J. Meyers & Co., Inc.*, 2000 WL 1683656, at *5 n.2 (S.D.N.Y. Nov. 8, 2000).

Here, Plaintiffs took an active role in the litigation by, among other things: (i) communicating with their counsel regarding the case; (ii) producing trading records to their attorneys; (iii) reviewing significant court filings; (iv) consulting with their attorneys regarding the settlement negotiations; and (v) evaluating and approving the proposed Settlement.   *See* Ex. 2, ¶¶4-5; Ex. 3, ¶¶4-5; Ex. 4, ¶¶4-5.  These are "precisely the types of activities that support awarding reimbursement of expenses to class representatives." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at *21 (S.D.N.Y. 2009).  Consequently, Lead Counsel respectfully requests that the Court grant Plaintiffs' request for reimbursement of their "reasonable costs and expenses incurred in managing this litigation and representing the Class." *Id.* at *21 (approving $214,657 total award to two lead plaintiffs); *In re Qudian Inc. Sec. Litig.*, 2021 WL 2328437, at *2 (S.D.N.Y. June 8, 2021) (awarding lead plaintiff $25,000, and class representative $12,500, for "reasonable costs and expenses directly related to [their] representation of the Class").[19]

## III.    CONCLUSION

For the foregoing reasons, Lead Counsel respectfully requests the Court grant the motion.

---

[19] *See also Signet*, 2020 WL 4196468, at *24 (collecting cases and awarding $25,410 to lead plaintiff); *TAL Educ. Grp.*, 2021 WL 5578665, at *13 (awarding two lead plaintiffs $7,500 each); *Veeco*, 2007 WL 4115808, at *12 (awarding lead plaintiff $15,964 for time spent supervising litigation, and characterizing such awards as "routine" in this Circuit); *In re Salomon*, No 02-cv-7966, ECF No. 93 at 2 (awarding three lead plaintiffs $5,000 each) (Ex. 24).

Dated: December 12, 2025

**GLANCY PRONGAY & MURRAY LLP**

By: */s/ Garth Spencer*
Robert V. Prongay
Joseph D. Cohen (*pro hac vice*)
Garth Spencer (GS-7623)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
rprongay@glancylaw.com
jcohen@glancylaw.com
gspencer@glancylaw.com

Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
glinkh@glancylaw.com

**HOLZER & HOLZER, LLC**
Corey D. Holzer (*pro hac vice*)
211 Perimeter Center Parkway, Suite 1010
Atlanta, Georgia 30346
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
cholzer@holzerlaw.com

*Lead Counsel for Plaintiffs and the Settlement Class*

**BLOCK & LEVITON LLP**
Jeffrey C. Block  (JCB-0387)
Jacob Walker (*pro hac vice*)
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
(617) 507-6020 fax
jeff@blockleviton.com
jake@blockleviton.com

*Additional Counsel for Plaintiffs*

26