## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HANG LI, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:23-cv-03722-PAE |
| Plaintiff, | |
| v. | |
| SPIRIT AEROSYSTEMS HOLDINGS, INC., TOM GENTILE III, and MARK J. SUCHINSKI, | |
| Defendants. | |

**JOINT DECLARATION OF GARTH SPENCER AND COREY D. HOLZER IN SUPPORT OF: (I) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND <u>REIMBURSEMENT OF LITIGATION EXPENSES</u>**

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................ 2

II.     PROSECUTION OF THE ACTION .................................................... 6

        A.      Background ..................................................................... 6

        B.      Commencement Of The Action And Appointment Of Lead Plaintiff And
                Lead Counsel ................................................................. 7

        C.      Plaintiffs' Counsel's Comprehensive Pre-Filing Investigation And
                Preparation Of The First Amended Complaint ........................ 8

        D.      Defendants' Motion To Dismiss The FAC, Plaintiffs' Continued
                Investigation, And Filing Of The Second Amended Complaint.......... 10

        E.      Briefing On Defendants' Motion To Dismiss The Second Amended
                Complaint, And Plaintiffs' Continued Investigation ................. 11

        F.      Mediation Efforts, Settlement Negotiations, Settlement-Related Discovery,
                And The Settlement's Preliminary Approval ........................ 13

III.    THE RISKS OF CONTINUED LITIGATION .................................. 17

        A.      Risks To Overcoming Defendants' Motion To Dismiss..................... 18

        B.      Risks To Proving Liability............................................ 20

        C.      Risks To Proving Loss Causation And Damages ...................... 24

        D.      Risks Faced In Obtaining And Maintaining Class Action Status .......... 29

        E.      Other Risks, Including Trial, Appeals, And Ability To Collect A Judgment....... 31

        F.      The Settlement Is Reasonable In Light Of Potential Recovery In The Action
                ................................................................................ 33

IV.     PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL
        ORDER REQUIRING ISSUANCE OF THE NOTICE .................................. 34

V.      ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT ...................... 37

VI.     LEAD   COUNSEL'S   REQUEST   FOR   ATTORNEYS'   FEES   AND
        REIMBURSEMENT OF LITIGATION EXPENSES .................................... 41

        A.      The Fee Application.......................................................... 42

1.      The Favorable Outcome Achieved Is The Result Of The Significant
Time And Labor That Plaintiffs' Counsel Devoted To The Action ......... 43

2.      The Magnitude And Complexity Of The Action ...................................... 51

3.      The Significant Risks Borne By Plaintiffs' Counsel ............................... 52

4.      The Quality Of Representation, Including The Result Obtained, The
Experience And Expertise Of Lead Counsel, And The Standing And
Caliber Of Defendants' Counsel .............................................................. 53

5.      The Requested Fee In Relation To The Settlement ................................. 54

6.      The Reaction Of The Settlement Class Supports Lead Counsel's Fee
Request .................................................................................................... 55

7.      Plaintiffs Support Lead Counsel's Fee Request ...................................... 55

B.      Reimbursement Of The Requested Litigation Expenses Is Fair And
Reasonable .................................................................................................... 55

VII.    CONCLUSION ................................................................................................... 59

## TABLE OF EXHIBITS TO DECLARATION

| EXHIBIT | TITLE |
|---|---|
| 1 | Excerpts from Edward Flores and Svetlana Starykh, *Recent Trends In Securities Class Action Litigation: 2024 Full-Year Review* (NERA January 22, 2025) |
| 2 | Declaration of Lead Plaintiff Hang Li in Support of: (1) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (2) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses |
| 3 | Declaration of Named Plaintiff Mike Drumright in Support of: (1) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (2) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses |
| 4 | Declaration of Named Plaintiff Marco Amiotti in Support of: (1) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (2) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses |
| 5 | Declaration of Layn R. Phillips in Support of Final Approval of Class Action Settlement |
| 6 | Truist, Spirit AeroSystems Holdings, Inc. (SPR), *FCF Reduced (Again) Amid Fewer Deliveries; Execution and Supply Chain In Focus* (May 3, 2023) |
| 7 | Wolfe Research,  Spirit AeroSystems Holdings, Inc. (SPR), *737 better than feared but hits keep coming elsewhere* (May 3, 2023) |
| 8 | J.P. Morgan, Spirit AeroSystems, *Near Term Still Challenging But Longer Term Potential Remains* (May 4, 2023) |
| 9 | Jefferies, Spirit AeroSystems, *Cash Continues to Spirit Away* (May 7, 2023) |
| 10 | Corrected Transcript, Spirit AeroSystems Holdings, Inc., *Q2 2023 Earnings Call* (Aug. 2, 2023) |
| 11 | Morgan Stanley, Spirit AeroSystems Holdings Inc, *Headwinds Sustain; Reiterate UW-Rating* (Aug. 3, 2023) |
| 12 | RBC Capital Markets, Spirit AeroSystems Holdings, Inc., *Capitulation on lower FCF and delivery outlook, increased 2024-2025 uncertainty; maintain SP, PT to $26* (Aug. 2, 2023) |
| 13 | Susquehanna Financial Group, LLLP, *Spirit AeroSystems: Disappointing 2Q Results and Worse 2023 Outlook, but Headwinds Are Transitory* (Aug. 3, 2023) |
| 14 | TD Cowen, Spirit AeroSystems, *Still Looking For A Turnaround Signal* (Aug. 2, 2023) |
| 15 | Corrected Transcript, Spirit AeroSystems Holdings, Inc., Jefferies Industrials Conference (Sept. 7, 2023) |

| | |
|---|---|
| 16 | Jefferies, Spirit AeroSystems, *2023 Global Industrials Conference Takeaways* (Sept. 7, 2023) |
| 17 | Declaration of Melissa Mejia Regarding: (A) Mailing/Emailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Claims Received to Date; and (D) Requests for Exclusion Received to Date |
| 18 | Table of Select Second Circuit Cases with 25% or Higher Fee Awards |
| 19 | Declaration of Garth Spencer, Esq. in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses, Filed on Behalf of Glancy Prongay & Murray LLP |
| 20 | Declaration of Corey D. Holzer, Esq. in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses, Filed on Behalf of Holzer & Holzer LLC |
| 21 | Declaration of Jacob A. Walker, Esq. in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses, Filed on Behalf of Block & Leviton LLP |
| 22 | Survey of Law Firm Billing Rates – Plaintiffs' and Defense Firms |
| 23 | *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, No. 19-cv-10067-PAE, ECF No. 242 (S.D.N.Y. Aug. 1, 2024) (settlement hearing transcript) |
| 24 | *In re Salomon Analyst Metromedia Litig.*, No. 02-cv-7966, ECF No. 93 (S.D.N.Y. Feb. 27, 2009) (fee order) |
| 25 | *In re Celestica Inc. Sec. Litig.*, No. 07-cv-00312, ECF No. 267 (S.D.N.Y. July 28, 2015) (fee order) |
| 26 | *Cornwell v. Credit Suisse Grp.*, No. 08-cv-03758, ECF No. 117 (S.D.N.Y. July 18, 2011) (fee order) |
| 27 | *Landmen Partners, Inc. v. The Blackstone Group, L.P. et al.*, No. 08-cv-03601, ECF No. 191 (S.D.N.Y. Dec. 18, 2013) (fee order) |
| 28 | *In re OSG Sec. Litig.*, No. 12-cv-07948, ECF No. 261 (S.D.N.Y. Dec. 2, 2015) (fee order) |
| 29 | *In re Am. Express Fin. Advisors Sec. Litig.*, No. 04-cv-1773, ECF No. 170 (S.D.N.Y. July 18, 2007) (fee order) |
| 30 | *In re L.G. Philips LCD Co. Sec. Litig.*, No. 07-cv-00909, ECF No. 82 (S.D.N.Y. Mar. 17, 2011) (fee order) |
| 31 | *In re Ubiquiti Networks, Inc. Sec. Litig.*, No. 18-cv-01620, ECF No. 49 (S.D.N.Y. Mar. 27, 2020) (fee order) |
| 32 | *In re TeleTech Litig.*, No. 08-cv-00913, ECF No. 82 (S.D.N.Y. June 11, 2010) (fee order) |
| 33 | Excerpts from Spirit AeroSystems Holdings, Inc. SEC Form 10-Q for the period ended Sept. 26, 2024, as filed with the SEC on Nov. 5, 2024 |

We, Garth Spencer and Corey D. Holzer, declare the following pursuant to 28 U.S.C. §1746:

1.      Glancy Prongay & Murray LLP ("GPM") and Holzer & Holzer LLC ("H&H") serve as lead counsel ("Lead Counsel") for the Settlement Class and for the Court-appointed Lead Plaintiff Hang Li, and additional named plaintiffs Marco Amiotti and Mike Drumright (collectively, "Plaintiffs") in this Action.[1] Garth Spencer is a partner with GPM, and Corey D. Holzer is a partner with H&H. We make this declaration in support of the concurrently filed: (a) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (b) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses. We have personal knowledge of the matters stated herein, and if called upon each of us could and would competently testify thereto under oath.

2.      As set forth in the memorandum in support of Plaintiffs' final approval motion ("Final Approval Memorandum"), Plaintiffs seek final approval of the $29,200,000 Settlement for the benefit of the Settlement Class, as well as final approval of the proposed Plan of Allocation of the Net Settlement Fund to eligible Settlement Class Members.

3.      As set forth in the memorandum in support of Lead Counsel's fee and expense motion ("Fee Memorandum"), Lead Counsel seek an award of attorneys' fees in the amount of 25% of the Settlement Fund (which, by definition, includes interest accrued thereon) net of Litigation Expenses. Lead Counsel also seek reimbursement of Litigation Expenses in the total amount of $156,341.45, which includes Plaintiffs' Counsel's total out-of-pocket litigation costs in the amount of $146,341.45, and a total of $10,000 to Plaintiffs, pursuant to the Private Securities

---

[1] Unless otherwise defined, all capitalized terms herein have the same meanings as set forth in the Stipulation and Agreement of Settlement dated August 4, 2025.  ECF No. 64-1.

1

Litigation Reform Act of 1995 ("PSLRA") for their costs, including lost wages, incurred in connection with their representation of the Settlement Class.[2]

4.     The Court preliminarily approved the proposed Settlement by Order dated September 4, 2025 (the "Preliminary Approval Order"), and therein directed notice of the Settlement to be disseminated to the Settlement Class. *See* ECF No. 67. Pursuant to the Preliminary Approval Order, Epiq Class Action & Claims Solutions, Inc. ("Epiq"), the Court-approved Claims Administrator, implemented a comprehensive notice program under the direction of Lead Counsel, whereby notice was given to potential Settlement Class Members by mail and by publication.

5.     As of December 5, 2025, notice has been distributed to a total of 209,273 potential Settlement Class Members and/or their nominees, and thus far, there has not been a single request for exclusion or objection. *See* Ex. 17 ("Mejia Decl.") ¶¶11, 21.

## I.    INTRODUCTION

6.     This is a federal securities class action pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder and Section 20(a) of the Exchange Act. Plaintiffs asserted claims against Defendant Spirit AeroSystems Holdings, Inc. ("Spirit" or the "Company") and Defendants Tom Gentile III and Mark J. Suchinski (together, the "Individual Defendants," and together with the Spirit, "Defendants"). Gentile and Suchinski were, respectively, Spirit's CEO and CFO during the Settlement Class Period.

7.     On March 12, 2024, Plaintiffs filed their Second Amended Class Action Complaint for Violations of the Federal Securities Laws (the "SAC" or "Complaint"). ECF No. 30. The SAC alleged that during the Settlement Class Period the Defendants materially misled investors

---

[2] Lead Counsel's motion for attorneys' fees and reimbursement of Litigation Expenses is made on behalf of Lead Counsel and additional Plaintiffs' Counsel, Block & Leviton LLP ("B&L"), and The Law Offices of Frank R. Cruz ("Cruz") (collectively, "Plaintiffs' Counsel").

regarding the quality and safety of Spirit's products, including 737 MAX aircraft fuselages, and that Spirit's stock price fell when the truth was revealed by disclosure of defects in certain 737 MAX components, and the financial impacts of those defects.

8.     The proposed Settlement provides for the resolution of all claims in the Action in exchange for a cash payment of $29,200,000 (the "Settlement Amount") for the benefit of the Settlement Class.  As detailed herein, Plaintiffs and Lead Counsel believe that the proposed Settlement represents a very good result for the Settlement Class considering the significant risks remaining in the Action. Such risks include, but are not limited to, Defendants' motion to dismiss, which has not yet been decided, and the risks that would be faced at class certification, summary judgment, trial and on appeal.

9.     Additionally, the $29,200,000 cash Settlement Amount is well within the range of reasonableness under the circumstances to warrant final approval of the Settlement.  Plaintiffs' damages expert estimates that if Plaintiffs had *fully prevailed* on their claims, if the Court certified the same class as the Settlement Class, and if the Court and jury accepted Plaintiffs' damages theory—*i.e.*, Plaintiffs' best case scenario—the total *maximum* damages would be approximately $1.5 billion.  Thus, the $29,200,000 Settlement Amount represents approximately 1.9% of the total *maximum* damages *potentially* available in this Action. Moreover, the Settlement Amount is approximately 2.9% of Lead Counsel's estimate of $1.0 billion of reasonably recoverable damages under an approach that takes into account confounding information released on certain alleged corrective disclosure dates to discount damages attributable to stock price declines on those dates.

10.     Under either scenario, the recovery is above the 1.3% median settlement value for securities class actions with comparable damages. *See, e.g.*, Ex. 1 (Excerpts from Edward Flores and Svetlana Starykh, *Recent Trends In Securities Class Action Litigation: 2024 Full-Year Review*

(NERA January 22, 2025) ("NERA Report")) at p. 26, Fig. 23 (median recovery in securities class actions from 2015-2024 was 1.3% for cases with investor losses of approximately $1 to $5 billion). Consequently, the amount recovered by Plaintiffs, when balanced against the risks of continued litigation, is well within the range of reasonableness, and weighs strongly in favor of final approval.

11.      The proposed Settlement is also the result of arm's length negotiations between well-informed, highly experienced counsel, with the aid and oversight of an experienced neutral mediator after contested litigation. *See* Ex. 19-C (GPM firm résumé); Ex. 20-C (H&H firm résumé); Ex. 21-C (B&L firm résumé). The Settlement was reached after contested litigation. Plaintiffs' Counsel's efforts involved, among other things: (a) conducting an extensive investigation into Defendants' alleged Exchange Act violations; (b) working with an investigator to locate and interview former employees of Spirit who have relevant knowledge; (c) consulting with experts in the fields of loss causation and damages; (d) drafting the comprehensive first Amended Class Action Complaint for Violations of the Federal Securities Laws ("FAC"); (e) reviewing Defendants' motion to dismiss the FAC, and conducting additional research and investigation to file the detailed, 100-page SAC; (f) substantial research and briefing opposing Defendants' motion to dismiss the SAC; (g) participating in mediation under the auspices of a well-respected mediator of complex cases—former United States District Judge Layn R. Phillips; (h) drafting, negotiating, and executing a confidential Term Sheet, which included a provision to allow Plaintiffs to conduct informal discovery to further assess the reasonableness of the proposed Settlement; and (i) conducting significant informal discovery, which included review and analysis of over 59,000 pages of documents produced by Spirit concerning the matters alleged in the SAC, and an interview with a knowledgeable, senior Spirit employee.

12. In preparation for the Parties' mediation, Plaintiffs' Counsel drafted a mediation statement and thoroughly reviewed and analyzed Defendants' mediation statement. Plaintiffs' Counsel also prepared for, and engaged in, a full-day mediation session overseen by Judge Phillips, which ended without an agreement to settle. However, in the weeks that followed the mediation Judge Phillips conducted additional negotiations. The negotiations were informed by the Parties' motion to dismiss briefing, their mediation submissions addressing factual and legal bases for the Parties' positions, detailed follow-up questions posed by Judge Phillips, and discussions during the full-day mediation session. The negotiations culminated in the Parties accepting Judge Phillips's recommendation to settle the Action for $29,200,000.

13. Based on the foregoing efforts, Plaintiffs and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action, and believe the Settlement represents a very good outcome for the Settlement Class and is in the best interests of its members. For all the reasons set forth herein and in the accompanying memoranda and declarations, Plaintiffs and Lead Counsel respectfully submit that the Settlement is "fair, reasonable, and adequate" in all respects, and that the Court should grant final approval pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

14. In addition, Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable. As discussed in further detail below, Lead Counsel developed the Plan of Allocation with the assistance of a damages consultant. The Plan of Allocation provides for the distribution of the Net Settlement Fund to each Authorized Claimant on a *pro rata* basis based on their Recognized Loss amounts.

15. Finally, Lead Counsel, on behalf of Plaintiffs' Counsel, seeks approval of their request for attorneys' fees and reimbursement of Litigation Expenses. As discussed in detail in the

accompanying Fee Memorandum, the requested 25% fee is within the range of awards granted by courts in this Circuit in comparable securities class actions. Additionally, the fairness and reasonableness of the request is confirmed by lodestar/multiplier cross-check, and warranted given the extent and quality of the work performed and the substantial result achieved. Likewise, the requested out-of-pocket litigation costs of $146,341.45 and the requested total of $10,000 in reimbursement to Plaintiffs pursuant to the PSLRA are also fair and reasonable. Accordingly, for the reasons set forth in the Fee Memorandum and for the additional reasons set forth herein, Lead Counsel respectfully submits that the request for attorneys' fees and reimbursement of Litigation Expenses be approved.

## II.    PROSECUTION OF THE ACTION

### A.    Background

16.    Plaintiffs allege that Defendants made materially false and misleading statements during the period from April 8, 2020 through September 7, 2023, both dates inclusive (the "Settlement Class Period") concerning the quality and safety of Spirit's products including 737 MAX aircraft fuselages. Specifically, the SAC alleges Defendants made materially false and misleading statements about quality and safety while failing to disclose that: (a) Spirit suffered from widespread, chronic quality failures that were so severe that Spirit's main customer, The Boeing Company ("Boeing"), placed Spirit on probation; and (b) former Spirit employee Joshua Dean identified mis-drilled holes on the 737 MAX aft pressure bulkhead months before Boeing publicly disclosed the defect.

17.    Plaintiffs allege in the SAC that as a result of Defendants' materially false and misleading statements, the price of Spirit's publicly traded common stock was artificially inflated and declined when the truth was revealed. The SAC alleges multiple corrective disclosures; to

begin, on April 13, 2023, statements from Boeing and the news media revealed that Spirit had defectively installed tail fin fittings on certain 737 MAX fuselages. Then, on May 3, 2023, Spirit reported its first quarter earnings, partially revealing the financial impact of the tail fin fittings defect. On August 2, 2023, Spirit reported its second quarter earnings, further revealing the extent of the financial impact of the tail fin fittings defect. On August 23, 2023, news media and Spirit revealed that Spirit had mis-drilled holes in certain 737 MAX aft pressure bulkheads. Finally, at a September 7, 2023 investor conference, Boeing and Spirit revealed the financial impact of the mis-drilled holes defect. Spirit's stock price declined substantially following each of these alleged corrective disclosures.

### B.    Commencement Of The Action And Appointment Of Lead Plaintiff And Lead Counsel

18.    On May 3, 2023, Lead Counsel, representing plaintiff Hang Li, initiated this action by filing a putative class action complaint in the United States District Court for the Southern District of New York (the "Court") asserting claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and under Rule 10b-5, 17 C.F.R. § 240.10b-5. *See* ECF No. 1.

19.    On July 3, 2023, Lead Counsel filed a motion seeking appointment of Li as Lead Plaintiff, and seeking approval of Li's selection of GPM and H&H as co-lead counsel for the putative class. ECF Nos. 8-10. Only one competing lead plaintiff motion was filed, and that movant subsequently stipulated to Li's appointment as Lead Plaintiff. ECF Nos. 11-13, 17.

20.    By Order dated October 20, 2023, the Court appointed Li as Lead Plaintiff and approved his selection of GPM and H&H as Lead Counsel for the putative class. ECF No. 22.

C.      **Plaintiffs' Counsel's Comprehensive Pre-Filing Investigation And Preparation Of The First Amended Complaint**

21.      Following appointment as Lead Counsel, our firms conducted a comprehensive investigation into Defendants' allegedly wrongful acts, which included, among other things, reviewing and analyzing: (i) Spirit's filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) research reports prepared by securities and financial analysts concerning Spirit, (iii) news articles concerning Spirit; (iv) Spirit's website, press releases, investor presentations, and investor call transcripts; (v) Federal Aviation Administration ("FAA") regulatory actions relating to Boeing and Spirit; (vi) other lawsuits relating to Boeing and Spirit; (vii) Boeing's supplier website and public statements from Boeing concerning Spirit; (viii) diagrams of 737 aircraft and the allegedly defective parts at issue in the case; (ix) former Spirit employee LinkedIn profiles, Spirit's WARN notices, and employee reviews of Spirit from job websites; (x) historical stock price and volume data for Spirit Class A common stock; and (xi) other publicly available information concerning Spirit. Lead Counsel also consulted with an expert on the subjects of loss causation and damages.

22.      In addition to such publicly available information, Lead Counsel also retained and worked with a private investigator to identify and interview former Spirit employees. The investigator identified numerous former employees of Spirit, worked with Lead Counsel to prioritize outreach to those most likely to have relevant information, and conducted initial outreach and interviews. As part of this investigation, Lead Counsel also participated in interviews with former employees and reviewed documents produced by former employees. During the investigation, Lead Counsel was aware of the Court's views on practices with respect to confidential witness interviews as discussed in *In re Millennial Media, Inc. Sec. Litig.*, 2015 WL 3443918 (S.D.N.Y. May 29, 2015). Lead Counsel worked to conduct their investigation

accordingly—directly communicating with former Spirit employees, proactively informing them of the intended use of their information and potential discoverability of their identities, respecting the wishes of those witnesses who requested that their information not be used in court filings, and confirming allegations with the witnesses to whom they are attributed.

23.     Another aspect of Lead Counsel's investigation consisted of efforts to obtain relevant information from the FAA pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. §552. In August 2023 Lead Counsel submitted two FOIA requests to the FAA for certain information concerning the tail-fin fittings defect and the mis-drilled holes defect. When the FAA failed to timely respond to one of Lead Counsel's requests, and to Lead Counsel's administrative appeal of the FAA's denial of the other request, on September 28, 2023 Lead Counsel filed suit against the FAA to attempt to compel production of the requested records. *See Glancy Prongay & Murray LLP v. Federal Aviation Administration*, C.D. Cal. Case No. 2:23-cv-8119.

24.     On December 19, 2023, Lead Plaintiff filed and served the FAC, asserting claims against all Defendants under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and against the Individual Defendants under Section 20(a) of the Exchange Act. ECF No. 25.   Among other things, the FAC alleged that Defendants made materially false and misleading statements about the quality and safety of Spirit's products while failing to disclose that: (a) Spirit suffered from widespread, chronic quality failures that were so severe that Boeing placed Spirit on probation; and (b) former Spirit employee Joshua Dean identified mis-drilled holes on the 737 MAX aft pressure bulkhead months before Boeing publicly disclosed the defect. The FAC included as exhibits copies of emails from a former Spirit employee to his superiors, including Defendant Gentile, and a copy of the former employee's ethics complaint filed internally

at Spirit, which documents Lead Counsel obtained from the former employee in the course of their investigation. ECF Nos. 25-2, 25-3, and 25-4.

      **D.**    **Defendants' Motion To Dismiss The FAC, Plaintiffs' Continued Investigation, And Filing Of The Second Amended Complaint**

    25.    After filing the FAC, Lead Counsel continued their investigation, continuing to monitor news reports about Spirit, the Company's SEC filings, and other sources of relevant publicly available information. Lead Counsel also continued to interview former Spirit employees as they had done leading up to the filing of the FAC.

    26.    On February 20, 2024, Defendants filed their motion to dismiss the FAC, along with 13 exhibits and a request for judicial notice. ECF Nos. 26-29. Defendants argued, among other things, that their challenged statements were inactionable puffery, or were otherwise not false or misleading, and that Spirit's risk factors disclosed the relevant risks. Defendants further argued that they had no duty to disclose any information beyond that already contained in their public disclosures. Defendants argued that the FAC failed to plead a strong inference of scienter because they had no motive to defraud,[3] and insufficient facts were pled to show conscious misbehavior or recklessness. Defendants also argued that the FAC failed to plead loss causation because the alleged stock price declines were not attributable to any previously concealed risks or adverse information, but rather merely reflected newly discovered defects that were promptly disclosed.

    27.    In accord with the Court's scheduling order then in effect (*see* ECF No. 24 at n.1), Plaintiffs elected to amend within 21 days of Defendants' motion to dismiss, filing the SAC on March 12, 2024. ECF No. 30.

---

[3] Neither Gentile nor Suchinski are alleged to have made suspicious sales of Spirit stock during the Settlement Class Period.

28.     As compared to the FAC, the SAC contained additional information drawn from Lead Counsel's ongoing investigation. For example, the SAC added allegations based on Lead Counsel's interviews with former Spirit Inspector Team Lead Robert Hurt, and Former Employee 3, a former Spirit Metals Mechanic, which Plaintiffs alleged provided further support for Spirit's knowledge of the mis-drilled holes defect prior to its public disclosure. *Id.* ¶¶228-60. The SAC also added allegations relating to the January 5, 2024 Alaska Airlines Flight 1282 door plug blowout and its aftermath, including media reports and governmental investigations that Plaintiffs alleged corroborated their claims of widespread quality problems in Spirit's products. *Id.* ¶¶287-305.

29.     After filing the SAC, Lead Counsel continued their investigation, making further efforts to seek relevant documents from the FAA and the SEC pursuant to FOIA, and monitoring, *inter alia*, Spirit's SEC filings, news reports about the Company, court filings in litigation between Spirit and the Texas Attorney General (*Spirit AeroSystems, Inc. v. Paxton*, W.D. Tex. Case No. 1:24-cv-472, the "Texas AG Litigation"), and other sources of relevant publicly available information.

### E.     Briefing On Defendants' Motion To Dismiss The Second Amended Complaint, And Plaintiffs' Continued Investigation

30.     On May 13, 2024, Defendants filed their motion to dismiss the SAC, along with 14 exhibits and a request for judicial notice. ECF Nos. 36-39. As with their motion to dismiss the FAC, Defendants argued, among other things, that their challenged statements were not false or misleading, that they had no duty to disclose any additional information, that the FAC failed to plead a strong inference of scienter, and that the FAC failed to plead loss causation.

31.     Plaintiffs filed their opposition to Defendants' motion on July 12, 2024, supported by seven exhibits, including news articles, Spirit's SEC filings, and documents filed in the Texas

AG Litigation.  ECF Nos. 41-42.

32.    With respect to falsity, Plaintiffs argued, *inter alia*, that: (a) Defendants' statements about Spirit's product quality were misleading for concealing chronic defects; (b) Defendants' statements were material to investors and not puffery; (c) Defendants' statements touting quality issued after the disclosure of the tail-fin fittings defect were misleading for concealing the mis-drilled holes defect; and (d) Spirit's risk factors were misleading for portraying quality failures in hypothetical terms. With respect to scienter, Plaintiffs argued, *inter alia*, that: (a) the facts alleged supported a strong inference of Defendants' knowledge of quality failures; (b) that inference was bolstered by the core importance of product quality and safety to Spirit; (c) former employee accounts of widespread and commonly known quality failures further added to the strong inference of scienter; and (d) the managers to whom Joshua Dean reported the mis-drilled holes defect were sufficiently high-ranking such that their scienter is imputed to Spirit at the pleading stage. Plaintiffs further argued that they sufficiently pled loss causation under theories of both corrective disclosure and materialization of the risk as Spirit's stock price declined substantially when new information was revealed about the tail-fin fitting and mis-drilled holes defects and their financial impacts.

33.    On August 12, 2024, Defendants filed their reply brief, supported by four additional exhibits, responding to Plaintiffs' opposition arguments and elaborating on arguments in Defendants' opening brief. ECF Nos. 43-45. Specifically, Defendants expanded on their arguments that Plaintiffs failed to plead falsity, scienter, and loss causation.

34.    On September 13, 2024 Plaintiffs filed a letter motion for leave to file a notice of recent decision concerning a ruling denying Boeing's motion to dismiss a securities class action alleging concealed quality problems, in the matter of *In re Boeing Company Securities Litigation*, E.D. Va. Case No. 1:24-cv-151 (Sept. 6, 2024).  ECF No. 47.

35.    Throughout the pendency of this Action, both before and after the close of briefing on Defendants' motion to dismiss the SAC, Plaintiffs' Counsel have continued to investigate the underlying facts, regularly monitoring Spirit's SEC filings, press releases, and other relevant sources of public information. For example, Plaintiffs' Counsel closely followed news relating to Boeing's planned acquisition of Spirit, first announced on July 1, 2024, to assess how the acquisition could impact their case. Plaintiffs' Counsel also reviewed documents and testimony made public in connection with the National Transportation Safety Board's August 6-7, 2024 investigative hearing into the Alaska Airlines Flight 1282 Left Mid Exit Door Plug Separation. Plaintiffs' Counsel continuously conducted such research in order to discover additional information that would strengthen their case to overcome Defendants' motion to dismiss, support a motion for leave to amend (if necessary), better prepare Plaintiffs to conduct discovery, and place Plaintiffs in the strongest possible position for any settlement discussions.

**F.    Mediation Efforts, Settlement Negotiations, Settlement-Related Discovery, And The Settlement's Preliminary Approval**

36.    After Defendants' motion to dismiss was fully briefed, the Parties agreed to participate in private mediation to explore the potential resolution of the Action. The Parties selected Judge Phillips to serve as mediator.  Judge Phillips has successfully mediated numerous complex commercial cases, including more than 300 securities class actions and shareholder derivative actions. *See* Declaration of Layn R. Phillips in Support of Final Approval of Class Action Settlement, Exhibit 5 hereto, at ¶7.

37.    While the Parties' relations have been courteous and professional throughout the pendency of this Action including the mediation process, that process was hard-fought, with both sides zealously advocating their positions. *See id.* at ¶11. The Parties negotiated in good faith while advancing their competing arguments and seeking to advance their own respective interests, in a

process that spanned multiple weeks before Judge Phillips eventually made, and the Parties accepted, a mediator's proposal to resolve the Action.

38.    On November 26, 2024, Plaintiffs' Counsel and Defendants' Counsel participated in a full-day, in-person mediation session with Judge Phillips. In advance of that session, the Parties exchanged detailed mediation statements and provided their mediation statements and motion to dismiss briefing to Judge Phillips. Judge Phillips then provided the Parties with detailed follow up questions testing their arguments and positions, which he discussed with them during the full-day mediation session. The session ended without an agreement being reached; however, Judge Phillips continued to work with the Parties over the following weeks.

39.    On December 18, 2024, Judge Phillips made a double-blind mediator's recommendation to resolve the Action for $29,200,000 in cash for the benefit of the Settlement Class. The Parties accepted the mediator's proposal, while continuing to negotiate a confidential settlement term sheet that would set forth material terms of an agreement in principle to resolve the Action. The Parties confidentially notified the Court of their negotiations, and requested that the Court stay the action pending further settlement discussions. *See* ECF Nos. 51-55.

40.    After further negotiations, the Parties' agreement in principle to settle the Action was memorialized in a confidential term sheet dated January 22, 2025 (the "Term Sheet"). The Term Sheet set forth, among other things, the Parties' agreement to settle and release all Released Plaintiffs' Claims as against the Released Defendants' Parties in return for a cash payment by or on behalf of Defendants of $29,200,000 for the benefit of the Settlement Class, subject to certain terms and conditions, and contemplated the execution of a customary "long form" stipulation and agreement of settlement and related papers.

14

41.     To ensure the fairness and reasonableness of the Parties' agreement in principle set forth in the Term Sheet, Plaintiffs' Counsel wished to further assess the strengths and weaknesses of the Parties' claims and defenses that would be advanced if the case proceeded to summary judgment and trial. As such, one condition set forth in the Term Sheet was that Defendants would, on a confidential basis, produce relevant documents to Plaintiffs and make a witness available to be interviewed concerning the matters alleged in the SAC. Following the execution of the Term Sheet, the Parties met and conferred concerning Defendants' provision of such informal discovery. The Parties then negotiated a stipulation providing for confidential treatment of the discovery materials produced by Defendants, which they executed on March 4, 2025. From March 6, 2025 to April 25, 2025, Defendants produced over 59,000 pages of documents concerning the matters at issue in the SAC.

42.     Among the types of documents requested by Plaintiffs and produced by Defendants were: Spirit employee emails, including certain emails to and from Defendants Gentile and Suchinski and other Spirit executives; materials for Spirit's Board of Directors, on which Defendant Gentile served during the Settlement Class Period; periodic reports and materials for various Spirit committees responsible for, or standing meetings related to, oversight of quality and safety, including materials distributed to, or produced for committees or meetings attended by, Defendants Gentile and/or Suchinski; training materials for Spirit's quality related functions; drafts of relevant SEC filings and public statements made by Defendants; business records relating to key matters alleged in the SAC, such as the tail-fin fittings defect and the mis-drilled holes defect; and documents relating to Spirit former employees such as Joshua Dean and Former Employee 1, and the key matters pertaining to them as alleged in the SAC.

43.     After reviewing and analyzing Defendants' initial document productions, on April 1, 2025, Plaintiffs made supplemental document requests to Defendants, and posed questions to Defendants concerning technical issues with the production, and certain redactions for responsiveness and privilege. In response, Defendants produced additional requested documents, and re-produced certain previously redacted documents with reduced or no redactions. Plaintiffs' Counsel dedicated substantial efforts to review and analysis of the documents produced by Defendants.

44.     On May 7, 2025, Defendants made available, on a confidential basis, a senior Spirit employee with relevant knowledge, for an interview with Plaintiffs' Counsel to discuss matters at issue in the SAC and documents produced by Defendants. In advance of the interview, Plaintiffs' Counsel provided Defendants' Counsel with a list of topics and documents to be discussed, to facilitate the witness's preparation and to ensure a productive interview. The interview lasted approximately two hours, and covered key issues alleged in the SAC including, *inter alia*, Spirit's quality and safety processes, the tail-fin fittings defect, the mis-drilled holes defect, and Plaintiffs' allegations relating to former Spirit employees Joshua Dean and Former Employee 1. We personally conducted this interview, and found the witness to be knowledgeable, credible, and candid.

45.     After thoroughly evaluating the documents produced by Defendants and the information provided in the interview, Plaintiffs' Counsel concluded that it revealed substantial risks to the continued litigation of Plaintiffs' claims, even if the SAC survived the pending motion to dismiss and the case proceeded to discovery. As such, Plaintiffs' Counsel concluded that: (a) the information produced supports the fairness, reasonableness, and adequacy of the Parties'

agreement in principle as set forth in the Term Sheet; and (b) the Parties' agreement to settle the Action in exchange for $29,200,000 is in the best interest of Plaintiffs and the Settlement Class.

46.    As the Parties were conducting the confidential discovery process, Plaintiffs' Counsel prepared and shared with Defendants' Counsel the first draft of the Stipulation and its exhibits. On May 16, 2025, Defendants' Counsel provided edits to those documents, and the Parties thereafter continued to negotiate their terms, exchanging multiple drafts. After substantial negotiations, the Parties ultimately executed the Stipulation dated August 4, 2025. ECF No. 64-1.

47.    On August 8, 2025, Plaintiffs filed their Unopposed Motion for: (I) Preliminary Approval of Class Action Settlement; (II) Certification of the Settlement Class; and (III) Approval of Notice To The Settlement Class. ECF Nos. 62-64. On September 4, 2025, the Court issued its Order Preliminarily Approving Settlement and Providing for Notice ("Preliminary Approval Order"). ECF No. 67. Plaintiffs' Counsel then worked with Epiq, the Court-approved Claims Administrator, to carry out the notice program as set forth in the Preliminary Approval Order (*see infra* Section IV), and continued preparing their motion papers in support of final approval of the Settlement.

## III.    THE RISKS OF CONTINUED LITIGATION

48.    The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a non-reversionary cash payment of $29,200,000. As explained more fully below, there were significant risks that the Settlement Class might recover substantially less than the Settlement Amount—or nothing at all—if the case were to proceed through additional litigation to a jury trial, followed by the inevitable appeals.

49.    Considering the benefits of the Settlement in relation to the significant risks of continued litigation, it is our opinion, as Lead Counsel for Plaintiffs and the Settlement Class, that

the Settlement is fair, reasonable, adequate, and in the best interests of Plaintiffs and the Settlement Class. Plaintiffs, who actively participated in the case and were informed of its progress, also believe that the proposed Settlement provides a fair, reasonable, and adequate recovery for the Settlement Class, particularly in light of the risks of continued litigation. Ex. 2 ¶¶7-8; Ex. 3 ¶¶7-8; Ex. 4 ¶¶7-8. Similarly, after presiding over the arm's-length mediation process in this case, Judge Phillips concluded based on his experience as a mediator and a former federal judge, and based on his knowledge of the issues in dispute and the risks of further litigation, that the terms of the Settlement are fair, adequate, reasonable and in the best interests of the Settlement Class.  Ex. 5 ¶¶16-18. Indeed, the Settlement Amount is the result of a mediator's recommendation that both sides accepted. *Id*. at ¶13.

**A.      Risks To Overcoming Defendants' Motion To Dismiss**

50.      As discussed *supra* in Sections II.D-E, Defendants raised a number of arguments in their motion to dismiss the FAC and the SAC, including, *inter alia*, that their challenged statements were not materially false or misleading, that the SAC failed to allege a strong inference of scienter, and that loss causation was inadequately pled. Any one of these arguments could have resulted in the dismissal of Plaintiffs' claims. While Plaintiffs believe they have strong arguments in opposition to the motion to dismiss the SAC as set forth in their opposition brief (ECF No. 41), there is no guarantee that the Court would have denied the motion.

51.      The risks to overcoming a motion to dismiss are substantial in a securities fraud class action such as this one, in part because of the heightened pleading requirements of the PSLRA and Rule 9(b), and the PSLRA's bar on discovery during the pendency of a motion to dismiss. A high proportion of motions to dismiss filed in securities class actions are granted in whole or in part. *See* Ex. 1, NERA Report, at p. 17, Fig. 15 (over 2015-2024, for motions to dismiss that were

filed in securities class actions and that were resolved by court decision: 55% were granted; an additional 6% granted without prejudice; an additional 20% partially granted; and only 19% fully denied).

52.     Moreover, Spirit has twice previously obtained dismissal of securities fraud class action lawsuits relating to production issues, highlighting the difficulty for plaintiffs to prevail at the pleading stage on similar claims. *See Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Holdings, Inc.*, 2022 WL 377415, at *21 (N.D. Okla. Jan. 7, 2022) ("Plaintiffs fail to provide particularized facts giving rise to a strong inference that Gentile intentionally misrepresented [Spirit's] production rate"), *aff'd*, 79 F.4th 1209 (10th Cir. 2023); *Anderson v. Spirit AeroSystems Holdings, Inc.*, 105 F. Supp. 3d 1246, 1261 & 1266 (D. Kan. 2015) (Spirit's statements concerning production cost reductions were "too vague to be material and cannot be objectively verified," and Spirit was "under no duty to disclose the intricate details of Spirit's alleged production problems"), *aff'd*, 827 F.3d 1229 (10th Cir. 2016), as amended (July 6, 2016).

53.     Furthermore, after Plaintiffs filed the SAC on March 12, 2024, the Supreme Court issued its decision in *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257 (2024) on April 12, 2024, holding that a "pure omission" of known trends or uncertainties required to be disclosed under Item 303 of SEC Regulation S-K (17 C.F.R. § 229.303) is not actionable under Rule 10b-5, and that "the failure to disclose information required by Item 303 can support a Rule 10b–5(b) claim only if the omission renders affirmative statements made misleading." *Id.* at 265. This holding abrogated prior controlling authority under which "a failure to make a required Item 303 disclosure in a 10–Q filing is indeed an omission that can serve as the basis for a Section 10(b) securities fraud claim." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015). Based on such prior authority, Plaintiffs' SAC included claims based on a pure omission theory

with respect to Items 303 and 105 of SEC Regulation S-K. *See* SAC ¶¶57-60, 64-66, 76-78, 89-91, 95-97, 101-03. In light of *Macquarie*, those claims were no longer viable. *See* ECF No. 41 at 22 n.22 (Plaintiffs' motion to dismiss opposition conceding that "Plaintiffs no longer pursue their pure omissions theory in light of *Macquarie*"). Thus, Plaintiffs' chances of prevailing over the motion to dismiss were meaningfully reduced.

54.     Therefore, despite their belief in the merits of this case, Plaintiffs' Counsel recognized that Defendants' motion to dismiss presented substantial risk.

**B.     Risks To Proving Liability**

55.     In addition to the hurdles of defeating Defendants' motion to dismiss, Plaintiffs faced numerous additional risks at summary judgment and trial, including proving Defendants' liability through admissible evidence. Defendants forcefully argued in their motion to dismiss that Plaintiffs could not establish the elements of their Exchange Act claims, and undoubtedly would have continued to argue at summary judgment and trial that the evidence did not support those claims.

56.     For instance, while Plaintiffs alleged that Boeing placed Spirit on probation around 2018 due to persistent quality failures, Defendants argued that the probation was alleged to have "ended during 2021." ECF No. 37 at 4. As such, Plaintiffs may have faced heightened difficulty in proving that Defendants knew Spirit suffered from elevated quality problems after the end of the probation, which occurred early in the alleged class period and preceded many of Plaintiffs' strongest alleged misleading statements. Defendants would likely produce evidence to show that Spirit executives took steps to improve the quality issues that resulted in the probation, and that they understood the end of probation to demonstrate Spirit's progress in addressing such issues.

57.     Relatedly, Plaintiffs likely would have faced challenges in proving that the level of defects Spirit experienced was abnormally high. As Defendants argued, "[f]inding and remediating manufacturing issues is a routine part of the job for any aerostructures manufacturer" (*id.* at 3), and "[q]uality 'escapes' as the aerospace industry calls them, and the resulting analyses and fixes are a normal part of manufacturing" (*id.* at 6 (quoting an article from leading aviation industry publication The Air Current, *see* ECF No. 38-9)). Therefore, the Parties were likely to present conflicting evidence and dueling expert testimony concerning whether Spirit merely experienced routine defects that arise in the ordinary course of any complex manufacturing business, or whether Spirit's quality issues were in fact unusually elevated. And such conflicting evidence as to the existence of excessive defects would make it even more difficult to show that Defendants *knew* Spirit suffered from excessive defects.

58.     Defendants were also likely to challenge Plaintiffs' evidence that they ignored quality problems and underreported defects. For example, while Plaintiffs alleged that Former Employee 1 was ordered to underreport defects and then demoted for objecting to the practice, Defendants argued that when FE1 raised the issue to Defendant Gentile, "the allegations in [FE1's] ethics complaint were sustained, his prior position was reinstated, and he was given backpay," which "demonstrates Mr. Gentile's support and enforcement of Spirit's reporting process, is an example of quality controls working, and contradicts Plaintiffs' theory of alleged quality problems." ECF No. 37 at 26. More generally, Defendants argued that "Spirit's complex manufacturing operations include a multilayered quality assurance system" that "worked as intended" to identify and remediate defects. Plaintiffs expect that Defendants would produce substantial evidence to support those contentions, further heightening the risks to Plaintiffs' case at summary judgment or trial.

59.    As to the specific defects the revelation of which Plaintiffs alleged as corrective disclosures, Defendants argued that "Plaintiffs allege no facts suggesting that Spirit or Boeing knew of the tail fin fitting issue" until shortly before its public disclosure on April 14, 2023. *Id.* at 8. Indeed, Plaintiffs alleged that the issue began to be investigated in "mid-March 2023," with the investigation continuing over the following weeks. *See* SAC ¶¶221-24. Plaintiffs alleged only two misleading statements issued, in late March 2023, while that investigation was ongoing. *Id.* ¶¶104-109. If the evidence produced in discovery confirmed that Spirit did not have prior knowledge of the tail fin fittings defect, then Plaintiffs would face significant challenges to argue that the defect's existence supports their fraud claims.

60.    As to the mis-drilled holes defect allegedly identified by Joshua Dean in October 2022, Defendants argued that "[a]ccepting Plaintiffs' allegations as true, the only employees who knew about the mis-drilled holes worked in rank-and-file positions and had no contact with the Individual Defendants." ECF No. 37 at 24 (quotes omitted). As alleged, Dean raised the mis-drilled holes issue to several managers from October 2022 until his termination in April 2023, however, he did not have contact with senior executives such as Defendants Gentile and Suchinski. *See* SAC ¶¶207-26. While Plaintiffs argued in opposing Defendants' motion to dismiss that the knowledge of the managers Dean informed of the issue can be imputed to Spirit although they did not make the allegedly misleading statements at issue (*see* ECF No. 41 at 31), it is unclear whether that argument would continue to apply after discovery, at summary judgement or trial. *See In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 765 (S.D.N.Y. 2017) ("courts have declined to require, *at the pleading stage*, that the same individual who made an alleged misstatement on behalf of a corporation personally possessed the required scienter.") (emphasis added) (quotes omitted); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 544 (S.D.N.Y. 2011)

(plaintiffs failed to prove scienter with respect to statement made by employee where "plaintiffs did not introduce any evidence whatsoever regarding [his] knowledge or state of mind. Nor did they introduce any evidence that . . . any actor at Vivendi who had scienter directed Lefort to make this statement"), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016). As such, proof of scienter as to the mis-drilled holes issue may have required showing that Gentile and Suchinski were aware of it when making the challenged statements, and there was no assurance that discovery would produce such evidence.

61.    Joshua Dean suddenly and unexpectedly died on or about May 2, 2024. *See* CBS News, *Whistleblower at key Boeing supplier dies after sudden illness* (May 2, 2024), *available at* https://www.cbsnews.com/news/joshua-dean-boeing-whistleblower-dies-sudden-illness/.    Dean was likely to be one of Plaintiffs' most important witnesses, if not the most important—able to persuasively describe his own experience of quality problems at Spirit, and uniquely positioned to testify as to his discovery of the mis-drilled holes defect and his efforts to inform other Spirit personnel about it. While Plaintiffs would have attempted to develop evidence to confirm Dean's allegations to the extent possible through business records in Spirit's possession or testimony of Spirit personnel with whom he interacted, there is no guarantee that such corroborating evidence would be obtained, and the impact of any such records and testimony would likely be far less than having Dean tell his own story first-hand. Certain Spirit managers to whom Dean allegedly reported the mis-drilled holes defect appear to remain employed at the Company, and their testimony may not be favorable to Plaintiffs' case. Furthermore, it is possible that Dean's statements to Lead Counsel made during their interviews and alleged in the SAC would be deemed inadmissible hearsay, presenting further problems of proof for Plaintiffs to the extent other corroboration of Dean's claims could not be obtained.

62.     In sum, even if the SAC survived Defendants' motion to dismiss there were substantial risks to Plaintiffs' ability to prove their case. Had the litigation continued there was no guarantee that documents and deposition testimony obtained during fact discovery would support Plaintiffs' narrative. Additionally, if Plaintiffs advanced past summary judgment and proceeded to trial, substantial uncertainty remained as to how a trier of fact would view each side's competing evidence and narrative of the events at issue.

### C.      Risks To Proving Loss Causation And Damages

63.     Assuming Plaintiffs overcame the above risks and established Defendants' liability, Plaintiffs would have confronted considerable challenges in establishing loss causation and class-wide damages. While Plaintiffs would have argued that the declines in the price of Spirit's Class A common stock were attributable to corrections of the alleged misstatements and materializations of the concealed risks, Defendants likely would have continued to argue that "Plaintiffs' allegations show that the market did not react to any revelation that Spirit's prior statements were false, but instead to decreased production and the cost of remediation from *newly discovered* issues." ECF No. 37 at 29 (emphasis added). Defendants were also likely to continue to argue that Plaintiffs cannot recover under a materialization of the risk theory, because the risks were "unambiguously apparent on the face of [Defendants'] disclosures." *Id.* at 30.

64.     Plaintiffs alleged five disclosures giving rise to loss causation: (i) on April 13, 2023, the tail fin fittings defect was first reported; (ii) on May 3, 2023, Spirit reported its first quarter earnings, partially revealing the financial impact of the tail fin fittings defect; (iii) on August 2, 2023, Spirit reported its second quarter earnings, further revealing the extent of the financial impact of the tail fin fittings defect; (iv) on August 23, 2023, the mis-drilled holes defect was first reported; and (v) at a September 7, 2023 investor conference, Boeing and Spirit revealed the financial impact

of the mis-drilled holes defect. SAC ¶¶111-78.

65. Defendants argued in their motion to dismiss that "Plaintiffs may not recover for stock declines on May 3, August 2 and September 7" because "[t]he tail-fin fitting and mis-drilled hole issues were fully disclosed on April 13 and August 23." ECF No. 37 at 30. If Defendants' argument was accepted by the trier of fact, that would dramatically reduce Plaintiffs' potential damages, as May 3, August 2, and September 7 accounted for the majority of the stock price declines for the five alleged disclosure dates. And, of course, if Defendants prevailed on their arguments that their challenged statements were not made with knowledge of the tail-fin fittings issue or the mis-drilled holes issue, that could potentially eliminate damages for even the April 13 and August 23 disclosures.

66. Illustrating the risks to Plaintiffs' ability to recover their maximum claimed damages, in a recent decision in a securities class action alleging misleading statements by Boeing relating to safety issues with 737 MAX aircraft, the court certified the proposed class but only for a much shorter class period than that proposed by the plaintiffs. *See In re Boeing Co. Sec. Litig.*, 2025 WL 2428481, at *2–3 (E.D. Va. Mar. 7, 2025).  For example, the court held that "[t]he alleged corrective events after January 8, 2024 reflected the consequences of, and reactions to, the Alaska Airlines incident as opposed to the correction of prior misstatements." *Id.* at *3.  Similarly here, Plaintiffs faced the risk that rulings on the motion to dismiss, class certification, or summary judgment could remove corrective disclosures from the proposed class period, significantly reducing potentially recoverable damages.

67. Further compounding the risks to Plaintiffs' ability to prove damages, each of the May 3, August 2, and September 7 disclosures was accompanied by potentially significant confounding information.

68.     On May 3, 2023 Spirit released its first quarter earnings. In addition to providing information about the financial impact of the tail-fin fittings issue (*see* SAC ¶¶122-28), Defendants provided new, material information about a number of topics, which Lead Counsel believes Defendants would argue was responsible for most, or all, of the decline in Spirit's stock price on that date. For example, on Spirit's earnings call that day Defendants disclosed: (i) shortages and supply chain challenges resulting in multi-million dollar charges; (ii) that due to an updated Airbus A320 production schedule Spirit expected to deliver only 580 A320 shipsets to Airbus in 2023 instead of the approximately 665 previously disclosed; (iii) substantially decreasing earnings per share and operating margins; (iv) $110 million in forward losses "primarily relat[ing] to the A220 program and to a lesser extent the A350 and 787 programs"; and (v) worsening free cash flow guidance for 2023. *See* ECF No. 44-3 at 4-6.

69.     Plaintiffs' Counsel expects that Defendants would produce evidence, including analyst reports, to support the argument that the stock price decline on May 3, 2023 was attributable to such other issues, and that the news relating to the tail-fin fitting issue that was released on that date was better than expected and therefore did not cause the May 3 stock price decline. *E.g.*, Ex. 6 (Truist analyst note: "Lower 737 and A320 deliveries, a reduced FCF outlook, more A220 charges, and ongoing supply chain challenges hit the stock"); *id.* ("737 vertical fin fix appears manageable"); Ex. 7 (Wolfe Research: "Despite the stock reaction, the 737 impact was on the low end of expectations," though "we're not sure investors are ready to step in given the consistent move lower in FCF"); Ex. 8 (J.P. Morgan: "Spirit underperformed by 12% on a Q1 miss and guide down. We understand some underperformance on these Q1 results, though Spirit also sold off in April on its 737 lapse and we had thought the manageable cost of fixing this issue disclosed yesterday would do more to cushion the blow"); Ex. 9 (Jefferies: "Q1 was mixed as the

impact of required rework on the MAX is expected to be just $72MM on our ests in total, less than the ~$200MM expected. The offset is our EPS falls to ($1.10) from $0.20 prior to reflect lower MAX and A320 deliveries and subdued margins, w/ FCF guidance cut").

70.    On August 2, 2023 Spirit released its second quarter earnings. In addition to providing additional information about the financial impact of the tail-fin fittings issue (*see* SAC ¶¶146-53), Defendants provided information about a number of topics that were likely significant to investors, including: (i) disruption from a labor union strike and increased production costs from the resulting renegotiated labor contract; (ii) additional costs and disruption due to continued supply chain challenges and distressed suppliers; (iii) further reduced expectations for Airbus and Boeing shipset deliveries; and (iv) continued worsening in free cash flow guidance for 2023. *See* Ex. 10 at 3-6 (August 2, 2023 earnings call transcript).

71.    As with the May 3 disclosures, Plaintiffs' Counsel expects that Defendants would produce evidence, including analyst reports, to argue that the stock price decline on August 2, 2023 was attributable to such other issues, and that the news relating to the tail-fin fitting issue was once again better than expected and, as such, did not cause the August 2 price decline. *E.g.*, Ex. 11 (Morgan Stanley: "SPR's stock ended the day down ~27.3% . . . In our view, the stock's underperformance was driven by decreased 2023 FCF outlook and structural headwinds to margin and FCF from increased labor costs as a result of the recent IAM labor contract, operating challenges from increased labor costs, inflation, and supply chain disruptions"); Ex. 12 (RBC: "Spirit AeroSystems (SPR) reported lower than expected results in 2Q23, also lowering their FY23 delivery and FCF outlooks . . . The company remains squeezed on margins, as the new IAM contract and increased supply chain costs have put additional pressure on program margins. The results, and lower visibility on 2024-2025 FCF, contributed to the ~27% sell-off."); Ex. 13

27

(Susquehanna: "Disappointing results and the worse outlook for 2023 are due in part to the impact from the IAM contract negotiations and resulting labor strike complications (detailed herein). On a positive note, SPR reported it has completed all of the rework related to the vertical fin attach issues on available 737 units in Wichita during 2Q"); Ex. 14 (TD Cowen: "Disappointing Q2 and hiked 2023 cash use guide reflected multiple disruptions (supply chain, 737 rework, IAM strike/settlement)" though "737 Fittings Overhang Looks Tolerable").

72.    On September 7, 2023 Boeing's CFO Brian West and Spirit's Gentile and Suchinski participated in the Jefferies Industrials Conference on behalf of their respective companies, both providing information about the scope of the mis-drilled holes issue. *See* SAC ¶¶169-75.  In addition, Gentile and Suchinski discussed a number of other topics that potentially affected Spirit's stock price. For example, their remarks revealed that: (i) Spirit's production rates continued to be negatively impacted by shortages of skilled labor and by supply chain disruptions; (ii) Spirit's economics for its Airbus A220 and A350 programs, as well as its Boeing 787 program, were "under pressure" and "not sustainable"; (iii) Spirit would have "negative cash flow" in the third quarter; and (iv) Spirit's profitability and margin targets would now take even longer to achieve than previously projected. Ex. 15 at 4-12 (transcript of Spirit September 7 conference presentation).

73.    As with the May 3 and August 2 disclosures, Plaintiffs' Counsel expected that Defendants would cite Jefferies's analyst note reporting on the conference to argue that the September 7 stock price decline was caused by such confounding information. *E.g.*, Ex. 16 (Jefferies: "Forward Loss Programs Unsustainable. The A220, A350, and 787 programs are in forward loss positions, impacted by lower rates, costs, and supply chain impacts"); *id.* ("The supply chain remains stressed, particularly at smaller suppliers with capital needs."); *id.* ("Q3 FCF

will be impacted by near-term delivery pressure"); *id.* ("Labor continues to be a challenge to hire skilled workers, with . . . attrition remaining high").

74.    In order for Plaintiffs to prove their claims, and to contest the evidence expected to be offered by Defendants to negate damages and loss causation, Plaintiffs would have to proffer expert testimony demonstrating, among other things: (a) what the "true value" of Spirit's stock would have been had there been no alleged material misstatements or omissions; (b) the amount by which the value of Spirit's stock was inflated by the alleged material misstatements and omissions; and (c) the amount of alleged artificial inflation removed by the alleged corrective disclosures. Such expert testimony is expensive, time consuming, and subject to rebuttal. Indeed, Defendants almost certainly would have presented their own damages expert(s), who would have no doubt presented conflicting conclusions and theories for Spirit's stock price declines on the alleged disclosure dates, and who would likely have presented alternative calculations to reduce or eliminate Plaintiffs' claimed damages. Defendants likely would have challenged Plaintiffs' expert(s) at the class certification stage, summary judgment, with *Daubert* motions, and at trial and on appeal. This "battle of the experts" creates an additional litigation risk because the reaction of a trier of fact to such expert testimony is highly unpredictable, creating uncertainty regarding how much weight a judge or jury will accord the analysis of competing experts.

### D.    Risks Faced In Obtaining And Maintaining Class Action Status

75.    Lead Counsel believe that they would be able to show all of the Rule 23 requirements for class certification are met, and that they could establish market efficiency by a preponderance of the evidence so as to invoke the presumption of reliance established under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  However, Defendants would have likely raised arguments challenging class certification.

76.     For instance, Defendants argued in their motion to dismiss that Plaintiffs principally challenged as misleading "general statements about Spirit's quality goals and generic risk disclosures" that did not include "specific statements of fact," and that "the market did not react to any revelation that Spirit's prior statements were false, but instead to decreased production and the cost of remediation from newly discovered issues." ECF No. 37 at 1, 11, 29. As such, it is likely that Defendants would renew such arguments at the class certification stage to attempt to rebut the *Basic* presumption by showing lack of price impact. The Supreme Court has held that "when the earlier misrepresentation is generic (*e.g.*, 'we have faith in our business model') and the later corrective disclosure is specific (*e.g.*, 'our fourth quarter earnings did not meet expectations') . . . it is less likely that the specific disclosure actually corrected the generic misrepresentation, which means that there is less reason to infer . . . price impact." *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 123 (2021).

77.     After remand from the Supreme Court in *Goldman*, the District Court certified the class, and the Second Circuit then reversed and remanded with instructions to decertify. *Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 105 (2d Cir. 2023). The Second Circuit found a mismatch in generality between allegedly misleading statements such as "integrity and honesty are at the heart of our business" and "[w]e have extensive procedures and controls that are designed to identify and address conflicts of interest," and corrective disclosures involving enforcement actions with respect to specific conflicts of interest in particular transactions. *Id.* at 82-83. Ultimately the Second Circuit concluded that "Defendants have demonstrated . . . that the misrepresentations did not impact Goldman's stock price, and, by doing so, rebutted *Basic*'s presumption of reliance." *Id.* at 105. Subsequent decisions in certain other cases have followed the Second Circuit's reasoning to deny class certification based on mismatches between the alleged

misleading statements and corrective disclosures. *E.g.*, *Shupe v. Rocket Companies, Inc.*, 752 F. Supp. 3d 735, 799 (E.D. Mich. 2024); *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *12 (S.D.N.Y. Mar. 29, 2024).

78.     While Plaintiffs' Counsel believes the facts here support price impact and applicability of the *Basic* presumption, even if Plaintiffs successfully obtained class certification Defendants could have sought permission from the Second Circuit to appeal any class certification order under Federal Rule of Civil Procedure 23(f), further delaying or precluding any potential recovery. Class certification was, by no means, a forgone conclusion.

### E.     Other Risks, Including Trial, Appeals, And Ability To Collect A Judgment

79.     Plaintiffs would have had to prevail at several stages of litigation, each of which would have presented significant risks. Lead Counsel know from experience that despite the most vigorous and competent efforts, success in complex litigation such as this case is never assured. In fact, GPM lost a six-week antitrust jury trial in the Northern District of California after five years of litigation, which included many overseas depositions, the expenditure of millions of dollars of attorney and paralegal time, and the expenditure of more than a million dollars in hard costs. *See In re: Korean Ramen Antitrust Litigation*, Case No. 3:13-cv-04115 (N.D. Cal.).

80.     GPM also litigated a securities class action in the Southern District of New York for approximately five years and, after surviving a motion to dismiss, successfully obtaining class certification and undertaking significant discovery efforts, which included depositions throughout the U.S. and in the U.K. and substantial document review, summary judgment was entered for defendants, and the judgment was affirmed on alternative grounds on appeal to the Second Circuit. *Gross v. GFI Grp., Inc.*, 784 F. App'x 27, 29 (2d Cir. 2019).   In short, complex litigation is uncertain, and success in cases like this one is never guaranteed.

81.    Even if Plaintiffs succeeded in proving all elements of their case at trial and obtained a jury verdict, Defendants would almost certainly have appealed. An appeal not only would have renewed the risks faced by Plaintiffs—as Defendants would have reasserted their arguments summarized above—but also would have resulted in significant additional delay and further depletion of Defendants' assets and wasting insurance policies.  Given these significant litigation risks, Plaintiffs and Lead Counsel believe the Settlement represents a very good result for the Settlement Class.

82.    Moreover, *if* Plaintiffs prevailed at trial and through post-trial appeals, there is no guarantee that they would succeed in collecting a substantial judgment. Plaintiffs' calculation of maximum damages significantly exceeds Defendants' insurance available to contribute to this Action. Absent settlement, the amount of available insurance would be eroded by litigation expenses. Furthermore, Spirit has incurred hundreds of millions of dollars in net losses per year since the beginning of the Settlement Class Period, and since the third quarter of 2024 Spirit's financial statements have included a warning expressing "substantial doubt about the Company's ability to continue as a going concern." *See* Ex. 33 (Spirit Form 10-Q excerpts).[4] Given these considerations, there was significant uncertainty about whether Plaintiffs would be able to collect a substantial judgment several years in the future after protracted litigation and appeals.

---

[4] On July 1, 2024 Spirit announced that it had entered into an agreement to be acquired by Boeing, however the transaction was "subject to the completion of the divestiture of the Airbus businesses by Spirit and is subject to other closing conditions, including approval of the definitive merger agreement by Spirit shareholders and receipt of regulatory approvals." *See* Spirit AeroSystems Announces    Acquisition    by    Boeing    in    $8.3    Billion    Transaction, https://www.spiritaero.com/pages/release/spirit-aerosystems-announces-acquisition-by-boeing-in-8.3-billion-transaction/ (last visited Nov. 25, 2025). The merger closed on December 8, 2025. *See*    Boeing    Completes    Acquisition    of    Spirit    AeroSystems, https://investors.boeing.com/investors/news/press-release-details/2025/Boeing-Completes-Acquisition-of-Spirit-AeroSystems/default.aspx (last visited Dec. 8, 2025).

**F.      The Settlement Is Reasonable In Light Of Potential Recovery In The Action**

83.      In addition to the attendant risks of litigation discussed above, the Settlement is also fair and reasonable in light of the potential recovery of available damages. Plaintiffs' damages expert estimates that if Plaintiffs had fully prevailed on each of their claims at both summary judgment and after a jury trial, if the Court certified the same class period as the Settlement Class Period, and if the Court and jury accepted Plaintiffs' damages theory, including proof of loss causation as to 100% of the residual stock price declines on each of the corrective disclosure dates alleged in this case—*i.e.*, Plaintiffs' best-case scenario—the total *maximum* damages potentially available in this Action would be approximately $1.5 billion.  Thus, the $29.2 million Settlement represents a recovery of 1.9%, which exceeds the 1.3% median settlement value for securities class actions with comparable maximum damages. *See* Ex. 1 (NERA Report) at 26-27 (Fig. 23-24).

84.      The Settlement Amount is approximately 2.9% of Lead Counsel's estimate of $1.0 billion of reasonably recoverable damages under an approach that discounts damages attributable to the stock price declines on May 3, 2023, August 2, 2023, and September 7, 2023, to account for potentially confounding effects of other information released on those dates (*see supra* Section III.C), as reflected in the proposed Plan of Allocation set forth in the long-form Notice at ¶¶56-58 (the Notice is filed herewith as Ex. B to the Mejia Declaration, Ex. 17). For the May 3, August 2, and September 7 alleged corrective disclosures, this damages approach and the Plan of Allocation consider the corresponding alleged artificial inflation to be 25% of the resulting residual daily declines in the price of Spirit Class A common stock, due to the presence of substantial confounding information also revealed on those dates.

85.    Of course, if Defendants prevailed on any of the arguments discussed above, damages could have been significantly lower, or eliminated entirely, for any or all of the alleged corrective disclosure dates.

## IV.    PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF THE NOTICE

86.    The Preliminary Approval Order (ECF No. 67) directed that the postcard notice highlighting key information regarding the proposed Settlement (the "Postcard Notice") be disseminated to the Settlement Class, and set a final fairness hearing for January 16, 2026 ("Settlement Hearing").  The Preliminary Approval Order also set a deadline of 28 calendar days prior to the Settlement Hearing (*i.e.*, December 19, 2025) for Settlement Class Members to request exclusion from the Settlement Class, and set a deadline of 21 calendar days prior to the Settlement Hearing (*i.e.*, December 26, 2025) for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Fee Memorandum.

87.    Pursuant to the Preliminary Approval Order, Lead Counsel instructed Epiq Class Action & Claims Solutions, Inc. ("Epiq"), the Court-approved Claims Administrator, to begin disseminating copies of the Postcard Notice and publish the Summary Notice.  Contemporaneously with the mailing of the Postcard Notice, Lead Counsel instructed Epiq to post downloadable copies of certain important documents online at www.SpiritAeroSecuritiesSettlement.com (the "Settlement Website"). Those documents include the Notice, Summary Notice, Claim Form, Preliminary Approval Order, Postcard Notice, Stipulation, and SAC.  Upon request, Epiq mailed copies of the Notice and Claim Form to Settlement Class Members and will continue to do so until the deadline to submit a Claim Form has passed.

88.    The Postcard Notice directed Settlement Class Members to the Settlement Website to obtain additional information on the Settlement, including how to file a claim and access to

downloadable versions of the Notice and Claim Form. The Notice contains, among other things, a description of the Action; the definition of the Settlement Class; a summary of the terms of the Settlement and the proposed Plan of Allocation; and a description of a Settlement Class Member's right to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the Fee Memorandum, or to exclude themselves from the Settlement Class. The Notice and Postcard Notice also inform Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 30% of the Settlement Fund, and for reimbursement of Litigation Expenses in an amount not to exceed $213,000, which may include an application of up to $10,000 total for reimbursement of the reasonable costs and expenses incurred by Plaintiffs related to their representation of the Settlement Class.

89.    To disseminate the Postcard Notice, Epiq obtained from Spirit's transfer agent names, addresses, and, if available, email addresses, of potential Settlement Class Members (the "Record Holder List") who purchased Spirit Class A common stock during the Settlement Class Period. *See* Preliminary Approval Order at ¶7(a); Mejia Decl. at ¶3.

90.    In addition, Epiq maintains a proprietary database (the "Broker Mailing Database") with the names and addresses of the largest and most common brokerage firms, banks, institutions, and other third-party nominees ("Nominees"). *See id.* at ¶4. On October 2, 2025, Epiq caused the Postcard Notice to be sent by first-class U.S. mail to the combined 1,423 mailing records contained in the Record Holder List and the Broker Mailing Database. *Id.* at ¶¶3-5. The Notice instructs Nominees on how to request copies of the Postcard Notice to forward to beneficial owners, request a link to the Notice and Claim Form (collectively, the "Notice Packet") to email to beneficial owners, or provide a list of beneficial owners' names and addresses to Epiq. *See* Ex. 17-B (Notice) at ¶90.

91.    As of December 5, 2025, Epiq mailed an additional 23,248 Postcard Notices to potential Settlement Class Members whose names and addresses were provided to Epiq by individuals or Nominees requesting that Postcard Notices be mailed to such persons. *See* Mejia Decl. at ¶7. Epiq has mailed another 67,906 Postcard Notices to Nominees who requested Postcard Notices to forward to their customers. *See id.*

92.    As of December 5, 2025, a total of 92,577 Postcard Notices have been mailed, and 117,058 links to the Notice Packet emailed, to potential Settlement Class Members and Nominees. *Id.* at ¶¶8-9.

93.    On October 6, 2025, in accordance with the Preliminary Approval Order, Epiq caused the Summary Notice to be published in *Investor's Business Daily* and to be transmitted once over the *PR Newswire*. *See id.* at ¶13; Ex. 17-E (copies of publication confirmations).

94.    Lead Counsel also caused Epiq to establish the Settlement Website, which became operational on October 2, 2025, and Epiq also maintained a toll-free telephone number to provide Settlement Class Members with information concerning the Settlement. The Settlement Website also allows visitors to submit a claim online, and download copies of the Notice and Claim Form, as well as copies of documents, including the Stipulation, Preliminary Approval Order, and the SAC. Mejia Decl. at ¶¶17-20.

95.    The deadline for Settlement Class Members to request exclusion from the Settlement Class is December 19, 2025. To date, no requests for exclusion have been received. *Id.* at ¶21. Epiq will file a supplemental affidavit after the December 19, 2025, deadline addressing whether any requests for exclusion have been received.

96.    The deadline for Settlement Class Members to object to the Settlement, Plan of Allocation, and/or to the Fee Memorandum, or to request exclusion from the Settlement Class is

December 26, 2025. To date, no objections have been entered on this Court's docket or have otherwise been received by Lead Counsel. Lead Counsel will file reply papers by January 9, 2026, that will address any objections that may be received.

## V.    ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT

97.    Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the $29,200,000 Settlement Amount, plus any and all interest earned thereon, less: (a) any Taxes; (b) any Notice and Administration Costs; (c) any Litigation Expenses awarded by the Court; and (d) any attorneys' fees awarded by the Court) must submit a valid Claim Form with all required information either online or postmarked no later than January 30, 2026. The Net Settlement Fund will be distributed among Authorized Claimants according to the proposed Plan of Allocation, subject to Court approval. *See* Ex. 17-B (Notice) at ¶46; ECF No. 64-1 (Stipulation) at ¶20. As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members according to the plan of allocation approved by the Court.

98.    The proposed Plan of Allocation is detailed in the Notice. *See* Ex. 17-B (Notice) at ¶¶55-75. A downloadable version of the Notice is posted online at www.SpiritAeroSecuritiesSettlement.com. If approved, the Plan of Allocation will govern how the Net Settlement Fund will be distributed among Authorized Claimants. The Plan of Allocation's objective is to equitably distribute the Net Settlement Fund to those Settlement Class Members who suffered economic losses as a result of the alleged wrongdoing as opposed to losses caused by market or industry-wide factors or Company-specific factors unrelated to the alleged wrongdoing. *See id*. As stated in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might

have been able to recover after a trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement. Instead, the calculations under the Plan of Allocation are a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund. *Id.* at ¶55.

99.     The Plan of Allocation is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act, and reflects an assessment of the damages that Plaintiffs contend could have been recovered under the theories of liability and damages asserted in the Action. The Plan of Allocation further reflects, and is based on, Plaintiffs' allegation that the price of Spirit Class A common stock was artificially inflated during the period from April 8, 2020 through and including September 7, 2023, due to Defendants' alleged materially false and misleading statements and omissions. *Id.* at ¶57.

100.    The Plan of Allocation is based on the premise that the decreases in the price of Spirit Class A common stock, net of price movements attributable to market- and industry-wide factors, on each of the following "Corrective Disclosure Dates" may be used to measure the alleged artificial inflation in the price of Spirit Class A common stock prior to the Corrective Disclosure Dates: (a) April 14, 2023, after news of the tail-fin fittings defect was released late on April 13; (b) May 3, 2023, after Spirit released its first quarter earnings; (c) August 2, 2023, after Spirit released its second quarter earnings; (d) August 24, 2023, after news of the mis-drilled holes defect was released late on August 23; and (e) September 7, 2023, after Spirit and Boeing discussed the financial impact of the mis-drilled holes defect at an investor conference. *See id.* at ¶¶57-58; SAC ¶¶110-78.

101.    Under the proposed Plan of Allocation, the estimated alleged artificial inflation in the price of Spirit Class A common stock also reflects Lead Counsel's assessment of the strengths

and weaknesses associated with the alleged corrective disclosures, including difficulties of proof and potential loss causation defenses, that justify an adjustment of the per-share Recognized Loss Amounts resulting from such disclosures. Notice at ¶¶57-58. Specifically, for the April 14, 2023 and August 24, 2023 Corrective Disclosure Dates (news of the tail-fin fittings defect and mis-drilled holes defect were first revealed after regular market trading hours on April 13, 2023 and August 23, 2023), the Plan of Allocation considers the corresponding alleged artificial inflation to be 100% of the resulting residual (*i.e.*, net of market- and industry-wide factors) daily declines in the price of Spirit Class A common stock. For the May 3, 2023, August 2, 2023, and September 7, 2023 Corrective Disclosure Dates, the Plan of Allocation considers the corresponding alleged artificial inflation to be 25% of the resulting residual daily declines in the price of Spirit Class A common stock, due to the presence of substantial confounding information also released on those dates (*see supra* Section III.C).

102.    For a Settlement Class Member to have a Recognized Loss under the Plan of Allocation, the Spirit Class A common stock must have been purchased during the Settlement Class Period and held through at least one of the Corrective Disclosure Dates. *Id.* at ¶58.

103.    For purchases of Spirit Class A common stock during the Settlement Class Period, Recognized Losses are generally calculated based on the purchase price, the sale price (or, if not sold, the "90-Day Lookback Value," *see* 15 U.S.C. § 78u-4(e)(1)), and the amount of alleged artificial inflation in the price of Spirit Class A common stock on the relevant dates. *See id.* at ¶¶58-61.

104.    Under the proposed Plan of Allocation, each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund. Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total of

Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. *Id.* at ¶65.

105.    An individual Claimant's recovery under the Plan of Allocation will depend on several factors, including the number of valid claims filed by other Claimants and the number and prices of shares of Spirit Class A common stock the Claimant purchased or sold during the Settlement Class Period and when that Claimant bought or sold the shares. If a Claimant has an overall market gain with respect to his, her, or its overall transactions in Spirit Class A common stock during the Settlement Class Period, or if the Claimant purchased Spirit Class A common stock during the Settlement Class Period, but did not hold any of those shares through an alleged Corrective Disclosure Date, the Claimant's recovery under the Plan of Allocation will be zero, as any loss suffered would not have been caused by the revelation of the alleged fraud. *Id.* at ¶¶58, 71.

106.    If the prorated payment to be distributed to any Authorized Claimant is less than $10.00, no distribution will be made to that Authorized Claimant. *Id.* at ¶65. Any prorated amounts of less than $10.00 will be included in the pool distributed to those Authorized Claimants whose prorated payments are $10.00 or greater. In Lead Counsel's experience, processing and sending a check for less than $10.00 is cost-prohibitive. If any funds remain after an initial distribution to Authorized Claimants, as a result of uncashed or returned checks or other reasons, subsequent distributions will be conducted as long as they are cost effective. Ex. 17-B (Notice) at ¶73.

107.    At such time as it is determined that the re-distribution of funds remaining in the Net Settlement Fund is not cost-effective, the remaining balance shall be contributed to non-sectarian, not-for-profit organization(s), to be recommended by Lead Counsel and approved by the Court. *Id.* Lead Counsel anticipates that in such circumstance it will seek the Court's approval to

distribute any remaining amount of the Net Settlement Fund to the Public Justice Foundation, a 501(c)(3) non-profit charitable public foundation dedicated to advancing the public interest, which undertakes many activities to advocate for investors harmed by public companies' misleading statements and has received numerous *cy pres* designations from securities related cases. *See, e.g.*, *In re Stable Rd. Acquisition Corp. Sec. Litig.*, 2025 WL 924929, at *2 (C.D. Cal. Mar. 24, 2025) ("the remaining funds will be donated to the Public Justice Foundation, a non-sectarian, not-for-profit 501(c)(3) organization dedicated to, among other things, investor education and advocacy"); *In re XL Fleet Corp. Sec. Litig.*, 2025 WL 2602616, at *2 (S.D.N.Y. Sept. 4, 2025) (similar); *Rodriguez v. Alfi, Inc.*, 2025 WL 2046444, at *2 (S.D. Fla. July 22, 2025) (similar).

108.    In sum, the Plan of Allocation was designed to allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered on transactions in Spirit Class A common stock that were attributable to the conduct alleged in the Complaint. Accordingly, Lead Counsel respectfully submit that the Plan of Allocation is fair and reasonable and should be approved by the Court.

109.    As noted above, as of December 5, 2025, notice has been distributed to a total of 209,273 potential Settlement Class Members and/or their nominees. *See* Ex. 17 (Mejia Decl.) ¶11. The Notice contains the Plan of Allocation, and advises Settlement Class Members of their right to object to the proposed Plan of Allocation. *See* Ex. 17-B (Notice). To date, no objections to the proposed Plan of Allocation have been received by Lead Counsel or filed on the Court's docket.

## VI.    LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

110.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel are applying for a fee award of 25% of the Settlement Fund net of Litigation Expenses ($7,260,914.63, plus interest earned at the same rate as the Settlement Fund). Lead Counsel also

request reimbursement of Litigation Expenses in the amount of $156,341.45, which includes $146,341.45 in out-of-pocket expenses incurred by Plaintiffs' Counsel in connection with the prosecution of the Action from the Settlement Fund, and a total of $10,000 to Plaintiffs for their reasonable costs (including lost wages) directly incurred in connection with their representation of the Settlement Class.

111.    The requested fee award is below the 30% maximum, and the requested Litigation Expenses are below the $213,000 maximum, as set forth in the Notice and Postcard Notice. No objections have been received to either request. The legal authorities supporting a 25% fee award are set forth in the accompanying Fee Memorandum. The primary factual bases for the requested fee and reimbursement of Litigation Expenses are summarized below.

A.    **The Fee Application**

112.    Lead Counsel seeks, on behalf of all Plaintiffs' Counsel, an award of attorneys' fees in the amount of 25% of the Settlement Fund (which, by definition, includes interest accrued thereon) net of Litigation Expenses.[5] The requested fee is well within the range of percentages courts in this Circuit and elsewhere have awarded in similarly complex cases. *See* Ex. 18 (Table of Select Second Circuit Cases with 25% or Higher Fee Awards). Moreover, the requested fee is amply supported by the particular facts of this case, as set forth below.

---

[5] As discussed *supra*, Lead Counsel are GPM and H&H. B&L and Cruz served as additional Plaintiffs' Counsel at the direction of Lead Counsel. As disclosed in the Notice, any attorneys' fees awarded by the Court will be divided between Lead Counsel GPM (40%) and H&H (40%), and additional Plaintiffs' Counsel B&L (20%) pursuant to a fee sharing agreement. In addition, GPM intends to share a portion of its net attorneys' fees with Cruz. Ex. 17-B, at ¶76 n.7.

1.    **The Favorable Outcome Achieved Is The Result Of The Significant Time And Labor That Plaintiffs' Counsel Devoted To The Action**

113.    The work undertaken by Plaintiffs' Counsel in investigating and prosecuting the Action and arriving at the present Settlement in the face of substantial risks has been time-consuming and challenging. At all times throughout the pendency of the Action, Plaintiffs' Counsel's efforts were driven and focused on advancing the Action to bring about the most successful outcome for the Settlement Class, whether through settlement or trial.

114.    Importantly, the favorable result achieved for the Settlement Class  is the product of Plaintiffs' Counsel's efforts. Plaintiffs' Counsel independently developed the key facts and theories at issue in this case, and did not simply piggyback off of a pre-existing regulatory action. That only one competing lead plaintiff motion was filed, despite the high volume of trading in Spirit's stock, its ownership by numerous sophisticated investors including many institutions, and the substantial damages at issue, further shows that the alleged fraud in this case was far from obvious based on the publicly available information, and required substantial efforts for Plaintiffs' Counsel to develop. *See* ECF Nos. 8-10 (lead plaintiff filings of Hang Li); ECF Nos. 11-13 (lone competing movant's lead plaintiff filings); *see also Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) ("Lack of competition [to serve as lead counsel] not only implies a higher fee, but also suggests that most members of the securities bar saw this litigation as too risky for their practices."); *Shah v. Zimmer Biomet Holdings, Inc.*, 2020 WL 5627171, at *12 (N.D. Ind. Sept. 12, 2020) (failure of other plaintiffs' lawyers to file lawsuits indicated that "this was going to be a difficult case and one in which the chances of success were low.").

115.    When Lead Counsel initiated this Action on May 3, 2023, following the April 13, 2023 disclosure of the tail fin fittings defect, there was no indication of any related governmental action other than the possibility of routine FAA oversight activity in response to a defect. *See* ECF

No. 1 at ¶60 ("The Federal Aviation Administration said it had 'validated' Boeing's assessment that there was no immediate safety issue 'based on the facts and data Boeing presented' and the agency will evaluate all affected aircraft before delivery."). When Lead Counsel filed the FAC on December 19, 2023, following the August 23, 2023 disclosure of the mis-drilled holes defect, that remained the case. *See* ECF No. 25 at ¶298 ("The Air Current further reported that 'The company earlier this week notified the Federal Aviation Administration of its initial findings,' and quoted an FAA spokesman as confirming that the agency is 'aware of the [mis-drilled holes] issue and are working it through our regular oversight process'."); *id.* at ¶243 ("After identifying the [tail-fin fittings] issue, our top priority was to work with Boeing and the FAA for their confirmation that it was not an immediate safety of flight issue. Once we confirm this, we turned our attention to ensuring our ongoing production meets manufacturing standards.").

116.    As such, the core of Plaintiffs' falsity and scienter allegations were based on the independent investigation conducted by Plaintiffs' Counsel, in particular their interviews of Spirit former employees including Joshua Dean, who allegedly discovered and raised the mis-drilled holes defect internally, and Former Employee 1, who emailed Defendant Gentile discussing Spirit's probation with Boeing and attaching a copy of an internal ethics complaint alleging that he was ordered to misreport defects. *See* ECF No. 25 at ¶¶119-31.

117.    It was not until after the January 5, 2024, Alaska Airlines Flight 1282 door plug blowout and its aftermath, that relevant governmental investigations were first publicly disclosed (and very likely, began). *See* SAC at ¶290 ("On January 17, 2024, the FAA announced that it 'is now investigating Boeing's manufacturing practices and production lines, including those involving subcontractor Spirit AeroSystems, bolstering its oversight of Boeing, and examining potential system change'."); *id.* at ¶292 ("Spirit's annual report on Form 10-K, filed with the SEC

on February 22, 2024, confirms that it is now responding to governmental investigations relating to safety and product quality."); *id.* at ¶304-05 (March 11, 2024 Seattle Times article reported that "the National Transportation Safety Board is investigating the door blowout and the Department of Justice has commenced a criminal investigation.").

118.    While Plaintiffs' SAC filed March 12, 2024, discussed such governmental investigations, they remained in early stages and there were no published enforcement actions or findings of fact, and so these investigations provided only indirect and supplemental support for Plaintiffs' claims. *See id.* at ¶¶287-305.[6] As with the FAC, the core of Plaintiffs' falsity and scienter theories in the SAC were based on the independent investigation conducted by Plaintiffs' Counsel, in particular their interviews of Spirit former employees including Joshua Dean and Former Employee 1. *See id.* at ¶¶179-268.

119.    In fact, far from Plaintiffs' Counsel piggybacking off of governmental investigations, Plaintiffs' Counsel's work has *informed* at least one such governmental investigation.

120.    After the January 5, 2024, Alaska Airlines Flight 1282 door plug blowout, various national media outlets reported on the allegations in Plaintiffs' recently filed FAC, with particular focus on the allegations derived from Lead Counsel's interviews with former Spirit employees. *E.g.*, CBS News, *Boeing supplier that made Alaska Airlines door plug was warned of "defects" with other parts, lawsuit claims* (Jan. 10, 2024) available at https://www.cbsnews.com/news/boeing-loose-bolts-alaska-airlines-united-airlines-spirit-

---

[6] There were ongoing proceedings in the DOJ's criminal prosecution of Boeing relating to the two 737 MAX crashes in 2018 and 2019, though that subject matter is distinct from Plaintiffs' claims relating to events at Spirit during the 2020-2023 Settlement Class Period. *See generally United States v. The Boeing Co.*, N.D. Tex. Case No. 21-cr-005.

aerosystems-door-plug/; NPR, *A recent lawsuit alleges 'excessive' defects at Boeing parts supplier* (Jan. 12, 2024) available at https://www.npr.org/2024/01/12/1223936777/a-recent-lawsuit-alleges-excessive-defects-at-boeing-parts-supplier.[7]

121.   Following the widespread publicity of the allegations in the FAC, the Texas Attorney General issued a Request To Examine to Spirit, dated March 28, 2024, which specifically referred to the instant Action, defined the "Mis-drilled Aft Pressure Bulkhead Holes Defect" as "the defect described in paragraph 10 of the Complaint in the Lawsuit," and sought documents including those relating to the "Mis-Drilled Aft Pressure Bulkhead Holes Defect" or "the issues that led to Spirit being placed on probation by Boeing." ECF No. 42-5. The request also sought documents relating to Joshua Dean's termination and personnel file, and events relating to the February 2022 events involving Former Employee 1. *Id.* In the ensuing Texas AG Litigation brought by Spirit, the Texas Attorney General filed a brief quoting alleged misstatements in this lawsuit and concluding that "[t]here are now serious reasons to believe that these representations were false when made," based in large part on facts alleged in the instant Action. ECF No. 42-6.

122.   Following the January 5, 2024, door plug blowout, Spirit also became subject to other investigations. In its SEC Form 10-Q filed May 7, 2024, Spirit disclosed that it had received information and document requests relating to issues including "safety and quality processes in the B737 MAX line production," including "grand jury subpoenas from the Department of Justice, and subpoenas or examination requests from the SEC." ECF No. 42-4. SEC investigations and grand jury proceedings are typically conducted in secret. For example, the SEC denied Lead Counsel's FOIA request for documents relating to its investigation of Spirit, citing the 5 U.S.C. §

---

[7] Plaintiffs' Counsel did not seek to publicize their allegations or to litigate this Action in the press, as evidenced by the fact that Plaintiffs' Counsel did not respond to the numerous media inquiries they received.

552(b)(7)(A) exemption and stating that, "[i]t is the general policy of the Commission to conduct its investigations on a non-public basis." As such, less information is publicly available about the scope of the SEC investigation and grand jury proceedings than the Texas Attorney General's investigation that became the subject of publicly filed litigation, though it would be logical for such other investigations to have similarly considered the facts alleged in this Action.

123.    In addition to informing at least one governmental investigation, the work of Plaintiffs' Counsel in this Action has also informed additional prominent media reporting as former Spirit employees cited in the SAC have sought to raise awareness of their experiences in the hopes of improving aviation safety. *E.g.*, BBC, *Boeing whistleblower says plane parts had serious defects* (May 9, 2024) (reporting on interview with Santiago Paredes, who for the first time allowed himself to be publicly identified himself as "Former Employee 1") available at https://www.bbc.com/news/business-68979354; Seattle Times, *Most complaints against Boeing, FAA go nowhere, frustrating whistleblowers* (Dec. 29, 2024) (quoting Paredes as stating that despite the difficulties of whistleblowing, "I reminded myself why I'm doing this: The safety of thousands of people who fly in these planes," and noting that "he has persisted by speaking to federal investigators and cooperating in a stockholder lawsuit against Spirit") available at https://www.seattletimes.com/business/boeing-aerospace/most-complaints-against-boeing-faa-go-nowhere-frustrating-whistleblowers/.

124.    In sum, the very good outcome achieved here is the result of the substantial, original efforts of Plaintiffs' Counsel, which have had the added benefit of revealing to the public previously unknown information that has informed one or more governmental investigations, as well as national discourse surrounding the important issue of aviation safety.

125.    As detailed above in Section II, Plaintiffs' Counsel's work on behalf of the

Settlement Class has included, *inter alia*:

- conducting an extensive investigation into Defendants' alleged Exchange Act violations;

- moving for appointment of Hang Li as Lead Plaintiff;

- working with an investigator to locate and interview former employees of Spirit who have relevant knowledge, and conducting said interviews in conformance with best practices outlined by the Court in *In re Millennial Media, Inc. Sec. Litig.*, 2015 WL 3443918 (S.D.N.Y. May 29, 2015);

- analyzing numerous sources of public information concerning Spirit;

- consulting with experts in the fields of loss causation and damages;

- drafting the comprehensive FAC;

- reviewing Defendants' motion to dismiss the FAC, and conducting additional research and investigation to file the detailed, 100-page SAC;

- substantial research and briefing opposing Defendants' motion to dismiss the SAC;

- participating in an arm's-length mediation process conducted by Judge Phillips;

- drafting, negotiating, and executing a confidential Term Sheet dated January 22, 2025, enabling Plaintiffs' Counsel to further assess the fairness, reasonableness, and adequacy of the proposed settlement via informal discovery;

- conducting significant informal discovery, which included review and analysis of over 59,000 pages of documents produced by Spirit concerning the matters alleged in the SAC, and an interview with a knowledgeable senior Spirit employee;

- drafting and negotiating the Stipulation and other Settlement-related documents; and

- moving for preliminary and final approval of the Settlement.

126.    Attached hereto as Exhibits 19-21 are declarations from GPM, H&H, and B&L, in

support of an award of attorneys' fees and reimbursement of litigation expenses. Each declaration

sets forth a table reflecting the position, hours, rate, and total lodestar of each individual who

worked more than 10 hours on this case, a summary of expenses by category, and attaches a firm résumé.

127.    The following is a summary chart of the hours expended and lodestar amounts using current rates for the three firms:

| LAW FIRM | HOURS | LODESTAR |
|---|---|---|
| Glancy Prongay & Murray LLP (Ex. 19) | 2,018.80 | $1,807,864.00 |
| Holzer & Holzer LLC (Ex. 20) | 1,062.50 | $946,943.75 |
| Block & Leviton LLP (Ex. 21) | 613.10 | $399,423.50 |
| **TOTAL** | **3,694.40** | **$3,154,231.25** |

128.    The lodestar charts presented in the declarations were prepared from contemporaneous daily time records regularly prepared and maintained by each respective firm. Ex. 19 at ¶3; Ex. 20 at ¶3; Ex. 21 at ¶3. Time expended on the Fee Memorandum has not been included in these calculations. Ex. 19 at ¶4; Ex. 20 at ¶4; Ex. 21 at ¶4.  Plaintiffs' Counsel will not request or receive any additional compensation for the time they will subsequently spend preparing their reply papers, preparing for and attending the final approval hearing, overseeing the claims administration process, responding to Settlement Class Members' inquiries regarding the Settlement, and preparing the Motion for Class Distribution Order.

129.    As set forth in detail in Exhibits 19-21, Plaintiffs' Counsel have collectively expended a total of 3,694.40 hours in the investigation and prosecution of the Action.  The resulting total lodestar is $3,154,231.25.  The requested fee of 25% of the Settlement Fund net of Litigation Expenses equates to a fee of $7,260,914.63 (before the addition of interest at the same rate as the Settlement Fund), and therefore represents a multiplier of 2.30 to Plaintiffs' Counsel's lodestar.[8] Such a multiplier is reasonable and well within the range of fee multipliers typically awarded in

---

[8] ($29,200,000 Settlement Amount - $156,341.45 Litigation Expenses) x 25% = $7,260,914.63.

comparable securities class actions and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere. Moreover, due to ongoing work in this Action for which no additional compensation will be requested, the multiplier will be smaller by the time the case concludes.

130.    Plaintiffs' Counsel's attorneys' and professional support staff's rates have been accepted as reasonable by other courts when performing a lodestar cross-check, both within the Second Circuit and throughout the country. *See, e.g.*, *Donley v. Live Nation Ent., Inc.*, 2025 WL 2490531, at *2 (C.D. Cal. Aug. 28, 2025) (granting 30% fee, with lodestar cross-check incorporating GPM's 2025 rates); *In re Tenaris S.A. Sec. Litig.*, 2024 WL 1719632, at *10 (E.D.N.Y. Apr. 22, 2024) (granting 33 $^{1}/_{3}$% fee, and noting that GPM's 2023 "billing rates . . . are comparable to peer law firms in recent years"); *In re Lyft Inc. Sec. Litig.*, 2023 WL 5068504, at *12 (N.D. Cal. Aug. 7, 2023) (B&L's then-current hourly rates were "in line with prevailing rates in this district for personnel of comparable experience, skill, and reputation"); *Davis v. Yelp, Inc.*, 2023 WL 3063823, at *2 (N.D. Cal. Jan. 27, 2023) (granting 33.3% fee, with lodestar cross-check incorporating H&H and GPM's then-current rates); *Lea v. Tal Education Group*, 2021 WL 5578665, at *12 (S.D.N.Y. Nov. 30, 2021) (granting 33 $^{1}/_{3}$% fee, and finding GPM's 2021 rates "comparable to peer plaintiffs and defense-side law firms litigating matters of similar magnitude").

131.    Additionally, the rates billed by Plaintiffs' Counsel (ranging from $535-$900 per hour for non-partner attorneys and $900-$1,290 per hour for partners) are comparable to peer plaintiff and defense firms litigating matters of similar magnitude. *See* Ex. 22 (table of peer plaintiff and defense law firm billing rates).

132.    Throughout this case, Plaintiffs' Counsel have devoted substantial time to the prosecution of the Action, as detailed above. We maintained control of, and monitored the work

performed by, lawyers and other personnel on this case.  We personally devoted substantial time

to this case and were directly involved in numerous aspects of the litigation including, *inter alia*,

drafting or editing Plaintiffs' complaints, opposition to the motion to dismiss, and other court

filings, engaging with counsel for Defendants on a variety of matters, participating in the mediation

and Settlement negotiations, and conducting the interview of a senior Spirit employee in

connection with the settlement-related discovery process. Other experienced attorneys at our firms

were also closely involved in various aspects of the litigation including research, briefing,

settlement and related discovery, and other matters.  Other professional support staff worked on

matters appropriate to their skill and experience level. We also worked with additional Plaintiffs'

Counsel, B&L and Cruz, to coordinate their provision of services to Plaintiffs and the Settlement

Class, including communications with Plaintiffs, research in support of Plaintiffs' opposition to

Defendants' motion to dismiss, and assistance with the settlement, related informal discovery, and

the approval process. *See* Ex. 21 at ¶2.  Throughout the litigation, we worked to ensure that

Plaintiffs' Counsel maintained an appropriate level of staffing that avoided unnecessary

duplication of effort and ensured the efficient prosecution of this litigation.

### 2.    The Magnitude And Complexity Of The Action

133.    As detailed in the Fee Memorandum, securities class action cases are known for

their complexity.  This case was no different.  As detailed above, this Action presented complex

issues, including the need for Plaintiffs' Counsel to research and understand, among other things,

Spirit's manufacturing and quality control processes, and the particular defects at issue, as well as

numerous legal issues raised in Defendants' motion to dismiss and that Plaintiffs would face at

class certification, summary judgment, and trial. To gain the necessary understanding, Plaintiffs'

Counsel, *inter alia*, conducted extensive research of publicly available information concerning

Spirit, consulted with an investigator to locate and interview former Spirit employees with relevant knowledge, and consulted with experts regarding loss causation and damages. *See supra* Section II.

134.    Moreover, the magnitude of this high-stakes litigation is clearly shown by the significant damages at issue. Plaintiffs' Counsel, in consultation with a damages expert, estimate total *maximum* possible damages of $1.5 billion, and reasonably recoverable damages of $1.0 billion under an approach that takes into account confounding information released on certain alleged corrective disclosure dates.

### 3.    The Significant Risks Borne By Plaintiffs' Counsel

135.    This prosecution was undertaken by Plaintiffs' Counsel on an entirely contingent basis. From the outset, this Action was a difficult and highly uncertain securities case, facing numerous substantial risks (*see supra* Section III). There was no guarantee that Plaintiffs' Counsel would ever be compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Plaintiffs' Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, that funds were available to compensate attorneys and staff, and that the considerable litigation costs required by a case like this one were covered. Thus, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Plaintiffs' Counsel received no compensation during the course of the Action and incurred $146,341.45 in out-of-pocket litigation-related expenses in prosecuting the Action.

136.    Additionally, Plaintiffs' Counsel faced risk in bringing and prosecuting this action based on the limited publicly available information concerning the events at issue. Defendants made no admission of wrongdoing, and there were no published findings of fact from a

governmental investigation, or similar sources of public information that could be relied on to show the falsity of Defendants' statements at the outset of the case. As detailed above (*see supra* Section VI.A.1), Plaintiffs' Counsel developed, alleged, and argued their claims based largely on the results of their independent investigation and interviews with former Spirit employees. Because this is a securities fraud class action, Plaintiffs' Counsel had no ability to gain information through discovery from Defendants or third-party subpoenas, due to the PSLRA's automatic discovery stay prior to resolution of Defendants' motion to dismiss.

137.    Moreover, despite the most vigorous and competent of efforts, success in contingent-fee litigation like this Action is never assured.  As discussed above (*see supra* Section III.E), Lead Counsel know from experience that the commencement of a class action does not guarantee a recovery. On the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

### 4.    The Quality Of Representation, Including The Result Obtained, The Experience And Expertise Of Lead Counsel, And The Standing And Caliber Of Defendants' Counsel

138.    As demonstrated by the firms' respective résumés, attached to Exhibits 19-C, 20-C, and 21-C, Plaintiffs' Counsel are highly experienced and skilled law firms that focus their practices on securities class action litigation. We believe Plaintiffs' Counsel's substantial experience provided advantages to the Settlement Class throughout this litigation, and valuable leverage in the settlement negotiations.

139.    Additionally, the quality of the work performed by Plaintiffs' Counsel in obtaining the Settlement should also be evaluated in light of the quality of the opposition. Here, Defendants were represented by Cravath Swaine & Moore LLP, one of the most well-known and respected

law firms in the nation, with particular strength and expertise in securities litigation. As stated on

Cravath's website, the firm's securities litigation practice has received numerous accolades:

> Repeatedly named 'Securities Practice Group of the Year' by Law360, most
> recently in 2024, as well as 'Securities Litigation Firm of the Year' by Benchmark
> Litigation, our securities litigation practice has been consistently ranked in the top
> tier by Benchmark Litigation, Chambers USA, The Legal 500 US and Best Lawyers
> Best Law Firms. The Firm was awarded New York Law Journal's overall
> 'Litigation Department of the Year' three times in the past six years, and the
> publication also has honored the Firm as 'Class Action Litigation Department of
> the Year' and 'Finance Litigation Department of the Year'.

Available at https://www.cravath.com/practices/practices/litigation/securities-litigation.html (last

visited Oct. 16, 2025).

140.    Here, Cravath vigorously represented the interests of its clients throughout this

Action, for example raising substantial and thoroughly-researched arguments in their motions to

dismiss and mediation statement, and throughout the Parties' settlement negotiations. In the face

of this experienced and formidable opposition, Plaintiffs' Counsel were able to develop a case that

was sufficiently strong to nonetheless persuade Defendants to settle the case on terms that we

believe were favorable to the Settlement Class.

### 5.    The Requested Fee In Relation To The Settlement

141.    Lead Counsel is requesting, on behalf of all Plaintiffs' Counsel, fees in the amount

of 25% of the Settlement Fund (which, by definition, includes interest accrued thereon) net of

Litigation Expenses. Based on the $156,341.45 of Litigation Expenses requested by Lead Counsel

(*see infra* Section VI.B) the requested fee equates to $7,260,914.63 before the addition of interest.

142.    We believe that the amount of the fee requested in relation to the $29.2 million

Settlement Amount is fair and reasonable. *See* Fee Memorandum §§ II.C-D.  It is also below the

amount set forth in the Notice, which informed the Settlement Class that Lead Counsel would

apply for an attorneys' fee award of up to 30% of the Settlement Fund (*i.e.*, $8.76 million before

the addition of interest).  Lead Counsel, however, seeks the lesser amount of 25% of the Settlement Fund net of Litigation Expenses, in recognition of the lodestar crosscheck and the stage at which this Action settled.

143.    In addition, the median attorneys' fee awarded in securities class actions with settlements of a similar magnitude is 25%, which further supports Lead Counsel's fee request.  *See* Ex. 1 (NERA Report) at p. 30 (from 1996 to 2024, the median attorneys' fee award for settlements between $25 million and $100 million was 25%).

### 6.    The Reaction Of The Settlement Class Supports Lead Counsel's Fee Request

144.    As noted above, as of December 5, 2025, direct notice of the Settlement has been provided to 209,273 potential Settlement Class Members and Nominees.  Mejia Decl. ¶11.  To date, no objections to the 30% maximum potential attorneys' fee request set forth in the Postcard Notice and in the Notice have been received by Lead Counsel or entered on this Court's docket.

### 7.    Plaintiffs Support Lead Counsel's Fee Request

145.    As set forth in the declarations submitted by Plaintiffs Hang Li, Marco Amiotti, and Mike Drumright, Plaintiffs have concluded that Lead Counsel's requested fee is fair and reasonable based on the work performed, the recovery obtained for the Settlement Class, and the risks of the Action.  *See* Ex. 2 ("Li Decl.") ¶¶9-11; Ex. 3 ("Drumright Decl.") ¶¶9-11; Ex. 4 ("Amiotti Decl.") ¶¶9-11.  Plaintiffs' endorsement of Lead Counsel's fee request supports the reasonableness of the request and should be given weight in the Court's consideration of the fee award.

### B.    Reimbursement Of The Requested Litigation Expenses Is Fair And Reasonable

146.    Lead Counsel, on behalf of all Plaintiffs' Counsel, seeks a total of $156,341.45 in Litigation Expenses to be paid from the Settlement Fund.  This amount includes: $146,341.45 in

out-of-pocket expenses reasonably and necessarily incurred by Plaintiffs' Counsel in connection with commencing, litigating, and settling the claims asserted in the Action; as well as a total of $10,000 to the Plaintiffs ($5,000 to Lead Plaintiff Hang Li, and $2,500 each to the additional named Plaintiffs Marco Amiotti and Mike Drumright), pursuant to 15 U.S.C. § 78u-4(a)(4) for their reasonable costs (including lost wages) directly incurred in connection with their representation of the Settlement Class. *See* Li Decl., ¶¶12-13; Amiotti Decl., ¶¶12-13; Drumright Decl., ¶¶12-13.

147.    Lead Counsel, on behalf of all Plaintiffs' Counsel, are seeking reimbursement of a total of $146,341.45 in out-of-pocket costs and expenses. The following is a combined breakdown by category of all expenses incurred by Plaintiffs' Counsel:

| CATEGORY OF EXPENSE | AMOUNT |
|---|---|
| COURIER AND SPECIAL POSTAGE | $83.04 |
| COURT FILING FEES | $1,204.00 |
| DOCUMENT MANAGEMENT (E-DISCOVERY) | $3,720.52 |
| EXPERTS - ECONOMETRIC (LOSS CAUSATION, DAMAGES, PLAN OF ALLOCATION) | $35,240.00 |
| PRIVATE INVESTIGATORS | $21,361.00 |
| MEDIATORS | $42,710.00 |
| ONLINE RESEARCH | $17,893.81 |
| PHOTOIMAGING | $475.33 |
| PRESS RELEASE | $227.50 |
| SERVICE OF PROCESS | $554.14 |
| TRANSCRIPTS | $56.70 |
| TRAVEL AIR & TRAIN FARE | $9,393.79 |
| TRAVEL AUTO | $795.85 |
| TRAVEL HOTEL (INCLUDING CONFERENCE ROOMS FOR MEDIATION) | $10,779.47 |
| TRAVEL MEALS (INCLUDING CATERING FOR MEDIATION) | $1,696.31 |
| TRAVEL PARKING | $149.99 |
| GRAND TOTAL | $146,341.45 |

148.    Expenses incurred by GPM, H&H and B&L are set forth in the accompanying declarations of each firm. *See* Exs. 19-21.

149.    The Notice and Postcard Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of Litigation Expenses in an amount not to exceed $213,000. The $156,341.45 requested by Lead Counsel on behalf of all Plaintiffs' Counsel and Plaintiffs, falls well below that amount. To date, no objections have been raised as to the maximum amount of expenses set forth in the Notice and Postcard Notice.

150.    From the beginning of the case, Lead Counsel were aware that they might not recover their out-of-pocket expenses.  Lead Counsel also understood that, even assuming the case was ultimately successful, reimbursement for expenses would not compensate them for the contemporaneous lost use of funds advanced to prosecute this Action.  Accordingly, Lead Counsel were motivated to, and did, take steps to assure that only necessary expenses were incurred for the vigorous and efficient prosecution of the case.

151.    The largest component of expenses, $42,710.00, or approximately 29% of the total out of pocket expenses, was expended on mediation fees for the services Judge Phillips and his firm provided.

152.    Additionally, Plaintiffs' Counsel paid $35,240.00, or approximately 24% of the total out of pocket expenses, for the retention of experts in loss causation and damages, in connection with Plaintiffs' Counsel's research for the drafting of their complaints, the mediation process, and the drafting of the proposed Plan of Allocation

153.    Another large component of expenses, $21,361.00, or approximately 15% of the total out of pocket expenses, was expended on the retention of an investigator who located relevant

former Spirit employees, conducted initial interviews, and assisted Plaintiffs' Counsel with further interviews.

154.    The other litigation expenses for which Lead Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These litigation expenses included, among other things, use of an online discovery platform, travel-related expenses, conference room rental for the Parties' mediation, and the cost of on-line legal research.

155.    Finally, as stated above, Plaintiffs seek reimbursement, pursuant to 15 U.S.C. § 78u-4(a)(4), of their reasonable costs (including lost wages) directly incurred in connection with their representation of the Settlement Class, in the total amount of $10,000 (comprised of $5,000 to Lead Plaintiff Hang Li, and $2,500 each to the additional named Plaintiffs Marco Amiotti and Mike Drumright).  *See* Ex. 2 (Li Decl.), ¶¶12-13; Ex. 3 (Drumright Decl.), ¶¶12-13; Ex. 4 (Amiotti Decl.), ¶¶12-13.  Plaintiffs worked with Plaintiffs' Counsel throughout the pendency of this Action.  For example, Plaintiffs: (a) regularly communicated with counsel regarding the posture and progress of the case; (b) reviewed significant documents filed in the Action; (c) produced trading records to counsel; (d) consulted with Plaintiffs' Counsel regarding the mediation and settlement negotiations; and (e) evaluated and approved the proposed Settlement.  *See* Ex. 2 (Li Decl.), ¶5; Ex. 3 (Drumright Decl.), ¶5; Ex. 4 (Amiotti Decl.), ¶5.

156.    To date, no objections to the Litigation Expenses have been filed on the Court's docket or received by Lead Counsel.  In our opinion, the Litigation Expenses incurred by Plaintiffs' Counsel and Plaintiffs were reasonable and necessary to represent the Settlement Class and achieve the Settlement.

## VII.    CONCLUSION

157.    For all the reasons set forth above, we submit that the Settlement and Plan of Allocation should be approved as fair, reasonable, and adequate. We further submit that the requested attorneys' fee in the amount of 25% of the Settlement Fund net of Litigation Expenses should be approved as fair and reasonable, and the request for reimbursement of $156,341.45 in Litigation Expenses, including the requested awards of $10,000 total for Plaintiffs' costs, should also be approved.

We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 12th day of December, 2025, at Wilmington, North Carolina.

_s/ Garth Spencer_
GARTH SPENCER

Executed this 12th day of December, 2025, at Atlanta, Georgia.

_s/ Corey D. Holzer_
COREY D. HOLZER